# EXHIBIT "1"

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**MARCH 2016**

E-Filing Number: 1603077405

**003161**

| | |
|---|---|
| PLAINTIFF'S NAME<br>ISLAND VIEW PROPERTIES, INC. | DEFENDANT'S NAME<br>PRUDENTIAL SAVINGS BANK |
| PLAINTIFF'S ADDRESS<br>ONE SOUTH STATE STREET<br>NEWTOWN PA 18940 | DEFENDANT'S ADDRESS<br>1834 W. OREGON AVENUE<br>PHILADELPHIA PA 19145 |
| PLAINTIFF'S NAME<br>ISLAND VIEW CROSSING II, LP | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS<br>ONE SOUTH STATE STREET<br>NEWTOWN PA 18940 | DEFENDANT'S ADDRESS |
| PLAINTIFF'S NAME<br>RENATO J. GUALTIERI | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS<br>1628 CARLENE COURT<br>LANGHORNE PA 19047 | DEFENDANT'S ADDRESS |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 3 | 1 | ☒ Complaint ☐ Petition Action ☐ Notice of Appeal<br>☐ Writ of Summons ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☒ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE

10 - CONTRACTS OTHER

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

**FILED
PRO PROTHY**

MAR **31** 2016

**K. EDWARDS**

IS CASE SUBJECT TO
COORDINATION ORDER?
  YES      NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: ISLAND VIEW PROPERTIES, INC. , ISLAND VIEW CROSSING II, LP , RENAT

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>MARK D. VILLANUEVA | ADDRESS<br>STRADLEY RONON STEVENS & YOUNG<br>2005 MARKET ST STE 2600<br>PHILADELPHIA PA 19103 |
|---|---|
| PHONE NUMBER<br>(215)564-8159 | FAX NUMBER<br>(215)564-8120 | |
| SUPREME COURT IDENTIFICATION NO.<br>89892 | E-MAIL ADDRESS<br>mvillanueva@stradley.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*MARK VILLANUEVA* | DATE SUBMITTED<br>Thursday, March 31, 2016, 02:31 pm |

STRADLEY, RONON, STEVENS & YOUNG, LLP
By:   Michael J. Cordone, Esquire (I.D. #59000)
      Mark D. Villanueva, Esquire (I.D. #89892)
      2005 Market Street, Suite 2600
      Philadelphia, PA  19103
      Phone:  215.564.8000
      Fax:  610.564.8120

*Filed and Attested by the
Office of Judicial Records
31 MAR 2016 02:31 pm
K. EDWARDS*

*Attorneys for Plaintiffs*
*Island View Properties, Inc., trading as*
*Island View Crossing, II, LP, and Renato J.*
*Gualtieri*

| | |
|---|---|
| ISLAND VIEW PROPERTIES, INC., trading as ISLAND VIEW CROSSING II, LP, and RENATO J. GUALTIERI,<br><br>               Plaintiffs,<br><br>     v.<br><br>PRUDENTIAL SAVINGS BANK,<br><br>             Defendant. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>JURY TRIAL DEMANDED<br><br>CIVIL ACTION NO. |

## <u>NOTICE</u>

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.   You may lose money or property or other rights important to you.

      ***You should take this paper to your lawyer at once.  If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.***

      Philadelphia Bar Association
      Lawyer Referral and Information Service
      One Reading Center
      Philadelphia, Pennsylvania 19107
      Telephone (215) 238-6333
      TTY (215) 451-6197

## AVISO

Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las priviones de estda demanda.  Usted puede perer dinero o sus propiedades u otros derechos importantes para usted.

*Lleva esta demanda a un abogado immediatamente.  Si no tiene abogado o si no tiene el dinero suficiente de pagartal servicio.  Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

Asociacion de Licenciados
de Filadelfia
Servicio de Referencia e
Informacion Legal
One Reading Center
Filadelfia, Pennsylvania 19107

Telefono (215) 238-6333
　　TTY (215) 451-6197

Case ID: 160303161

STRADLEY, RONON, STEVENS & YOUNG, LLP
By:    Michael J. Cordone, Esquire (I.D. #59000)
          Mark D. Villanueva, Esquire (I.D. #89892)
          2005 Market Street, Suite 2600
          Philadelphia, PA 19103
          Phone:  215.564.8000
          Fax:  610.564.8120                    *Attorneys for Plaintiffs*
                                                                    *Island View Properties, Inc., trading as*
                                                                    *Island View Crossing, II, LP, and Renato J.*
                                                                    *Gualtieri*

| | |
|---|---|
| ISLAND VIEW PROPERTIES, INC., trading as ISLAND VIEW CROSSING II, LP, and RENATO J. GUALTIERI, <br><br> Plaintiffs, <br><br> v. <br><br> PRUDENTIAL SAVINGS BANK, <br><br> Defendant. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY <br><br> CIVIL ACTION NO. |

## <u>COMPLAINT</u>

Plaintiffs, Island View Properties, Inc. ("IVP"), trading as Island View Crossing II, LP ("Island View"), and Renato J. Gualtieri ("Mr. Gualtieri"), by and through their counsel Stradley Ronon Stevens & Young, LLP files this Complaint against Prudential Savings Bank ("Prudential") and allege the following:

### PRELIMINARY STATEMENT

1.      As part of their long-standing relationship with Prudential, dating back to 1994, Plaintiffs obtained a $5,541,468.00 construction loan from Prudential to enable them to complete a 169 unit townhouse and condominium residential development located directly on the Delaware River at 1600 Radcliffe Street in Bristol Borough, Bucks County, Pennsylvania (the "Project").   However, shortly after Prudential became a publicly held bank and underwent personnel changes, Plaintiffs' long and successful banking relationship with Prudential suddenly

1

Case ID: 160303161

changed, and Prudential embarked upon an effort to coerce Plaintiffs into accepting numerous and substantial changes to its existing loan agreement with Prudential.  As its tools of coercion, Prudential:  (i) refused to honor its unconditional commitment to refinance or purchase a third-party loan co-signed and/or guaranteed by Plaintiffs; (ii) delayed and refused to advance funds as required under the loan agreements between the parties; (iii) refused to release funds escrowed for site improvements; (iv) attempted to control what subcontractors and suppliers received payment, how much, and when; (v) repeatedly threatened to foreclose on the Project and other collateral of Plaintiffs and their affiliated entities without any default existing or having been declared; and (vi) attempted to force Plaintiffs' affiliated entities to sell other real estate for millions of dollars less than the appraised value reflected in the appraisals obtained by Prudential.

2.     As a result of Prudential's many efforts to force Plaintiffs into accepting dramatic changes to the existing loan agreements, Prudential restricted advances under the loan so significantly that Plaintiffs have been unable to pay the subcontractors and suppliers that have worked on the Project, and homebuilding and sales for the Project has now been halted, causing in excess of $27 million in damages to Plaintiffs, on this Project alone, and destroying Plaintiffs' reputations in the industry and in the community.

THE PARTIES

3.     Plaintiff Island View is a Pennsylvania limited partnership with its principal place of business located at One South State Street, Newtown, Bucks County, Pennsylvania 18940.

4.     Plaintiff IVP is a Pennsylvania corporation that serves as the general partner of Island View, and IVP maintains its principal place of business at One South State Street, Newtown, Bucks County, Pennsylvania 18940.

2

Case ID: 160303161

5.      Plaintiff Mr. Gualtieri is an adult individual, citizen and resident of Pennsylvania and maintains a mailing address of 1628 Carlene Court, Langhorne, Bucks County, Pennsylvania 19047.

6.      Defendant, Prudential, is a Pennsylvania chartered savings bank with its principal place of business located at 1834 W. Oregon Avenue, Philadelphia, Pennsylvania 19145.

## JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over Defendant because this action arises from Defendant's contacts and activities within the Commonwealth of Pennsylvania.

8.      Venue is proper in Philadelphia County because transactions giving rise to the causes of action occurred in Philadelphia County.

## FACTS GIVING RISE TO PLAINTIFFS' COMPLAINT

9.      Beginning in 1989, Mr. Gualtieri and various entities with which he is affiliated began developing residential real estate and constructing homes.

10.     In 1994, Mr. Gualtieri and his affiliated entities formed what would become a long-lasting banking and lending relationship with Prudential.

11.     In the years following the establishment of his banking relationship with Prudential, Mr. Gualtieri and his affiliated entities obtained numerous different loans to support their real estate development and construction business, borrowing and repaying in excess of $50 million and paying what Plaintiffs estimate to be in excess of $8 million in interest and fees to Prudential over the years.

3

Case ID: 160303161

*The Project*

12.     In 2011, Plaintiffs saw an opportunity to acquire the Project at a price that they believed was far below market value and an opportunity to develop the 17.5 acre, former World War I shipbuilding facility on the Delaware River and earn a substantial profit.

13.     Although the Project was already subject to a $2.5 million first mortgage in favor of the Redevelopment Authority of Bucks County (the "Redevelopment Authority"), Plaintiffs sought and obtained, from Prudential, the balance of the funds needed to acquire the Project, paying a total of $3 million (inclusive of an assumption of the existing Redevelopment Authority loan) to acquire the Project.

14.     When IVC purchased the Project in September of 2011, the prior owner had obtained certain subdivision approval permitting the development of the Project to include the construction of 73 townhouses and 96 condominiums.

15.     While Plaintiffs were able to purchase the Project well below its fair market value, the property needed substantial site work before development and construction could visibly begin.

16.     In particular, many of the permits and approvals that the prior owner of the Project had obtained had expired or would soon expire and needed to be renewed and/or updated by Plaintiffs before any development or construction could begin.

17.     Similarly, as a result of the historical uses of the Project as a World War I shipbuilding facility, the Project had significant industrial issues that would need to be remediated, including: (i) removal of enormous amounts of concrete and steel that were the foundation of the former shipbuilding facility and its surrounding parking lots; (ii) removal of

Case ID: 160303161

underground tanks; (iii) supply of vast amounts of clean fill; and (iv) re-grading the entire Project.

18.     Plaintiffs and their affiliated entities planned to perform most of the thousands of hours of back-breaking work necessary to convert the Project from its former shipbuilding days to its intended use as a residential community, even though the costs and financial outlay necessary to accomplish this metamorphosis would be substantial and time-consuming, and because of Plaintiffs' unique vision and willingness to undertake this hard work and time-commitment, it was able acquire the Project at such a favorable price.

19.     Between September of 2011, when IVC purchased the Project, and November of 2014 when IVC obtained construction financing to develop it, Plaintiffs' affiliated entities were busy:  (i) completing 18 single family homes in the "Durham Ridge" development that had been financed by Prudential and repaid in full by Plaintiffs' affiliates; and (ii) completing the items necessary to dedicate Phase I of the "Calnshire Estates" development to West Caln Township as a necessary precondition to the issuance of building permits for the completion of Phase II of that development.

*The Construction Loan and the Lava Loan*

20.     In late 2014, Plaintiffs approached its usual banking "partner" Prudential about providing a construction loan for the development and construction of the Project, sharing with Prudential Plaintiffs' confidential, comprehensive, and detailed data and projections concerning their plans for the Project.

21.     Included among the detailed confidential data and projections provided to Prudential were early financial projections, cash flow statements, and budgets which were formulated based upon Plaintiffs' many years of experience in the residential development and

Case ID: 160303161

construction business. These projections, however, were made before Plaintiffs had begun obtaining the requisite renewals of the permits and approvals and before Plaintiffs began removing the concrete and steel from the former shipbuilding facility.

22.     In November of 2014, at the time that Plaintiffs were negotiating with Prudential to obtain a construction loan for the Project, certain separate business entities sharing common owners with Plaintiffs – Calnshire Estates, LP ("Calnshire") and Steeple Run, LP ("Steeple Run") – had outstanding loans from Prudential as part of their acquisition of certain real estate for future development of single-family home communities.

23.     Because of their long, close, and trusted relationship with Prudential, and notwithstanding the legal separateness between each of the entities and their assets, Calnshire, Steeple Run, and Plaintiffs agreed to give Prudential the cross-collateralization that it requested on the Project – requiring the Project to serve as collateral for not only the loans related to the Project but also the wholly unrelated loans that Prudential had previously made to Calnshire and Steeple Run – instead of insisting that each separate borrower and their respective assets only have responsibility for their own loans.

24.     As they had done so many times before for their other developments, Plaintiffs negotiated the new construction loan with Salvatore Fratanduono, the Senior Vice President and Chief Credit Officer of Prudential, and Thomas Vento, the President, Chief Executive Officer, and Chairman of the Board of Prudential.

25.     During the negotiations leading to Prudential's decision to provide construction financing to Plaintiffs for the Project, Prudential decided that Mr. Gualtieri needed to raise more than $600,000 of additional equity for Plaintiffs and allow Prudential to hold such funds in a restricted account controlled by Prudential.

6

Case ID: 160303161

26.    At the time of the request for the additional equity, Prudential told Plaintiffs that the equity in the restricted account was needed because Prudential was concerned that the Project would not be "cash flowing."  Prudential expressed concern that Plaintiffs would be unable to pay the monthly loan obligations to the Redevelopment Authority on account of its first mortgage on the Project for what might be several years because Plaintiffs had no other liquid assets from which they could fund the monthly payments to the Redevelopment Authority until such time that Plaintiffs could close on the sale of the townhouses and condominiums that they planned to build.

27.    Plaintiffs did not have any other liquid assets to invest into the Project – their only substantial asset being the Project itself – and began exploring the possibility of having a friend or family member invest money in Island View.

28.    With the full knowledge and consent of Salvatore Fratanduono and Thomas Vento of Prudential, Plaintiffs began exploring the possibility of obtaining a $625,000 loan on behalf of Mr. Gualtieri's ninety-one-year-old father.

29.    The only lender that Mr. Gualtieri and his father could find on such short notice that was willing to provide the $625,000 loan was Lava Funding, LLC ("Lava"), who was willing to provide such a loan on the terms and conditions more fully described in its complaint (the "Lava Complaint"), including the need for full repayment within one year, co-signatures, and guaranties by Plaintiffs and an unconditional commitment from Prudential that it would refinance the loan thirty (30) days before it matured on December 1, 2015.  A true and correct copy of which is attached to this complaint and incorporated herein as Exhibit 1.

30.    Moreover, in order to obtain a $625,000 loan on such short notice, Mr. Gualtieri's father was required to agree to, among other things, mortgages on his previously unencumbered

7

Case ID: 160303161

personal residence and a two unit income-producing rental property that he owned and to pay an exorbitant rate of interest.

31.    In order to induce Mr. Gualtieri's father and Plaintiffs to accept the loan terms offered by Lava and induce Lava to make the loan, Salvatore Fratanduono, in his capacity as a Senior Vice President and Chief Lending Officer at Prudential, signed and delivered to Lava a certain unconditional commitment to refinance or purchase the Lava loan at least fifteen (15) days before it matured.  A true and correct copy of the unconditional commitment to refinance or purchase the Lava loan is attached as an Exhibit B to the Lava Complaint.

32.    In order to further induce Plaintiffs to enter into the loan with Lava and promise to repay the Lava loan on or before December 1, 2015, Salvatore Fratanduono, in his capacity as a Senior Vice President and Chief Lending Officer at Prudential signed and delivered to Mr. Gualtieri's father and Plaintiffs additional unconditional commitments unconditionally promising that Prudential would refinance the Lava loan at least thirty (30) days before December 1, 2015. True and correct copies of the additional, unconditional Prudential commitment letters given to Mr. Gualtieri's father and Plaintiffs are attached to this Complaint and incorporated herein collectively as Exhibit 2.

33.    Upon information and belief, at or before the time that Salvatore Fratanduono signed and sent the various unconditional commitment letters on behalf of Prudential, promising to refinance the Lava loan, to Lava, Mr. Gualtieri's father, and Plaintiffs, Salvatore Fratanduono obtained actual authority to do so from Thomas Vento, Prudential's President, Chief Financial Officer, and Chairman of its Board.

34.    On November 26, 2014, Plaintiffs and Prudential reached an agreement on a new $5,541,468 construction loan for the Project, and the terms of that agreement were embodied in a

Case ID: 160303161

series of documents prepared on behalf of Prudential by and through its counsel and board member, Jerome Balka, Esquire.    Such documents included, among others, a $5,541,468 promissory note (the "Note"), a Development Construction Loan Agreement (the "Loan Agreement"), a mortgage on the Project (the "Mortgage"), a Builder's Agreement, and numerous other related documents (collectively, with the Note, Loan Agreement, Mortgage, and Builder's Agreement, the "Loan Documents").    True and correct copies of the Note, Loan Agreement, and Mortgage are attached to this complaint and incorporated herein as Exhibits 3, 4, and 5, respectively.

35.    Section 1.5 of the Loan Agreement specifically requires that proceeds from the sale of specified townhouses and condominiums that Plaintiffs sell be used to repay other loans not made to Plaintiffs, including the loans made to Calnshire and Steeple Run.

36.    Section 2.16 and Exhibit D to the Loan Agreement identified more than twelve (12) executed agreements of sale between Plaintiffs and third party buyers of residential properties to be constructed on the Project.

37.    In addition, on or after November 26, 2014, Prudential filed multiple mortgages against the Project as additional collateral security for Calnshire's and Steeple Run's obligations to Prudential on their unrelated loans.

38.    Section 5 of the Loan Agreement governs how Island View can request advances of loan proceeds (known as "draws") from Prudential to pay its costs of construction for the townhouses and condominiums on the Project, providing the amounts of permitted draws, procedures for Prudential to verify the completion of the work, the forms to be used, and the three (3) day turnaround time for Prudential to fund Island View's draw requests.

Case ID: 160303161

39.     The procedure outlined in the Loan Agreement for the draw requests was consistent with procedures used in Prudential's many other loans to Plaintiffs and their affiliated entities, and because Prudential had a custom of filing mechanics lien waivers on all of the other developments that they had financed for Plaintiffs and their affiliated entities, Prudential did not customarily require interim lien releases from subcontractors or certifications from the borrower in order to fund draw requests.

40.     Section 5.4 of the Loan Agreement, in conjunction with separate agreements among Island View, Prudential, and the Borough of Bristol (described more fully below), governs the procedures for Island View to obtain loan advances from the escrow ("Escrow Releases") created by Prudential to fund the public and quasi-public site improvements on the Project.

*Development of the Project Commences*

41.     Once the construction loan was in place, Plaintiffs commenced work to update the requisite approvals and permits, immediately engaging numerous attorneys and engineers to move the Project forward, despite the fact that Prudential was not able to begin making advances under the Note and Loan Agreement for several months.

42.     Between November 2014 and February 2015, Plaintiffs had incurred more than $500,000 of engineering and legal fees necessary to update the approvals and permits on the Project and had self-funded these expenses by borrowing from affiliated entities in order to pay the professionals working on the Project until advances under the Note could be obtained from Prudential to repay the loans.

43.     On March 4, 2015, Island View, Prudential, and Bristol Borough entered into a "Subdivision Financial Security Agreement" (the "Tri-Party Agreement") which provides certain

10

Case ID: 160303161

assurances by Island View and Prudential to Bristol Borough that the public and quasi-public site improvements at the Project, such as streets, curbs, sidewalks, landscaping, and drainage facilities, will be constructed in accordance with the final approved plans for the Project. A true and correct copy of the Tri-Party Agreement is attached to this complaint and incorporated herein as Exhibit 6.

44.     Pursuant to the terms of the Tri-Party Agreement, Island View and Prudential were required to, among other things, establish: (i) an irrevocable, standby letter of credit in the amount of $2,090,381.19 (the "Letter of Credit"); and (ii) a $2,090,381.19 escrow reserve (the "Escrow Reserve") of funds within Island View's construction loan which Prudential unconditionally committed to lend in order to guarantee the construction of the public and quasi-public site improvements on the Project.

45.     Paragraph 4 of the Tri-Party Agreement provides for interim releases of funds from the Escrow Reserve based upon the value of completed site improvements as approved and authorized by the Borough Administrator and the engineers for Bristol Borough and provides a form "certificate of completion", attached to the Tri-Party Agreement as Exhibit C, to fully authorize Prudential to release money from the Escrow Reserve.

46.     Paragraph 7 of the Tri-Party Agreement obligates Prudential to disburse funds from the Escrow Reserve notwithstanding any insolvency, termination of the Loan Agreement, or alleged default by Island View on any of its obligations to Prudential and leaves Prudential no discretion to evaluate whether or not the Borough of Bristol is correct in requesting the release of funds from the Escrow Reserve.

47.     The Tri-Party Agreement was accepted and signed by Thomas Vento, acting as the President and Chief Executive Officer on behalf of Prudential.

Case ID: 160303161

48.    On March 4, 2015, Thomas Vento, Prudential's President and Chief Executive Officer, issued the irrevocable Letter of Credit to the Borough of Bristol to assure the Borough of Bristol that the public and quasi-public site improvements at the Project would be completed or that Prudential would immediately provide up to $2,090,381.19 of funds to the borough to ensure that the site improvements would be completed.  A true and correct copy of the Letter of Credit is attached to this complaint and incorporated herein as Exhibit 7.

49.    In accordance with its many years of prior practice with Prudential and as specifically set forth in the Loan Documents, when Plaintiffs began building the first townhouses on the Project, it requested and obtained an advance of "management fees" from Prudential on the townhouses under construction.

50.    Consistent with its many years of prior borrowing experience with Prudential, Plaintiffs requested and used the "management fees" to pay overhead costs incurred as part of operating the Project and to repay the funds they had borrowed from their affiliated entities for the significant legal, engineering, and other fees incurred before Prudential could begin funding but were a prerequisite to the commencement of the construction.

51.    In March of 2015, Island View, Plaintiffs performed substantial soil remediation in accordance with a plan approved by the Pennsylvania DEP on the Project.

52.    Also in early 2015, after the necessary approvals and permits for the Project had all been obtained, affiliated entities of Plaintiffs, themselves, undertook all of the concrete and steel removal, removing an estimated 2000 cubic yards of concrete and 180 tons of steel, in order to keep the remediation costs to a minimum for the Project, while simultaneously readying the Project to begin townhouse construction.

Case ID: 160303161

53.    Because it used affiliated entities to perform the substantial concrete and steel removal at the actual cost incurred by the affiliated entities, Plaintiffs did not have to pay profits to any other contractor, and it is believed that Plaintiffs saved approximately $900,000 on the concrete removal and approximately $200,000 on the steel removal, which helped to keep the per-lot costs of the Project to well below the national average for a residential development of this type.

54.    Consistent with its prior loans and long history of borrowing from Prudential, from February through October of 2015, Island View submitted draw requests to borrow money under the Loan Documents based upon completion of specified portions of the townhouse construction, using the forms and procedures outlined in and attached to the Loan Documents, and Prudential almost always funded such draw requests on the same day.

55.    Consistent with its prior loans and long history of borrowing from Prudential, from February through October of 2015, Island View also submitted requests for Escrow Releases from the funds that were required to be escrowed under the Loan Documents for the completion of general site improvements using the forms and procedures outlined in and attached to the Loan Documents, and Prudential funded such Escrow Releases immediately upon presentation of the requests approved by the Borough of Bristol and the engineers reviewing the completed site improvements.

*Prudential Undergoes Changes and Refuses to Honor Its Unconditional Commitment*

56.    In the fall of 2015, Prudential became publicly owned and underwent substantial changes, including the firing of Salvatore Fratanduono and Thomas Vento, with whom Plaintiffs and their related entities had worked closely for most of their twenty-one (21) year relationship with Prudential.

13

Case ID: 160303161

57.     On November 1, 2015, the date that was thirty (30) days before the maturity of the Lava loan, the new personnel at Prudential refused to honor Prudential's unconditional commitment to refinance or purchase the Lava loan and have failed and refused to do so to date, offering as its only explanation that Salvatore Fratanduono, a Senior Vice President of Prudential and its Chief Lending Officer, allegedly lacked authority to make such a commitment on behalf of Prudential or that it might not have been his signature on the various commitment letters given to Lava and Plaintiffs.

58.     At the time that Prudential failed to honor its unconditional commitment to refinance or purchase the Lava loan, Prudential knew or should have known that Plaintiffs and Mr. Gualtieri's father had no other liquid assets.

*Prudential Seeks to Change the Existing Loan Documents*

59.     On or about November 19, 2015, a few weeks after Prudential failed or refused to honor its unconditional commitment to refinance or purchase the Lava loan, Anthony Migliorino, Prudential's new Executive Vice President and Chief Operating Officer, called Plaintiffs to discuss the status of the Island View construction loan and to request that Plaintiffs meet with the bank at Prudential's offices on November 25, 2015.

60.     On November 25, 2015, Mr. Gualtieri, acting on behalf of Plaintiffs, met with Anthony Migliorino, Joseph Corrato, and Alex Nadalini on behalf of Prudential (the "First Meeting") at Prudential's offices.

61.     At the First Meeting, Anthony Migliorino advised Mr. Gualtieri that Prudential was unhappy with the Loan Documents and did not "think that they were fair to Prudential" because Plaintiffs were poised to make millions in profits "while the bank makes only six percent (6%)."

14

Case ID: 160303161

62.    At the First Meeting, Anthony Migliorino also advised Mr. Gualtieri that Prudential was unwilling to allow Plaintiffs to keep all of the cash remaining from the anticipated sales of the townhouses and condominiums after the payments currently required to be made to Prudential under the Loan Documents.  Anthony Migliorino further advised that neither Prudential nor he not cared what the current Loan Documents provide because the personnel that agreed to those terms on behalf of Prudential are no longer employed by the bank.

63.    Although Prudential had not previously provided any such notices to Plaintiffs, Anthony Migliorino falsely advised Mr. Gualtieri that Plaintiffs were in default of their obligations to Prudential under the Loan Documents and threatened to foreclose not only on the Project but all other collateral that Plaintiffs and their related entities had provided to Prudential to secure the various Prudential loans.

64.    At the First Meeting, Anthony Migliorino further advised Mr. Gualtieri that Prudential had no interest in negotiating with Plaintiffs and was simply providing a list of the changes that Prudential was insisting be made to the existing Loan Documents and relationship between the parties in order for Plaintiffs and their affiliated entities to avoid having Prudential foreclose.

65.    In addition, at the First Meeting, Prudential insisted that Plaintiffs agree to cooperate with and assist the bank's residential construction consultant (the "Consultant") that it hired to analyze the Project.  Plaintiffs agreed and fully cooperated with the Consultant in the weeks that followed in order to allow the Consultant to prepare a full report and analysis of the Project (the "Consultant's Report").

Case ID: 160303161

66. A few weeks later, when Prudential had not obtained certain concessions that it demanded from Plaintiffs, Prudential asked Plaintiffs to come to Prudential's main office for a second meeting (the "Second Meeting") on December 10, 2015.

67. On December 10, 2015, Mr. Gualtieri, on behalf of all of Plaintiffs attended the Second Meeting with Anthony Migliorino, Joseph Corrato, Alex Nadalini, and Doug Smith attending on behalf of Prudential.

68. As was the case at the First Meeting, Anthony Migliorino did most of the "talking" and began by accusing Mr. Gualtieri and Plaintiffs of diverting money advanced on account of "Management Fees" from the Project and demanding that the money advanced on account of Management Fees be repaid to Prudential immediately.

69. Despite Mr. Gualtieri's attempts to explain that Prudential is required to advance specific loan amounts on account of "Management Fees," that Island View is permitted to use the Management Fees under the Loan Agreement, and that Island View had used the Management Fees in question specifically for the benefit of the Project, Anthony Migliorino continued to accuse Plaintiffs of "screwing" Prudential and demand the immediate repayment of the Management Fees.

70. As he did during the First Meeting, Anthony Migliorino advised Mr. Gualtieri that the Loan Documents were all going to change and that it was not negotiable, or Prudential would foreclose, even though Prudential had not attempted to declare Plaintiffs in default or even provide Plaintiffs with any notice of a potential event of default.

71. In addition, at the Second Meeting, Anthony Migliorino demanded that one of the affiliated entities turn over to Prudential all of the rents that it receives from an income producing property that it owns, even though that property is subject to a first mortgage and assignment of

16

Case ID: 160303161

rents in favor of a different lender and paying such rents to Prudential would be a default under that other bank's loan documents.

72.     At the Second Meeting, Anthony Migliorino also advised Mr. Gualtieri that Lava had threatened a claim against Prudential for Prudential's breach of its unconditional commitment to refinance or purchase the Lava loan before it matured and again threatened to foreclose on the collateral pledged by Plaintiffs and their affiliated entities if Prudential was unable to resolve the Lava loan issues in a way that was favorable to Prudential.

73.     In addition to all of the foregoing, at the Second Meeting, Anthony Migliorino told Mr. Gualtieri that Plaintiffs' affiliated entities would have to sell and close, within ninety (90) days, the properties securing the loans Prudential had made to Calnshire and Steeple Run, or Prudential would foreclose on those properties *and the Project*.

74.     During the Second Meeting, Prudential used the threat of foreclosure – despite the fact that no default or potential default had been declared by Prudential and that it was Prudential that had defaulted on its obligation to refinance or purchase the Lava loan – to attempt to coerce Plaintiffs into accepting the many changes that Prudential wanted to make to the Loan Documents in order to make such documents "fairer" to Prudential.

75.     Before the Second Meeting ended, Anthony Migliorino and Joseph Corrato told Mr. Gualtieri that they were expecting him to agree to all of the changes to the existing Loan Documents that they had raised verbally at the meeting, and when Mr. Gualtieri advised them that he needed Prudential to put its requests in writing so that he could discuss it with Plaintiffs' lawyers and accountants, they told him that Plaintiffs had to accept those terms on or before December 31, 2015, reminding him that the terms were not negotiable and that Prudential would

17

Case ID: 160303161

foreclose on all of the properties pledged to it to secure the loans made to Plaintiffs and their related entities if Plaintiffs did not concede.

*Prudential Makes a Written Demand for Changes to the Existing Loan Documents*

76.     On December 18, 2015, Anthony Migliorino, on behalf of Prudential, sent a letter (the "Migliorino Letter") to Plaintiffs summarizing the demands made by Prudential at the Second Meeting for changes required to the existing Loan Documents in order for Plaintiffs and their related entities to avoid foreclosure on all of their assets.  A true and correct copy of the Migliorino Letter is attached to this complaint and incorporated herein as Exhibit 8.

77.     Despite the statement to the contrary in the first sentence of the Migliorino Letter, Prudential had never previously "notified" Island View that its loans were in default as required under the Loan Documents, and had not even notified Island View of any action or inaction that could become a default under the Loan Documents.

78.     The Migliorino Letter confirms the foreclosure threats made at the Second Meeting; reinforces that Prudential attempted to impose a "Deadline Date" of December 31, 2015 for Plaintiffs to accede to Prudential's terms if they want to avoid foreclosure; and outlines the material changes that Prudential demanded be made to the Plaintiff's existing Loan Documents.

79.     On December 23, 2015, Plaintiffs' counsel, Stradley, Ronon, Stevens & Young, LLP sent a letter (the "First Stradley Letter") to Anthony Migliorino requesting clarification of the basis for Prudential's many significant demands and concessions, noting that Plaintiffs had not received any default letter or notice of potential default from Prudential.  A true and correct copy of the First Stradley Letter is attached to this complaint and incorporated herein as Exhibit 9.

Case ID: 160303161

80.    Although Prudential was willing to agree to a telephone conference between the parties and counsel for Plaintiffs, it never produced any prior default letter or other communication from Prudential notifying Plaintiffs of a potential event of default in response to the First Stradley Letter.

81.    On December 30, 2015, Prudential and Plaintiffs had a telephone conference (the "First Conference Call") to discuss the many changes to the existing Loan Documents demanded by Prudential in the Migliorino Letter, and William R. Sasso and Michael J. Cordone participated in the First Conference Call as counsel for Plaintiffs.

82.    During the First Conference Call, counsel for Plaintiffs questioned Prudential about the status of Plaintiffs' loans with Prudential, and Anthony Migliorino admitted that Plaintiffs were not in default of any of their loans and that Prudential had not previously sent any default letters to Plaintiffs but told Plaintiffs and their counsel "that the Loan Agreement is a very large document with lots of provisions and that he was sure that Prudential could find a default if it needed to do so."

83.    During the First Conference Call, Anthony Migliorino also threatened:   (i) immediately to foreclose on all of the real estate collateral pledged by Plaintiffs and their affiliated entities if Plaintiffs would not agree to sell the real estate securing the Calnshire and Steeple Run loans within ninety (90) days, even if that meant that the properties would have to be sold for millions less than the fair market values indicated in Prudential's recent appraisals of the properties; and (ii) that Prudential was ready, willing and able to take over and complete the Project (depriving Plaintiffs of the millions of dollars that they stood to earn) if Plaintiffs were unwilling to agree to all of the terms set forth in the Migliorino Letter.

19

Case ID: 160303161

84.    When questioned about the deficiency that would be created by selling the Calnshire and Steeple Run properties for millions less than their fair market value, Prudential stated that Island View and Plaintiffs would have to repay the deficiency created by Prudential forcing Calnshire and Steeple to sell their assets in a ninety-day period and without first obtaining the necessary approvals and permits required to obtain fair market value, and Anthony Migliorino again threatened to foreclose if Plaintiffs would not agree.

*Prudential Repeatedly Changes the Draw Request Process Without Prior Notice to Plaintiffs and Delays the Funding of Loans Under the Loan Agreement*

85.    In addition to refusing to honor its unconditional commitment to refinance or purchase the Lava loan and attempting to coerce Plaintiffs into accepting numerous changes to their existing Loan Documents, Prudential began to delay and change the process for approving draw requests for advances of loans under the Loan Agreement, substantially delaying the process to the detriment of Plaintiffs and their subcontractors and suppliers.

86.    Although Plaintiffs continued to follow the same process that they had used previously under the Loan Agreement prior to the changes of personnel at Prudential and the same process utilized for many years prior under their other loans with Prudential, beginning in December of 2015, Prudential started to request other documents and information to support draw requests, unilaterally decided to begin paying the subcontractors and suppliers directly, and started taking far longer than the customary three (3) days to approve and advance funds under the Loan Agreement – sometimes taking weeks or longer than one month to fund the loan advances.

87.    On or about December 2, 2015, Island View submitted a draw request seeking a loan under the Loan Agreement, using the same draw request forms and procedures that it had followed with Prudential under this Loan Agreement and for years used in conjunction with its

20

Case ID: 160303161

many other Prudential loans, but the draw request was not honored within the customary three-day period in which Prudential had previously acted.

88.     Instead of verifying the completion of appropriate steps in the construction of the townhouses on the Project as it had previously done on this and other loans to Plaintiffs, Prudential began demanding additional information and documents before it would review draw requests, significantly delaying Island View's ability to timely pay the subcontractors and suppliers critical to the completion of the Project.

89.     In fact, Prudential did not pay the December 2, 2015 draw request until over a month later, on <u>Saturday</u>, January 16, 2016, when it advised Island View that it could pick up the checks that Prudential had cut directly to some of the subcontractors and suppliers in the draw request.

90.     Not only did Prudential substantially delay the loan advance in response to the December 2, 2015 draw request and make the loan advance directly payable to some of the parties working the Project, but Prudential unilaterally decided not to advance all of the amounts requested in the draw request, despite the fact that Prudential's independent inspector of the progress on the Project had confirmed that the draw request was proper and supported by the progress on the Project.

91.     Between December 2015 and February 2016, Prudential also began determining what subcontractors should and should not be paid as part of the draw request process, and even how much to pay the subcontractors, deviating from the approved draw amounts specified in the Loan Agreement and causing significant harm to Plaintiffs and its relationships with its subcontractors and suppliers.

Case ID: 160303161

92.     At about the same time that Prudential was delaying its lending, trying to coerce Plaintiffs into accepting changes to their existing Loan Agreements and conducting a "fire sale" of the assets owned by their affiliated entities, Prudential's experts completed an appraisal of the Project and the Consultant's Report, both confirming that the Project was likely to be extremely profitable because the fully improved per lot costs of the Project are tens of thousands of dollars below the national average and the expected sale prices are projected to be well above average due to the location of the Project, its river frontage, and views.

93.     On January 13, 2016, at the request of Prudential, Plaintiffs, counsel for Plaintiffs, and Prudential had a second telephone conference (the "Second Conference Call"), the purpose of which was for Prudential to determine if Plaintiffs were willing to finally agree to the changes demanded in the Migliorino Letter.

94.     Once again, Anthony Migliorino, acting on behalf of Prudential:  (i) threatened to foreclose on the assets of Plaintiffs and their affiliated entities if they would not agree to the material terms of the Migliorino Letter; (ii) suggested that Plaintiffs were not making any progress on the completion of the townhomes started on the Project; and (iii) stated that Prudential believed that Plaintiffs had "stolen" the money taken as "management fees."  At the conclusion of the Second Conference Call, Anthony Migliorino suggested that the parties have a follow up call the following week for Prudential to determine whether sufficient progress was being made on Prudential's demand that the Calnshire and Steeple Run properties be listed for sale with a real estate broker and sold within ninety (90) days.

95.     On January 14, 2016, even though Prudential had not yet advanced any loans on account of the December 2, 2015 draw request, Island View submitted a new draw request for an additional $142,500 in an effort to obtain the loan proceeds necessary to pay the subcontractors

Case ID: 160303161

that had done substantial amounts of work on the Project and suppliers that had provided materials used between November 2015 and January 2016, resulting in the townhouses being "under roof" and ready for interior completion.

96.    In an effort to prevent the delays encountered with regard to the December draw request, Island View's January 14, 2016 draw request was supported by the additional information that Prudential had requested for the December 2 draw request, as well as dated photographs showing the continuing construction occurring on the Project, all of which would ultimately be verified by Prudential's construction inspector when he visited the Project.

97.    In response to the January 14, 2016 draw request, Prudential sent an email to Plaintiffs' counsel advising Plaintiffs that the information required to support a draw request under (i) the parties long history of prior dealings; (ii) the Loan Agreement; and (iii) the December 2 draw request was changing yet again and that Prudential was unilaterally insisting that additional information be provided before it would advance loans under the Loan Agreement, creating a moving target of requirements retroactively instituted to existing draw requests to render them ineffective and afford Prudential an excuse not to lend money to Plaintiffs under the Loan Agreement.  A true and correct copy of the January 14, 2016 email from Prudential is attached to this complaint and incorporated herein as Exhibit 10.

98.    On January 19, 2016, Plaintiffs, acting through their counsel, sent to Prudential copies of its updated production schedules, and Prudential responded that the production schedules were not sufficient for it to honor the January draw request because Prudential needed additional information not found on the production schedules relating to site improvements, even though Prudential did not previously advise Plaintiffs that they required information relating to site improvements (for which there was an escrow of loan proceeds that was required to be

23

funded separately) in order to fund construction draws related solely to construction of the townhouses. A true and correct copy of the January 19, 2016 email response from Prudential is attached to this complaint and incorporated herein as Exhibit 11.

99.     Later in the day on January 19, 2016, Prudential and counsel for Plaintiffs had a conference call (the "Third Conference Call") to discuss the status of Plaintiffs' willingness to agree to Prudential's demands.

100.    During the Third Conference Call, counsel for Plaintiffs advised Prudential that the draw request process was a moving target and that Prudential was constantly adding requirements not found in the Loan Agreement, the course of dealing between the parties, or in other writings between the parties. Counsel for Plaintiffs requested that Prudential put in writing what it was now requiring in order to promptly fund draw requests in order to avoid the continuing and significant damage that Prudential's numerous delays were causing Island View.

101.    During the Third Conference Call, Anthony Migliorino renewed Prudential's demand that Plaintiffs agree to the terms of the Migliorino Letter in order to avoid foreclosure and requested a litany of detailed information from Plaintiffs, including: (i) a breakdown of how Island View used all money advanced by Prudential on account of "Management Fees;" (ii) the names of brokers that Calnshire and Steeple Run would be willing to hire to market and sell their real estate; (iii) a detailed cash flow budget for 2016; (iv) evidence that the Project was approved as a single phase sufficient to establish that none of the overall site improvements can be delayed as Prudential was demanding; (v) an updated list of townhouses that Plaintiffs sold on the Project that Plaintiffs believed are still enforceable and will close; and (vi) updated reports on the status of townhouse construction and site development.

Case ID: 160303161

102.    At the conclusion of the Third Conference Call, Anthony Migliorino advised Plaintiffs' counsel that Prudential was engaging lawyers to represent it, and that the bank's lawyers would be sending a "default letter" to Plaintiffs because of Plaintiffs' alleged failure to provide certain financial information to Prudential.

*Prudential Sends Letters Threatening Default While Continuing Its Efforts to Force Plaintiffs to Accept Changes to the Loan Documents by Delaying Loan Advances and Controlling Payments*

103.    On January 22, 2016, Plaintiffs received letters from Prudential's recently-hired counsel, and the letters demanded that Plaintiffs provide certain tax returns and other financial information to Prudential and advised Plaintiffs that they ***would be in default*** if they failed to provide the specified information to Prudential within thirty (30) days and threatened legal action against Plaintiffs *if such a default occurred in the future*.

104.    Notwithstanding Prudential's many prior threats to foreclose beginning in November of 2015, the January 22, 2016 letters from Prudential's counsel did not state or even suggest Plaintiffs were currently in default of any obligations, that Prudential was currently entitled to foreclose or otherwise exercise any rights or remedies against Plaintiffs or their affiliated entities or that any prior notice of default or "Event of Default" existed.

105.    On January 25, 2016, with Prudential still refusing to advance the loan requested as part of the January 14, 2016 draw request, Plaintiffs continued to provide additional information to Prudential, updated the draw request to add additional loan requests, (now seeking a total of $172,520.50) and reminded Prudential that Plaintiffs were awaiting the bank's list of new requirements for draw requests.

106.    As evidenced by the January 25, 2016 email from Prudential in response to the updated January 14 draw request and additional information requested by the bank, Prudential (i) unilaterally imposed still more conditions on Island View's borrowing under the Loan

Case ID: 160303161

Agreement, now seeking to have Island View do some of the work that was Prudential's responsibility as part of the inspections of the construction; (ii) was, itself, unsure about what it had and was insisting upon from Plaintiffs in order to honor draw requests; and (iii) was intentionally changing the course of dealing between the parties saying "[Mr. Gualtieri] has been used to getting his own way around here [sic] but this is over." A true and correct copy of Prudential's January 25, 2016 email is attached to this complaint and incorporated herein as Exhibit 12.

107.    Notwithstanding Prudential's threats of foreclosure, intentional delays in advancing loans under the Loan Agreement, and its impairment of Island View's relationships with its subcontractors and suppliers, Plaintiffs proceeded with its development of the Project and construction of the townhouses, frequently working weekends in an effort to keep the Project on schedule to have the water mains, drainage, curbs, lighting, roads, and other material site improvements, along with the townhouses under construction, completed in time for the spring marketing season which is historically the biggest season for the sale of residential homes.

108.    Between the Third Conference Call and February 1, 2016, Plaintiffs provided to Prudential a long list of detailed information, reports, documents, and other data (including full proof that Plaintiffs used the funds advanced as "management fees" for the full benefit of the Project, contrary to Prudential unsubstantiated accusations) that Prudential had requested in the Third Conference Call, but Prudential still refused to fund the January 14, 2016 draw request that was amended on January 25, 2016.

109.    On February 1, 2016, the parties, this time joined by Prudential's counsel, had another telephone conference (the "Fourth Conference Call") to discuss the status of the demands made by the bank in the Migliorino Letter and the constantly changing demands of

Case ID: 160303161

Prudential concerning the necessary documentation to support draw requests and the delays encountered by Plaintiffs in obtaining the loans promised under the Loan Agreement.

110.   As part of the Fourth Conference Call, Prudential indicated that it wanted to revamp the whole draw request process with new forms and procedures and agreed to provide drafts of the new forms and proposed procedures to counsel for Plaintiffs for their comment.

111.   On February 2, 2016, Prudential provided to Plaintiffs' counsel drafts of the proposed new draw request forms and procedures to which Plaintiffs' counsel proposed some suggested changes.

112.   Immediately following the Fourth Conference call, counsel for Plaintiffs re-sent the January 25, 2016 email that amended the unpaid January 14, 2016 draw request in an effort to finally convince Prudential to honor it and advance the loans under the Loan Agreement, noting that the bank's own inspector previously had approved that particular draw request.

113.   After the Fourth Conference Call, counsel for Prudential and counsel for Plaintiffs had an additional telephone conversation in which counsel for Prudential requested that Plaintiffs put together a proposal indicating what changes they would be willing to make to the existing Loan Documents, keeping in mind the types of changes that Prudential had demanded in the Migliorino Letter.

114.   On February 4, 2016, Prudential finally approved the January 14, 2016 draw request and made the loan advance in the form of checks made payable directly to the subcontractors and suppliers working on the Island View Project.  As with the prior draw request, Prudential offered to either mail the checks directly to the subcontractors or allow Plaintiffs to pick up the checks and distribute them instead of advancing the loan proceeds directly to Plaintiffs for them to disburse.

27

Case ID: 160303161

115.    Prudential unilaterally and without warning or explanation to Plaintiffs decided how much to pay some of Plaintiffs' subcontractors, paying their plumbing, electric, and drywall subcontractors $12,349.50 less than the budgeted amount set forth in the draw request, as modified on January 25, 2016.

116.    On February 10, 2016, Plaintiffs submitted a new, $84,813.00 draw request to Prudential with the same types of supporting information that it had provided in support of the December and January draw requests, but to this day Prudential has neither funded the draw request nor specified what, if anything, is defective about it.

117.    As a result of Prudential's refusal to advance the funds requested in the February 10, 2016 draw request, Plaintiffs subcontractors and suppliers that worked on the Project have never been paid for their recent work and/or materials.

118.    On February 12, 2016, in a continuing effort to cooperate with Prudential and find an acceptable solution to the recent and severe problems between the parties, Plaintiffs provided to Prudential the following documents: (i) detailed cash flow projections for 2016; (ii) its markup of and comments to the proposed, new procedures for draw requests; and (iii) Plaintiffs' written response to the Migliorino Letter demands and proposal for changes to the Loan Documents that Plaintiffs would be willing to consider and the terms and conditions for such changes.

*Prudential Refuses to Honor Escrow Releases as Required Under the Loan Documents*

119.    Also on February 12, 2016, Plaintiffs delivered to Prudential a third escrow release (the "Third Escrow Release") request for the Project, in the amount of $303,261.75, which had been approved by Bristol Borough and its engineers based upon specific progress made by Plaintiffs in the completion of public and quasi-public site improvements at the Project.

Case ID: 160303161

A true and correct copy of the Third Escrow Release is attached to this complaint and incorporated herein as Exhibit 13.

120.    Part of the money requested in the Third Escrow Release, $87,200 was due to Plaintiffs for work that they had performed for the benefit of Island View, and Plaintiffs requested that Prudential apply $53,400 of the $87,200 due to Plaintiffs on account of monthly loan payments due to Prudential from Plaintiffs and some of their affiliated entities.

121.    The Third Escrow Release was made by Plaintiffs using the same forms and process that had been used for the prior two Escrow Releases obtained from Prudential prior to November 2015 and the forms and process specified in the Loan Documents and the Tri-Party Agreement.

122.    Despite the fact that the Tri-Party Agreement and Loan Documents leave Prudential no discretion in reviewing or approving an Escrow Release approved by Bristol Borough and its engineers, Prudential not only failed to promptly honor the Third Escrow Release, but as of the date of this Complaint, Prudential has continued to refuse to release the escrowed funds to Plaintiffs that were requested in the approved Third Escrow Release.

*Prudential Attempts to Manufacture a Default*

123.    Upon information and belief, Prudential has withheld the funding of the Third Escrow Release and latest draw request in an effort to restrict or eliminate the cash flow of Plaintiffs and their related entities in order to create payment default that would allow Prudential to declare an "Event of Default" under the Loan Documents and support the threats that Prudential had been making against Plaintiffs since November 2015 and further damage Plaintiffs and their reputation in the community and the construction industry.

29

Case ID: 160303161

124.   Prudential postponed a conference call between the parties that had been scheduled for February 17, 2016, and on February 18, 2016, counsel for Plaintiffs emailed counsel for Prudential expressing significant concern about the delays in the draw request and Escrow Release process.  A true and correct copy of the February 18, 2015 email is attached to this complaint and incorporated herein as Exhibit 14.

125.   After restricting Plaintiffs' cash flow since November, refusing to refinance or purchase the Lava loan, controlling what subcontractors were paid, when and how much, and denying Plaintiffs' Escrow Release requests, Prudential's efforts to cut-off Plaintiffs' cash flow completely finally had an impact on Plaintiffs who were no longer able to self-fund shortfalls created by Prudential's refusal to honor its obligations under the Loan Agreement.

126.   After refusing without explanation to honor the Third Escrow Release that, among other things, would have paid the February monthly payments due from Plaintiffs and their affiliated entities to Prudential, in letters dated February 19, 2016, Prudential accused Plaintiffs of being in default of their obligations under the Loan Agreements for failing to make the monthly payments.

127.   After receiving the February 19, 2016 letters accusing Plaintiffs of being in default as a result of the payment deficiency caused by Prudential's own refusal to honor the Third Escrow Release, counsel for Plaintiffs sent an email to Prudential's counsel advising Prudential that the Loan Documents and Tri-Party Agreement did not give Prudential any discretion to avoid payment of an Escrow Release approved by Bristol Borough and its engineers and outlining Plaintiffs' many concerns with Prudential's conduct with regard to its funding obligations under the Loan Documents.  A true and correct copy of the February 19, 2016 email

30

Case ID: 160303161

from Plaintiffs' counsel to Prudential's counsel is attached to this complaint and incorporated herein as Exhibit 15.

128.    On February 22, 2016, Plaintiffs provided all of the financial information and tax returns requested by Prudential in the letters that Plaintiffs received on January 22, 2016, including CPA prepared statements for several entities that are not even borrowers of Prudential.

129.    On February 23, 2016, counsel for Plaintiffs sent a letter to Prudential's counsel outlining the claims that Plaintiff might assert against Prudential as a result of its continuing refusal to honor its obligations and commitments under the Loan Documents and its related promise to refinance or purchase the Lava loan.  A true and correct copy of the February 23, 2016 letter is attached to this complaint and incorporated herein as Exhibit 16.

130.    Also on February 23, 2016, counsel for Plaintiffs sent an email to Prudential's counsel asking Prudential to reconsider its position on the Third Escrow Release and outlined the critical need for the funds to be released in order to keep the Project moving forward, as well as the potential adverse effects on the Project that were likely to result from Prudential's continued refusal to honor its obligations with regard to the Escrow Release.  A true and correct copy of the February 23, 2016 email to Prudential's counsel is attached to this complaint and incorporated herein as Exhibit 17.

131.    The February 23, 2016 email and all of Plaintiffs other efforts to convince Prudential to honor its obligations to fund the Third Escrow Release as required under the Loan Documents – and do so without imposing conditions requiring Plaintiffs to accede to changes to their existing Loan Documents – were refused by Plaintiffs, and the Third Escrow Release remains unfunded to this date.

Case ID: 160303161

*Lava Sues Plaintiffs and Prudential*

132.    On March 2, 2016, Lava commenced a lawsuit against, among others, Prudential and Plaintiffs on account of the outstanding Lava loan that Prudential has thus far refused to refinance or purchase in accordance with the unconditional commitments Prudential gave to Plaintiffs and Lava in order to induce them to enter into the Lava loan and the loan for the Project.

*Plaintiffs Share Financial Projections for the Project with Prudential to Dissuade Prudential from Continuing to Restrict the Cash Flow and Loans Necessary to Operate the Project*

133.    On March 9, 2016, a few weeks before it was forced to cease homebuilding and sales operations on the Project due to Prudential's refusal to make the loans promised in the Loan Agreement, Plaintiffs shared its pro forma projections for the Project with Prudential in an effort to convince Prudential to change course and avoid litigation over the parties' respective obligations under the Loan Documents because of the income and profits that Plaintiffs would earn if permitted to continue developing the Project.

134.    Plaintiffs' pro forma projections demonstrated that Plaintiffs conservatively stand to earn more than $27 million in profits if permitted to complete the Project, and such projections are consistent with the assumptions and conclusions of Prudential's own real estate appraiser and its Consultant with regard to the expected sales prices for the townhouses (prices which have been achieved and exceeded in comparable developments mentioned in the appraisal) and per lot costs that are well below industry averages.

135.    As a result of Prudential's refusal to fund the Third Escrow Release and the latest draw request as required under the Loan Documents and its continuing efforts to disrupt Plaintiffs' cash flow and harm its relations with its subcontractors and suppliers, Plaintiffs have been forced to cease construction on the Project because they cannot in good faith ask

Case ID: 160303161

subcontractors and suppliers to continue working and providing materials when Plaintiffs have no assurances that Prudential will make any additional Escrow Releases or honor any of Plaintiffs' future draw requests.

136.    Prudential's failure to provide the financing as and when promised under the Loan Documents has not only caused Plaintiffs to halt homebuilding and sales, but it will also cause, among other things, the following:  (i) Plaintiffs will miss the spring market and possibly more; (ii) Plaintiffs will not be able to open a model home to generate additional sales; (iii) Plaintiffs will not be able to pay its subcontractors and suppliers for the work already performed and materials delivered; (iv) Plaintiffs will not be able to deliver the homes as promised under the existing agreements of sale; (v) Plaintiffs will default on the existing contracts for the sale of townhouses in the Project; (vi) Plaintiffs will be forced to defend themselves against the Lava Complaint; (vii) Plaintiffs will not be able to begin generating cash flow from the Project in order to start repaying their obligations to Prudential, the Redevelopment Authority, subcontractors, suppliers and other creditors; and (viii) Plaintiffs' reputations will suffer in the community and the industry which will cause them losses not only on the Project but also on other potential future developments.

**COUNT I**
**BREACH OF CONTRACT AND DUTY OF GOOD FAITH AND FAIR DEALING**

137.    The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

138.    Pursuant to the Prudential Loan Documents and the Tri-Party Agreement, Prudential agreed to be bound by numerous obligations with respect to the financing of the Project.  Prudential's obligations under the Loan Documents and the Tri-Party Agreement

33

Case ID: 160303161

include, but are not limited to, the dispersal of funds under the loan in accordance with Section 5 of the Loan Agreement and the release of funds escrowed for site improvements.

139.    Pursuant to the Tri-Party Agreement, Prudential agreed to the interim releases of funds from the Escrow Reserve based upon the value of completed site improvements as approved and authorized by the Borough Administrator and the engineers for Bristol Borough.

140.    The Tri-Party Agreement obligates Prudential to disburse funds from the Escrow Reserve notwithstanding any insolvency, termination of the Loan Agreement, or alleged default by Island View on any of its obligations to Prudential and leaves Prudential no discretion to evaluate whether or not the Borough of Bristol is correct in requesting the release of funds from the Escrow Reserve.

141.    Despite the fact that the Tri-Party Agreement and Loan Documents leave Prudential no discretion in reviewing or approving an Escrow Release approved by Bristol Borough and its engineers, Prudential not only failed to promptly honor the Third Escrow Release, but Prudential has continued to refuse to release the escrowed funds to Plaintiffs that were requested in the approved Third Escrow Release

142.    Prudential has also failed and/or refused to disburse funds in connection with Plaintiffs' draw requests.

143.    Prudential's failure to release funds in accordance with the Loan Documents and Tri-Party Agreement constitutes a material breach of such agreements.

144.    Further, in addition to breaching the unconditional commitments, Prudential also breached its duty of good faith in its dealings with Plaintiffs.

145.    The duty of good faith requires that the parties to a contract conduct themselves with honesty in the transaction.

34

Case ID: 160303161

146.    Prudential is in breach of its duty of good faith and fair dealing by, among other things, refusing to honor its unconditional commitment to refinance or purchase the Lava loan; delaying and refusing to advance funds as required under the Loan Documents; refusing to release funds escrowed for site improvements; attempting to control what subcontractors and suppliers receive payment, how much, and when; repeatedly threatening to foreclose on the Project and other collateral of Plaintiffs and their affiliated entities without any default existing or having been declared; and attempting to force Plaintiffs' affiliated entities to sell other real estate for millions of dollars less than the appraised value reflected in the appraisals obtained by Prudential.

147.    As a direct and proximate result of Prudential's breach of the Loan Documents, Tri-Party Agreement, and duty of good faith, homebuilding and sales have ceased and site development of the Project has been severely impaired, Plaintiffs' reputation has been damaged, and Prudential has caused Plaintiffs to suffer significant actual and consequential damages, including but not limited to lost profits, in excess of $27 million.

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus interest, fees, and costs and such other relief as this Court deems appropriate.

## COUNT II
## BREACH OF FIDUCIARY DUTY

148.    The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

149.    A fiduciary relationship existed between Plaintiffs and Prudential.

150.    A fiduciary duty is created by a lender where the lender exercises substantial control over the borrower's affairs.

Case ID: 160303161

151.    Prudential exercised control over Plaintiffs' business transactions by, among other things:  unilaterally deciding to pay the subcontractors and suppliers directly; taking far longer than the customary three (3) days to approve and advance funds under the Loan Agreement; demanding additional information and documents before it would review draw requests; significantly delaying Island View's ability to timely pay the subcontractors and suppliers critical to the completion of the Project; making loan advances directly payable to some of the parties working the Project; unilaterally deciding not to advance all of the amounts requested in the draw request, despite the fact that Prudential's independent inspector of the progress on the Project had confirmed that the draw request was proper and supported by the progress on the Project; determining which subcontractors should and should not be paid; and determining how much to pay the subcontractors.

152.    Further, Plaintiffs' provided confidential financial information to Prudential.

153.    As a result of Prudential's conduct, it was in a fiduciary relationship with Plaintiffs, owed a fiduciary duty to Plaintiffs, and intentionally and/or negligently breached that duty.

154.    As a direct and proximate result of Prudential's breach of fiduciary duty, homebuilding and sales have ceased and site development of the Project has been severely impaired, Plaintiffs' reputation has been damaged, and Prudential has caused Plaintiffs to suffer significant actual and consequential damages, including but not limited to lost profits, in excess of $27 million.

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus interest, fees, and costs and such other relief as this Court deems appropriate.

Case ID: 160303161

## COUNT III
## FRAUD IN THE INDUCEMENT

155.   The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

156.   Prudential acted intentionally to induce Plaintiffs to enter into the Loan Documents by representing that Prudential would unconditionally repay the Lava loan before the Lava loan matured.

157.   Prudential's unconditional commitments to repay the Lava loan were material to Plaintiffs' decision to enter into the Loan Documents.

158.   Plaintiffs reasonably relied on Prudential's unconditional commitments, and but-for Prudential's unconditional commitments to repay the Lava loan, Plaintiffs would not have entered into the Loan Documents.

159.   On information and belief, Prudential's unconditional commitments were made falsely or recklessly, as Prudential has intentionally failed to satisfy its unconditional commitments.

160.   As a direct and proximate result of Prudential's conduct, homebuilding and sales have ceased and site development of the Project has been severely impaired, Plaintiffs' reputation has been damaged, and Prudential has caused Plaintiffs to suffer significant actual and consequential damages, including but not limited to lost profits, in excess of $27 million.

161.   Prudential's actions were malicious and done willfully in conscious disregard of the Plaintiffs' rights and were calculated to injure Plaintiffs.  As such, Plaintiffs are entitled to recover, in addition to actual damages, punitive damages to punish Prudential and to deter them from engaging in future misconduct.

Case ID: 160303161

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus punitive damages, interest, fees, and costs and such other relief as this Court deems appropriate.

## COUNT IV
## CONSTRUCTIVE FRAUD

162. The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

163. Prudential induced Plaintiffs to enter into the Loan Documents by representing that Prudential would unconditionally repay the Lava loan before the Lava loan matured.

164. Prudential's unconditional commitments to repay the Lava loan were material to Plaintiffs' decision to enter into the Loan Documents, and Prudential had a duty to advise Plaintiffs and/or its affiliates that, contrary to the written unconditional commitments, Prudential would not repay the Lava loan.

165. Plaintiffs' reasonably relied on Prudential's unconditional commitments, and but-for Prudential's unconditional commitments to repay the Lava loan, Plaintiffs would not have entered into the Loan Documents.

166. As a direct and proximate result of Prudential's conduct, homebuilding and sales have ceased and site development of the Project has been severely impaired, Plaintiffs' reputation has been damaged, and Prudential has caused Plaintiffs to suffer significant actual and consequential damages, including but not limited to lost profits, in excess of $27 million.

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus punitive damages, interest, fees and costs and such other relief as this Court deems appropriate.

38

Case ID: 160303161

## COUNT V
## FRAUDULENT MISREPRESENTATION

167.    The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

168.    Prudential acted intentionally to induce Plaintiffs to enter into the Loan Documents by representing that Prudential would unconditionally repay the Lava loan before the Lava loan matured.

169.    Prudential's unconditional commitments to repay the Lava loan were material to Plaintiffs' decision to enter into the Loan Documents.

170.    Plaintiffs reasonably relied on Prudential's unconditional commitments, and but for Prudential's unconditional commitments to repay the Lava loan, Plaintiffs would not have entered into the Loan Documents.

171.    On information and belief, Prudential's unconditional commitments were made falsely or recklessly, as Prudential has intentionally failed to satisfy its unconditional commitments.

172.    As a direct and proximate result of Prudential's misrepresentations, homebuilding and sales have ceased and site development of the Project has been severely impaired, Plaintiffs' reputation has been damaged, and Prudential has caused Plaintiffs to suffer significant actual and consequential damages, including but not limited to lost profits, in excess of $27 million.

173.    Prudential's actions were malicious and done willfully in conscious disregard of the Plaintiffs' rights and were calculated to injure Plaintiffs.  As such, Plaintiffs are entitled to recover, in addition to actual damages, punitive damages to punish Prudential and to deter them from engaging in future misconduct.

Case ID: 160303161

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus punitive damages, interest, fees and costs and such other relief as this Court deems appropriate.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

174.    The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

175.    Prudential knew or should have known, or was deliberately ignorant that its unconditional commitments and other representations would cause Plaintiff to enter into the Loan Documents.

176.    Prudential had a duty and responsibility to verify the accuracy and completeness of its unconditional commitments.

177.    Plaintiffs foreseeably, reasonably, and justifiably relied on the Prudential's representations in entering into the Lava loan and the Loan Documents.

178.    As a direct and proximate result of Prudential's negligent misrepresentations, homebuilding and sales have ceased and site development of the Project has been severely impaired, Plaintiffs' reputation has been damaged, and Prudential has caused Plaintiffs to suffer significant actual and consequential damages, including but not limited to lost profits, in excess of $27 million.

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus punitive damages, interest, fees and costs and such other relief as this Court deems appropriate.

Case ID: 160303161

## COUNT VII
## <u>TORTIOUS INTERFERENCE WITH CONTRACTUAL AND</u>
## <u>PROSPECTIVE BUSINESS RELATIONS</u>

179.    The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

180.    Plaintiffs have a sterling reputation as residential real estate developers, and have demonstrated success in developing residential real estate projects.

181.    As set forth in the Loan Agreement, Plaintiffs have existing contractual agreements with purchasers of residential properties to be built on the Project.

182.    In addition, Plaintiffs have existing contractual relations with other third parties, including but not limited to subcontractors and suppliers who are working on the Project.

183.    By intentionally failing to fund the Project as provided in the Loan Documents and Tri-Party Agreement, Prudential is intentionally interfering with Plaintiffs' contractual relations with its subcontractors, suppliers, and existing and potential purchasers of residential properties because Prudential's conduct will cause Plaintiffs' to breach its agreements with its subcontractors, suppliers, and purchasers of residential properties.

184.    By contending that Plaintiffs were in default of the Loan Documents when there was no basis to do so, and conditioning disbursement of loan funds on unreasonable and unprecedented demands, Prudential intentionally, maliciously, wantonly, and without justification interfered with Plaintiffs' prospective business relationships.

185.    These breaches will irreparably tarnish Plaintiffs' reputation, and the actions of Prudential were not privileged or justified.

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus punitive damages, interest, fees and costs and such other relief as this Court deems appropriate.

41

Case ID: 160303161

## COUNT VIII
## NEGLIGENCE

186.   The averments of the preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

187.   Prudential owed a duty to exercise reasonable care and skill in the handling and administration of the loan it issued to Plaintiffs, and to discharge and fulfill the other obligations attendant to the maintenance, administration, and servicing of the loan.

188.   In taking the actions alleged above, and in failing to take the actions as alleged above, the Prudential breached its duty of care and skill to Plaintiffs by, among other things: refusing to honor its unconditional commitment to refinance or purchase the Lava loan; delaying and refusing to advance funds as required under the Loan Documents; refusing to release funds escrowed for site improvements; attempting to control what subcontractors and suppliers received payment, how much and when; repeatedly threatening to foreclose on the Project and other collateral of Plaintiffs and their affiliated entities without any default existing or having been declared; and attempting to force Plaintiffs' affiliated entities to sell other real estate for millions of dollars less than the appraised value reflected in the appraisals obtained by Prudential.

189.   As a direct and proximate result of Prudential's negligence, homebuilding and sales have ceased and site development of the Project has been severely impaired, Plaintiffs' reputation has been damaged, and Prudential has caused Plaintiffs to suffer significant actual and consequential damages, including but not limited to lost profits, in excess of $27 million.

WHEREFORE, Plaintiffs, Island View, IVP, and Mr. Gualtieri, demand judgment against Defendant, Prudential in an amount in excess of $27 million, plus punitive damages, interest, fees and costs and such other relief as this Court deems appropriate.

Case ID: 160303161

## DEMAND FOR JURY TRIAL

Plaintiffs, Island View, IVP, and Mr. Gualtieri demand a jury trial for all claims so triable.

Respectfully submitted,

*/s/ Michael J. Cordone*_____
Michael J. Cordone, Esquire
Mark D. Villanueva, Esquire
STRADLEY, RONON, STEVENS & YOUNG, LLP
2005 Market  Street, Suite 2600
Philadelphia, PA  19103
Phone:  215.564.8000
Fax:  215.564.8120

*Attorneys for Defendants*
*Francesco Gualtieri, Renato Gualtieri and Island*
*View Crossing II, .LP*

Dated:  March 31, 2016

# 2770802  v. 5

Case ID: 160303161

## **VERIFICATION**

I, Renato Gualtieri, individually and as President of Island View

Properties, Inc., the general partner of Island View Properties II, LP, state that the facts set forth

in the foregoing Complaint of Renato Gualtieri, Island View Properties, Inc. and Island View

Crossing II, LP, are true and correct to the best of my knowledge, information, and belief.  I

understand that the statements made herein are made subject to the penalties of 18 Pa. Cons. Stat.

Ann. § 4904 relating to unsworn falsifications to authorities.

Renato Gualtieri, individually and as
President of Island View Properties, Inc., the
general partner of Island View Crossing II,
LP

- Dated: 3-31-16

# 2770802  v. 1

Case ID: 160303161

# <u>Exhibit 1</u>

*Filed and Attested by the
Office of Judicial Records
31 MAR 2016 02:31 pm
K. EDWARDS*

Case ID: 160303161

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS OF PHILADELPHIA

Lava Funding, LLC

v.

Prudential Savings Bank                    CASE NO.: 160102716

    and
Francesco Gualtiero
    and
Renato Gualtieri
    and
Island View Crossing II, LP

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decider a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| *You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | *Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| Philadelphia Bar Association<br>Lawyer Referral<br>and Information Service<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 | Asociacion De Licenciados<br>De Filadelfia<br>Servicio De Referencia E<br>Informacion Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197 |

Case ID: 160303161

JOSEPH P. KERRIGAN, ESQUIRE
461 N. 3rd Street; Suite 2B
Philadelphia, PA 19123
I.D. No.: 69754
(215) 302-3737                                                  Attorney for Plaintiff

---

| | |
|---|---|
| Lava Funding, LLC | : |
| 1205 Delsea Drive | : |
| Deptford, NJ 08093 | : |
|      Plaintiff | : |
|      v. | : |
| | : |
| Prudential Savings Bank | : |
| 1834 W. Oregon Avenue | : |
| Philadelphia, PA 19145 | : |
|     and | : |
| Francesco Gualtieri | : |
| 1587 Edge Hill Road | : |
| Abington, PA 19001 | : |
|     and | : |
| Renato Gualtieri | : |
| 1628 Carlene Court | : |
| Langhorne, PA 19047 | : |
|     and | : |
| Island View Crossing II, LP | : |
| 1628 Carlene Court | : |
| Langhorne, Pa 19047 | : |
|      Defendants | : |

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

NO.: 160102716

## COMPLAINT

Plaintiff Lava Funding, LLC, by and through its attorney JOSEPH P.
KERRIGAN, ESQUIRE respectfully brings the within Complaint and avers as follows:

### PARTIES

1.      Plaintiff, Lava Funding, LLC ("Lava") is a Limited Liability Company,
duly authorized to conduct business in the Commonwealth of Pennsylvania. Its principal
place of business is located at 1205 Delsea Drive, Deptford, NJ 08093.

2.      Defendant Prudential Savings Bank ("Prudential") is a Pennsylvania
chartered savings bank with a principal place of business located at 1834 W. Oregon
Ave., Philadelphia, PA 19145.

Case ID: 160303161

3.     Defendant Francesco Gualtieri is an adult individual residing at 1587 Edge Hill Road, Abington, Pa. 19001.

4.     Defendant Renato Gualtieri is an adult individual residing at 1628 Carlene Court, Langhorne, Pa 19047.

5.     Defendant Island View Crossing II, LP ("Island View") is a Pennsylvania Limited Partnership with an address of 1628 Carlene Court, Langhorne, Pa 19047.

## VENUE

6.     Venue is proper in Philadelphia County under Pa. R.C.P. 1006(a) in that Philadelphia is the county where the cause of action arose.

## FACTS

7.     In or around November 2014, Defendant Francesco Gualtieri and Island View sought a construction loan from Lava.

8.     On November 25, 2014, Lava extended a term sheet to Francesco Gualtieri for a loan in the amount of $625,00.00. (Copy of Term Sheet attached as "Exhibit A").

9.     The terms called for, inter alia, personal guarantees on the loan from both Francesco Gualtieri and Renato Gualtieri.

10.     Lava also required a "guaranteed take out of the loan from Prudential Savings Bank, in form satisfactory to lenders attorney". (See Exhibit "A").

11.     On November 20, 2014, co-defendant Prudential Savings Bank's Senior Vice President Salvatore Fratanduono sent a letter to Lava regarding the prospective loan to Island View and Francesco Gualtieri. (Attached hereto as Exhibit "B").

12.     In the letter Prudential represented to Lava "as a material inducement" to them for providing the loan to Island View agreed "no later than fifteen (15) days prior to loan maturity" to either:

> **1. refinance and pay to Lava the unpaid Loan balance along with current interest and past due interest, fees or costs past due to Lava or 2. purchase from Lava the Loan documents for the amount due under the terms of the Loan and pay Lava all expenses incurred by Lava in transferring title to the Loan documents.** (emphasis added).

13.     Prudential stated that their "obligations hereunder are unconditional, irrespective of the status of the Loan…" and acknowledged that "Lava would not make

Case ID: 160303161

this loan to the Borrowers but for the promises and representations of PSB as set forth in this letter."

14.    On December 1, 2014, the loan was funded and loan documents executed at Prudential's main office with officers of Prudential and Lava present at the loan's closing.

15.    At that time an place, Island View and Francesco Gualtieri executed a commercial note in the amount of $625,000.00.  The note's terms provided interest only commencing on January 1, 2015 and continuing thereafter for twelve (12) consecutive months or until December 1, 2015 when all outstanding amounts became due and payable to Lava including any past due interest, late fees, cost and attorney's fees.  (Attached as "Exhibit C").

15.    Also on December 1, 2014, Renato J. Gualtieri personally guaranteed all monies due or to become due to Lava on behalf of Island View and Francesco Gualtieri, a copy of said Guarantee Agreement is attached hereto as Exhibit "D".

16.    Defendants Island View and Francesco Gualtieri are in default of their obligations to Lava Funding, LLC for failure to pay pursuant to the terms of the loan documents.

17.    Defendant Renato Gualtieri is in default of his obligations to guarantee payment of the loan to Lava Funding, LLC.

18.    Defendant Prudential Savings Bank is in default of its obligations to Lava Funding, LLC for its refusal to act in accordance with its unconditional financial obligation as represented in their November 20, 2014 letter to Lava (See "Exhibit "B").

## COUNT I - (Lava v. Island View)

19.    Plaintiff incorporates paragraphs 1-18 of the Complaint as though fully set forth herein.

20.    Island View is in default under the terms of the Note (Exhibit "A") it executed by virtue of its failure to timely pay Plaintiff all amounts due and owing.

21.    Island View is in breach of its contractual obligations to Lava.

WHEREFORE, Plaintiff, Lava Funding LLC, prays this Honorable Court grant judgment in its favor and against Defendant Island View Crossing II L.P. for damages,

late fees, attorney's fees, interest, and costs of suit in addition to any other relief that the Court deems appropriate.

### COUNT II  - (Lava v. Francesco Gualtieri)

22.     Plaintiff incorporates paragraphs 1-21 of the Complaint as though fully set forth herein.

23.     Francesco Gualtieri is in default under the terms of the Note (Exhibit "A") he executed by virtue of his failure to timely pay Plaintiff all amounts due and owing.

24.     Francesco Gualtieri is in breach of his contractual obligations to Lava.

WHEREFORE, Plaintiff, Lava Funding LLC, prays this Honorable Court grant judgment in its favor and against Defendant Francesco Gualtieri for damages, late fees, attorney's fees, interest, and costs of suit in addition to any other relief that the Court deems appropriate.

### COUNT III  - (Lava v. Renalto J. Gualtieri)

25.     Plaintiff incorporates paragraphs 1-24 of the Complaint as though fully set forth herein.

26.     Renalto J. Gualtieri is in default under the terms of the Guaranty Agreement (Exhibit "D") he executed by virtue of his failure to timely pay Plaintiff all amounts due and owing.

27.     The Guaranty Agreement (Exhibit "D") provides that Renalto J. Gualtieri guarantees the prompt payment and performance of all loans, advances, debts, liabilities, obligations, covenants and duties owing by borrowers, Francesco Gualtieri and Island View Crossing II, L.P. to Lava.

28.     Renalto J. Gualtieri is in breach of his contractual obligations to Lava.

WHEREFORE, Plaintiff, Lava Funding LLC, prays this Honorable Court grant judgment in its favor and against Defendant Renalto J. Gualtieri for damages, late fees, attorney's fees, interest, and costs of suit in addition to any other relief that the Court deems appropriate.

### COUNT IV  - (Lava v. Prudential Savings Bank)

29.     Plaintiff incorporates paragraphs 1-28 of the Complaint as though fully set forth herein.

30.    In accordance with the Term Sheet presented by Lava to Francesco Gualtieri and Island View Crossing II, L.P. Prudential Savings Bank was to provide assurance that no later than fifteen (15) before the loan's maturity Prudential would either refinance and pay to Lava the unpaid loan balance with current interest and past due interest, fees or cost due to Lava or alternatively purchase the loan from Lava.

31.    Prior to the loan's maturity date of December 31, 2015, Lava notified Prudential that it expected either to be paid-off by refinancing of the loan or Prudential's purchase of the loan.

32.    Prudential acknowledged Lava's demand but, to date has been unwilling or unable to abide by the terms of its agreement with Lava dated November 20, 2014 (Exhibit "B").

33.    Prudential is in default under its agreement with Lava by virtue of its failure to timely pay Plaintiff all amounts due and owing.

23.    Prudential is in breach of his contractual obligations to Lava.

WHEREFORE, Plaintiff, Lava Funding LLC, prays this Honorable Court grant judgment in its favor and against Prudential Savings Bank for damages, late fees, attorney's fees, interest, and costs of suit in addition to any other relief that the Court deems appropriate.

Dated: 3/2/16

Joseph P. Kerrigan, Esquire
Attorney for Plaintiff

Case ID: 160303161

## CERTIFICATION OF COUNSEL

I, Joseph P. Kerrigan, Esquire, hereby certify that I will serve in accordance with

Pennsylvania Rules of Procedure 440 all parties not served electronically. The Court in

accordance with Pennsylvania Rules of Procedure 205.4(g) will electronically serve all

other parties.

Dated: 3/2/16

JOSEPH P. KERRIGAN, ESQUIRE
Attorney for Plaintiff
461 N. 3rd Street, Suite 2B
Philadelphia, PA 19123
Attorney I.D. No. 69754
Office: (215) 302-3737

**VERIFICATION**

I, John Barrasso, verify that I am duly authorized to make this verification on

behalf of plaintiff, and that the statements made in the foregoing Complaint are true

and correct to the best of my knowledge, information and belief.

These statements are made subject to the penalties of 18 Pa. C.S.A.§ 4904

relating to unsworn falsification to authorities.


LAVA FUNDING  LLC


Dated:

3-2-16

_____
John Barrasso

EXHIBIT A

Case ID: 160303161



# Lava Funding

To: Francesco Gualtieri, Island View Crossing II, LP

From:  John Barrasso

Date: 11-25-14

Re: 1587 Edge Hill Road Abington PA and 625 Fern Road Glenside PA

We are pleased to present this Term Sheet in regard to the refinance of the above referenced investment properties, subject to the terms set forth below.  The terms are as follows:

- Loan amount $625,000

- 13% interest only, 5pts Origination, 12 month term

The requirements are as follows:

- First position title insured mortgage lien both subject properties

- Second position uninsured mortgage lien 1628 Carlene Court Langhorne PA

- Personal Guarantees of Francesco and Renato Gualtieri

- Guarantee of Island View Crossing II, LP

- Satisfactory appraisals for both first position properties

- Hazard insurance for both first position properties naming Lava Funding as first mortgagee and loss payee

PO Box 770
Turnersville NJ 08012
609-820-9587
Fax 888-723-3105
JohnB@LavaFunding.com

EXHIBIT B

Case ID: 160303161

 **Prudential Savings Bank**

1834 West Oregon Avenue, Philadelphia, PA 19145-4725   215-755-1500

---

November 20, 2014

Lava Funding, LLC
1205 Delsea Drive
Deptford, New Jersey 08093
Attention: John Barrasso, President

      Re: Francesco Gualtieri, Island View Crossing II, LLC

Dear Mr. Barrasso,

    Prudential Savings Bank (PSB), as a material inducement to Lava Funding, LLC (Lava) extending a 12 month term, $625,000.00 loan (the "Loan") to Francesco Gualtieri and/or Island View Crossing II, LP, does hereby agree no later than fifteen (15) days prior to Loan maturity to either:

1. refinance and pay to Lava the unpaid Loan balance along with current interest and past due interest, fees or cost due to Lava or
2. purchase from Lava the Loan documents for the amount then due under the terms of the Loan and pay to Lava all expenses incurred by Lava in transferring title to the Loan documents.

    PBS also agrees, regardless of loan or mortgage priority, to pay to Lava the first $25,000 out of the proceeds from the sale of each of the first fifteen sales at the Island View Crossing or Island View Crossing II project(s), which sums shall be applied by Lava as a reduction to the amounts due on the Loan.

    PSB acknowledges that its obligations hereunder are unconditional, irrespective of the status of the Loan, the Borrowers, any debts that may be due PBS from the Borrowers, their affiliated entities or the Project. PSB acknowledges that Lava would not make this loan to the Borrowers but for the promises and representations of PSB set forth in this letter.

    If you have any questions, please feel free to contact me at 215-755-1500.

Salvatore Fratandruono

Senior Vice President, CEO

OTHER PRUDENTIAL OFFICES (215) 755-1500

Member FDIC

2101 SOUTH 19TH STREET, PHILADELPHIA, PA 19145-5705
112 SOUTH 19TH STREET, PHILADELPHIA, PA 19103-4629
220 A MOORE STREET, PHILADELPHIA, PA 19148-1825
www.prudentialsavingsbank.com

1722 SOUTH BROAD STREET, PHILADELPHIA, PA 19145-2315
28 NORTH 3RD STREET, PHILADELPHIA, PA 19106-2113
601 MORGAN AVENUE, DREXEL HILL, PA 19026-3186  610-259-8100
Bank by Phone/Rate Line 215-755-1505

 EQUAL HOUSING LENDER

Case ID: 160303161

EXHIBIT C

Case ID: 160303161



# Lava
# Funding, LLC

**Commercial Mortgage Note**

**$625,000.00**
**Interest Rate 13.0%**

**December 1, 2014**

### TERMS OF THE LOAN

FOR VALUE RECEIVED the undersigned, **ISLAND VIEW CROSSING II, LP**, a Pennsylvania limited partnership, having an address of 1628 Carlene Court, Langhorne, Pennsylvania and **FRANCESCO GUALTIERI**, having an address of 1587 Edge Hill Road, Abington, Pennsylvania (hereafter jointly referred to as "Borrower"), promise to pay to the order of **Lava Funding, LLC** (hereinafter called "Lender"), the principal sum of **SIX HUNDRED TWENTY-FIVE THOUSAND ($625,000.00) DOLLARS** (the "Loan") together with interest at the rate of thirteen percent (13.0%) per annum. The Loan is for commercial purposes and Borrower hereby represents that property being acquired is not to be used as marital residences.

Borrower shall repay the Loan in consecutive monthly interest only payments in the sum of SIX THOUSAND SEVEN HUNDRED SEVENTY DOLLARS AND EIGHTY-FOUR CENTS ($6,770.84) each, beginning on January 1, 2015 and continuing monthly thereafter on the first day of the month, until December 1, 2015, when a final payment of principal and interest, together with any other charges that may be due on the Loan as set forth herein or the other loan documents, shall be due and payable in full.

Interest is calculated based upon a 365/360 day year. The Lender shall charge a $50.00 fee for any returned checks, together with any other charges that may be due on the Loan, becomes due and payable in full.

### LATE CHARGE

In the event the Lender has not received any payment within ten (10) calendar days of its due date, Borrower will pay Lender a late charge equal to the greater of (i) ten percent (10.0%) of Borrower's overdue payment or (ii) $125.00.

### SECURITY INTEREST

As security for the prompt payment as and when due of all amounts due under this Note, including any renewals, extensions and/or modifications thereof, together with all other existing and future liabilities and obligations of the Borrower and any endorsers, sureties or guarantors (hereinafter "Obligor[s]"), to Lender, whether absolute or contingent, of any nature whatsoever and out of whatever transactions arising (hereinafter collectively referred to as the "Obligations"), in addition to any other security agreement or document granting Lender any rights in any of Obligor's property for the purpose of securing the Obligations, Obligor hereby grants to Lender a lien and security interest in and to all property of Obligor, or any of them, which at any time Lender shall have in its possession.

Case ID: 160303161

Borrower acknowledges that the Loan would not be made by Lender but for the guaranty that Prudential Savings Bank would make Lender whole at or before the Loan maturity date, regardless of the status of the Loan or the Borrower (or any one of them).

## PREPAYMENTS

The Loan may be prepaid without penalty, in whole or in part, upon thirty (30) days' written notice to the Lender.

## EVENTS OF DEFAULT

Each of the following shall be an Event of Default hereunder entitling the Lender to accelerate the maturity of this Note and demand immediate payment of all outstanding principal, accrued interest and any other charges or costs allowed hereunder or under any other Loan Document: (a) the nonpayment when due of any amount payable under this Note or under any obligation or indebtedness to Lender of Borrower, any Obligor or any person liable, either absolutely or contingently, for payment of any indebtedness which such nonpayment continues for ten (10) days after written notice thereof is provided by Lender to Borrower; (b) if Borrower or any Obligor has failed to observe or perform any other existing or future agreement with Lender of any nature whatsoever which failure continues for ten (10) days after written notice thereof is provided by Lender to Borrower; (c) if any representation, warranty, certificate, financial statement or other information made or given by Borrower or any Obligor to Lender is materially incorrect or misleading; (d) if Borrower or any Obligor shall become insolvent or make an assignment for the benefit of creditors or if any petition shall be filed by or against Borrower or any Obligor under any Bankruptcy or insolvency law; (e) the entry of any judgment against Borrower or any Obligor which remains unsatisfied for fifteen (15) days, or the issuance of any attachment, tax lien, levy or garnishment against any property of the Borrower or any Obligor; (f) the dissolution, merger, consolidation or change in control of any Borrower which is a corporation, limited liability company, or partnership, or the sale or transfer of any substantial portion of any of Borrower's assets, or if any agreement for such dissolution, merger, or consolidation, change in control, sale or transfer is entered into by Borrower, without the written consent of Lender; (g) the death, incarceration or adjudication of legal incompetence of any Borrower or Obligor who is a natural person; (h) if Borrower shall fail to remit promptly when due to the appropriate government agency or authorized depository, any amount collected or withheld from any employee of Borrower for payroll taxes, Social Security payments or similar payroll deductions; (i) if any Obligor shall attempt to terminate or disclaim such Obligor's liability for the indebtedness evidenced by this Note; (j) if Borrower shall fail to pay when due any material indebtedness to third parties for borrowed money; (k) the failure of any Obligor to furnish such financial and other information as the Lender may request; or (l) the sale, conveyance, abandonment, encumbering or other disposition of all or a portion of any collateral pledged to the Lender as security for the Loan, except as permitted by the Lender in writing. Any notice called for herein may be by email.

## REMEDIES

Upon the occurrence of and during a continuance of any Event of Default, Lender may, in addition to any rights or remedies available to the Lender at law, in equity or under any other Loan Document, do all or any of the following: (a) accelerate the maturity of this Note, and any of the other Obligations, and demand immediate payment of all outstanding principal, accrued interest, costs and expenses; (b) begin accruing and collect interest at the rate of twenty percent (20%) per annum (the "Default Rate") on the unpaid Principal balance, provided, however, that no interest shall accrue hereunder in excess of the maximum amount of interest then allowed by law. The Default Rate shall apply from the date default first occurred and be charged until all amounts due hereunder are paid or collected in full, even though same may occur after legal judgment is entered. Borrower agrees to pay such interest upon demand; (c) setoff the amount owing hereon against any deposit account maintained in the Lender by any Obligor, and such right of setoff shall be deemed to have been exercised immediately upon the stated or accelerated maturity hereof even though such setoff is not noted on the

Case ID: 160303161

Lender's records until a later time; (d) sell all or part of any collateral pledged to the Lender as security for the Loan at public or private sale, with such notice, if any as may be required by law, all such notice being hereby waived to the extent permitted by law: and (e) hold as security for the payment hereof any other property heretofore or hereafter delivered into the custody, control or possession of the Lender for any reason or purpose whatsoever, by any Obligor. The net proceeds of any collateral held by Lender as security for any of the Obligations shall be applied first to the reasonable expenses of Lender in preparing the collateral for sale, selling and the like, including, without limitation, attorney's fees and expenses incurred by Lender (including fees and expenses of any litigation incident to any of the foregoing), and second, in such order as Lender may elect, in its sole discretion, to the complete satisfaction of all of the Obligations together with all interest thereon. Obligor waives and releases any right to require Lender to collect any of the Obligations to Lender from any other collateral under any theory of marshalling of assets or otherwise, and specifically authorizes Lender to apply any collateral proceeds in which Obligor has any right, title or interest against any of Obligor's Obligations to Lender in any manner that Lender may determine. The Lender's failure to accelerate for any cause shall not prevent the Lender from doing so for a later cause.

Borrower shall promptly upon demand pay the Lender's costs of collection and/or enforcement of the Loan, including any and all attorney's fees and costs.

## POWER TO CONFESS JUDGMENT

The Borrower hereby empowers any attorney of any court of record, after the occurrence and during the continuance of any Event of Default hereunder, to appear for the Borrower and, with or without complaint filed, confess judgment, or a series of judgments, against the Borrower in favor of the Lender or any holder hereof for the entire principal balance of this Note, all accrued interest and all other amounts due hereunder, together with costs of suit and an attorney's fee of the greater of 10% of such principal and interest or $1,000 added as a reasonable attorney's fee, and for doing so, this Note or a copy verified by affidavit shall be a sufficient warrant. The Borrower hereby forever waives and releases all procedural errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. Interest on any such judgment shall accrue at the Default Rate.

No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Lender shall elect until such time as the Lender shall have received payment in full of the debt, interest and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Lender may recover from the Borrower shall not exceed the actual attorneys' fees incurred by the Lender.

## MISCELLANEOUS

The Borrower hereby represents and warrants to Lender that the proceeds of the Loan will be used exclusively for business, commercial or agricultural purposes and agrees that any disbursement of the proceeds of the Loan, or any portion thereof, to any one or more Borrowers, shall be conclusively deemed to constitute disbursement of such proceeds to and for the benefit of all Borrowers. Any notice that must be given to the Lender under this Note will be given by mailing it by certified mail to the Lender at 1205 Delsea Drive, Deptford, NJ 08093. A notice will be mailed to the Lender at a different address if Borrower is given a notice of that different address. All representations, warranties and agreements of Borrower made in connection with this Note shall bind Borrower's personal representatives, heirs, successors and assigns. If any provision of this Note shall for any reason be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof, but this Note shall be construed as if such invalid or unenforceable provision had never been contained herein.

Case ID: 160303161

Borrower hereby waives protest, notice of protest, presentment, dishonor, notice of dishonor, demand, and notice of demand.  ANY AND ALL DISPUTES ARISING OUT OF OR UNDER THIS NOTE OR THE LOAN DOCUMENTS SHALL BE DECIDED BY A JUDGE, SITTING WITHOUT A JURY, AND THE UNDERSIGNED BORROWER(S) HEREBY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY ON ANY MATTERS IN DISPUTE AND FURTHER WAIVE ANY AND ALL CLAIMS IN THE FUTURE FOR DAMAGES OTHER THAN DIRECT COMPENSATORY DAMAGES.  THIS NOTE HAS BEEN DELIVERED TO AND ACCEPTED BY LENDER IN, AND SHALL BE GOVERNED BY THE LAWS OF, THE COMMONWEALTH OF PENNSYLVANIA.   THE PARTIES AGREE TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED IN PENNSYLVANIA IN CONNECTION WITH ANY MATTER ARISING HEREUNDER.

**IN WITNESS WHEREOF**, Borrower has duly executed this Note the day and year first written above, and has hereunto set Borrower's hand and seal.

WITNESS:

ISLAND VIEW CROSSING II, LP, a Pennsylvania limited partnership

By: _____

Name:  Renato J. Gualtieri
Title: General Partner

Francesco Gualtieri, Individually by his
Attorney in fact, Antonio Gualtieri

Page -4-

Case ID: 160303161

EXHIBIT D

Case ID: 160303161



# Lava
# Funding, LLC

---

**Guaranty Agreement**

---

**THIS GUARANTY AGREEMENT** is executed December 1, 2014 by **RENATO J. GAULTIERI** (the "Guarantor"), with an address at 1628 Carlene Court, Langhorne, Pennsylvania, in consideration of the extension loans and other credit accommodation by **Lava Funding LLC** (the "Lender"), having an address at 1205 Delsea Drive, Deptford, New Jersey 08093, to ISLAND VIEW CROSSING II, LP, a Pennsylvania Limited Partnership and FRANCESCO GAULTIERI (hereinafter jointly referred to as "Borrower"), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

1.    **Guaranty.** The undersigned Guarantor hereby guarantees the prompt payment and performance of all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Lender of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in Bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other interest rate protection or similar agreement, or in any other manner, whether arising out of overdrafts on deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, and any amendments, extensions, renewals or increases and all costs and expenses of the Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses (hereinafter referred to collectively as the **"Obligations"**). If the Borrower defaults under any such Obligations, the Guarantor will pay the amount due to the Lender.

2.    **Guaranty Absolute and Unconditional.** The liability of the Guarantor under this Guaranty is absolute and unconditional irrespective of:

   2.1.    any lack of validity or enforceability of any of the Loan Documents;

   2.2.    any change in the time, manner, place or amount of payment or in any other term of all or any of the Indebtedness, or any other amendment or waiver of or any consent to departure from any of the terms of the Indebtedness;

Case ID: 160303161

2.3.  any exchange, release or non-perfection of any collateral or lien securing all or any part of the Indebtedness, which exchange, release or non-perfection the Guarantor expressly agrees will not be deemed an unjustifiable impairment of the collateral;

2.4.  any release or amendment or waiver of or consent to departure from any other guaranty, for all or any part of the Indebtedness;

2.5.  any settlement or compromise with any Borrower or any other person relating to the Indebtedness; or

2.6.  any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Borrower, any guarantor or other obligor in respect of the Indebtedness or the Guarantor in respect of this Guaranty.

This Guaranty is a continuing guarantee and shall remain in full force and effect until all of the Indebtedness has been paid in full and will continue to be effective, or be reinstated, as the case may be, if at any time any of the Indebtedness is rescinded, avoided or rendered void or must otherwise be returned by the Lender for any reason, including, without limitation, the insolvency or Bankruptcy of any Borrower, the Guarantor or otherwise, all as though such payment had not been made.

3.   **Waiver.**  This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Lender has terminated this Guaranty.  This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time.  This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Lender of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Lender to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof.  The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, deduction or defense based upon any claim the Guarantor may have against the Borrower or the Lender, except payment or performance of the Obligations.  The Guarantor hereby waives (a) promptness and diligence; (b) notice of incurring any Indebtedness by the Borrower; (c) notice of any actions taken by the Lender or the Borrower under any Loan Document; (d) acceptance of this Guaranty and reliance thereon by the Lender; (e) presentment, demand of payment, notice of dishonor or nonpayment, protest and notice of protest with respect to the Indebtedness, and all other formalities of every kind in connection with the enforcement of the Indebtedness or of the obligations of Guarantor hereunder or of any other guarantor, the omission of or delay in which, but for the provisions hereof, might constitute grounds for relieving Guarantor of the obligations hereunder; (f) any requirement that the Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against the Borrower, the Guarantor, any other person or any collateral; and (g) notice of any election by the Lender to sell any of the property mortgaged, assigned or pledged as security for any of the Indebtedness at a public or private sale.

4.   **Voided Repayments.**  If any demand is made at any time upon the Lender for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Lender repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Lender.  The

Case ID: 160303161

provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to the Lender's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

5. **Subrogation, Reimbursement and Indemnity.** The Guarantor waives (a) all right to seek reimbursement, indemnity or contribution from the Borrower, and (b) any right to subrogation it may have or acquire as result of performance under this Guaranty. If, notwithstanding such waiver, any amount shall be paid to the Guarantor on account of such subrogation, indemnification or contribution at any time when the Indebtedness has not been paid in full, such amount shall be held in trust for the benefit of the Lender, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Lender to be applied in whole or in part by the Lender against the Indebtedness, whether matured or unmatured, in accordance with the Loan Documents.

6. **Financial Statements.** Unless compliance is waived in writing by the Lender or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Lender such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Lender may reasonably request.

In the event that any such information submitted to the Lender has been prepared by an outside accountant, the same shall be accompanied by a statement in writing signed by the accountant disclosing that the accountant is aware that the information prepared by the accountant would be submitted to and relied upon by the Lender in connection with the Lender's determination to grant or continue credit.

7. **Costs.** To the extent that the Lender incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be included in the Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

8. **Notices.** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and will be effective upon receipt. Such notices and other communications may be hand-delivered, sent by facsimile transmission with confirmation of delivery and a copy sent by first-class mail, or sent by nationally recognized overnight courier service, to the addresses for the Lender and the Guarantor set forth above or to such other address as one may give to the other in writing for such purpose.

9. **Preservation of Rights.** No delay or omission on the Lender's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Lender's action or inaction impair any such right or power. The Lender's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Lender may have under other agreements, at law or in equity. The Lender may proceed in any order against the Borrower, the Guarantor or any other obligor of, or collateral securing, the Obligations.

10. **Illegality.** In case any one or more of the provisions contained in this Guaranty should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

11. **Right of Set-off; Security Interest.** Upon the occurrence of an Event of Default, the Lender is authorized at any time, without notice to the Guarantor, to set off and apply to any unpaid

Case ID: 160303161

Indebtedness: (a) any amounts which the Lender from time to time may owe the Guarantor, including any balance or share of any general or special deposit, certificate of deposit, savings certificate or other account (regardless of the source or intended use of any funds in such account); and (b) any other property, tangible or intangible, owned by or in which the Guarantor has an interest which may be in the possession or control of the Lender, in which accounts and other property Guarantor grants the Lender a security interest. This right is in addition to and not in limitation of any other rights, including of set-off, which the Lender may have by law.

12. **Power to Confess Judgment. The Guarantor hereby empowers any attorney of any court of record, after the occurrence and during continuance of an Event of Default hereunder, to appear for the Guarantor and, with or without complaint filed, confess judgment, or a series of judgments, against the Guarantor in favor of the Lender for the amount of the Obligations and an attorney's commission of the greater of 10% of such principal and interest or $1,000 added as a reasonable attorney's fee, and for doing so, this Guaranty or a copy verified by affidavit shall be a sufficient warrant. The Guarantor hereby forever waives and releases any procedural errors in said confession of judgment proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted.**

**No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Lender shall elect until such time as the Lender shall have received payment in full of the Obligations and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Lender may recover from the Guarantor shall not exceed the actual attorneys' fees incurred by the Lender.**

13. **Continuing Guaranty; Assignment.** This Guaranty is a continuing guaranty and will: (a) be binding upon the Guarantor, its successors and assigns; and (b) inure to the benefit of and be enforceable by the Lender and its successors, transferees and assigns; provided, however, that the Guarantor can not assign this Guaranty without the prior written consent of the Lender.

14. **Guaranty Not Modified by Bankruptcy.** Neither the Guarantor's obligation in accordance with the terms of this Guaranty, nor any remedy for the enforcement, nor the amount of the Indebtedness of the Borrower will be impaired, modified, or limited in any manner whatsoever by any impairment, modification, discharge or limitation of the Indebtedness of the Borrower or its estate in Bankruptcy or any remedy for the enforcement, resulting from the operation of any present or future provision of the Bankruptcy Code of the United States or other statute, or from the decision of any court interpreting any of the same. The amount of the Indebtedness will, for the purposes of this Guaranty, be determined as if no such impairment, stay, modification, discharge or limitation had occurred.

15. **Consent To Jurisdiction; Service of Process.** In the event the Lender brings any action hereunder in any court of record of the state governing this Guaranty, the Guarantor consents to and confers personal jurisdiction over the Guarantor by such court or courts and agrees that service of process may be made upon the Guarantor by mailing a copy of such process to Guarantor.

16. **Waiver of Jury Trial.** GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE INDEBTEDNESS OF THE BORROWER TO THE LENDER.

Case ID: 160303161

17.     <u>Governing Law.</u>  This Guaranty will be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania.

18.     <u>Indemnity.</u>  The Guarantor agrees to indemnify each of the Lender, its directors, officers and employees and each legal entity, if any, who controls the Lender (the **"Indemnified Parties"**) and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation or preparation therefore) which any Indemnified Party may incur or which may be asserted against any Indemnified Party as a result of the execution of or performance under this Guaranty; <u>provided</u>, <u>however</u>, that the foregoing indemnity agreement shall not apply to claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Guaranty. The Guarantor may participate at its expense in the defense of any such claim.

       This Agreement of Guaranty shall be construed in accordance with the laws of the State of Pennsylvania.

WITNESS:

RENATO J. GAULTIERI

Case ID: 160303161

# **Exhibit 2**

Case ID: 160303161



# Prudential Savings Bank

1834 West Oregon Avenue, Philadelphia, PA 19145-4725   215-755-1500

---

November 21, 2014

Mr. Francesco Gualtieri
1587 Edgehill Road
Abington, PA 19001

RE:   Lava Funding/Prudential Refinance
       1587 Edgehill Road, Abington, PA 19001
       625 Fern Road, Glenside, PA 19038
       1628 Carlene Court, Langhorne, PA 19047-2303

Dear Frank:

Prudential Savings Bank agrees to refinance the unpaid loan balance on the $625,000.00 Lava Funding loan granted to you and recorded against 1587 Edgehill Road, 625 Fern Road, and 1628 Carlene Court. The Lava Funding loan will be paid off from a Prudential Savings Bank refinance, with a 30-year fixed rate mortgage at prevailing interest rates, no later than 30 days from the date of loan maturity.

If you have any questions, please feel free to contact me at 215-755-1500

Sincerely,

Salvatore Fratanduono
Sr. Vice President/Chief Lending Officer


OTHER PRUDENTIAL OFFICES (215) 755-1500

Member FDIC
2101 SOUTH 19TH STREET, PHILADELPHIA, PA 19145-3703
112 SOUTH 18TH STREET, PHILADELPHIA, PA 19103-4025
238 A MOORE STREET, PHILADELPHIA, PA 19148-1925
www.prudentialsavingsbank.com

1722 SOUTH BROAD STREET, PHILADELPHIA, PA 19145-2315
28 NORTH 3RD STREET, PHILADELPHIA, PA 19106-2113
601 MORGAN AVENUE, DREXEL HILL, PA 19026-3105  610-259-8100
Bank by Phone/Rate Line 215-755-1505



Case ID: 160303161



# Prudential Savings Bank

1834 West Oregon Avenue, Philadelphia, PA 19145-4725    215-755-1500

November 21, 2014

Mr. Francesco Gualtieri
1587 Edgehill Road
Abington, PA 19001

RE:    Lava Funding/Prudential Refinance
       1587 Edgehill Road, Abington, PA 19001
       625 Fern Road, Glenside, PA 19038
       1628 Carlene Court, Langhorne, PA 19047-2303

Dear Frank:

Prudential Savings Bank will forward a check in the amount of $25,000.00 from the proceeds from the first twenty-five sales at Island View Crossing to Lava Funding.  The proceeds will be applied as a Principal reduction on the $625,000.00 loan granted to you.

At the time of maturity of the Lava Funding loan and the subsequent refinance by Prudential Savings Bank, as previously agreed, Prudential Savings Bank hereby agrees that the $25,000.00 payments (per sale) shall then be applied to the Prudential loan until satisfied.

If you have any questions, please feel free to contact me at 215-755-1500

Sincerely,

Salvatore Fratanduono
Sr. Vice President/Chief Lending Officer

OTHER PRUDENTIAL OFFICES (215) 755-1500

Member FDIC

2101 SOUTH 19TH STREET, PHILADELPHIA, PA 19145-3709
112 SOUTH 19TH STREET, PHILADELPHIA, PA 19103-4629
238 A MOORE STREET, PHILADELPHIA, PA 19148-1925
www.prudentialsavingsbank.com

1722 SOUTH BROAD STREET, PHILADELPHIA, PA 19145-2315
26 NORTH 3RD STREET, PHILADELPHIA, PA 19106-2113
601 MORGAN AVENUE, DREXEL HILL, PA 19026-3105  610-259-8100
Bank by Phone/Rate Line 215-755-1505

LENDER

Case ID: 160303161

# **Exhibit 3**

Case ID: 160303161



**<u>NOTE</u>**

**<u>Philadelphia, Pennsylvania</u>**

**<u>November 26, 2014</u>**

**<u>$5,541,468.00</u>**

      **FOR VALUE RECEIVED,** and intending to be legally bound, **Island View Crossing II, L.P., A PA Limited Partnership,** having an address at One South State Street, Newtown, PA 18940 **and Island View Properties, Inc., its General Partner and Renato J.  Gualtieri** ("Maker"), hereby promises to pay to the order of **Prudential Savings Bank,** with office at 1834 W. Oregon Avenue, Philadelphia, PA 19145 ("Payee") the principal sum of **Five Million Five Hundred Forty One Thousand Four Hundred Sixty Eight ($5,541,468.00) Dollars** or so much thereof as shall have been advanced for Maker's account and shall be outstanding from time to time, together with interest thereon from the date or dates on which such sum is advanced upon the terms and conditions hereinafter set forth.

      **1.  <u>Note.</u>**  This Note is the "Note" as defined in that certain Development Construction Loan Agreement of even date herewith (the "Loan Agreement") between Island View Crossing II, L.P.  and Payee, the terms and provisions of which Loan Agreement are incorporated herein and made a part hereof Capitalized terms not defined herein shall have such meaning as provided in the Loan Agreement.

      **2.  <u>Interest Rate.</u>**  Interest only shall accrue at a definite and certain, but variable per annum rate equal to One (1%) per annum in excess of the Prime Rate effective from time to time (the "Interest Rate"), which Interest Rate shall change each time the Prime Rate is changed; however, in no event shall the interest rate ever be less that five (5%) percent.  For purposes of this Note, the term "Prime Rate" means the rate if interest publically annonced as such from time to time in the Money Rates Section of the New York edition of the Wall Street Journal.  If the Wall Street Journal ceases to be published or is otherwise not published for any significant time period or if it ceases to publish a "Prime Rate", then the Payee may use any similar published prime or base rate.  If and when the Prime Rate changes, the rate of interest on this Note shall change automatically without notice to Maker effective on the date of any change.  Interest shall be calculated onthe basis of a three hundred sixty (360) day year for the actual number of days elapsed in each calendar year.

      **3.  <u>Default Rate.</u>**  Notwithstanding the foregoing, interest will accrue and be payable on any outstanding principal amount hereof and all other sums payable under the Loan Documents not paid when due (whether at the stated maturity date thereof or by reason of any requirement for the prepayment thereof, by acceleration or otherwise), until paid at the rate per annum that is three (3%) percent in excess of the Interest Rate (the "Default Rate").

      **4.  <u>Monthly Payments; Maturity.</u>**  Interest only on the outstanding principal balance hereof at the Interest Rate shall be due and payable monthly in arrears on the first day of each

Case ID: 160303161

calendar month during the term hereof, commencing on **December 1, 2014.** Unless sooner paid pursuant to the terms of Paragraph 5 hereinbelow, on **November 1, 2019,** the entire principal balance of this Note, together with all accrued and unpaid interest thereon and all other sums due and payable hereunder or under the Loan Agreement or any other document executed and delivered in connection herewith, or therewith shall be due and payable in full without prior notice or demand.

**5. Prepayment.** Maker shall have the right to prepay, without premium or penalty, the principal sum hereof, in whole or in part, at any time, provided that such prepayment is accompanied by the payment of all interest accrued hereunder to the date of prepayment and all other fees and charges due hereunder or under the Loan Documents (as hereinafter defined), and provided further that Maker shall have satisfied all of its obligations under the Loan Documents. Any prepayment of part of the principal sum hereof shall not relieve Maker of the obligation to pay periodic installments of interest as and when such installments of interest would otherwise fall due, or to make principal reductions upon the sale of each house, nor of any obligations hereunder. Any partial prepayment shall be applied first to any costs or fees due Payee, then to any accrued and unpaid interest, and then to the principal sum due hereunder.

**6. Place of Payment.** Principal and interest hereunder shall be payable at the office of Payee set forth in the heading hereof, or at such other place as Payee, from time to time, may designate in writing.

**7. Late Charge.** If any installment of principal and/or interest or any other payment is not paid within fifteen (15) days after the date on which it is due under the terms of this Note or any of the other Loan Documents, then there shall also be immediately due and payable a late charge at the rate of five ($.05) cents for each dollar of such delinquent payment, to cover the extra expense involved in handling delinquent payments.

**8. Security.** In addition to all rights, interests and remedies provided for elsewhere in this Note, repayment of this Note is secured by, and Payee shall be entitled to, all the rights and remedies provided in the Loan Agreement, including, without limitation, all of the terms, agreements, conditions, covenants, provisions and stipulations contained therein and in all other documents providing security for this Note or executed or delivered in connection herewith, all of even date herewith (collectively the "Loan Documents"). All of the terms, conditions, agreements, covenants, provisions and stipulations contained in any of the Loan Documents are hereby made a part of this Note to the same extent and with the same force and effect as if they were fully set forth herein, and Maker hereby covenants and agrees to keep and perform, or to cause to be kept and performed, all such terms, conditions, agreements, covenants, provisions and stipulations strictly in accordance with these terms.

**9. Default; Acceleration; Remedies.** Should there occur an Event of Default (as defined in the Loan Agreement or any of the other Loan Documents), then Payee, at its option and without notice to Maker, may declare immediately due and payable the entire unpaid balance of principal and all other sums due by Maker hereunder or under the Loan Documents, together with interest accrued thereon at the applicable rate specified herein to the date of default and thereafter at the Default Rate, anything herein or in the Loan Documents to the contrary notwithstanding.

Case ID: 160303161

Upon such a declaration of all such sums becoming due and payable by reason of such Event of Default, payment thereof may be enforced and recovered in whole or in part at any time by one or more of the remedies provided to Payee in this Note or in the Loan Documents. If Payee employs counsel to enforce this Note by suit or otherwise, Maker will reimburse Payee for all reasonable costs of suit and other reasonable expenses in connection therewith, whether or not suit is actually instituted, together with an attorney's fee for collection equal to five (5%) percent of the outstanding principal balance of this Note and unpaid accrued interest, but in no event less than Twenty Thousand ($20,000.00) Dollars, and all costs of suit and other expenses.

**10.  Confession of Judgment.**  MAKER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR FOR MAKER AT ANY TIME AFTER THE OCCURRENCE OF AN EVENT OF DEFAULT HEREUNDER, UNDER THE LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS IN ANY ACTION BROUGHT AGAINST MAKER ON THIS NOTE OR THE LOAN DOCUMENTS AT THE SUIT OF PAYEE, WITH OR WITHOUT DECLARATION FILED, AS OF ANY TERM, AND THEREIN TO CONFESS OR ENTER JUDGMENT AGAINST MAKER FOR THE ENTIRE UNPAID OUTSTANDING PRINCIPAL BALANCE OF THIS NOTE AND ALL OTHER SUMS TO BE PAID BY MAKER TO OR ON BEHALF OF PAYEE PURSUANT TO THE TERMS HEREOF AND OF THE LOAN DOCUMENTS AND ALL ARREARAGES OF INTEREST THEREON, TOGETHER WITH AN ATTORNEY'S FEE FOR COLLECTION EQUAL TO TEN (10%) PERCENT OF THE OUTSTANDING PRINCIPAL BALANCE AND ACCRUED BUT UNPAID INTEREST, BUT IN NO EVENT LESS THAN FIVE THOUSAND ($5,000.00) DOLLARS, AND ALL COSTS OF SUIT AND OTHER EXPENSES; AND FOR SO DOING THIS NOTE OR A COPY HEREOF VERIFIED BY AFFIDAVIT SHALL BE A SUFFICIENT WARRANT.  THE AUTHORITY GRANTED HEREIN TO CONFESS JUDGMENT SHALL NOT BE EXHAUSTED BY ANY EXERCISE THEREOF BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL THE AMOUNTS DUE HEREUNDER.

MAKER KNOWINGLY WAIVES ITS RIGHT TO BE HEARD PRIOR TO THE ENTRY OF SUCH JUDGMENT AND UNDERSTANDS THAT, UPON SUCH ENTRY, SUCH JUDGMENT SHALL BECOME A LIEN ON ALL REAL PROPERTY OF MAKER IN THE COUNTY WHERE SUCH JUDGMENT IS ENTERED.

**11.  Remedies Cumulative, Etc.**

(a) Remedies.  The remedies of Payee provided herein or in the Loan Documents shall be cumulative and concurrent, may be pursued singly, successively or together at the sole discretion of Payee, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

(b) Recovery of Judgments.  The recovery of any judgment by Payee and/or the levy of execution under any judgment upon any collateral securing this Note shall not affect in any manner or to any extent the lien of any mortgage securing this Note upon, or any security interest in, such collateral, or any rights, remedies or powers of Payee under any of the Loan Documents, but such liens and such security interest, and such rights, remedies and powers of Payee, shall continue unimpaired as before.  The exercise by Payee of its rights and remedies and the entry of any judgment by Payee shall not adversely affect in any way the interest rates payable hereunder on any amounts due to Payee, but interest shall continue to accrue on such amounts at the Default

Case ID: 160303161

Rate specified herein.

(c) <u>Release.</u>  Maker agrees that Payee may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Loan Documents (and Maker hereby waives any notice of any of the foregoing), and hereby agrees that the Loan Documents may be amended, supplemented or modified by Payee and the other signatory parties and that Payee may resort to any guaranty or any collateral in such order and manner as it may think fit, or accept the assignment, substitution, exchange or pledge of any other collateral or guaranty in place of, or release for such consideration, or none, as it may require, all or any portion of any collateral or any guaranty, without in any way affecting the validity of the lien over or other security interest in the remainder of any such collateral (or the priority thereof or the position of any subordinate holder of any security interest with respect thereto), or any rights that it may have with respect to any other guaranty.  Any action taken by Payee pursuant to the foregoing shall in no way be construed as a wavier or release of any right or remedy of Payee, or of any Event of Default, or of any liability or obligation of Maker, under any of the Loan Documents.

(d) <u>Consent to Jurisdiction.</u>  Maker and each endorser agree that any action or proceeding against it, them or any of them to enforce this Note or the Loan Document may be commenced in any state or federal court in any county in the Commonwealth of Pennsylvania, and Maker waives personal service of Process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and shall confer personal jurisdiction if served by registered or certified mail to Maker at its address appearing herein.  Maker and each endorser agree that such service upon Maker or upon any endorser shall constitute service upon all of them, each hereby appointing the other their attorney-in-fact for the purpose of acceptance of such service.

**12.  <u>Waivers and Releases.</u>**  To the extent permitted by applicable law, Maker and each endorser, jointly and severally, hereby waive and release all errors, defects and imperfections in any proceedings instituted by Payee under the terms of this Note or the Loan Documents, as well as all benefits that might accrue to Maker by virtue of any present or future laws exempting any other property, real or personal, or any part of the proceeds arising from any sale of any such property, from attachment, levy or sale under execution, or providing for any stay of execution to be issued on any judgment recovered on this Note and any warrant contained herein or attached hereto or in any replevin or foreclosure proceeding, or otherwise providing for any valuation, appraisal or exemption from civil process or extension of time for payment.  Maker and each endorser, jointly and severally, further waive the right to inquisition on any real estate that may be levied upon under a judgment obtained by virtue hereof, and agrees that any real estate that may be levied upon pursuant to a judgment obtained by virtue hereof, on any writ of execution issued thereon, may be sold upon any such writ in whole or in part in any order desired by Payee.  Maker and each endorser consent to immediate execution of any judgment.

**13.  <u>Additional Waivers.</u>**  Maker and all endorsers, sureties and guarantors hereby jointly and severally waive presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note; any requirement for bonds, security or sureties required by statute, court rule or otherwise; any

Case ID: 160303161

demand for possession of any collateral securing payment of this Note prior to commencement of any suit; and all rights to recover attorney's fees and costs in the event Maker and/or any surety is successful in any action to remove or suspend a judgment entered by confession. They agree that the liability of each of them shall be unconditional, without regard to the liability of any other party, and shall not be affected in any manner by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Payee. Maker and all endorsers, sureties and guarantors consent to any and all extensions of time, renewals, waivers or modifications that may be granted by Payee with respect to the payment or other provisions of this Note, and to the release of the collateral securing this Note or any part thereof, with or without substitution, and agree that additional makers, endorsers, guarantors or sureties may become parties hereto without notice to them or affecting their liability hereunder.

**14.  Costs and Expenses.**  Maker shall pay upon demand all costs and expenses (including all amounts paid to accountants, real estate brokers and other advisors employed by Payee and/or for labor and materials), incurred by Payee in connection with the preparation of, and the exercise by Payee of any of its rights, remedies or powers under this Note or under the Loan Documents or with respect to any guaranty or any collateral, and any amount hereof not paid promptly following demands therefor shall be added to the principal sum hereunder and shall bear interest at the Default Rate set forth herein from the date of such demand until paid in full, and shall be secured by the Loan Documents and all other collateral securing this Note.

Maker shall pay the cost of any revenue, tax or other stamps or levies now or hereafter required by law regarding this Note and the Loan Documents; and if any taxes be imposed with respect to debts secured by mortgages, or with respect to notes evidencing debts so secured, maker shall pay to Payee upon demand the amount of such taxes and, to the extent permitted under applicable law, hereby waives any contrary provisions of any laws or rules of court now or hereafter in effect. This shall not apply to income or similar taxes.

**15.  Severability.**  If any provision of this Note is held to be invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Note shall remain in full force and effect and shall be liberally construed in favor of Payee in order to effect the provisions of this Note.

**16.  Limitation of Interest to Maximum Lawful Rate.**  In no event shall the rate of interest payable hereunder exceed the maximum rate of interest permitted to be charged by applicable law (including the choice of law rules) and any interest paid in excess of the permitted rate shall be refunded to Maker. Such refund shall be made by application of the excessive amount of interest paid against any sums outstanding and shall be applied in such order as Payee may determine. If the excessive amount of interest paid exceeds the sums outstanding, the portion exceeding the said sums outstanding shall be refunded in cash to Maker by Payee. Any such crediting or refund shall not cure or waiver any default by Maker hereunder. Maker agrees, however, that in determining whether or not any interest payable under this Note exceeds the highest rate permitted by law, any non-principal payment, including, without limitation, prepayment fees and late charges, shall be deemed to the extent permitted by law to be an expense, fee, premium or penalty rather than interest.

Island View Crossing II, L.P.                    Note 11.26.14                                                    5

Case ID: 160303161

**17. Limitation on Payee's Waivers.** Payee shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Payee, and then only to the extent specifically set forth in the writing. A waiver with respect to one event shall not be construed as continuing or as a bar to or waiver of any right or remedy with respect to a subsequent event.

**18. Applicable Law.** This instrument shall be governed by and construed according to the laws of the Commonwealth of Pennsylvania.

**19. No Joint Venture.** Nothing herein contained shall be construed to create a partnership or joint venture between Payee and Maker or render Payee in any way responsible for the debts or losses of Maker.

**20. Modifications.** The provisions of this Note may be changed only by a written agreement signed by Maker and Payee.

**21. Captions.** The cation or headings of the paragraphs in this Note are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Note.

**22. Construction.** Whenever used, the singular number shall include the plural, the plural the singular and the use of any gender shall be applicable to all genders. The words "Payee", "Maker", "endorser", "surety", or "guarantor" shall be deemed to include the respective heirs, personal representatives, successors and assigns of Payee, Maker, endorser, surety and guarantor. The term "Payee" shall be deemed to include the Payee specifically named herein as "Payee" or any subsequent holder or assignee of the Note.

**23. Waiver of Jury Trial.** Maker, after consultation with counsel, knowingly, voluntarily and irrevocably waives its rights to trial by jury in any action or proceeding commenced by Maker, payee or any other party in connection with this Note or any of the Loan Documents.

**IN WITNESS WHEREOF,** Maker, intending to be legally bound hereby, has caused this Note to be duly executed, under seal, the day and year first above written.

ISLAND VIEW CROSSING II, L.P.,                CO-BORROWERS:
A PA Limited Partnership                       ISLAND VIEW PROPERTIES, INC.
by: ISLAND VIEW PROPERTIES, INC.              A PA Corporation
    its General Partner

by:_____            by:_____
    Renato J. Gualtieri, President              Renato J. Gualtieri, President


                                        _____
                                         Renato J. Gualtieri, Individually


Island View Crossing II, L.P.          Note 11.26.14                        6

Case ID: 160303161

# Exhibit 4

Case ID: 160303161

## DEVELOPMENT CONSTRUCTION LOAN AGREEMENT

**THIS  DEVELOPMENT CONSTRUCTION LOAN AGREEMENT** (the "Agreement") is made this __26th__ day of __November__, **2014** by and between **Island View Crossing , L.P.** a PA Limited Partnership with address at One South State Street, Newtown, PA 18940 (the "Borrower") and **Prudential Savings Bank** with address at 1834 W. Oregon Avenue, Philadelphia, PA 19145-4725 (the "Bank").

### BACKGROUND

Borrower is now the owner in fee simple of a certain lot or piece of ground  situate and known as **1600 Radcliff Street, Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-27-119)** as more particularly described in Exhibit "A" attached hereto and made a part hereof (the "Real Property").  Borrower desires and intends to construct or cause to be constructed on the Real Property within the time hereinafter set forth in three phases Site Improvements (the "Improvements") in accordance with certain Plans and Specifications, copies of which have been signed by Borrower for identification purposes and deposited with the Bank (Phase One), the Plans and Specifications are made a part of this Agreement.  In Phase Two, Borrower intends to construct seventy three (73) single family dwellings (the "Houses and the Condominium and the Condominium") and in Phase Three, Ninety Six (96) Condominium Units (the "Condominium"), all as more fully set forth on the Island View Crossing II, L.P. proposed Residential Development Phasing Plan Exhibit dated March 13, 2014 prepared by Bohler Engineering (the "Plan"), the Houses and the Condominium and the Condominium and the Condominiums are to be constructed in accordance with certain Plans and Specifications, copies of which have been signed by Borrower and deposited with the Bank, the Houses and the Condominium and the Condominium to be in a Planned Unit Community created pursuant to the PA Uniform Planned Community Act to be known as "Island View."  Borrower desires to borrow from the Bank and Bank , subject to the terms and conditions set forth herein is prepared to lend to Borrower certain sums of money as more particularly described herein to finance the cost of construction of the Improvements, the Houses and the Condominium and certain other costs and expenses.

**NOW, THEREFORE**, in consideration of the premises, and of the mutual promises and undertakings of the parties set forth herein, and as an inducement for Bank to advance sums to Borrower, and with the intention of being legally bound hereby, the parties hereto agree as follows:

### SECTION 1. THE LOAN

**1.1 Amount and Term:** Bank shall lend to Borrower and Borrower shall borrow from Bank up to the aggregate sum of **Five Million Five Hundred Forty One Thousand Four Hundred Sixty Eight ($5,541,468.00) Dollars** (the "Loan") according to the terms and conditions set forth herein.  The proceeds of the Loan shall be advanced from time to time by the Bank solely towards the direct costs associated with the actual construction of the Site Improvements and the Houses and the Condominium  and certain other project costs in accordance with and subject to the terms and conditions set forth herein. Advances under the Loan shall be limited to, and shall not exceed, the amount budgeted for each category as set forth on Exhibit "B".  The Loan proceeds

Case ID: 160303161

shall be advanced in portions from time to time by the Bank for sixty (60) months from the date of this Agreement (the "Due Date"). Provided that Borrower not be in default of any of the covenants, conditions and terms of this Agreement, the Due Date, at the request of Borrower, may be extended for one additional period of six (6) months upon payment by Borrower of a fee for the extension of the Due Date of one half (.50%) percent of the outstanding balance of the loan, Borrower to pay all costs of preparation and recording of the extension agreement including Bank's attorney's fees. Borrower shall fund from other sources all construction costs for the Site Improvements and the Houses and the Condominium in excess of the loan amount.

**1.2**      **Interest and Payment.** Advances under this Agreement shall bear interest and shall be repaid as provided in the Note (as hereafter defined), as such Note may be amended from time to time upon the mutual consent of the parties thereto.

**1.3**      **Loan Fee.** At closing on the purchase of the Real Property, Borrower shall pay to Bank a closing fee of Fifty Five Thousand Four Hundred Fourteen Dollars and Sixty Eight cents ($55,414.68) Dollars. In addition, Borrower shall reimburse Bank for all expenses it incurred in underwriting the loan, including, but not limited to appraisal fees, credit report fees, legal fees incurred in connection with drafting the commitment, all of the above being considered as earned in full at closing of the loan. Such fees shall be in addition to the interest and other amounts which Borrower is required to pay under the Loan Documents (as hereafter defined).

## 1.4   Loan Documents.

(a)      Note. Borrower's obligation to repay the Loan shall be evidenced by Note of even date herewith of Borrower, Island View Properties, Inc., its General Partner and Renato J. Gualtieri in the principal amount of Five Million Five Hundred Forty One Thousand Four Hundred Sixty Eight ($5,541,468.00) Dollars (the "Note") providing for the payment of principal, together with interest thereon at the rate set forth therein, in such installments, at such times and according to such terms as set forth therein.

(b)      Security for Note. The Note and all of the obligations of Borrower and all other parties thereunder and hereunder shall be and are secured by the following, which Borrower shall execute and deliver to Bank or cause to be executed and delivered to Bank, as the case may be, and as applicable:

(i)   A second lien priority Open-End Mortgage and Security Agreement under and subject to the lien of a certain first mortgage to the Redevelopment Authority of Bucks County securing an aggregate amount of Five Million Five Hundred Forty One Thousand Four Hundred Sixty Eight ($5,541,468.00) Dollars ("Mortgage") covering the Real Property, the Improvements, the Houses and the Condominium and all building materials, furniture, furnishings, appliances, plumbing heating, ventilating and air-conditioning systems, fixtures, machinery, equipment, contracts, permits, books, records, and personal property necessary or incidental to the construction or general operation and maintenance of the Real Property, the Improvements, the Houses and the Condominium and all renewals and replacements thereof or additions thereto (collectively, the "Mortgaged Property"). Pursuant to such Mortgage, Borrower shall grant to Bank, inter alia, a first priority security interest and lien which with the recording of the financing

Case ID: 160303161

statements referred to in Subsection 1.4 (b) (ii) below shall constitute a perfected security interest in all such building materials, contracts, permits, EDUs, furniture, furnishings, appliances, plumbing, heating, ventilating, and air-conditioning systems, fixtures, machinery, equipment, books, records and personal property owned or hereafter acquired by Borrower and used or useful in connection with the Mortgage Property and/or the Improvements and Houses and the Condominium and the cash and non-cash proceeds thereof.

(ii) Two (2) UCC-1 Financing Statements from Borrower to Bank evidencing the security interests referred to in Subsection 1.4 (b) (I) above, to be filed with the Office of the Recorder of Deeds of Bucks County, and the Secretary of State of the Commonwealth of Pennsylvania.

(iii) A first lien priority assignment of and security interests in all of Borrower's rights under all existing or future leases or agreements of sale of the Mortgaged Property or any portion thereof (including deposit monies thereunder) and the proceeds thereof.

(iv) A first lien priority assignment of all of Borrower's right, title and interest in and to all agreements for the furnishing of labor and/or materials in connection with the construction of the Improvements, the Houses and the Condominium, including, without limitation, all Agreements between the Borrower and the Contractors (collectively, the "Construction Agreements").

(v) A first lien priority assignment of all of the Borrower's right, title and interest in and to all agreements for the furnishing of architectural and/or design services in connection with the development and construction of the Improvements, the Houses and the Condominium.

(vi) A first lien priority assignment of all of Borrower's right, title and interest in and to all licenses, permits, approvals, authorizations, consents and other agreements and orders pertaining to the Mortgaged Property or relating to the construction of the Improvements, in and to all deposits, letters of credit or other property pledged or delivered pursuant thereto and all sewer capacity and sewer hookup rights with respect to the Mortgaged Property.

(vii) A first lien priority assignment of all of Borrower's right, title and interest in and to the Plans and Specifications and all other agreements in any way affecting or relating to the construction of the Improvements and the house or the operation and use of the Real Property.

(viii) A first priority lien and security interest in all deposits, funds, collateral, documents or agreements granted, pledged or assigned to or held by the Bank, in any capacity, whether directly or indirectly as security for any existing or future indebtedness of any kind, whether direct or indirect secured or unsecured, of the Borrower and/or any Co-Borrower, to the Bank or pursuant to any Loan or indebtedness in which the Bank is a participating lender to Borrower.

(Ix) A lien and security interest in all deposits, funds, collateral, documents or agreements granted, pledged or assigned to or held by Bank, in any capacity, whether directly or indirectly, as security for any existing or future indebtedness of any kind, whether direct or indirect, secured or unsecured, of Borrower and/or any, Co-Borrowers, to Bank or pursuant to any Loan or indebtedness in which Bank is a participating lender and in all other assets of Borrower or Co-

Case ID: 160303161

Borrowers in which Bank now has or may at any time hereafter obtain a line, mortgage or security interest for any reason.

(x) The assignment by AmeriCorp Homes, Inc. as owner of a certain $3,000,000.00 Term Life Insurance Policy No. 206127247 US issued by Met Life Investors, USA Insurance Company on the life of Renato J. Gualtieri.

(c)     Additional Documents; Filing Fees.  Borrower shall execute and delivery such additional documents, instruments, agreements, guaranties, assignments or security as the Bank shall require in order to perfect Bank's interest in any of the foregoing property on which Bank deems necessary to adequately secure the Loans.  This Agreement, the Note and all of the documents and instruments referred to in Subsection 1.4 (b) above and all documents collateral thereto (all of which, together with this Agreement, are herein collectively referred to as the "Loan Documents") shall be in form and substance satisfactory to Bank and Bank's counsel, and all necessary filing and recording fees with respect thereto shall be paid by Borrower.

**1.5   Partial Releases.**

(A)  At Borrower's cost and expense, Bank agrees to execute, from time to time, a release of mortgage, in form and substance acceptable to Bank in its sole discretion, of any or all Houses and the Condominium comprising the Real Property upon the written request of Borrower, provided that: (a) no event of default shall exist hereunder or under any of the Loan Documents; (b) the remaining unreleased portion of the Real Property complies with all representations and warranties of Borrower contained herein or in any of the Loan Documents; (c) on the sale and settlement of each House, Borrower pay the Bank One Hundred Sixty Thousand Five Hundred ($160,500.00) Dollars, Thirty Thousand Five Hundred ($30,500.00) of which shall be applied by the Bank  in reduction of advances by the Bank to the Borrower for Site Improvement costs, One Hundred Thirty Thousand ($130,000.00) Dollars  in reduction of advances by the Bank to the Borrower for the construction of the Houses and on the sale and settlement of each Condominium unit One Hundred Thirty Thousand Five Hundred ($130,500.00) Dollars, Thirty Five Thousand ($35,000.00) Dollars of which shall be applied by the Bank in reduction of advances to the Borrower for Site Improvement costs and One Hundred Thousand ($100,000.00) Dollars in reduction of advances for the construction of the Condominium unit to be released from the lien (d) on the sale and settlement of the last Condominium all unpaid principal, interest and any other unpaid Bank costs and charges; (e) all costs incident to the preparation and recording of the release documents shall be paid by Borrower; (f) Bank shall have approved the agreement of sale, and the settlement sheet executed and delivered in respect of the sale of any such House and Condominium and (g) Borrower shall give Bank at least ten (10) days notice of the settlement of the sale of the House or Condominium to be released.

(B) In addition to the payments required by Subsection (A) above, on the settlement on the sale of each of the first 25 houses, the Borrower shall pay LAVA Financial Twenty Five Thousand ($25,000.000) Dollars, on the sale of each of the first 128 houses and Condominium units, the Borrower shall pay the Bank Ten Thousand ($10,000.00) Dollars in reduction of a certain $1,400,000.00 Dollar mortgage loan by the Bank to Island View, L.P. which is subordinated to the loan which is the subject of this Agreement.  Upon settlement on the sale of each of the 21st house and/or Condominium to the 128th, the Borrower shall pay the Bank Thirty Five Thousand

Case ID: 160303161

($35,000.00) Dollars in reduction of a certain mortgage loan known as Steeple Run. On settlement on the sale of each of the 21st house and/or Condominium to the 169th, Borrower shall pay the Bank Ten Thousand ($10,000.00) Dollars in reduction of a certain mortgage loan known as Calnshire Estates and on settlement on the sale of each of the 69th house and/or Condominium unit to the 169th, the Borrower shall pay Ten Thousand ($10,000.00) on account of certain past due accounts payable. On settlement on the sale of each of the 21st house and/or Condominium unit to the 169th, Borrower shall deposit with the Bank Ten Thousand ($10,000.00) Dollars to replenish the Interest Reserve.

(C) In addition to the payments required by Subsections A and B above, upon settlement on the sale of each of the 21st house and/or Condominium to the 169th, Borrower shall pay the Authority Twelve Thousand Three Hundred Fifty ($12,350.00) Dollars for release of the house and/or Condominium unit from the lien of the Authority's mortgage.

**1.6    Use of Loan Proceeds, Re-Advances.** Up to Eighty Five Thousand ($85,000.00) of the loan proceeds shall be released by the Bank to the Borrower to be used by the Borrower for payment of closing costs, including fees for title insurance, attorney's filing fees and other settlement expenses. Five Hundred Thousand ($500,00.00) Dollars for interest reserve, Three Million Three Hundred Ninety Six Thousand Four Hundred Sixty Eight ($3,396,468.00) Dollars to pay for the cost of construction of Site Improvements will be retained by the Bank and disbursed to the Borrower during construction. One Million Five Hundred Sixty Thousand ($1,560,000.00) Dollars will be retained by the Bank and disbursed to Borrower to pay for the costs of construction of Houses or Condominiums, no more than One Hundred Thirty Thousand ($130,000.00) Dollars to be advanced by the Bank for the cost of construction of any one House and One Million Five Hundred Ninety Thousand One Hundred Fifty ($1,590,150.00) Dollars for the construction of any one of the six, sixteen (16) unit Condominium buildings. As each House is sold, settled and released from the lien of the Mortgage as set forth in Section 1.5 above, the Bank will re-advance up to One Hundred Thirty Thousand ($130,000.00) Dollars per House in stages a set forth on Exhibit "C" for the construction of an additional House provided that at no time the total advances by the Bank for the cost of construction of the Houses and Site Improvements exceed $5,541,468.00. The Bank will also re-advance up to One Million Six  Hundred Thousand ($1,600,000) Dollars for construction of each of the six  Condominium buildings in stages.

## SECTION 2. BORROWER'S REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Bank (which representations and warranties shall survive until the Loan has been paid and satisfied in full and the Loan Documents have been terminated) that:

**2.1    Valid Organization.** Borrower is a Pennsylvania Limited Partnership whose general partner is Island View Properties, Inc.  and whose limited partner is Renato J.  Gualtieri. Both the Limited Partnership and the General Partner are  duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and have full  power and authority to carry on their business as it is now being conducted. Borrower has full power and authority to own, operate and develop the Real Property in the Commonwealth of Pennsylvania. True and correct copies of Borrower's Certificate of Limited Partnership and Partnership, and Articles of

Case ID: 160303161

Incorporation of Corporate General Partner have been certified by Borrower and delivered to Bank, and the same are in full force and effect as of the date of this Agreement.

**2.2      Title to Real Property.** Borrower has or will at closing have good and marketable title to an indefeasible fee simple estate in the Real Property, subject to no lien, charge or encumbrance except as existing in favor of Bank with respect to the Mortgage (as defined hereinbelow) except for a certain Two Million Five Hundred Thousand ($2,500,000.00) Dollar Mortgage in favor of the Redevelopment Authority of Bucks County (the "Authority") subordinated to the Bank's loan in accordance with a certain Cross Subordination Agreement and certain Collateral Mortgages in favor of the Bank which are additional security for a loan by the Bank to Steeple Run, L.P. and Calnshire Estates, LLC respectively and such as are listed as exceptions to title or exclusions from coverage in the title insurance policy being issued by Attleboro Abstract Company, as agent for Chicago Title Insurance Company ("Title Company") to Bank concurrently with the recording of the Mortgage.

**2.3      Power and Authority; Authorization; Enforceability.** Borrower, and Co-Borrowers have full power, authority and legal right to execute, deliver and comply with each of the Loan Documents and any other documents or instruments relating to the Loan to be executed. All actions of Borrower and the Co-Borrowers and all other authorizations necessary or appropriate for the execution and delivery of and compliance with the Loan Documents, and such other documents and instruments have been taken or obtained. The Loan Documents and such other documents and instruments shall constitute the valid and legally binding obligations of Borrower and Co-Borrowers enforceable against them in accordance with their respective terms.

**2.4      Governmental Approval of Loan Documents.** No consent, approval or other authorization of or by any court, administrative agency or other governmental authority is required in connection with Borrower's and/or any Co-Borrowers' execution and delivery of or compliance with any of the Loan Documents or any other document or instrument relating to the Loans.

**2.5      Conflict; Breach.** Neither Borrower's nor any Co-Borrowers' execution and delivery of and compliance with the Loan Documents and any other documents and instruments relating to the Loan will conflict with or result in a breach of; (a) any applicable law, judgment, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority; or (b) the Limited Partnership Agreements of Island View Crossing II, L.P.; or (c) any agreement or other document or instrument to which Borrower or any Co-Borrower is a party or by which any of them are bound, and such action by Borrower and Co-Borrower will not result in the creation or imposition of any lien, charge or encumbrance upon any property of Borrower or any Co-Borrower in favor of anyone other than Bank.

**2.6      Litigation.** There is no action, suit or proceeding pending or threatened against or affecting the Real Property, Borrower or any Co-Borrower before or by any court, administrative agency or other governmental authority, or which brings into question the validity of the transactions contemplated hereby.

**2.7      Financial Statements:** All financial statements of Borrower and Co-Borrowers which have been furnished to Bank fairly and accurately reflect the financial condition of the

Case ID: 160303161

Borrower and each Co-Borrower, as the case may be, as of and for the time periods set forth therein, and there has been no material adverse change in the financial condition of Borrower or such Co-Borrowers since the latest dates thereof.

**2.8** **Tax Returns.** Any and all federal, state and local income tax returns required to have been filed by Borrower and each Co-Borrower have been filed, and all taxes reflected upon any such tax returns, all past due taxes, interest and penalties and all estimated payments required to be paid have been paid.  Such tax returns are complete and accurate in all respects.

**2.9** **Title to Personal Property.** All personal property with respect to which Borrower has granted to Bank a security interest pursuant to any of the Loan Documents is owned by Borrower free and clear of all liens, encumbrances and security interests except those in favor of Bank.

**2.10** **Governmental Approval of Construction of Improvements.** All necessary approvals from governmental or quasi-governmental authorities having jurisdiction over the Real Property and the construction of the Improvements including, but not limited to, street openings or closings, zoning or use permits, variances (or special exceptions, zoning reclassifications, foundation permits, sewer permits, building permits, subdivision approvals, earth moving permits, environmental permits and approvals, historic certifications and approvals of fire underwriters, have been obtained, are in full force and effect, are final and the time for appeal from the granting of all such permits and approvals has run with no appeal having been taken therefrom.  The current and proposed use of the Real Property and Improvements complies with all subdivision, zoning, building, environmental and other applicable laws, ordinances, rules and regulations.  The subdivision agreement with Bristol Borough, all other governmental agencies having jurisdiction and the agreement with Aqua PA are in full force and effect and Borrower is not in default or violation of any of the provisions of the said agreements.

**2.11** **Utility Services.** All utility services, including water, electric, gas and telephone, and all storm and sanitary sewer drainage facilities are available on or at the boundary of the Real Property or will be available as part of the construction of the Improvements for use by Borrower at competitive rates and are of sufficient capacity to adequately serve the Improvements, or Borrower has binding written agreements for the provision of all of such utilities in form and content satisfactory to Bank.

**2.12** **Contracts.** Neither Borrower nor the General Contractor has executed or is a party to any contract or agreement of any kind which could give rise to a right by the other party thereto to acquire a lien against the Real Property or the Improvements, The contract with the General Contractor is in full force and effect and neither Borrower nor any other party thereto is in default thereunder.

**2.13** **Plans and Specifications**. The Plans and Specifications are identical in all respects to those on which were based all approvals from governmental and quasi-governmental authorities having jurisdiction over the Real Property and construction of the Improvements.

**2.14** **Schedule of Site Improvement Costs.** Exhibit "B" and Exhibit "C" attached hereto

Case ID: 160303161

and made a part hereof represents, inter alia: (i) the amounts which will be due from Borrower to subcontractors and materialmen in connection with each and every category of work represented by the services and materials to be supplied; and (ii) the total cost of the Site Improvements including demolition, architect and engineering costs, interest reserves, administrative and legal costs and labor and management costs and (iii) the cost of construction of each house and each condominium.

**2.15. Bankruptcy; Insolvency.** Neither Borrower, nor any Co-Borrower, as the case may be, has applied for or consented to the appointment of a receiver, trustee or liquidator for, as the case may be, itself or themselves or any of its or their property, admitted in writing its or their inability to pay its or their debts as they mature, made a general assignment for the benefit of creditors, been adjudicated a bankruptcy or insolvent or filed a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it or them in any proceeding under any such law, and no action has been taken by it or them for the purpose of effecting any of the foregoing, No order, judgment or decree has been entered by any court of competent jurisdiction approving a petition seeking reorganization of all or a substantial part of the assets of Borrower or any Co-Borrower or appointing a receiver, sequestrator, trustee or liquidator or any of its or their property.

**2.16 Agreements of Sale.** Exhibit "D" attached hereto is an accurate and complete list identifying all agreements of sale currently executed and in effect for any of the Houses and the Condominium (the "Existing Agreements of Sale") setting forth: (a) the buyer's name and address; (b) the date of the agreement of sale; (c) the house identification; (d) the purchase price (e) the deposit amount; and (f) the completion date for the house. Borrower has delivered to Bank copies of all Existing Agreements of Sale, together with all amendments and modifications thereto,

**2.17 Licenses.** Borrower and its employees, servants and agents have all licenses, registrations and other authority as may be necessary to enable them to perform all services and business which they have agreed to perform in any state, municipality or other jurisdiction.

**2.18 General Contractor.** Borrower has or will engage AMCORP IVC ("AMCORP") as the general contractor for construction of the Improvements and Houses and the Condominium on the Real Property, all other contractors to be subcontractors of AMCORP. The agreement between Borrower and AMCORP shall be assigned to Bank and shall provide that in the event of default by Borrower, the general contractor, if requested by the Bank, shall continue with the construction, the price for completion being equal to the undistributed portion of the construction funds designated for the improvements and the Houses and the Condominium.

## SECTION 3. BORROWER'S COVENANTS

Borrower hereby covenants and agrees that, until the Loan has been paid and satisfied in full and the Loan Documents have been terminated:

**3.1 Commencement and Completion of Construction.** Borrower shall commence the

Case ID: 160303161

demolition and construction of the Improvements in accordance with the Plans and Specifications promptly but in any event no later than thirty (30) days after the execution of this Agreement and shall proceed diligently, employing sufficient workmen and supply sufficient materials for that purpose, so that construction of the Improvements (except Houses and the Condominium not commenced) shall be completed and ready for occupancy by no later than the earlier of (a) the date of completion set forth in the applicable Agreement of Sale, or (b) the Due Date ("Completion Date"), which Completion Date is of the essence of this Agreement. For purposes of this Agreement, construction of the Improvements and the Houses and the Condominium shall be deemed completed only when: (i) (A) the physical construction of the Site Improvements has been completed in strict accordance with the Plans and Specifications, as the same may have been amended and supplemented from time to time with the written approval of Bank and any governmental authorities having jurisdiction; (B) all utilities serving the Real Property have been connected and are operating; and (C) the Houses and the Condominium are ready for occupancy for the purposes for which designed; (ii) a final certificate of occupancy (or its equivalent) shall have been issued for the Houses and the Condominium by the Borough of Bristol; (iii) certificates of inspection and approval shall have been issued by all insurance bureaus and governmental authorities whose certificates or approvals are required for Borrower to operate the improvements for the purposes for which designed; (iv) Bank shall have received a satisfactory as-built survey; (v) Bank shall have completed an inspection of the Site Improvements and/or the Houses and the Condominium showing construction satisfactory to it; and (vii) Bank shall have received releases executed by each Contractor, subcontractor, materialman and other persons performing work on the Site Improvements and the Houses and the Condominium, in form and content satisfactory to Bank, at its sole discretion.

**3.2  Construction in Accordance with Plans and Specifications and with Applicable Laws.** The construction of the Site Improvements and the Houses and the Condominium shall be performed substantially in accordance with the Plans and Specifications; with all applicable statutes, laws and ordinances; with the rules, regulations and requirements of all boards, agencies and departments, governmental or otherwise, all utility companies having jurisdiction over the Mortgaged Property or the Improvements, and with all directions, rules and regulations of any fire marshal, health officer, building inspector or other officer of every governmental agency nor or hereafter acquiring jurisdiction; with requirements of fire underwriters; and with all of the requirements set forth in any permanent Loan commitment. The Plans and Specifications shall not be amended without the prior written consent of Bank and such other persons or entities as Bank shall request.

**3.3  Contracts.** Borrower shall furnish to Bank copies of all contracts or agreements which Borrower will enter into with all Contractors prior to execution of such contracts or agreements. The agreements with the Contractors are subject to the approval of Bank as to form and content. Each of such agreements shall be modified as Bank shall request and shall be assigned to Bank by assignment in form and substance approved by Bank. Each of such agreements shall contain covenants or stipulations on the part of the Contractor thereunder, in form satisfactory to Bank: (a) waiving the right of each such Contractor and all subcontractors, laborers, materialmen and other parties claiming under or through them to file and maintain any mechanics' lien, Notice of Intention (or claim against the Real Property or Improvements;  (b) that the agreement shall remain in full force and effect notwithstanding the occurrence of an event of default hereunder;

Case ID: 160303161

and (c) that in the event of default by Borrower the contractor shall complete the work in accordance with the original contract for the then undistributed portion of the escrow fund set forth in Exhibit "C" to be paid out from time to time.

**3.4  Removal of Nonconforming Materials.**  Borrower shall remove or cause to be removed from the Real Property all portions of the Improvements and all materials which fail to substantially conform with the Plans and Specifications, and Borrower shall replace at its own expense all portions of the Improvements and other materials damaged by such removal.

**3.5  Maintenance of Construction Site.**  Borrower shall cause the Real Property and the Improvements to be kept in good condition and repair, maintain the same in a clean and orderly manner, make all necessary replacements and operate the same properly, efficiently and in compliance with all pertinent laws and regulations respecting health, safety and the conduct of similar operations, and maintain such insurance coverage as the Bank may require with respect to the Real Property, Improvements and the construction thereof.

**3.6  Compliance: As-Built Survey.**  The Improvements when erected shall not violate any applicable public or private restrictions.  Borrower shall deliver to Bank, upon completion of the pouring of the foundation of the Houses and the Condominium, a certification by a registered engineer showing that the foundation lies entirely within the property lines of the lot on which the house is to be erected and within all applicable building set back lines, and that the foundation does not encroach upon any easements or rights of way.

**3.7  Certificate of Occupancy.**  On or before the completion date under each Acceptable Agreement, Borrower shall deliver to the Bank a final certificate of occupancy (or its equivalent) issued by the governmental authority having jurisdiction over the Real Property and Improvements which confirms that construction of the applicable house has been completed in accordance with all applicable requirements.

**3.8  Amendments of Documents.**  Borrower shall not amend or permit to be amended the Plans and Specifications, any agreements with the Contractors, any agreements with any utilities or any other document or instrument referred to in any of the Loan Documents without in each case obtaining the prior written approval of the Bank, which consent will not be unreasonably withheld.

**3.9  Contractors.**  Borrower shall not enter into an agreement with, retain the services of, or continue to employ any contractor, subcontractor or materialmen who may be objectionable to the Bank.

**3.10  Leases, Agreements of Sale.**

(a)        Borrower shall not lease or agree to sell any portion of the Real Property or Improvements without the prior written approval of Bank as to the form and content of such lease or agreement of sale, including, without limitation, the term and rental for any lease and the sale price for any agreement of sale which consent shall not be unreasonably withheld and will be based, inter alia, on the Bank's interest in maintaining the value of unsold Houses and the Condominium and the Condominium so that upon release of the final house to be sold, the loan

Case ID: 160303161

will be paid in full.

(b)      Borrower shall furnish to Bank a complete list of all leases and agreements of sale of the Real Property or the Improvements in such reasonable detail as may be requested by Bank. Borrower shall deliver to Bank executed or certified copies of all leases and agreements of sale together with copies of correspondence and memoranda between Borrower and tenants or purchasers thereunder setting forth the contractual arrangements between them. Borrower warrants and represents to Bank that neither the Real Property nor the Improvements are subject to any lease, rental agreement or agreement of sale as of the date hereof, except as disclosed to and approved by Bank in writing.

(c)      In the event of default under this Agreement or under any of the Loan Documents, Bank may effect new leases or agreements of sale, cancel or surrender existing leases or agreements of sale, alter and amend the terms of and renew existing leases or agreements of sale, evict tenants and make concessions to tenants or purchasers, and Bank may apply any rents and other amounts collected to delinquencies of interest and principal and any other amounts evidenced by the Note or secured by the Mortgage, and pay any and all charges, costs and expenses of management, operation and maintenance of the Real Property. Without limiting the generality of the foregoing, Bank may pay for repairs and upkeep and for the operation, protection and preservation of the Real Property or the Improvements, wages, and payroll taxes and other management costs and expenses (including payments in this regard to itself), real estate taxes and assessments, water, sewer and similar charges, insurance and workmen's compensation premiums, ground rents, real estate commissions, attorneys' fees and costs and court costs. Bank may make the foregoing application and payments, or make some and omit others, in any order as it sees fit. All of the foregoing powers herein granted to Bank shall be liberally construed. Bank need not expend its own funds in the exercise of such powers, but if it does, such amounts shall be considered as obligatory advances for and on behalf of Borrower secured by this Agreement and the Loan Documents. Any amounts so advanced shall bear interest at the rate to be applied under the Notes after an Event of Default.

(d)      Borrower agrees to faithfully observe and perform all of the obligations and agreements imposed upon it as lessor under any lease or as seller under any agreement of sale and Bank will not be deemed in any manner to have assumed the same, Borrower agrees to indemnify and to hold harmless Bank of, from and against any and all liability, loss or damage which it may or might incur by reason of any claims or demands against it based on its alleged assumption of Borrower's duty and obligation to perform and discharge the terms, covenants and agreements in any such lease or agreement of sale.

(e)      Nothing herein contained shall be construed as making Bank a mortgagee in possession, or as constituting a waiver or suspension by Bank of its right to enforce payment of the debt under the terms of the Note and the Mortgage.

**3.11   Additional Financing.** The Borrower shall not be permitted to obtain any other loans or other financing, whether or not secured by an encumbrance, lien, mortgage, security interest or other interest in the Mortgaged Property or the other Collateral, without the Bank's prior written consent, which consent the Bank reserves the right to withhold in its sole discretion.

Case ID: 160303161

**3.12**  **Status of Title to Property**.  Except for leases or agreements of sale approved by the Bank in accordance with the terms of Section 3.10 above, Borrower shall not offer for sale, sell or otherwise transfer control or ownership of the Real Property, the Improvements or any part thereof, directly or indirectly, voluntarily or involuntarily, except in accordance with the terms hereof and without the Bank's prior written consent, which consent the Bank reserves the right to withhold in its sole discretion, Borrower shall not create or permit to exist any assignment, pledge, lien, encumbrance or security interest in favor of any third party with respect to the Real Property, Improvements or any item of property, whether or not a fixture, installed on the Real Property or stored thereat without the Bank's prior written consent, which consent the Bank reserves the right to withhold in its sole discretion. Borrower shall keep all such property free from any such lien or security interest other than those created in favor of the Bank and liens for taxes not yet due and payable. In general, Borrower shall keep the title to the Real Property and the Improvements free of any matter which would, at the time of completion of the Improvements, prevent any title insurance company from certifying the lien of any mortgage to be executed in favor of a permanent lender or other mortgagee in substitution for or in payment of the Loan, as other than a good and valid first lien upon the Real Property and the Improvements.

**3.13**  **Mechanic's Liens and Other Encumbrances**. Borrower shall fully pay and discharge all claims for work done and materials and services furnished and shall take all other steps to forestall the assertion of claims or liens therefor against the Improvements, Mortgaged Property or other Collateral.  Borrower shall pay or discharge any mechanics' liens or other encumbrances which may be filed or recorded against the Real Property or Improvements within ten (10) days after they receive notice thereof, from the Bank or otherwise.  In the event that Borrower shall fail to pay or discharge any such mechanics' lien or other encumbrance, the Bank, in addition to such other rights as may be available to it, may pay and discharge such mechanics' lien or other encumbrance or deposit in escrow an amount sufficient to do so, and the amount so paid or deposited shall be treated as an advance of the Loans from the Bank to Borrower. Borrower shall not permit any materials, appliances or other property delivered to the Real Property for the purpose of being incorporated in the construction or used in the Improvements to be subject to any security interests, liens or other encumbrances, except as agreed to by Bank in writing, Borrower shall fully pay and discharge all proper claims for labor done and material and services furnished and shall take all other steps to forestall the assertion of claims of liens against the Improvements or the Real Property.

**3.14**  **Financial Statements**.
(a)     Borrower's Annual Statements, Borrower shall furnish or cause to be furnished to Bank within ninety (90) days after the end of each fiscal year its annual financial statements for such fiscal year.  All such financial statements (i) shall be prepared by independent certified public accountants on a review basis, (ii) shall be prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied, (iii) shall be in a form satisfactory to Bank, and (iv) shall be certified by the Chief Financial Officer of Borrower.

(b)     Co-Borrowers' Annual Statements.  Each Co-Borrower shall furnish to Bank on or before June 1 of each year annual financial statements of such Co-Borrower and of each entity (other than Borrower) in Co-Borrowers  have a controlling interest in form and in content acceptable to the Bank and certified by such Co-Borrower to be true, correct and complete, Such

Case ID: 160303161

financial statements shall contain, without limitation, a statement showing all contingent liabilities of each Co-Borrower and entity.

(c)   Other Financial Information.  Borrower shall also deliver or cause to be delivered to Bank such other information related to the financial condition of Borrower or any Co-Borrower or the Mortgaged Property as Bank may require from time to time, in form and substance satisfactory to Bank.

**3.15   Tax Returns.**  Borrower and Co-Borrowers shall furnish or cause to be furnished to Bank at or prior to execution and delivery of this Agreement, copies of Borrower's and Co-Borrowers' 2013 income tax returns, each of which shall be certified by the preparer as true, correct and complete copies of such returns actually filed, and shall furnish or cause to be furnished to Bank within ten (10) days after the applicable filing date or any extension thereof (provided that the Borrower or the applicable Co-Borrower shall have timely filed a request for extension for the filing of such return and a copy of such request was delivered to Bank within ten (10) days after the filing thereof), copies of Borrower's and each Co-Borrower's income tax returns for each calendar year of the loan term, all of which returns shall be certified by the preparer as true, correct and complete copies of such returns as actually filed.

**3.16   Books and Records.**  Borrower shall keep complete and accurate books and records in accordance with generally accepted accounting principles consistently applied, Borrower shall furnish to the Bank all such written information relating to its affairs as may be requested by the Bank from time to time.

**3.17   Audit.**  Bank shall have the right at any time and from time to time to audit the books and records of Borrower, the Co-Borrowers and Contractor.  Borrower, the Co-Borrowers and the Contractor shall be obligated to make available for any such audit all books, records and other information that Bank may request for such purpose and to cooperate fully with Bank in connection therewith.

**3.18   Use of Proceeds.**  Borrower shall use the Loan proceeds solely for the payment of costs itemized in Exhibit "B" for the specific site improvements, house construction costs and condominium construction costs detailed in Exhibit "C", as the same may be amended from time to time with the prior written consent of Bank or with the consent of the Bank, to pay off any mortgage or other lien which, if not paid off, could or would be a lien senior to the lien of the Bank's mortgage.

**3.19   Changed Circumstances.**  Borrower shall promptly notify Bank of any change in any fact or circumstance represented or warranted by Borrower herein and in any other documents furnished to Bank in connection with this Agreement.

**3.20   Bank's Costs.**  Borrower shall pay or reimburse Bank for all costs and expenses, including, without limitation, all costs incurred by Bank in engaging and maintaining the services of any consulting architect until completion of the Improvements and all attorneys' fees and costs and fees and costs of any accountant, consultants, engineers, surveyors or architects as hereafter provided, incurred by Bank in connection with the preparation, review, modification and

Case ID: 160303161

enforcement of the Loan Documents and the administration and collection of the Loan.

**3.21  Evidence of Payment of Premiums.**  All premiums and other charges relating to all insurance required hereunder shall be paid by Borrower for such periods as Bank may require and evidence thereof shall be delivered to Bank promptly upon payment of such premiums and charges.

**3.22  Other Businesses.**  Borrower shall not engage in any other business, venture or undertaking except for businesses, ventures or undertakings similar in nature to those in which Borrower is presently engaged.

**3.23  Guarantees.**  Without the express prior written consent of Bank, neither Borrower nor Co-Borrowers shall assume, guarantee, endorse or otherwise become contingently liable upon, or responsible for, any obligations of others, except to endorse checks or drafts in the ordinary course of business.

**3.24  Escrow Deposits.**  Borrower shall deposit with Bank, in an escrow account, all monies collected as security or escrow deposits unless prohibited by law.

**3.25  Sale or Issuance of Ownership Interests.**  No shares in Borrower, nor AMCORP shall be issued, sold, transferred, assigned or encumbered without the prior written consent of Bank, which consent Bank reserves the right to withhold in its sole discretion.

**3.26  Distributions.**  In the event that Borrower is other than an "S" corporation, no dividends or distributions shall be paid or declared by Borrower on account of any of its shares or ownership interests without Bank's prior consent.

**3.27  Declarations, Easements and Restrictions.**  All declarations, easements and restrictions in any way affecting the Real Property or Improvements to be recorded in respect of the Real Property, shall be subject to prior written approval and consent of Bank.  Borrower hereby agrees to provide Bank with copies of any proposed declarations, easements or restrictions at least twenty (20) days prior to the anticipated date of execution and filing of such declarations, easements or restrictions.

**3.28  Compliance with Laws and Agreements.**  Borrower shall comply with all federal, state and local statutes, regulations and agreements applicable to the Real Property and/or the construction of the Improvements.  Borrower shall comply with all contracts, leases, agreements and restrictions pertaining to the Real Property and/or the Improvements.

**3.29  Publicity Signs.**  Subject to the applicable zoning ordinances, Bank may, at its option, publicize its participation in the financing of the Improvements by means and media determined by Bank in its sole discretion.  If the Borrower or any other party connected with the project should erect a sign advertising the project, the name of the Bank, as the construction lender, shall be prominently displayed on the sign.  In the absence of the sign advertising the development, the Bank may erect its own sign which will provide information as to the source of construction financing.  Further, Borrower agrees to identify Bank as the party providing the financing for the construction of the Improvements in any publicity issued by Borrower regarding the Mortgaged

Case ID: 160303161

Property.

**3.30  Permanent Mortgages on Houses and the Condominium.** Borrower will not make the sale of individual Houses and the Condominium contingent upon the Buyer obtaining financing from any particular source; however, should the Buyer ask the Borrower for a recommendation of a mortgage lender, Borrower shall inform the Buyer that Prudential Savings Bank is familiar with the project and is providing financing to home buyers who purchases homes in this particular project.

**3.31  Insurance.**  Borrower shall at all times maintain or cause to be maintained such insurance coverage as Bank may from time to time require.  Such insurance policies shall be in such amounts and shall be issued by companies satisfactory to Bank and shall contain the agreement of the insurer to give Bank not less than thirty (30) days written notice prior to cancellation or material change in coverage and confirmation that no cancellation or change in coverage made in the absence of such notice shall be effective as to Bank.  With respect to all casualty loss insurance for the Mortgaged Property, Bank shall be named as insured mortgagee with a standard mortgagee's endorsement and with respect to liability insurance, Bank shall be named as an additional insured, Borrower shall not take out any insurance with respect to the Mortgaged Property without having Bank named as insured mortgagee (or additional insured, as applicable).  The proceeds of any insurance shall be applied by Bank as provided in the Mortgage.

Borrower shall deliver to Bank the insurance policies (or, if permitted by Bank, certificates of insurance) evidencing such required insurance coverage and any renewals thereof at least thirty (30) days prior to expiration of any such policies together with evidence of the payment of the premium therefore.

**3.32  Environmental.**  To the best of Borrower's knowledge, the Real Property is not in violation of any Federal, State or local law, ordinance or regulations relating to industrial hygiene or to the environmental conditions on same, Hazardous materials shall include but shall not be limited to substances defined as "hazardous substances" in the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended; the Hazardous Materials Transportation Act of 1975; the Resource Conservation and Recovery Act of 1976; and those substances defined as "hazardous waste" or "hazardous substances" by the laws, ordinances or regulations adopted pursuant thereto of the state, county or any subdivision thereof where the mortgaged premises are situate, Borrower shall indemnify and hold the Bank harmless from and against any and all claims, losses, damages, liabilities and enforcement actions of any kind and all costs and expenses incurred in connection therewith, including, but not limited to, attorney's fees and expenses arising directly or indirectly out of any failure of Borrower to comply with the provisions of this paragraph.

## SECTION 4. CONDITIONS PRECEDENT

The obligations of Bank to make the initial advance of the proceeds of the Loan and to make each subsequent advance thereof is subject to the satisfaction of the following conditions precedent at the time of each such advance:

Case ID: 160303161

**4.1 Representations and Warranties.** Each and all of the representations and warranties set forth in Section 2 hereof shall be true and correct in all respects, as though separately and independently made on and as of the date of each such advance.

**4.2 Covenants.** Each and all of the covenants set forth in Section 3 hereof shall have been performed and complied with in all respects.

**4.3 No Default.** There shall be no Event of Default in existence under any of the Loan Documents.

**4.4 Fees, Charges, Premiums.** Borrower shall have paid for all premiums on insurance policies and bonds, all recording and conveyancing costs assessed against Borrower (including, without limitation, transfer taxes and title insurance premiums), all fees of Bank and the legal fees and disbursements of the Bank's counsel in connection with the Loans.

**4.5 Delivery of Loan Documents.** The Loan Documents shall have been duly executed on behalf of Borrower and Co-Borrowers and titleholder) of real property subject to the Collateral Mortgage and delivered to Bank and, where applicable, shall have been recorded or filed in the appropriate public office.

**4.6 Delivery of Other Documents.** The following documents shall have been delivered by or on behalf of Borrower to Bank:

(a)     Survey. Two (2) copies of a current survey of the Real Property, certified to and acceptable to Bank and the Title Company bearing the stamp of a registered surveyor showing the distance to the nearest intersection and the location of all present and proposed improvements (including the Improvements), driveways, fences, utility lines, easements (recorded and unrecorded), rights-of-way, restrictions, encroachments (if any) building setback lines, parking, ingress, egress and driveways, together with a metes and bounds description of the Real Property corresponding to such survey and a surveyor's certificate acceptable to the Bank and the Title Company, which survey shall be paid for by Borrower.

(b)     Plans and Specifications. Two (2) copies of a set of the final Plans and Specifications acceptable to Bank, marked "approved" by all appropriate governmental agencies and initialed by Borrower and any other party requested by Bank, which Plans and Specifications shall not be changed or amended without the prior written consent of Bank.

(c)     Project Cost Breakdown. A copy of Borrower's final Schedule of Site Development Costs acceptable to Bank which shall be initialed by Borrower. As a condition of advances for construction of a House or a Condominium, Borrower's final Schedule of House Costs and Condominium Costs acceptable to Bank which shall be initialed by Borrower. Such Schedule of Site Development Costs and Schedule of House Costs and Condominium Costs shall be subject to Bank's approval in all respects, and as to each subsequent advance, shall include budgetary information on a current basis in the same format.

(d)     Permits and Approvals. Copies of all approvals, permits and/or authorizations of all

Island View Crossing II, L.P.   Development Construction Loan Agreement - 11/26/14          16

Case ID: 160303161

boards, agencies and departments, governmental or otherwise, having jurisdiction over the development, construction or use of the Improvements and Real Property, including, without limitation, zoning boards, environmental agencies, boards and departments and water and sewer authorities necessary for the construction of and the hookup to utilities; subdivision agreements, site plans, escrow agreements and bonds; approvals and/or contracts from or with all appropriate utility companies furnishing utilities to the development, construction or use of the Improvements and Real Property, including, without limitation, water, sanitary sewer, electric, gas and/or oil; such satisfactory evidence of the hookup and availability and adequacy of the aforesaid utilities as Bank shall require; and such satisfactory evidence that construction in accordance with the Plans and Specifications is authorized by such permits and approvals. All such permits and approvals shall be in full force and effect and the time for appeal from the granting thereof shall have run with no appeal having been taken therefrom

　　　　(e)　　Title Insurance.  A marked-up title report of the Title Company, representing its commitment to issue in favor of Bank, but at the expense of Borrower, a standard ALTA form mortgage title insurance policy, insuring the lien of the Mortgage as a valid second lien on the Real Property and a valid perfected first security interest on the Improvements, including but not limited to all easements and appurtenances thereto, free and clear of all liens (including possible mechanics' and materialmen's liens, filed or unfiled, arising out of the construction of the Improvements) and encumbrances and subject only to such other objections and exceptions as Bank may approve in writing. Each and every advance made by Bank hereunder shall be fully covered at all times by such title insurance policy.

　　　　(f)　　Property, Liability and Other Insurance.  Evidence of such insurance as Bank may require, covering any loss, damage or defect to the Real Property and the Improvements or to persons or other property in, on or about the Real Property and the Improvements during the period of construction and thereafter, including, but not limited to:

　　　　(i)　A certificate to the effect that Borrower and AMCORP have procured insurance policies covering workmen's compensation, contingent liability and public liability, protecting Borrower and the Bank against any liability for loss or damage to persons or property in any way occurring during the process of the construction of the Improvements or in any way arising therefrom, including, without limitation all Contractors, The workmen's compensation insurance shall cover Borrower's full statutory liability as employer without limit, and the contingent liability and public liability insurance shall be with a company and in amounts satisfactory to Bank, The aforesaid certificate shall contain the agreement of the insurer to give not less than thirty (30) days notice to Bank prior to cancellation of such policies or material change in the coverage thereof, and confirmation that no cancellation or change made in the absence of such notice shall be effective as to Bank.

　　　　(ii)　An original paid up policy of builder's risk insurance with extended coverage (with a standard mortgagee clause in favor of Bank), in an amount equal to the full insurable value of the real and personal property subject to the Mortgage and with a company satisfactory to Bank, and containing a provision allowing the insured to complete the work provided for hereunder and in the contracts for construction of the Improvements and covering the building materials on the Real Property during construction.

Case ID: 160303161

(iii)  An original policy of flood insurance to the extent required by any applicable federal, state or local law, including, without limitation, the Flood Disaster Protection Act of 1973 (P.L. 93-234), or in the alternative, a certification in form and content acceptable to Bank that the Real Property is not located in a flood hazard area identified by the United States Department of Housing and Urban Development.

(iv)  All policies, certificates and endorsements required in this Agreement shall be issued to: Prudential Savings Bank, 1834 W. Oregon Avenue, Philadelphia, PA 19145-4725. <u>Attention:</u> Salvatore Fratanduono, Sr. Vice President/CLO, receipt of any policies or certificates of insurance shall not bar Bank from requiring other or additional insurance which the Bank reasonably requires due to changed circumstances.

(g)     <u>Other Insurance</u>.  Evidence, in form and substance acceptable to Bank, that all assets of Borrower and the General Contractor are adequately insured and Bank has been named as loss payee on all policies of insurance covering assets in which Bank has a security interest.

(h)     <u>Construction Contracts and Costs</u>.  An executed copy of the contract with the General Contractor providing for the construction of the Site Improvements and the Houses and the Condominium in a good and workmanlike manner and in strict accordance with the Plans and Specifications. This contract must be satisfactory in form and substance to Bank, and Bank's approval thereof is specifically conditioned upon the total contract price therein not exceeding the fair and reasonable cost of the work to be performed thereunder. This contract shall be collaterally assigned to Bank by a document in form and substance satisfactory to Bank, and the Contractor and all subcontractors shall consent in writing to such assignment.

Borrower shall cause the General Contractor to supply a list of all subcontractors it has engaged or intends to engage in connection with the construction of the Improvements, and the Houses and the Condominium, together with fully executed copies of the agreements with such subcontractors.

(i)     <u>Certification</u>.  A written certification of Borrower in form and substance satisfactory to Bank (and if requested by Bank, written acknowledgments of each Contractor and/or Material supplier specified by the Bank), stating that: (i) In the event of a default under any of the Loan Documents Bank is authorized to use the Plans and Specifications without cost to it; and (ii) each Subcontractor and/or supplier shall upon the occurrence of an event of default continue to perform under its contract on behalf of Bank or its designee without any cost increase over the sum set forth in such contract in the event Bank or such designee takes possession of the Real Property or takes over construction of the Improvements and/or Houses and the Condominium as a result of a foreclosure, acceptance of a deed in lieu of foreclosure, or otherwise.

(j)     <u>Product Manufacturer Warranties</u>.  Copy of all product, manufacturer and other warranties, guarantees and service agreements acquired by Borrower in connection with the construction of the Improvements and the Houses and the Condominium, together with all manuals, instructions and related documents regarding the ownership, use or operation of the same.  Borrower's right, title and interest in and to any and all of such warranties, guarantees and agreements, whether express or implied, shall be collaterally assigned to Bank by document in form

Case ID: 160303161

and substance satisfactory to Bank.

(k)    Releases and Waivers of Liens. [INTENTIONALLY OMITTED]

(1)    Opinion of Counsel. [INTENTIONALLY OMITTED]

(m)    Financial Statements. True and correct copies of Borrower's and each Co-Borrower's current and annual financial statements as prepared in accordance with generally accepted accounting principles consistently applied, in a form and content satisfactory to Bank, and true and correct copies of Borrower's and each Co-Borrower's most recent tax returns, as filed.

(n)    Formation Documents.    A certified copy of Borrower's Certificate of Limited Partnership and Partnership Agreement, as well as resolutions authorizing the borrowing.

(o)    Good Standing Certificates.    If required by the Bank, a certificate issued by the Department of State of the Commonwealth of Pennsylvania certifying that Borrower exists and is in good standing under the laws of such jurisdiction.

(p) Borrower shall have deposited Seven Hundred Fifty Thousand ($750,000.00) Dollars into an account with the Bank, withdrawals from which shall be to and used to make monthly payments on the Authority's first mortgage and such other uses to which the Bank, in its sole discretion, shall agree.

**4.7    Fees, Charges and Premiums.** Borrower shall have paid for: (i) all premiums on insurance policies; (ii) all recording and conveyancing costs assessed against Borrower (including, without limitation, transfer taxes and title insurance premiums); (iii) Bank's fees; and (iv) all expenses incurred by Bank in connection with making the Loan, including without limitation, counsel fees and disbursements, appraisal and inspection expenses.

**4.8    No Material Adverse Change.**    There shall be no material adverse change in the financial or operating condition of Borrower or any Co-Borrower or any material adverse change in the value of the Real Property or any other collateral securing the Loan, other than increased liability for sums advanced hereunder or in the costs of construction.

## SECTION 5. DISBURSEMENTS: ADVANCES OF THE LOAN

**5.1    Deposits and Disbursements of Required Equity Contribution** If at any time or from time to time during the term of the Loan it is determined by Bank in its sole discretion that the total cost to complete the Site  Improvements and construct the Houses and the Condominium, including, without limitation, all amounts due and payable to third parties and those amounts due for interest reserves, management, labor and administrative costs and architect, engineering and legal fees, exceeds the proceeds of the Loan yet to be disbursed by Bank, then Borrower shall immediately deposit with Bank an amount equal to such difference and such amount shall be disbursed prior to any further advances of the Loan.    Borrower shall notify Bank in writing immediately upon determining any increase in the construction costs, which notice shall be

Case ID: 160303161

accompanied by an amount equal to such increase in the construction costs.

**5.2.  Submission of Applications; Additional Representations.**  Prior to the disbursement of any funds under the Loan for the construction of a House or a Condominium,  and in addition to all other requirements herein, Borrower shall deliver to Bank; (i) copies of all required building permits for the construction of each such House or Condominium, (ii) copies of the Plans and Specifications for each, and (iii) the line item breakdown for each.  All disbursements of advances of the Loan shall be made by Bank in accordance with a schedule of payments fixed by the Bank, a copy of which is attached hereto as Exhibits "B" and "C".  Such disbursements and advances shall be made as the construction progresses upon written applications for payment in form and content satisfactory to Bank ("Applications") by Borrower.  Applications shall be submitted only for work completed and materials, free of any lien, encumbrance or security interest, physically, incorporated into the construction of the Improvements, and Borrower shall not submit applications for materials that are not incorporated into the work even if such materials are stored on the Real Property or for deposits on any items not incorporated into completed work.  Each Application (other than an Application for a final draw with respect to any House or Condominium, as thus submitted, shall be accompanied by Borrower's Certificate attached hereto as Exhibit "E" and shall:

(a)  automatically constitute a representation and certification by Borrower that; (i) the work done and materials supplied to date are in strict accordance with the Plans and Specifications; (ii) the work and materials for which payment is requested have been physically incorporated into the construction of the Improvements or suitably stored on the Real Property with Bank's prior approval; (iii) the value is as stated; (iv) with respect to each category of work for which payment is being sought, the amount of such payment together with all prior payments for such category represents a percentage of the total payments to be made for such category as shown on the Schedule of Costs, which is no greater than the percentage of total work for such category which has been performed as of the date of the Application; (v) all work has been done in a good and workmanlike manner and the work and materials conform with all applicable laws, ordinances, rules, regulations, restrictions and building codes of the governmental authorities having jurisdiction of the Real Property and/or Improvements; (vi) all necessary certificates licenses and permits required to be obtained from any board, agency or department, governmental or otherwise, for the work to date have been obtained; (vii) the undisbursed balance of the Loans is sufficient to complete construction of the in accordance with the Plans and Specifications; and (viii) the work is proceeding satisfactorily and on schedule; and,

(b)  automatically constitute a further representation and certification by Borrower that; (i) payment for the work and materials described in such Application has been made or will be made with the proceeds of the disbursements or advances for which the Application was submitted; (ii) no event has occurred which is or with the passage of time or giving of notice or both would become an Event of Default under any of the Loan Documents; (iii) each and all of the representations and warranties set forth in this Agreement continue to be true; and (iv) all prior bills applicable to the Improvements have been paid in full.  Bank reserves the right to approve the form and content of each Application and to verify the representations therein by an inspection of the Real Property and Improvements.

(c)  Environmental Audit.  A Phase I environmental audit by an environmental engineer

Case ID: 160303161

satisfactory to Bank showing that the Real Property is not in violation of any federal, state or local environmental law or regulation and that the said property is otherwise not contaminated by hazardous substances and, if requested by Bank, satisfactory review of such environmental audit and circumstances by am engineer or other environmental specialist retained by Bank, the cost of which shall be borne by Borrower and any other tests, and inquiries deemed necessary or appropriate by Bank, such that Bank shall, in its sole and absolute judgment, have conducted all inquiry which it deems appropriate in order to successfully assert an innocent landowner defense under The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and any and all similar state and local statutes, laws, rules and regulations.

**5.3  Procedure for Making Disbursements and Advances; Holdback.**  To the extent required by any contract between Borrower and any other party, such Applications will be subject to holdbacks in the amounts as set forth in such agreement.  On or about three (3) business days after receipt of an Application, Bank will disburse or advance the amount requested; provided that after inspection and review Bank has verified those representations and certifications required to be set forth in the Application pursuant to Subsection 5.2 hereof, provided, further, that all other conditions precedent to such disbursements and advances set forth in this Agreement have been satisfied.  Provided that no Event of Default exists, Lender shall advance the remaining holdback amount, if any, of all sums requested on the Completion Date and upon: (a) Borrower's certification of completion of all Improvements and construction of the Improvements in accordance with the Plans and Specifications; (b) a satisfactory "as built" survey; (c.) the issuance of all final governmental and utility company approvals; (d) receipt of all releases of liens executed by all mechanics and materialmen who have provided materials and/or services in connection with the Improvements; (e) the acceptance of the construction as completed by Borrower, Bank and any such municipal authority; and (f) the acceptance by the Borough of Bristol of all Site Improvements required to be completed on the Real Property.

**5.4  Limitation on Advances.**  In no event shall Bank have an obligation to make any advances on the Loan; (i) after the Completion date; (ii) if the unadvanced balance of the Loan would be insufficient to complete construction of the Improvements in accordance with the Plans and Specifications, unless Borrower has deposited with Bank such additional funds as are required to complete the same; (iii) if there exists and Event of Default under any of the Loan Documents or an event or state of affairs which with the passage of time or the giving of notice or both could constitute an Event of Default hereunder or thereunder; or (iv) if Borrower fails to satisfy all of the conditions described in Section 4 hereof.  Any undisbursed proceeds of the Loan remaining after Due Date shall cease to be available for the payment of any Improvements or otherwise.

**5.5  Payor: Payees.**  All disbursements and advances shall be made by check jointly payable to Borrower and the General Contractor or other appropriate credit transfer: (i) and shall be disbursed to Borrower in the case of that portion of the proceeds of the Loan representing reimbursement of costs previously incurred by Borrower; (ii) in the sole discretion of Bank, to the order of any subcontractor, materialmen or any other person entitled thereto in the amount due them on account of work performed and/or materials furnished in connection with the construction of the Improvements and the Houses and the Condominium; (iii) to governmental bodies pursuant to agreements securing obligations of Borrower with such entities; or (iv) to Bank in respect of the proceeds of the Loan representing the Interest Reserve (as hereinafter defined) or fees.  All

Case ID: 160303161

payments to persons other than Borrower shall be deemed made for the use and benefit of Borrower with the same force and effect as if disbursed or advanced directly to Borrower. It is understood that this provision shall not create any priority of contract or trustee, beneficiary or guarantor relationship of any kind between said parties and Bank. Advances will be made no more frequently than bi-weekly.

**5.6  Set Asides; Escrows.**  Borrower hereby agrees that any set aside and/or escrow required to be established by Borrower under any agreements with governmental authorities for the completion of site improvements, shall reduce availability of funds under the Loan by an aggregate amount equal to the face amount of each such set aside.  In addition, Bank shall have no obligation to advance such sums unless and until Bank shall have received written authorization from the applicable governmental authority confirming completion of the site improvements or the applicable portion thereof in accordance with the Plans and Specifications.  Any sums actually required to be set aside or held in escrow by Bank and any advances under any set aside or escrow agreement shall constitute advances under the Note and shall bear interest at the applicable rates thereunder.

**5.7    Interest Reserve.**

(a)    The portion of the Loan proceeds allocated and reserved for the payment of interest installments and referred to as the "Interest Reserve" shall be withheld from disbursement at closing and may be disbursed from time to time by Bank for the account of Borrower for the payment of the interest due on the Loan automatically as the same shall become due and payable, without authorization from Borrower, Disbursement of such interest reserve shall be subject to the provisions of Section 1.1 hereof. No interest shall accrue upon any portion of the Interest Reserve until Bank actually disburses such portion thereof which shall represent the then due and payable monthly interest installment on the Loan, whereupon the sum so disbursed shall be added to the outstanding principal balance of the Loan and shall bear interest as provided for in the Note. Bank, in its sole discretion, may elect to apply Interest Reserve in reduction of the loan balance.

(b)    Upon the occurrence of an Event of Default under any of the Loan Documents, Bank shall have the right but not the obligation to continue to disburse such monthly interest installments from the Interest Reserve notwithstanding any limitation or condition on the availability of proceeds of the Interest Reserve.

(c)    In the event: (i) the Interest Reserve is depleted; (ii) Bank in its sole determination deems that the remaining Interest Reserve is insufficient to pay in full the then due and payable monthly installments or any portion thereof; or (iii) an Event of Default under the Loan Documents occurs and Bank determines not to make any further advances under the Loan, including the Interest Reserve, then Bank may elect, at its option, to no longer be required to make disbursements from the Interest Reserve, and thereafter, upon five (5) business days written notice from Bank, Borrower shall commence to pay monthly interest installments on the then outstanding principal balance of the Loan directly to Bank.

(d)    Establishment of an Interest Reserve shall in no way relieve the Borrower of its obligations to pay interest as set forth in the Note.

Case ID: 160303161

**5.8 <u>Variance of Procedure.</u>**  In the event that Borrower requests and Bank agrees, or Bank elects to vary the procedures set forth above, all such advances shall be deemed to have been made pursuant to an obligation under this Agreement.

**5.9 <u>Maximum Rate of Interest on Loan.</u>**  Notwithstanding anything to the contrary contained herein or in any other document executed in connection with the Loan, the effective rate of interest on the Loan shall not exceed the maximum effective rate of interest permitted by applicable law or regulation, Borrower hereby agrees to give Bank prior written notice in the event any interest payment made to Bank with respect to the Loan will cause the total interest payments collected in any one year to be usurious under applicable law, and Bank hereby agrees not to collect knowingly any interest from Borrower in the form of fees or otherwise which will render this Loan usurious.  In the event that such interest would be usurious in Bank's opinion, Bank reserves the right to reduce the interest payable by Borrower, This provision shall survive closing hereunder and the repayment of the Loan.

## SECTION 6. INSPECTION

**6.1 <u>Inspection Facilities.</u>**  Borrower agrees to cooperate with Bank and its authorized representatives to provide adequate facilities at all times for inspection of the construction work by Bank and other authorized representatives of Bank, and agrees that full and free access to the Real Property and the Improvements and  to Borrower's books and records shall be afforded to such authorized persons as may be designated, from time to time, by Bank.  Borrower shall pay Three Hundred Fifty ($350.00) Dollars for each inspection of the construction of the Site Improvements and/or Houses and the Condominium.

**6.2 <u>Construction Superintendent or Inspector.</u>**  Bank may at any time place upon the Real Property a superintendent, inspector, architect or engineer ("Consulting Architect") who shall inspect the content of the Improvements and shall require that the Improvements be constructed substantially in  accordance with the Plans and Specifications.  If such superintendent or inspector is placed upon the job at any time, such Consulting Architect shall be paid a reasonable amount specified by Bank which shall be deemed to be advanced under the Loan for the benefit of Borrower.  Borrower agrees to reimburse Bank immediately upon demand for such sums and repayment thereof by Borrower shall be secured by the Loan Documents.

**6.3 <u>No Representation or Warranty by Bank.</u>**  Although Bank and its agents may inspect the Plans and Specifications, the Schedule of Site Improvement Costs, the Schedule of House Costs, and Condominium Costs,  the course of construction and other matters pertaining to the construction of the Improvements, such inspections are solely for the protection of Bank, as lender, and Borrower hereby confirms that Bank is not making and will not be deemed to make any representations or warranties as to any matters pertaining to the Improvements by reason of such inspections.

## SECTION 7. LIMITATION OF BANK'S LIABILITY

**7.1 <u>Bank's Liability to Borrower.</u>**  Borrower has selected the General Contractor, the subcontractors and all other furnishing services or materials to or for the construction of the

Case ID: 160303161

Improvements and/or Houses and the Condominium and Bank has not had and shall not have any responsibility whatsoever for its selection or for the quality of their materials or workmanship, it being understood and agreed that Bank's sole function is that of lender and the only consideration passing from Bank to Borrower is the proceeds of the Loan in accordance with and subject to the terms of this Agreement. Neither Borrower, any Co-Borrower nor any other person shall have any right to rely on any procedures required by Bank herein, such procedures being solely for the protection of Bank as lender.

**7.2  Bank's Liability to Third Parties.** The rights and benefits of this Agreement shall not inure to the benefit of any third party. Notwithstanding anything to the contrary contained in this Agreement or in any of the other Loan Documents, or any conduct or course of conduct by Borrower or Bank or their respective affiliates, agents or employees, neither this Agreement nor any of the Loan Documents shall be construed as creating any rights, claims or causes of action against Bank in favor of the Contractors or any other persons furnishing services or materials to or for the construction of the Improvements, or their respective creditors or any other person or entity other than Borrower, Without limiting the generality of the foregoing, disbursements or advances made directly to the General Contractor or any other contractor, subcontractor, laborer, materialman or any third parties pursuant to this Agreement shall not be deemed a recognition by Bank of a third party beneficiary status for any such person or entity.

## SECTION 8. INDEMNITY

Borrower, for itself, and all those claiming under or through it, agrees to protect, indemnify, defend and hold harmless Bank, its directors, officers, employees and attorneys, agents and representatives from and against any and all liability, expense, or damage of any kind or nature and from any suits, claims or demands, including legal fees and expenses, arising out of this Agreement or the Loan Documents or in connection therewith including, without limitation, claims in any way related to hazardous wastes on the Real Property or environmental contamination of the Real Property, claims for brokerage and finder's fees in connection with the Loans, disputes among Borrower and the Contractors or any subcontractor, materialman or supplier, or between Borrower, the Contractors or any subcontractor and any municipal or public authority, or on account of any act or omission to act or negligence of Bank, except for claims arising under this Agreement (or the Loan Documents resulting directly from Bank's gross negligence or willful misconduct, This obligation specifically shall survive the completion of construction of the Improvements and the repayment of the Loan.

## SECTION 9. DEFAULTS

**9.1  Events of Default.** The occurrence of any one or more of the following events all, at the sole option of Bank, constitute an event of default hereunder:

(a)  Borrower shall fail to pay within fifteen (15) days after the date when due any payment of interest or principal or any other sums as provided hereunder, or under any or all of the Loan Documents.

(b)  Borrower shall fail to observe and perform any of the covenants or

Case ID: 160303161

agreements on its part to be observed and performed under this Agreement, any or all of the Loan Documents, and such failure shall continue beyond thirty (30) days following written notice from Bank to Borrower of such failure.

(c)  Any representation or warranty of Borrower in this Agreement, in any of the other Loan Documents or otherwise made to Bank proves to be false or misleading in any material respect.

(d)  Any uncured Event of Default shall occur under any of the other Loan Documents.

(e)  Borrower, or any Co-Borrower, as the case may be, shall apply for or consent to the appointment of a receiver, trustee, or liquidator of itself or themselves or any of its or their property, admit in writing its or their inability to pay its or their debts as they mature, make a general assignment for the benefit of creditors, be adjudicated a bankrupt or insolvent or file a voluntary petition in bankruptcy, or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt dissolution or liquidation, law or statute, or an answer admitting the material allegations of a petition filed against them in any proceeding under any such law, or if action shall be taken by Borrower or any Co-Borrower for the purpose of effecting any of the foregoing.

(f)  Any order, judgment or decree shall be entered by any court of competent jurisdiction, approving a petition filed by any third party seeking reorganization of Borrower, any Co-Borrower of  all or a  substantial part of the assets of Borrower or any Co-Borrower, or appointing a receiver, sequestrator, trustee or liquidator of Borrower, any Co-Borrower or any of its or their property, and such order, judgment or decrees shall continue unstayed and in effect for any period of forty five (45) days.

(g)  Any of the Contractors, subcontractors or materialmen shall default under their contracts, which default Bank in its reasonable discretion deems to be substantial, and Borrower, upon ten (10) days notice from Bank, shall fail to exercise any resulting right or remedy to which it is entitled thereunder or replace such person or contractor on similar terms.

(h)  The Improvements or any material portion thereof shall be materially injured or destroyed by fire or other casualty, which injury or destruction is not fully covered by insurance.

(i)  Borrower fails to commence compliance with any requirements of governmental or quasi-governmental authorities having jurisdiction over the Real Property or Improvements within ten (10) days after notice of such requirement has been given to Borrower.

(j)  Any permit, license or approval necessary for the construction of the Improvements shall be revoked or modified or shall expire.

Case ID: 160303161

(k)  If construction of the Improvements is not commenced as required under Section 3.1, or is delayed or suspended for a period in excess of ten (10) days, subject to force majeure or is not prosecuted diligently after commencement thereof with such force of workers and materials as shall be satisfactory to Bank at any time during the progress of construction, or if construction of the Improvements is not completed as herein provided.

(l)  If any assets of Borrower or the Improvements on the Real Property are subject to attachment, execution or other judicial seizure or enforcement, the enforcement of which has not been stayed by appropriate legal process.

(m)  If any person obtains an order or decree in any court of competent jurisdiction enjoining the construction of the Improvements, or enjoining or prohibiting Borrower or Bank from performing this Agreement.

(n)  If an Event of Default occurs under any other agreement between Borrower and Bank or any Co-Borrower and Bank.

(o)  If there shall occur any material adverse change in the financial condition of Borrower (other than liability for advances under this Agreement) or any Co-Borrower or any material adverse change in the value of the Real Property, the Improvements or any other collateral securing the Loan.

(p)  If a judgment shall be entered against Borrower, or any Co-Borrower in any way materially adversely affecting Borrower's or such Co-Borrower's ability to perform its or their respective obligations owed to Bank.

(q)  The dissolution or liquidation of Borrower, or the liquidation or death of any Co-Borrower.

(r)  The Real Property and/or the proposed construction or use of the Improvements shall fail to comply with any applicable zoning law or requirement.

(s)  Except as expressly permitted by Bank, Borrower or Co-Borrowers shall voluntarily, involuntarily or by, operation of law, sell, assign, transfer, convey, pledge, mortgage or encumber any or all of the Mortgaged Property or other collateral for the Loan or any interest therein, without the prior written consent of Bank.

(t)  Failure of Borrower to perform any of its obligations or covenants under any agreement or undertaking with Bristol Borough or with the request of the first mortgage to the Redevelopment Authority of Bucks County.

**9.2  Acceleration and Remedies.**  Upon the occurrence of any Event of Default hereunder, in addition to any other rights or remedies available to it hereunder or under any other Loan Document or at law or in equity, Bank may exercise any or all of the following rights and remedies as it may deem necessary or appropriate:

Case ID: 160303161

(a)     Terminate the Loan.

(b)     Declare the outstanding principal balance of the Loan, together with all accrued and unpaid interest thereon and all other sums due hereunder or under any of the other Loan Documents, to be immediately due and payable in full.

(c)     Cease making any further disbursements or advances hereunder.

(d)     Enter upon the Real Property and construct, equip and complete the Improvements in accordance with the Plans and Specifications with such changes as Bank may from time to time in its sole discretion deem appropriate, all at the risk, cost and expense of Borrower, Bank shall have the right at any and all times to discontinue any work commenced by it in respect to the Improvements or to change any course of action undertaken by it and shall not be bound by any limitations or requirements of time whether set forth herein or otherwise. Bank shall have the right to assume any contract made by Borrower in any way relating to the Improvements and to take over and use all or any part of the labor, materials, supplies, other personal property and equipment contracted for by Borrower, whether or not previously contracted for by Borrower, and whether or not previously incorporated into the Improvements, all in the sole discretion of Bank. In connection with any construction of the Improvements undertaken by Bank pursuant to the provisions of this section, Bank may: (i) engage builders, contractors, architects, engineers and others for the purpose of furnishing labor, materials and equipment in connection with any construction or equipping of the Improvements; (ii) pay, settle or compromise all bills or claims which may become liens against the Real Property and/or the Improvements, or which have been or may be incurred in any manner in connection with the construction, completion and equipping of the Improvements or for the discharge of liens, encumbrances or defects in the title of Real Property or the Improvements; and (iii) take such action or refrain from acting under this Agreement as Bank in its sole discretion may determine from time to time without any limitation whatsoever, Borrower shall be liable to Bank for all sums paid or incurred for the construction, completion and equipping of the Improvements, whether paid or incurred pursuant to the provisions of this section or otherwise, and all payments made or liabilities incurred by Bank under this Agreement of any kind whatsoever shall be paid by Borrower to Bank upon demand with interest to the date of payment to Bank at the rate to be applied under the Notes after an event of default. All of the foregoing, including interest, shall be deemed and shall constitute advances under this Agreement and shall be evidenced and secured by the Loan Documents. For the purpose of carrying out the provisions and exercising the rights, powers and privileges granted by this section, Borrower hereby irrevocably constitutes and appoints Bank its true and lawful attorney-in-fact to execute, acknowledge and deliver any instruments and do and perform any acts such as are referred to in this section in the name and on behalf of Borrower. Anything herein to the contrary notwithstanding, it is specifically understood and agreed that all funds furnished by Bank and employed in performance of the obligations of Borrower under this Agreement shall be deemed advanced by Bank under an obligation to do so, regardless of the identity of the person or persons to whom such funds are furnished. Funds advanced by Bank in the reasonable exercise of its judgment that the same are needed to complete the Improvements or to protect its security are to be deemed obligatory advances hereunder and are to be added to the total indebtedness secured by the Loan Documents and said indebtedness shall be increased accordingly.

Case ID: 160303161

(e)   Set off all property of Borrower now or hereafter at any time in its possession in any capacity whatsoever including, but not limited to, any balance or share of any deposit, trust or agency account, as to all of which property Borrower hereby grants Bank a lien and security interest.

(f)   Effect new leases or agreements of sale, cancel or surrender existing leases or agreements of sale and take any and all other actions described in Section 3.10 hereof.

### 9.3  Remedies Cumulative, Etc.

(a)   No right or remedy conferred upon or reserved to Bank under any of the Loan Documents, or with respect to any guaranty of payment of the Loan or of performance of any of Borrower's obligations under any of the Loan Documents or any collateral securing the payment of the Loan under any of the Loan Documents ("Collateral"), or now or hereafter existing at law or in equity or by statute or any other such legislative enactment, is intended to be or shall be deemed exclusive of any other such right or remedy, and each and every such right or remedy shall be cumulative and concurrent, and shall be in addition to every other such right or remedy, and may be pursued singly, concurrently, successively or otherwise, at the sole discretion of Bank, and shall not be exhausted by any one exercise thereof but may be exercised as often as occasion therefore shall occur. No act of Bank shall be deemed or construed as an election to proceed under any one such right or remedy to the exclusion of any other such right or remedy; furthermore, each such right or remedy of Bank shall be separate, distinct and cumulative and none shall be given effect to the exclusion of any other, The failure to exercise or any delay in exercising any such right or remedy, or the failure to insist upon strict performance of any term of any of the Loan Document, shall not be construed as a waiver or release of the same, or of any event of default thereunder, or of any obligation or liability of Borrower thereunder, Nothing herein however, shall be construed to prevent Bank from waiving any condition, obligation or default it should so elect. In the event of such election by Bank, any waiver, in order to be effective, must be in writing and signed by Bank, and any such waiver shall be strictly limited in its effect to the condition, obligation or default specified therein and shall not extend to any subsequent condition, obligation or default or impair any right of Bank with respect thereto.

(b)   The recovery of any judgment by Bank and/or the levy of execution under any judgment shall not affect in any manner or to any extent liens or other security interests in any Collateral, or any rights, remedies, or powers of Bank under any of the Loan Documents or with respect to any guaranty or any Collateral, but such liens and security interests, and such rights, remedies and powers of the Bank shall continue unimpaired as before. Further, the entry of any judgment by Bank shall not affect in any way the interest rate payable under any of the Loan Documents on any amounts due to Bank, but interest shall continue to accrue on such amounts at the Default Rate specified in the Note.

(c)   Borrower hereby waives presentment, demand, notice of nonpayment, protest, notice of protest, or other notice of dishonor, and any and all other notices in connection with any default in the payment of, or any enforcement of the payment of, the Loan. Borrower further waives and releases all procedural errors, defects and imperfections in any proceedings instituted by Bank under the terms of any of the Loan Documents or with respect to any guaranty or any collateral.

Case ID: 160303161

(d) Borrower agrees that Bank may release, compromise, forbear with respect to, waive, suspend, extend or renew any of the terms of the Loan Documents or any guaranty (and Borrower hereby waives any notice of any of the foregoing), and that the Loan Documents or any guaranty may be amended, supplemented or modified by Bank and the other signatory parties and that Bank may resort to any guaranty and any collateral in such order and manner as it may think fit, or accept the assignment, substitution, exchange or pledge of any other collateral or guaranty in place of, or release of such consideration, or none, as it may require, all or any portion of any collateral or any guaranty, without in any way affecting the validity of any liens over or other security interest in the remainder of any such collateral (or the priority thereof or the position of any subordinate holder of any lien or other security interest with respect thereof), or any rights which it may have with respect thereof, or any rights which it may have with respect to any other guaranty; and any action taken by Bank pursuant to the foregoing shall in no way be construed as a waiver or release of any right or remedy of Bank, or of any event of default, or any liability or obligation of Borrower under any of the Loan Documents.

**9.4   Cost and Expenses.**   Borrower shall pay upon demand all costs and expenses (including all amounts paid to attorneys, accountants, real estate brokers and other advisors employed by Bank and/or to any contractors for labor and materials), incurred by Bank in the exercise of any of its rights, remedies, or powers under any of the Loan Documents or with respect to any guaranty or any Collateral, or to preserve or protect the Collateral and any amount thereof not paid promptly following demand therefor with interest thereon at the rate specified in the Note from the date of such demand, shall become part of the Loan and shall be secured by the Loan Documents and all other Collateral, In connection with and as part of the foregoing, in the event that any of the Loan Documents is placed in the hands of an attorney for the collection of any sum payable thereunder, Borrower agrees to pay all reasonable attorneys' fees for the collection of the amount being claimed under such Loan Document, as well as all costs, disbursements and allowances provided by law, the payment of which sums shall be secured by the Loan Documents and all other Collateral.  Borrower shall pay all marketing and selling costs and commissions and taxes related to sales of Houses and the Condominium.

**9.5   Jurisdiction; Venue.**   Borrower agrees that any action or proceeding against it to enforce the Loan may only be commenced in state or federal court in any county in the Commonwealth of Pennsylvania, and Borrower waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and shall confer personal jurisdiction if served by registered or certified mail in accordance with the notice provisions set forth herein.

**9.6   Waiver of Subrogation.**   Borrower and each Co-Borrower hereby waive any right to subrogation, reimbursement, contribution or indemnity from Borrower or any other Co-Borrower in connection with any of the Borrower's obligations hereunder.

## SECTION 10. MISCELLANEOUS

**10.1   Time of the Essence.** All dates and times for the performance of Borrower's and Guarantor's obligations set forth herein and in the Loan Documents shall be deemed to be of the essence of this Agreement.

Case ID: 160303161

**10.2  Broker's and Finder's Fees.** Borrower represents and warrants that it has not dealt with or through any broker or other intermediary in connection with the Loan and agrees to indemnify, defend and hold Bank harmless from and against any loss, liability or damage (including attorneys' fees and expenses) arising from any claim for a broker's fee or finder's fee in connection with the Loan, Borrower further agrees to pay all costs and fees of the brokers and shall deliver to Bank prior to Closing proof of such payments in form acceptable to Bank.

**10.3  Successors and Assigns.** This Agreement inures to the benefit of and binds the parties hereto and their respective successors and assigns, and the words "Borrower" and "Bank" whenever occurring herein shall be deemed to include such respective successors and assigns. However, Borrower shall not voluntarily, or by operation of law, assign or transfer any interest which it may have under this Agreement, in the proceeds of the Loan or convey the Real Property or the Improvements, or any part thereof, without the prior written approval of Bank.  Bank may assign or otherwise transfer the Loan and any or all of the Loan Documents to any other person, or seek and obtain participants) satisfactory to Bank for portions of the Loan.  In connection therewith, Bank shall have the right to deliver to any such assignee, transferee or participant any and all information regarding Borrower or the Loan Documents.  Such assignee, transferee or participant shall thereupon become vested with all of the benefits in respect thereof granted to Bank herein or otherwise.

**10.4  Notices.** All notices, requests and demands to or upon the parties hereto shall be in writing and shall be deemed to have been duly given or made if delivered in person, immediately upon delivery; if by facsimile transmission, immediately upon sending and upon confirmation of all transmission; if by nationally recognized overnight courier service with instructions to deliver the next business day, one (1) business day after sending; and if by registered or certified mail, return receipt requested, five (5) days after mailing.  All notices, requests and demands upon the parties are to be given to the following addresses (or to such other  address as any Party may designate by notice in accordance with this Section):

**Borrower:**
> Island View Crossing II, L.P.
> One South State Street
> Newtown, PA 18940
> <u>Attention:</u> Renato J. Gualtieri


**Bank:**
> Prudential Savings Bank
> 1834 W. Oregon Avenue
> Philadelphia, PA 19145-4725
> <u>ATTENTION:</u>  Salvatore Fratanduono, Sr.  VP/CLO

> **with copy to:**

> Jerome R. Balka, Esquire
> Two Penn Center, Suite 520

Case ID: 160303161

1500 John F. Kennedy Blvd.
Philadelphia, PA 19102-1756

**10.5  Definitions: Numbers and Gender.**  In the event Borrower consists of more than one person or entity, the obligations and liabilities hereunder of each of such persons and entities shall be joint and several, and the word "Borrower" shall mean all or some or any of them.  For purposes of this Agreement, the use of any gender shall be deemed to include all genders.  The singular member shall include the plural, or the plural the singular, as the context may require.

**10.6  Conflicts Between Instruments.**  In the event of any conflict between the provisions of this Agreement and the provisions of any of the other Loan Documents, the provisions of this Agreement shall prevail.  This Agreement shall supersede the Commitment Letter.

**10.7  Captions.**  The captions or headings of the paragraphs of this Agreement are for convenience only and shall not control or affect the meaning or construction of any of the terms or provisions of this Agreement.

**10.8  Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**10.9  Survival**.  The terms and conditions of this Agreement and all representations and warranties made by or on behalf of Borrower herein or in the Loan Documents shall survive completion of construction and repayment of the Loan.

**10.10  Modification, Waiver, Consent.**  Any modification or waiver of any provision of this Agreement, or any consent to any departure by Borrower therefrom, shall not be effective in any event unless the same is in writing and signed by Bank, in which event such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given.  Any notice to or demand on Borrower not specifically required of Bank hereunder shall not entitle Borrower to any other of further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

**10.11  Severability.**  If any provision of this Agreement is prohibited by, or is unlawful or unenforceable under, any applicable law of any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof; provided, however, that any such prohibition in any jurisdiction shall not invalidate such provision in any other jurisdiction; and provided, further, that where the provision of any such applicable law may be waived, is hereby waived by Borrower to the full extent permitted by law to the end this Agreement shall be deemed to be a, valid and binding agreement in accordance with its terms.

**10.12  Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute only one agreement.  It shall not be necessary, when making proof of this Agreement, to produce or account for more than one counterpart.

Case ID: 160303161

**IN WITNESS WHEREOF**, Borrower and Bank have executed this Agreements, under seal, on the date first set forth.

**ISLAND VIEW CROSSING II, L.P.**                    PRUDENTIAL SAVINGS BANK
**A PA Limited Partnership**
**By: ISLAND VIEW PROPERTIES, INC.**
    **Its General Partner**

                                                      by: _____
                                                      Salvatore Fratanduono
                                                      Senior VP/CLO

**by:** _____
        Renato J.  Gualtieri, President


**The undersigned Co-Borrowers  hereby consent to and agree to be bound by the terms, conditions and covenants applicable to the undersigned as set forth in the foregoing Development Construction Loan Agreement.**


**ISLAND VIEW PROPERTIES, INC.**
**A PA Corporation**


**by:** _____           _____
        Renato J.  Gualtieri, President            Renato J.  Gualtieri, Individually

Case ID: 160303161

## EXHIBIT "A"

## LEGAL DESCRIPTION

**ALL THAT CERTAIN** lot or piece of land, situate in Bristol Borough, Bucks County, Pennsylvania described according to Plan of Subdivision dated March 29, 2000, revised May 1, 2000 and recorded in Plan Book 300 Page 96, as follows, to wit:

**BEGINNING** at a point on the Southeasterly side of Radcliffe Street (SR 2002), a corner of Lot No. 2 on said Plan; thence extending from said point of beginning along said Lot No. 2, South 54 degrees 04 minutes 10 seconds East 694.13 feet to a point in line of the Delaware River; thence extending along the same, the two following courses and distances: (1) South 21 degrees 17 minutes 52 seconds West 271.88 feet; and (2) South 33 degrees 23 minutes 27 seconds West 718.45 feet to a point, a corner of lands now or late of Bucks County Redevelopment Authority; thence extending along the same the three following courses and distances, viz: (1) North 54 degrees 04 minutes 50 seconds West 450.19 feet; (2) South 35 degrees 55 minutes 10 seconds West 36.63 feet; and (3) North 54 degrees 04 minutes 10 seconds West 344.47 feet to a point on the Southeasterly side of Radcliffe Street, aforesaid; thence extending along the same, North 35 degrees 55 minutes 50 seconds East 1017.52 feet to the first mentioned point and place of beginning.

**BEING** Lot No. 1 on said Plan.

**BEING** Tax Parcel  No. 4-027-119.

BEING THE SAME PREMISES which the Redevelopment Authority of the County of Bucks, by Deed dated June 5, 2003 and recorded on August 25, 2003 in the Office of the Recorder of deeds in and for the County of Bucks, Pennsylvania in Book 3537 at Page 234 et seq granted and conveyed unto Island View Crossing II, L.P., in fee.

Case ID: 160303161

## EXHIBIT "B"

## USE OF LOAN PROCEEDS

<u>To Be Disbursed at Settlement</u>
Closing costs, including fees for title
insurance, attorney's fees, filing
fees, etc.                                                            $    85,000.00

To Be Retained by Bank and Disbursed
<u>During Construction</u>
Site Improvements (Phase One)                                $3,396,468.00

Interest and Reserve                                                $   500,000.00


Construction of Houses (Phase Two)


Construction of Condominium (Phase Three)            <u>$1,560,000.00</u>
                      **TOTAL**                                        **$5,541,468.00**

Case ID: 160303161

EXHIBIT "C-1"

## ISLAND VIEW CROSISNGII, LP
### BUCKS COUNTY
### PRUDENTIAL SAVINGS BANK
## DEVELOPMENT LOAN STRUCTURE

Date :  15-Oct-14

| | | | |
|---|---|---|---|
| **Land Acquisition:** | Island View Crossing | $0.00 | |
| | | $0.00 | |
| · Total Land Acquisition: | | | $0.00 |
| | | | |
| **Site Development:** | Bristol Borough | | |
| | Letter of Credit  On-Site(Subdivision/Development Agreem | $1,859,116.61 | |
| | Letter of Credit  Off-Site(Development Agreement) | $0.00 | |
| | 10% Contingencies | $185,911.66 | |
| Subtotal Letter of Credit | | $2,043,928.27 | |
| | | | |
| | Cash Deposit  (Pump and Haul Agreement/Misc) | $0.00 | |
| | Cash Deposit On-Site(Engineering Inspection/Legal Fees) | $46,452.92 | |
| | Other ( Parks & Recreation/Impact Fees) | $0.00 | |
| Subtotal Cash Deposit: | | $46,452.92 | |
| Total Site Development: | | | $2,090,381.19 |
| | | | |
| **Sewer Installation:** | Bristol Borough | | |
| | On-Site(Sewer Main Extension Agreement)  Included Above | $0.00 | |
| | Off-Site( Pump Station )  Included Above | $0.00 | |
| | 10% Contingencies | $0.00 | |
| Subtotal Letter of Credit | | $0.00 | |
| | | | |
| | Cash Deposit On-Site(E.D.U's-Sewer Service Agreement) | $0.00 | |
| | Cash Deposit On-Site(Engineering Inspection/Legal  Fees) | $0.00 | |
| | Other-( Pump Station Reimbursement) | $0.00 | |
| | Debt Service Retirement Cost | $0.00 | |
| Subtotal Cash Deposit: | | $0.00 | |
| Total Sewer Installation: | | | $0.00 |
| | | | |
| **Water Installation:** | Aqua PA | | |
| | On-Site(Water Main Extension Agreement) | $293,445.50 | |
| | Off-Site(Water Main Extension Agreement) | $0.00 | |
| | 10% Contingencies | $0.00 | |
| Subtotal Letter of Credit: | | $293,445.50 | |
| | Cash Deposit On-Site( Water Tap In Fees) | $0.00 | |
| | Cash Deposit On-Site( Administration Value Added Fee) | $20,126.30 | |
| | Cash Deposit On-Site( CAC TAX ) | $5,727.00 | |
| | Water Meters | $0.00 | |
| Subtotal Cash Deposit: | | $25,853.30 | |
| Total Water Installation: | | | $319,298.80 |
| | | | |
| **Other Loan Components:** | | | |
| ~~Planning/Engineering Fees:~~ | | ~~$~~ | |
| ~~Interest/Finance~~ | | ~~$~~ | |
| Sub Surface Concrete Removal | | $460,000.00 | |
| Site Improvement Management Fee | | $420,000.00 | |
| Public Utility Fees/Trenching: | | $75,000.00 | |
| HOP Contribution | | $41,788.40 | |
| Total Other Loan Components: | | | $986,788.40 |
| **TOTAL** | | | $3,396,468.40 |

Page 1

- 34 -

Case ID: 160303161

EXHIBIT "C-2"
**Average Hard Cost Budget**
**ISLAND VIEW**
Draw Schedule
PHASE TWO HOUSES

| Unit Number | | 1 | | |
|---|---|---|---|---|
| Date Started | | | | |
| | | Available | Amount Received | Cumulative Draws |
| I. Plan Plus Management | | 22,150 | | 0 |
| A. | Dig Foundation | 3,500 | | 0 |
| B. | Footings | 3,000 | | 0 |
| C. | Foundation Walls | 7,000 | | 0 |
| D. | Deck/Slab | 4,300 | | 0 |
| | **Stage I Total** | 39,950 | 0 | 0 |
| II. Framing | | | | 0 |
| A. | First Floor Walls | 12,500 | | 0 |
| B. | Second Floor Walls | 12,500 | | 0 |
| C. | Roof Trusses and Sheathing | 5,000 | | 0 |
| D. | Windows Installed | 4,000 | | 0 |
| | **Stage II Total** | 34,000 | 0 | 0 |
| III. Sheathing Reeves Rough Mech HVAC/Plumb Elec | | | | 0 |
| A. | Basement Floor | 0 | | 0 |
| B. | Rough Plumbing | 7,000 | | 0 |
| C. | Rough Heating | 7,000 | | 0 |
| D. | Rough Electric | 5,000 | | 0 |
| E. | Roof | 4,000 | | 0 |
| | **Stage III Total** | 23,000 | 0 | 0 |
| IV. Exterior Dumpster | | | | 0 |
| A. | Siding | 5,200 | | 0 |
| B. | Frontal Veneer (Siding/Masonry) | 3,500 | | 0 |
| C. | Drywall | 9,000 | | 0 |
| D. | Trim and Paint | 4,500 | | 0 |
| E. | Tile and Vinyl | 1,500 | | 0 |
| F. | Kitchen and Vanities Installed | 4,500 | | 0 |
| | **Stage IV Total** | 28,200 | 0 | 0 |
| V. Final Paint Final Dec Finish Plumb Finish HVAC Fixtures Shelving | | | | 0 |
| A. | Carpet Installed | 2,000 | | 0 |
| B. | Appliances Installed | 1,500 | | 0 |
| C. | Walks and Porches | 450 | | 0 |
| D. | Grading and Driveway | 750 | | 0 |
| E. | Cleanup of all Construction | 150 | | 0 |
| | **Stage V Total** | 4,850 | 0 | 0 |
| | **Total** | 130,000 | 0 | 0 |

Case ID: 160303161

EXHIBIT "C - 3"

**PHASE THREE**
**HARD COST PROJECTION**
**ISLAND VIEW CROSSING**
16 UNIT - 5 STORY MID RISE CONDO BUILDING                    $1,590,150.00

| DESCRIPTION | MODEL | DATE | BUDGET |
|---|---|---|---|
| Plot Plans | 16 Unit Building | 01-Mar-14 | $2,000.00 |
| Surveys | 16 Unit Building | 01-Mar-14 | $2,000.00 |
| Excavation-Basement | 16 Unit Building | 01-Mar-14 | $3,000.00 |
| Excavation-Footings | 16 Unit Building | 01-Mar-14 | $1,500.00 |
| Footings | 16 Unit Building | 01-Mar-14 | $50,000.00 |
| Crushed Stones | 16 Unit Building | 01-Mar-14 | $3,000.00 |
| Basement Walls | 16 Unit Building | 01-Mar-14 | $70,000.00 |
| Rough Grade\Backfill | 16 Unit Building | 01-Mar-14 | $1,500.00 |
| Cut Driveway\Stone | 16 Unit Building | 01-Mar-14 | $1,000.00 |
| Steel Beams | 16 Unit Building | 01-Mar-14 | $5,000.00 |
| Parking Garage Floor | 16 Unit Building | 01-Mar-14 | $10,000.00 |
| Frame Lumber | 16 Unit Building | 01-Mar-14 | $175,000.00 |
| Frame Labor | 16 Unit Building | 01-Mar-14 | $112,000.00 |
| Roof Trusses | 16 Unit Building | 01-Mar-14 | $25,000.00 |
| Stairs - Metal | 16 Unit Building | 01-Mar-14 | $7,500.00 |
| Stairs - Concrete Block Shaft | 16 Unit Building | 01-Mar-14 | $15,000.00 |
| Dumpster | 16 Unit Building | 01-Mar-14 | $8,000.00 |
| Roof Shingles | 16 Unit Building | 01-Mar-14 | $35,500.00 |
| Windows | 16 Unit Building | 01-Mar-14 | $21,250.00 |
| Exterior Doors\Locks | 16 Unit Building | 01-Mar-14 | $26,000.00 |
| Front Stoop - Balconies | 16 Unit Building | 01-Mar-14 | $16,000.00 |
| Exterior Decorative Trim | 16 Unit Building | 01-Mar-14 | $5,100.00 |
| Siding\Facias | 16 Unit Building | 01-Mar-14 | $10,000.00 |
| Rough Heat | 16 Unit Building | 01-Mar-14 | $64,000.00 |
| Rough Plumbing | 16 Unit Building | 01-Mar-14 | $64,000.00 |
| Rough Electric | 16 Unit Building | 01-Mar-14 | $48,000.00 |
| Insulation | 16 Unit Building | 01-Mar-14 | $32,000.00 |
| Drywall\Tape\Spackle | 16 Unit Building | 01-Mar-14 | $80,000.00 |
| Trench\Screen W&S | 16 Unit Building | 01-Mar-14 | $2,000.00 |
| Trench\Screen Utilities | 16 Unit Building | 01-Mar-14 | $2,000.00 |
| Water & Sewer Lines | 16 Unit Building | 01-Mar-14 | $12,000.00 |
| Furnance | 16 Unit Building | 01-Mar-14 | $32,000.00 |
| Frontal Veneer | 16 Unit Building | 01-Mar-14 | $35,000.00 |
| Trim & Interior Doors | 16 Unit Building | 01-Mar-14 | $32,000.00 |
| Railing-Exterior | 16 Unit Building | 01-Mar-14 | $8,000.00 |
| Finish Carpentry Labor | 16 Unit Building | 01-Mar-14 | $24,000.00 |
| Painting | 16 Unit Building | 01-Mar-14 | $40,000.00 |
| Med Cabs\Shower Door | 16 Unit Building | 01-Mar-14 | $10,400.00 |
| Shelving | 16 Unit Building | 01-Mar-14 | $8,000.00 |
| Tile\Labor\Masterbath | 16 Unit Building | 01-Mar-14 | $14,400.00 |
| Tile\Labor\Hallbath | 16 Unit Building | 01-Mar-14 | $0.00 |
| Vinyl Floors | 16 Unit Building | 01-Mar-14 | $19,200.00 |
| Hardwood Floors | 16 Unit Building | 01-Mar-14 | $1,500.00 |
| Finish Heat\AC Unit | 16 Unit Building | 01-Mar-14 | $16,000.00 |
| Cabinets\Vanities | 16 Unit Building | 01-Mar-14 | $48,000.00 |
| Appliances | 16 Unit Building | 01-Mar-14 | $16,000.00 |
| Hardware | 16 Unit Building | 01-Mar-14 | $5,600.00 |
| Cabinets\Vanities Install | 16 Unit Building | 01-Mar-14 | $12,000.00 |
| Plumbing Fixtures | 16 Unit Building | 01-Mar-14 | $12,000.00 |
| Finish Plumbing | 16 Unit Building | 01-Mar-14 | $48,000.00 |
| Electrical Fixtures | 16 Unit Building | 01-Mar-14 | $8,000.00 |
| Finish Electric | 16 Unit Building | 01-Mar-14 | $24,000.00 |
| Carpet Installation | 16 Unit Building | 01-Mar-14 | $32,000.00 |
| Shutters | 16 Unit Building | 01-Mar-14 | $9,000.00 |
| Sidewalk | 16 Unit Building | 01-Mar-14 | $3,500.00 |
| Driveway Paving | 16 Unit Building | 01-Mar-14 | $4,000.00 |
| Finish Grade\Seed | 16 Unit Building | 01-Mar-14 | $2,500.00 |
| Gutters\Downspouts | 16 Unit Building | 01-Mar-14 | $8,500.00 |
| Cleaning\Paint Touch Up | 16 Unit Building | 01-Mar-14 | $7,200.00 |
| Sprinklers | 16 Unit Building | 01-Mar-14 | $64,000.00 |
| Contingencies | 16 Unit Building | 01-Mar-14 | $5,000.00 |
| Elevator | 16 Unit Building | 01-Mar-14 | $50,000.00 |
| Halls - Common Areas Electric | 16 Unit Building | 01-Mar-14 | $15,000.00 |
| Halls - Common Areas Carpeting | 16 Unit Building | 01-Mar-14 | $5,000.00 |
| Halls - Common Areas Trim | 16 Unit Building | 01-Mar-14 | $5,000.00 |
| Halls - Common Areas Paint | 16 Unit Building | 01-Mar-14 | $4,000.00 |
| Halls - Common Areas Sprinklers | 16 Unit Building | 01-Mar-14 | $10,000.00 |
| Parking Garage - Electric | 16 Unit Building | 01-Mar-14 | $10,000.00 |
| Parking Garage - Paint - Striping | 16 Unit Building | 01-Mar-14 | $2,000.00 |
| Parking Garage - Sprinklers | 16 Unit Building | 01-Mar-14 | $18,000.00 |
| Fire Extinguishers - Egress Lighting | 16 Unit Building | 01-Mar-14 | $12,000.00 |

- 36

Case ID: 160303161

## EXHIBIT "D"

## EXISTING AGREEMENTS OF SALE

| LOT NUMBER | ADDRESS | AOS DATE | BUYER'S NAME | MODEL |
|---|---|---|---|---|
| 2 | 191 Island View Drive | 05/31/14 | Samira Ranganathan and Ranganathan Khandulana | Cambridge |
| 4 | 187 Island View Drive | 06/14/14 | O'Neill, Dawn | Bostonian |
| 5 | 185 Island View Drive | 07/03/14 | Hernandez, Jayson & Sarah | Cambridge |
| 8 | 179 Island View Drive | 06/24/14 | Mastridge, Benjamin | Bostonian |
| 9 | 177 Island View Drive | 05/25/14 | DelGrosso, Frank | Cambridge |
| 10 | 175 Island View Drive | 06/05/14 | Yacker, Judy & Nikki | Charleston |
| 11 | 173 Island View Drive | Pending | Carnivale, Bruce & Elisa | Bostonian |
| 13 | 169 Island View Drive | 06/28/14 | Clark, Jason & Jodi | Cambridge |
| 15 | 165 Island View Drive | 08/23/14 | Bridge, Peter & Jane | Cambridge |
| 25 | 145 Island View Drive | 04/04/11 | Silva, Joseph & Phyllis | Cambridge |
| 68 | 110 Island View Drive | 07/08/14 | Maychuk, Nancy | Cambridge |
| 69 | 108 Island View Drive | 07/07/14 | Schmitt, Harry & Judy | Cambridge |
| 70 | 106 Island View Drive | 07/08/14 | Donato, Joseph & Lynn | Cambridge |
| 71 | 104 Island View Drive | 07/08/14 | Donato, Joseph & Lynn | Cambridge |
| 72 | 102 Island View Drive | 07/10/14 | Ferry, Joseph & Kathleen | Cambridge |
| 73 | 100 Island View Drive | 0/11/14 | Conner, Alicia | Cambridge |

Case ID: 160303161

## FORM OF BORROWER'S CERTIFICATE

Island View Crossing II, LP ("Borrower") does hereby request an advance pursuant to the terms and conditions as specified in that certain Development Construction Loan Agreement between Borrower and Prudential Savings Bank, ("Bank") dated November 26, 2014 (the "Loan Agreement") and does hereby certify to Bank that:

1.  The undersigned is authorized to execute this certificate on behalf of Borrower.  All capitalized terms used herein shall have the meanings ascribed to them in the Loan Agreement.

2.  The work done and materials supplied to date are in strict accordance with the approved Plans and Specifications.

3.  The work and materials for which payment is requested have been physically incorporated into the construction of the Improvements or suitably stored on the Real Property with Bank's prior approval.

4.  The value of the work and materials for which payment is requested is as stated in such request.

5.  With respect to each category of work for which payment is being sought, the amount of such payment together with all prior payments for such category represents a percentage of the total payment to be made for such category as shown on the Schedule of Costs, which is no greater than the percentage of total work for such category which has been performed as of the date of the application for payment.

6.  All work to date has been done in a good and workmanlike manner and all work and materials conform with all applicable laws, ordinances, rules, regulations, restrictions and building codes of governmental authorities having jurisdiction of the Real property and the Improvements.

7.  All necessary certificates, licenses and permits required to be obtained from any board, agency or department, governmental or otherwise, for the work to date have been obtained.

8.  The undisbursed balance of the Loan allocated to construction costs is sufficient to complete the construction of the Improvements in accordance with the Plans and Specifications.

9.  The work is proceeding satisfactorily and on schedule.

10.  All prior bills applicable to the Improvements have been paid.

11.  There does not exist any uncured event of default under the Loan Agreement nor any event or state of affairs which with the passage of time or the giving of notice or both would constitute an event of default thereunder.

12.  There is not any uncured material adverse change in the financial or operating condition of Borrower or in the Real Property from that condition prevailing on the date of the Loan Agreement.

13.  The representations and warranties made by Borrower in the Loan Agreement are correct and true as of the date hereof.

14.  Payment for the work and materials described in the application for payment has been made or will be made with the proceeds of the disbursements or advances for which such application was submitted.

**IN WITNESS WHEREOF,** Borrower has caused this certification to be executed on the _____ day of _____
___, 20____.

**ISLAND VIEW CROSSING II, L.P.**
**A PA Limited Partnership**
**BY: ISLAND VIEW PROPERTIES, INC.**
**Its General Partner**

By:_____
        Renato J.  Gualtieri, President

Case ID: 160303161

# <u>Exhibit 5</u>

Case ID: 160303161



PREPARED BY:

Jerome R. Balka, Esquire

Two Penn Center, Suite 520

1500 John F. Kennedy Blvd.

Philadelphia, PA 19102-1756


RECORD & RETURN TO:

Attleboro Abstract Company

117 East Maple Avenue

Langhorne, PA 19047


UPI Number: 4-27-119

# MORTGAGE

MORTGAGOR:        ISLAND VIEW CROSSING II, L.P.

MORTGAGEE:        PRUDENTIAL SAVINGS BANK

1

Case ID: 160303161

## OPEN END MORTGAGE AND SECURITY AGREEMENT
### [THIS IS AN OPEN END MORTGAGE AND SECURITY AGREEMENT AND SECURES FUTURE ADVANCES PURSUANT TO 42 Pa.C.S, 8143 and 8144, ACT NO. 126 of 1990]

**THIS OPEN END MORTGAGE AND SECURITY AGREEMENT** ("Mortgage") is made as of this **26th** day of **November, 2014** by and between **ISLAND VIEW CROSSING II, L.P.** a PA Limited Partnership ("Mortgagor") and **Prudential Savings Bank** ("Mortgagee").

### WITNESSETH:

**WHEREAS**, Mortgagor, in accordance with the terms of a certain Development Construction Loan Agreement of even date herewith by and between Mortgagee and Mortgagor (the "Loan Agreement") has agreed to make loan advances and readvances to Mortgagor up to a maximum amount of **Five Million Five Hundred Forty One Thousand Four Hundred Sixty Eight ($5,541,468.00) Dollars** and this Mortgage is given by Mortgagor to Mortgagee in consideration of and as security for all present and future advances as well as all of Mortgagor's obligations under the Loan Agreement, the lien of this Mortgage relating back to the date of this Mortgage with respect to all advances which are at anytime made to Mortgagor under the Loan Agreement and any renewals and extensions thereof; and,

**WHEREAS**, Mortgagor's obligation to repay the sums advanced under the Loan is evidenced by Mortgagor's Note of even date herewith in the original principal amount aforesaid, as the same may be amended, modified, supplemented, extended and/or renewed from time to time, (the "Note"), which Note, made payable to the Order of Mortgagee, if not sooner paid is due and payable on **November 1, 2019.** Hereinafter, the Loan Agreement, the Note, this Mortgage and all other documents executed and delivered in connection with or collateral to any of the foregoing may be referred to collectively as the "Loan Documents", and the terms and conditions thereof are incorporated herein by reference as though set forth herein in full; and,

**WHEREAS,** the balance of the sums due under Loan Documents from time to time outstanding and all interest, charges, fees and expenses due thereunder, together with the balance of all Future Advances (as hereinafter defined) from time to time outstanding, and all interest, charges, fees and expenses to be paid by Mortgagor as provided therein or in this Mortgage, and all other liabilities and obligations of Mortgagor to Mortgagee, present or future, direct, contingent, joint, several or individual, are hereinafter collectively referred to as the "Secured Indebtedness"; and,

**WHEREAS,** as security for payment of the Note, for the performance of its obligations under the other Loan Documents and as otherwise provided for herein, Mortgagor has agreed, inter alia, to grant to Mortgagee a mortgage lien against, and a security interest in, the Mortgaged Property (as hereinafter defined).

**NOW, THIS INDENTURE WITNESSETH** that Mortgagor, as an inducement for

Case ID: 160303161

Mortgagee to lend sums to Mortgagor pursuant to the Loan Agreement as well as in consideration of the Secured Indebtedness and to secure the payment and performance of the Note, the other Loan Documents and all Secured Indebtedness with interest as therein recited, the Future Advances and all other sums due or to become due thereunder, including, without limitation, payment of all sums, fees and charges described in the Loan Agreement, all according to the respective terms and conditions contained therein and in certain other agreements and instruments made and given by Mortgagor to Mortgagee in connection therewith, and as security for any and all past, present or future loans or advances that may be made by Mortgagee to Mortgagor, or to any third party upon the guaranty, surety, endorsement or other accommodations of Mortgagor, and for and in consideration of the further sum of One ($1.00) Dollar, paid by Mortgagee to Mortgagor at the execution and delivery hereof, receipt of which is hereby acknowledged, and intending to be legally bound, has granted, conveyed, bargained, sold, aliened, enfeoffed, released, confirmed, transferred, assigned, pledged and mortgaged, and by these presents does hereby grant, convey, bargain, sell, alien, enfeoff, release, confirm, transfer, assign, pledge and mortgage (and grant a security interest to the extent governed by the (Uniform Commercial Code) unto Mortgagee, its successors and assigns in:

**ALL THAT CERTAIN** lot or parcel of ground lying and being located in Bristol Borough, Bucks County, Pennsylvania, as more fully described in Exhibit "A" attached hereto and made a part hereof (the "Premises").

**TOGETHER WITH** all of Mortgagor's right, title and interest now owned or hereafter acquired in:

(i) Site improvements, buildings, structures and improvements now or hereafter erected on the Premises, as well as all alterations, additions and improvements now or hereafter made thereto (collectively, the "Improvements");

(ii) Easements, rights of way, streets, alleys, passages, ways, water, watercourses, mineral rights, rights, liberties, privileges, tenements, hereditaments and the appurtenances thereunto belonging (collectively, the "Appurtenances");

(iii) Leases, subleases, agreements of sale, options, other agreements, and all reversions, remainders, rents, income, proceeds, issues, profits, fees, payments, grants, franchises, rights, liberties, concessions and privileges of whatever kind or character derived or arising from or received in connection with any leases, subleases, agreements of sale, options or other agreements, or derived or arising from or received in connection with all purposes for which the Premises, Improvements and Appurtenances might be employed, whether now existing or hereafter arising (collectively, the "Sales Proceeds");

(iv) Building materials, machinery, apparatus, equipment, fittings, fixtures and appliances of any nature whatsoever, and any other articles of personal property nor or hereafter located on, about, under or in the Premises or the Improvements at any time erected thereon, without regard

Case ID: 160303161

to whether the same may be affixed to the Premises or Improvements, at any time or from time to time and used, intended to be used or usable in connection with any present or future maintenance or operation of the Premises or the Improvements (collectively, the "Building Materials");

(v) Awards, decrees, condemnation or other proceeds and settlements made to or for the benefit of Mortgagor by reason of any damage to, destruction of or taking of the Premises or any part thereof or any Appurtenances, Improvements or any Building Materials, whether such award shall be made by reason of the exercise of the right of eminent domain or otherwise, or by any public or private authority, tribunal, corporation or other entity or by any natural person (collectively, the "Awards"); and,

(vi) Contracts, licenses, permits, approvals, product and manufacturer warranties, guarantees and service agreements, including all manuals, policies, and other documents in connection with the same in favor of Mortgagor or by and between Mortgagor and any and all boards, agencies, departments, governmental or other parties of any kind, relating, directly or indirectly to the Premises or the Building- Materials, whether heretofore or hereafter issued, executed or delivered (collectively, the "Licenses").

All of the above mentioned Premises, Improvements, Appurtenances, Sales Proceeds, Building Materials, Awards, Licenses and all other property interests described hereinabove, together with the appurtenances thereto and all other property of whatever kind described in or covered by this Mortgage may be hereinafter referred to collectively as the "Mortgaged Property."

**TO HAVE AND TO HOLD** the Mortgaged Property hereby conveyed or mentioned and intended so to be, unto Mortgagee, its successors and assigns, to its or their own use, forever.

**PROVIDED HOWEVER,** that if Mortgagor shall promptly pay or cause to be paid to Mortgagee the Secured Indebtedness, and shall perform and comply with or cause to be performed and complied with all the other terms, conditions, agreements and provisions contained in the Loan Documents and any and all other instruments, documents, agreements or writings now or hereafter evidencing, securing or pertaining hereto or thereto, and any and all agreements entered into with respect to any Future Advances, all without fraud or delay or deduction or abatement of anything or for any reason, then this Mortgage and the estate hereby granted shall cease, terminate and become void.

**AND MORTGAGOR FURTHER WARRANTS, REPRESENTS, COVENANTS AND AGREES AS FOLLOWS:**

**1. Warranty of Title.** (a) Mortgagor presently possesses an unencumbered good and marketable fee simple title to the Mortgaged Property, free from any liens, claims, encumbrances and/or restrictions, except for those title exceptions (if any) approved by Mortgagee in writing; (b) this Mortgage is and will remain a valid and enforceable second priority lien on the Mortgaged

Case ID: 160303161

Property subject only to the aforesaid title exceptions (if any); and (c) Mortgagee, subject to Mortgagor's right of possession prior to an Event of Default (as defined herein), shall quietly enjoy and possess the Mortgaged Property.  Mortgagor shall preserve such title and the validity and priority of the lien hereof and shall forever warrant and defend the same unto Mortgagee against the claims of all persons and parties whatsoever.

    **2.**  **Security Agreement.**  This Mortgage constitutes a security agreement under the Uniform Commercial Code as adopted and existing from time to time in the Commonwealth of Pennsylvania (the "Code") and Mortgagor hereby grants to Mortgagee a security interest in and lien upon all that property (and all cash and on cash proceeds thereof) included in the Mortgaged Property which might otherwise be deemed personal property covered by the Code (collectively, the "Personalty"), including all Fixtures (as defined in the Code) (and all cash and on cash proceeds thereof) located on or about the Mortgaged Property.  Upon filing this Mortgage in the appropriate offices, this Mortgage shall also be effective as a Financing Statement filed in such offices with respect to such Personalty and Fixtures.  Mortgagor shall execute, deliver, file and refile any Financing Statements, continuation statements or other security agreements Mortgagee may require from time to time to confirm the lien of this Mortgage with respect to such Personalty and/or Fixtures. Without limiting the foregoing, Mortgagor hereby irrevocably appoints Mortgagee attorney-in-fact for Mortgagor (which appointment is agreed to be coupled with an interest) to execute, deliver and file such instruments for and on behalf of Mortgagor.  All costs of such filing and refiling shall be paid by Mortgagor.  Mortgagor shall not change its principal place of business without giving Mortgagee at least thirty (30) days prior written notice thereof.  To the extent permitted by law, Mortgagor and Mortgagee agree that the items set forth on the Financing Statements shall be treated as part of the Premises and Improvements regardless of the fact that such items are set forth in the Financing Statement.  Such items are contained in the Financing Statements to create a security interest in favor of Mortgagee in the event such items are determined to be Personalty or Fixtures.  Notwithstanding any release of any or all of the property included in the Mortgaged Property which is deemed "real property", any proceedings to foreclose this Mortgage or its satisfaction of record, the terms hereof shall survive as a security agreement with respect to the security interest created hereby and referred to above until the repayment or satisfaction in full of all of the Secured Indebtedness.

    **3.**  **Future Advances.**
    (a)  This Mortgage shall further constitute security for all of the following (collectively, the "Future Advances"), together with interest thereon, whether or not Mortgagee is obligated to make any such Future Advance: (i) any and all future advances, readvances, loans, extensions of credit or other financial accommodations to or for the credit of Mortgagor or to third parties upon the surety, guaranty, endorsement or other accommodations of Mortgagor, regardless of the amount, the purpose of which such debt may be created and whether any reference is made to this Mortgage therein; (ii) any and all future obligations, indebtedness and/or liabilities of Mortgagor to Mortgagee hereafter incurred, due or owing under the provisions of the Note, the Loan Agreement, this Mortgage, any of the other Loan Documents or any of the other Secured Indebtedness; (iii) any and all obligations, costs or expenses assumed or incurred by Mortgagee

Case ID: 160303161

in connection with any Future Advances; (iv) all advances Mortgagee may make or become obligated to make for the protection of the security hereby given, including, without limitation, the unpaid balances of advances made with respect to the Mortgaged Property for the payment of taxes, assessments, maintenance, charges, insurance premiums and costs incurred for the protection of the Mortgaged Property or the lien of this Mortgage, and all expenses incurred by Mortgagee by reason of an Event of Default by Mortgagor hereunder; and (v) all advances Mortgagee may make to pay toward all or part of the cost of completing any erection, construction, alteration or repair of any part of the Mortgaged Property. With respect to each such advance or readvance, the lien of this Mortgage with respect thereto shall relate back to the date of this Mortgage, regardless of whether the maturity hereof or of the Note or any other Secured Indebtedness shall have been extended, regardless of whether this Mortgage shall have been modified, and regardless of whether there shall have been any modification of the Mortgaged Property or of any other property securing payment of the Secured Indebtedness. Without limiting the foregoing, this Mortgage secures all advances and readvances made by Mortgagee of any kind or nature described in 42 Pa C. S. §8144. This Mortgage is an Open End Mortgage as defined in Section 8143 "Open End Mortgages" of Title 42 (Judiciary and Judicial Procedure) of the Pennsylvania Consolidated Statutes, establishing the priority of advances made under certain mortgages, as amended by Senate Bill No, 693 (Session of 1989) effective December 12, 1990.

(b) If Mortgagor sends a written notice to Mortgagee which purports in any manner to limit the indebtedness secured by this Mortgage and to release the obligation of Mortgagee to make any additional advances to Mortgagor, such a notice shall be ineffective as to any future advances made: (i) to enable completion of the Improvements on the Mortgaged Property for which the loan secured hereby was originally made; (ii) to pay taxes, assessments, maintenance charges and insurance premiums; (iii) for costs incurred for the protection of the Mortgaged Property or the lien of this Mortgage; (iv) for expenses incurred by Mortgagee by reason of a default of Mortgagor under this Mortgage or under the Note or any of the Loan Documents; and (v) for any other costs incurred by Mortgagee to protect and preserve the Mortgaged Property, It is the intention of the parties hereto that any such advance made by Mortgagee after any such notice by Mortgagor shall be secured by the lien of this Mortgage on the Mortgaged Property.

**4. Payment of Obligation.** Mortgagor will pay when due the Secured Indebtedness, together with interest thereon, at the times and in the manner as provided in and by the Loan Documents and any and all agreements entered into with respect to any Secured Indebtedness.

**5. Compliance, and Terms.** Mortgagor will promptly and faithfully observe and perform all the terms, agreements, conditions, stipulations, covenants and provisions contained herein, in the Loan Documents and in any and all agreements entered into with respect to any Secured Indebtedness, shall commence, complete and pay for any and all construction which is commenced at any time on the Premises in accordance with the terms of the Loan Agreement, and shall timely perform all of its obligations and duties as seller under any agreement of sale now or hereafter in effect with respect to the Premises or any part thereof.

Case ID: 160303161

**6.   Taxes, Rents and Other Charges.**   Mortgagor will pay, prior to the time when interest or penalties commence to accrue thereon, all required monthly payments on the first mortgage, all taxes, sewer and water rents, other claims and charges, including charges in lieu of taxes, which may be levied, assessed or filed with respect to the Mortgaged Property or Mortgagor by any and all federal, state and local agencies, boards, bureaus and departments(collectively the "Governmental Authority").   Within thirty (30) days after the payment of each of the foregoing, Mortgagor will produce to Mortgagee receipts or other satisfactory evidence of such payment. However, if Mortgagor; (i) in good faith and by appropriate legal action shall contest the validity of any such item or the amount thereof after notice thereof to Mortgagee; (ii) shall have furnished and deposited security as required by Mortgagee; and (iii) shall have furnished assurance satisfactory to Mortgagee indemnifying it against any loss by reason of such contest, then Mortgagor shall not be required to pay the item (except for all real estate taxes which must be paid regardless of any challenge) or to produce the required receipts so long as the contest operates to prevent collections, does not jeopardize the lien of this Mortgage, is maintained and prosecuted with diligence and shall not have been terminated or discontinued adversely to Mortgagor. Mortgagor will not apply for or claim any deduction, by reason of this Mortgage, from the taxable value of all or any part of the Mortgaged Property.   No credit shall be claimed or allowed on the interest payable on the Notes by reason of any taxes or other charges paid.

**7.   Escrow Deposits.**   Without limiting the effect of Sections or 8 hereof, Mortgagor will deposit with Mortgagee monthly, if so requested by Mortgagee in writing; (i) a sum equal to one twelfth (1/12) of the annual taxes, sewer and water rents, and such other claims and charges as may be assessed or levied by any Governmental Authority on or against the Mortgagor or the Mortgaged Property, including charges in lieu of taxes; and (ii) such amounts as shall be necessary to create a fund adequate to pay the premiums con all insurance required herein prior to expiration of the current policies.   Unless otherwise required by law, Mortgagee shall have no obligation to pay interest to Mortgagor on such escrow deposits.   It is intended that not later than one month prior to the respective dates on which the premiums shall be due and payable and the real property taxes shall last be due and payable without interest or penalty, and provided no Event of Default shall have occurred and no event shall have occurred which, with the giving of notice or the passage of time or both would become an Event of Default, such sums shall be applied to the payment of the item or items in respect of which such amounts were deposited or, at Mortgagee's option, to the payment of such items in such order of priority as Mortgagee shall determine, as the same become due and payable, and Mortgagor shall make available to Mortgagee proper bills therefor.   If Mortgagor is required to have deposited such sums with Mortgagee and the amount then held by Mortgagee on deposit shall be insufficient to pay such premiums or taxes, Mortgagor, upon demand, shall pay to Mortgagee any amount necessary to makeup such deficiency.   If an Event of Default shall have occurred and remains uncured, Mortgagee may at its option apply the amounts then deposited with Mortgagee, or any part thereof, in payment of the unpaid sums secured by this Mortgage.   Nothing contained in this Section 7 shall be deemed to affect any right or remedy of Mortgagee under any other provisions of this Mortgage or of any statute or rule of law to pay any such items and to add the amount of the payment, with interest, as herein provided, to the principal sums secured of this Mortgage, and to require payment thereof on

Case ID: 160303161

demand.  If, when making any assignment of this Mortgage, the then mortgagee shall pay over to its assignee the then balance of the deposits made by Mortgagor under this section, such assigning mortgagee shall have no further obligation to Mortgagor for the proper application of such deposits.

**8.   Insurance.** Mortgage shall keep the Mortgaged Property continuously insured to the extent of its full insurable value against fire, theft, explosion and all hazards included in "all risk coverage", and shall cause Mortgagee, its successors and assigns, as its interests may appear, to be named as "Insured Mortgagee" thereunder pursuant to a standard mortgagee clause, upon terms and with companies satisfactory to Mortgagee.  Such coverage shall be in an amount satisfactory to Mortgagee, which amount shall be not less than an amount required to prevent the application of any co-insurance contribution requirement of such policy and shall not be less than the greater of the full face amount of the Secured Indebtedness, when fully funded, or the replacement value of the improvements.  Mortgagor shall deliver all policies of insurance to Mortgagee, which policies shall contain clauses providing for unconditional thirty (30) days written notice to Mortgagee prior to cancellation or material change in coverage.  Mortgagor shall maintain and deliver satisfactory evidence to Mortgagee that there are in effect policies of workman's compensation insurance, flood insurance (if required) and comprehensive general liability and property damage insurance against claims for personal injury, including, without limitation, injury or death to persons and damage or destruction to property in or about the Mortgaged Property, all in such amounts as Mortgagee may from time to time require, in such form and issued by companies acceptable to Mortgagee, and such other insurance as Mortgagee may from time to time require, which policies shall contain clauses providing for unconditional thirty (30) days written notice to Mortgagee prior to cancellation or material change in coverage. Mortgagor shall cause Mortgagee to be named as "additional insured" on all such policies of general liability insurance. Mortgagor shall pay as they shall become due all premiums for all insurance, and evidence thereof satisfactory to Mortgagee shall be delivered to Mortgagee within thirty (30) days of payment thereof.  Renewal policies, with premiums paid, shall be delivered to Mortgagee at least thirty (30) days before expiration of the old policies. Mortgagor shall not take out separate insurance concurrent inform or contributing in the event of loss with the insurance required to be maintained hereunder unless Mortgagee is included therein as a named insured with loss payable to Mortgagee under a non-contributory mortgagee clause satisfactory to Mortgagee.   Mortgagor shall immediately notify Mortgagee whenever any such separate insurance is taken out, specifying the insurer thereunder, and Mortgagor shall supply duplicate originals or certificates of such insurance to Mortgagee on demand.

If any required insurance or part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Mortgagor, become void or unsafe by reason of the failure or impairment of the capital of any company in which said insurance may then be carried or if for any other reason whatsoever said insurance shall become unsatisfactory to Mortgagee to adequately insure the Mortgaged Property and/or Mortgagee's interests therein, Mortgagor shall promptly proceed to effect new insurance on the Mortgaged Property in form, content, amount and from such insurers as shall be satisfactory to Mortgagee in its sole discretion.  In the event of loss,

Case ID: 160303161

Mortgagor will give immediate notice by mail to Mortgagee and Mortgagee may make proof of loss whether or not the same is made by Mortgagor, Mortgagor hereby directs any insurance company concerned to pay directly to Mortgagee any moneys that may become payable to Mortgagee or Mortgagor under any insurance policies maintained in connection with the Mortgaged Property, including return of unearned premiums, and Mortgagor appoints Mortgagee as attorney-in-fact which appointment is agreed to be coupled with an interest) to endorse any draft therefor. Mortgagee shall have the right to retain and apply the proceeds of any such insurance, at its election, to reduction of the Secured Indebtedness, in any order, manner or preference as Mortgagee, in its sole discretion, determines, or to restoration or repair of the property damaged, subject to such terms and conditions as Mortgagee may require. No application of any insurance proceeds against the Secured Indebtedness shall release Mortgagor from its obligations hereunder or under the Note or the Loan Documents or postpone or delay any current or future payments of principal or interest becoming due under the Note until the Note and all interest and other sums, if any, due thereunder and hereunder are paid in full. If requested by Mortgagee, Mortgagor shall, from time to time have the then replacement value and insurable value of the Improvements determined by the fire insurance underwriter on the Mortgaged Property, and Mortgagor will deliver such determination to Mortgagee. Such policies of insurance and all renewals thereof are hereby assigned to Mortgagee as additional security for payment of the Secured Indebtedness and Mortgagor hereby agrees that any values available thereunder upon cancellation or termination of any of said policies or renewals, whether in the form of return of premiums or otherwise, shall be payable to Mortgagee as assignee thereof. In the event of foreclosure of this Mortgage or other transfer of title to the Mortgaged Property in extinguishment of all or any part of the Secured Indebtedness, all right, title and interest of Mortgagor to any insurance policies then in force covering the Mortgaged Property shall pass to the transferee of the Mortgaged Property.

   **9. Maintenance of Mortgaged Property.** Mortgagor: (a) shall keep and maintain the Mortgaged Property in good repair and order and shall make as and when necessary all repairs and replacements thereto; (b) shall not remove from the Premises or Improvements, the Building Equipment or any other property of any nature covered by the lien or security interest granted by this Mortgage; (c) shall not make, install or permit to be made or installed any alterations, additions or improvements of any nature to or in the Mortgaged Property that negatively affect the value of the Mortgaged Property or, except as permitted in the Loan Agreement, are structural in nature without obtaining the prior written consent of Mortgagee and without obtaining insurance thereon; (d) shall not permit the Mortgaged Property to become vacant, deserted, abandoned or unguarded; (e) shall not permit any lien or claim to be filed against the Mortgaged Property or any part thereof; and (f) shall not commit or suffer any waste of the Premises, Improvements or Building Equipment, or make any change in the use thereof which will in any way increase the risk of fire or other hazard or that may impair the security of this Mortgage.

   **10. Declaration of Amount Due and No Set-Off.** Mortgagor shall, within five (5) days after request, furnish a written statement or declaration, duly acknowledged, of the amount due under the Loan Documents and whether any offsets or defenses exist thereto or against this Mortgage or any other such document (and specify the precise amount and nature of any such

Case ID: 160303161

offsets or defenses).

**11. Inspection.** Mortgagor shall permit Mortgagee and/or its agents, at any time and from time to time, to enter upon the Mortgaged Property to inspect, photograph or appraise the Mortgaged Property for any purpose.

**12. Compliance with Laws.** Mortgagor will comply with all laws, statutes, codes, ordinances, regulations, rules, resolutions, orders, agreements, covenants, conditions, contracts, declarations, easements, licenses and restrictions of any federal, state, municipal or other governmental or quasi-governmental authority or agency affecting the Premises, Improvements and Building Equipment and will not suffer or permit any violation thereof. The foregoing shall not preclude the right of Mortgagor to, in good faith, contest the enforcement of any of the foregoing provided that enforcement is stayed by the operation of such contest and Mortgagor deposits with Mortgagee, during the pendency of any such contest, security satisfactory to Mortgagee. Mortgagor shall, at its sole cost and expense, pay all licenses, fees and charges with respect to or applicable to the use, ownership, operation or management of the Mortgaged Property or any portion thereof. Mortgagor will do or cause to be done all things necessary to preserve intact and unimpaired any and all easements, appurtenances, rights of way and other interests and rights in favor of, or constituting any portion of, the Mortgaged Property.

**13. Environmental Representations, Covenants, Indemnity and Testing.**

(a) Representation. Mortgagor hereby represents and warrants to Mortgagee that, except as described in that certain Environmental Certificate of even date herewith delivered to Mortgagee by Mortgagor (the "Environmental Certificate"), there are no Special Materials (hereinafter defined) presently located on or near the Mortgaged Property. Mortgagor further represents and warrants to Mortgagee that, except for the activities and Special Materials described in the Environmental Certificate, the Mortgaged Property is not now being used nor, to the best of its knowledge, has it ever been used in the past for activities involving Special Materials, including, but not limited to, the use, generation, collection, storage, treatment or disposal of any Special Materials and, in particular, without limiting the generality of the foregoing, the Mortgaged Property is not now being used nor has it ever been used in the past for a landfill, surface impoundment or area for the treatment, storage or disposal of solid waste (including, without limitation, solid waste such as sludge).

(b) Notice of Violation. Mortgagor represents and warrants that it has not received any notices of the filing of any civil or criminal action or notices of any investigation or request for information by any governmental or quasi-governmental agency, authority, instrumentality or board relative to the condition of the Mortgaged Property. Mortgagor shall notify the Mortgagee immediately upon receipt of any such notices or filings and, at such time, shall provide Mortgagee with copies of any and all such notices, filings, reports and related materials.

(c) Covenant Regarding Compliance. Mortgagor will not place or permit to be placed any Special Materials (other than those, if any, specifically described in the Environmental

Case ID: 160303161

Certificate) on the Mortgaged Property.  For all Special Materials at any time located on the Mortgaged Property, Mortgagor shall take or cause to be taken, at Mortgagor's sole expense, such actions as may be necessary to comply with all Environmental Requirements (hereinafter defined). If Mortgagor shall fail to take any such action, Mortgagee may make advances or payments towards performance or satisfaction of the same but shall be under no obligation to do so; and all sums so advanced or paid, including all sums advanced or paid by Mortgagee in connection with any judicial or administrative investigation or proceeding relating thereto, including, without limitation, attorney's fees, fines or other penalty payments, shall be at once repayable by Mortgagor and all sums so advanced or paid shall become a part of the Secured Indebtedness. Failure of Mortgagor to comply with all Environmental Requirements shall constitute and be an Event of Default.

(d)  Indemnity.  Mortgagor hereby agrees to indemnify and hold harmless Mortgagee, its parents, subsidiaries, successors and assigns, and any officer, director, shareholder, employee or agent of Mortgagee, from and against all loss, liability, damage, cost and expenses, including attorney's fees and costs, for failure of the Mortgaged Property to comply in all respects with the Environmental Requirements or a breach by Mortgagor of any representation, warranty, agreement or covenant in this Section 13.

(e)  Testing.  Mortgagor hereby irrevocably authorizes Mortgagee to conduct such tests, examinations or inspections of or upon the Mortgaged Property to confirm compliance with all Environmental Requirements.  The cost and expense of such tests, examinations and inspections shall be the responsibility of Mortgagor, In the event Mortgagee pays such costs or expenses on behalf of the Mortgagor, such sums shall be at once repayable by Mortgagor and all sums so advanced or paid by Mortgagee shall become part of the Secured Indebtedness.

(f)  Survival.  The representations, warranties, agreements and covenants of Mortgagor contained in this Section 13 shall survive the. occurrence of any event whatsoever, including, but not limited to, payment in full of the Secured Indebtedness, the release, satisfaction or foreclosure of this Mortgage or the acceptance by the Mortgagee of a deed in lieu of foreclosure.

(g)  Definitions.  For purposes of this Section 13: (1) "Environmental Requirements" means any and all federal, state or local laws, statutes, ordinances, regulations or standards, administrative or court orders or decrees, and private agreements; and (2) "Special Materials" means any and all material that, under any Environmental Requirement, requires special handling in use, generation, collection, storage, treatment or disposal, or the payment of costs or similar economic loss associated with responding to the lawful directives of any court or agency of competent jurisdiction with respect to any such material.  Without limiting the foregoing, Special Materials shall include any materials that violate any national or local contingency plan or the release or threatened release of which may violate or create liability under any of the Environmental Requirements, Special Materials shall also include, without limitation: (i) asbestos in any form; (ii) urea formaldehyde foam insulation; (iii) paint containing lead; and (iv) transformers or other equipment that contains dielectric fluid containing polychlorinated biphenyls

Case ID: 160303161

(commonly referred to as "PCBs").

**14.   Costs; Expenses and Indemnification.**  In the event Mortgagee shall ever refer any or all of the Loan Documents or any agreements entered into with respect to any Secured Indebtedness to counsel because of any default thereunder, Mortgagor shall reimburse Mortgagee for any and all attorney's fees and costs incurred, If judgment shall be entered under the Note or any of the other Loan Documents or any agreements entered into with respect to any Secured Indebtedness, or foreclosure proceedings shall be commenced upon this Mortgage because of any such default, then all costs and expenses of suit, together with attorney's Fees for collection of five (5%) percent of the total amount due under the Note or any of the other Loan Documents or other agreements, but in no event less than Twenty Thousand ($20,000.00) Dollars shall be payable and recovered in addition to all principal, interest and other recoverable sums then due.  If Mortgagee shall become a party, either as plaintiff or defendant, to any suit or legal proceeding affecting the lien or security interests hereby created on or in the Mortgaged Property, Mortgagor shall pay to Mortgagee on demand its costs, expenses and attorneys' fees in such suit or proceeding. Mortgagor, for itself and all those claiming under or through it, agrees to protect, indemnify, defend and hold harmless Mortgagee, its directors, officers, shareholders, employees and attorneys from and against any and all liability, expense or damage oaf any kind or nature and from any suits, claims or demands, including legal fees and expenses arising out of this Mortgage or in connection therewith, including, without limitation, claims for brokerage or finder's fees, disputes between Mortgagor and any other person, including, without limitation, any contractors, subcontractors or materialmen, or any municipal or public authority, or any claims in any way related to any hazardous wastes on or environmental contamination of the Premises, or on account of any act or omission to act or negligence of Mortgagee.  All of the obligations in this Section 14 shall survive satisfaction of this Mortgage.

**15.   No Transfer.** Except as provided in Section 16 hereinbelow, Mortgagor will not sell, exchange, convey, transfer or assign, and will not permit the sale, exchange, conveyance, transfer or assignment, voluntarily or by operation of law, of all or any interest in the Mortgaged Property, or any part thereof or interest therein, or any transfer or sale of partnership interests in Mortgagor, without the prior written consent of Mortgagee, which consent Mortgagee may withhold in its discretion.

**16.   Release of Individual House Lots Constructed on the Mortgaged Property.** Provided Mortgagor is not then in default hereunder or under any of the Loan Documents or any other agreements or instruments heretofore or hereafter executed collateral hereto or thereto, Mortgagee agrees to release from the lien of this Mortgage any or all individual houses and/or lots (individually, a "House") as well as all individual condominium units  comprising a portion of the Mortgaged Property and constructed pursuant to the terms of the Loan Agreement utilizing the loan proceeds provided by Mortgagee under the Note and the Loan Agreement, subject to satisfaction of all of the following conditions:

(a)  Mortgagor shall have provided Mortgagee at least ten (10) days prior written notice of

Case ID: 160303161

settlement of the sale of such House or Condominium Unit,

(b)  Mortgagor shall have completed all construction related to the House or Condominium Unit to be released and all appurtenant facilities and shall have furnished Mortgagee with evidence of such completion, which evidence shall be in form and content satisfactory to Mortgagee in its sole discretion.

(c)  Mortgagor shall have delivered to Mortgagee an executed  copy of the agreement of sale for such House or Condominium Unit, which agreement of sale shall be acceptable in form and content to Mortgagee.

(d)  Mortgagor shall receive at settlement of the sale of such House or Condominium Unit such sum as is set forth in paragraph 1.5 of the Loan Agreement.

(e)  The remaining unreleased portion of the Premises complies with all representations and warranties of Mortgagor contained in the Loan Documents.

(f)  Mortgagor shall pay all costs of Mortgagee in connection with the release of any House, including, without limitation, all costs and expenses of document preparation and recording fees.

**17.   Other Liens.** Mortgagor will not create, incur, assume or suffer to exist any mortgage, lien, charge, security interest or other encumbrance upon the Mortgaged Property, or any part thereof, without the prior written consent of Mortgagee, which consent Mortgagee may withhold in its sole discretion.

In the event that the Mortgaged property, or any part thereof, is now or hereafter subject to any other mortgage, lien, charge, security interest or other encumbrance, with respect to which Mortgagor shall have received Mortgagee's prior written consent as required herein (the "Approved Mortgage"):

(a)     Such Approved Mortgage shall be, and shall at all times remain, under and subject, secondary and subordinate in all respects to the lien of this Mortgage and to all renewals, extensions, modifications, rearrangements and release, including without limitation, increases in interest rate, future advances hereunder and all release provisions for portions of the Mortgaged Property, with or without consideration, without any obligation on Mortgagor's part to give notice of any kind.

(b)     Mortgagor will pay the principal, interest and all other sums due and payable with respect to such Approved Mortgage on or before the applicable due date, and will comply with all of the other terms, covenants and conditions thereof;

(c)     Upon request by Mortgagee, Mortgagor will produce to Mortgagee from time to time, a copy of the check or other evidence of payment in connection with the Approved Mortgage;

Case ID: 160303161

(d)      Mortgagor will not enter into any modification, amendment, agreement or arrangement, without the prior written consent of Mortgagee which consent Mortgagee may withhold in its sole discretion, pursuant to which Mortgagor is granted any forbearance or indulgence in the payment of any principal, interest or other sums due in accordance with the terms and provisions of the Approved Mortgage;

(e)      Upon request by Mortgagee, Mortgagor will obtain the written agreement of the holder, from time to time, of any Approved Mortgage, to send Mortgagee copies of all notices with respect thereto;

(f)      Mortgagor shall notify Mortgagee promptly of the receipt of any notice given by the holder of any Approved Mortgage and shall forward to Mortgagee a copy of such notice;

(g)      If applicable, Mortgagor shall deliver to the Recorder of Deeds of Bucks County for recording the written notice permitted by and in accordance with the provisions of 42 Pa.C.S.A. Section 8143 et seq (the "Open End Mortgage Act") to limit the indebtedness secured by the holder of the Approved Mortgage and to release the obligation of such holder to make further payments and Mortgagor shall serve et copy of such notice upon the holder of the Approved Mortgage more than three (3) days prior to the delivery of such notice to the Recorder, and with respect to the provisions of this subsection (f), Mortgagor irrevocably appoints Mortgagee as its attorney-in-fact (which appointment is agreed to be coupled with an interest) to execute and deliver on Mortgagor's behalf the notice referred to in this subsection (f); and,

(h)      Mortgagor acknowledges and agrees that Mortgagee has the right, pursuant to the Open End Mortgage Act, to deliver to the holder of the Approved Mortgage written notice of the existence of this Mortgage, which written notice otherwise complies with the provisions of the Open End Mortgage Act for the delivery of notice by subordinate lienholders.

**18. Condemnation.** Mortgagor shall notify Mortgagee promptly upon receiving any notice of commencement of any proceedings for the condemnation or other taking of any or all of the Mortgaged Property and shall permit Mortgagee to participate in such proceedings and to receive all proceeds payable to Mortgagor as an award or in settlement, up to the amount of the unpaid principal, accrued interest and any other sums secured hereby.  No settlement for any damages sustained may be made by Mortgagor without Mortgagee's prior written approval, and Mortgagor hereby irrevocably appoints Mortgagee attorney-in-fact for Mortgagor (which appointment is agreed to be coupled with an interest); (a) to collect and receive any such awards, damages, payments and compensation from the authorities making the same; (b) to give receipts and acquittances therefor; (c)  to institute, appear in and prosecute any proceeding therefor in the event Mortgagor fails to take such action; and (d) to prosecute to final determination or settlement an appeal or other appropriate proceeding win the event that any initial award or settlement is insufficient to pay in full the Secured Indebtedness, Mortgagor shall execute such further assignments of condemnation awards as Mortgagee may required.  All sums collected by or paid to Mortgagee pursuant to any such assignment, net of any costs, including attorney's fees, incurred

Case ID: 160303161

by Mortgagee in collecting the same may be: (x) applied by Mortgagee, in such order of priority as Mortgagee shall determine, to the payment of accrued interest and principal, whether or not then due and payable, or to any other sums secured by this Mortgage (and receipt and application by Mortgagee of any proceeds less than the full amount of the then outstanding indebtedness of Mortgagor secured hereby shall not alter or modify Mortgagor's obligation to continue to pay all amounts specified in the Notes and the Loan Documents); or (y) paid or made available by Mortgagee to Mortgagor, on such terms as Mortgagee may specify, without Mortgagee thereby waiving or impairing any equity or lien, tender and by virtue of this Mortgage, as a result of any such taking, alteration of grade or other injury to or decrease in value of the Mortgaged Property. If, prior to the receipt by Mortgagee of said sums, the Mortgaged Property shall have been sold on foreclosure of this Mortgage, Mortgagee shall have the right, whether or not a deficiency judgment on the Secured Indebtedness shall have been sought, recovered or denied, to receive said sums to the extent of the Secured Indebtedness remaining unsatisfied after such sale, with interest thereon at the "Default Rate (if any) set forth in the Notes, and to receive costs and expenses, disbursements, including attorneys' fees and costs, incurred by Mortgagee in connection with the collection of said sums.   Nothing herein shall limit the rights otherwise available to Mortgagee at law or in equity, including the right to intervene as a party to any condemnation proceeding.

**19.  Leases; Agreements of Sale.**  Mortgagor represents and warrants that there are no leases or agreements to lease, or agreements of sale for all or any part of the Mortgaged Property now in effect, other than  agreements of sale in form and content acceptable. to Mortgagee, copies of which have been delivered to Mortgagee prior to execution and delivery of this Mortgage, Without the prior written consent of Mortgagee as to the form and content of any agreement of sale or any lease and the tenant thereunder, including, without limitation, the purchase price under any agreement of sale or the term and rental amount of any lease, which consent Mortgagee may withhold in its discretion, Mortgagor shall not sell or lease or permit anyone else to sell or lease any portion of the Mortgaged Property.  Mortgagor hereby assigns to Mortgagee and grants to Mortgagee a security interest in and lien upon, as additional security for the Secured Indebtedness, any and all leases or agreements of sale entered into for any portion of the Mortgaged Property, whether now existing or hereafter created, together with all rentals or sale proceeds due and to become due thereunder and all rights and remedies provided therein for the collection of said rents or sale proceeds Mortgagee in no way assumes or will assume any of the obligations as landlord under any leases or as seller under any agreement of sale, and this assignment shall not release Mortgagor of its obligations as lessor or seller.   Until such time as Mortgagee directs otherwise, Mortgagor or such other party as Mortgagor shall direct shall have the right to collect the rentals under said lease, Mortgagor shall perform (or cause to be performed) every obligation of the lessor or seller, as the case may be, and shall enforce every obligation of the lessee or buyer, as the case may be, under every lease or agreement of sale in connection with the Mortgaged Property.  Mortgagor shall not modify, alter, waive or cancel any lease, agreement of sale or any part thereof, nor collect in advance more than one month's rent under any lease nor assign any lease or any such rents or the proceeds under any such agreement of sale, except in favor of Mortgagee, All leases and agreements of sale to which Mortgagee

Case ID: 160303161

consents shall be expressly subject and subordinate in all respects to the lien of this Mortgage. At Mortgagee's request, Mortgagor shall deliver or cause to be delivered to Mortgagee, assignments of specific leases together with subordination and/or attornment agreements and estoppel letters or certificates from any or all tenants of the Mortgaged property, and such assignments, subordination and/or attornment agreements, estoppel letters and certificates are to be in such form as Mortgagee may require.

Mortgagor shall furnish to Mortgagee from time to time as requested by Mortgagee, a complete list of all agreements of sale and leases for the Mortgaged Property or any portion thereof, in such detail as may be requested by Mortgagee. Mortgagor shall deliver to Mortgagee certified copies of all agreements of sale and leases together with copies of correspondence and memoranda between Mortgagor and purchasers and/or tenants or any successors thereunder setting forth the contractual arrangements between them.

**20.    Right to Remedy.** In the event Mortgagor should fail to: (i) pay any taxes, water and sewer rents, assessments, charges, claims, costs, expenses or fees required to be paid under the terms of this Mortgage; (ii) maintain insurance as required herein; or (iii) make all necessary repairs to the Mortgaged Property as required herein, Mortgagee may advance sums on behalf of Mortgagor in payment of said taxes, water and sewer rents, assessments, charges, claims, costs, expenses, fees, insurance premiums and repairs without prejudice to the right of enforcement of the obligations under the Notes, the other Loan Documents or the Secured Indebtedness or the other remedies of Mortgagee as herein provided, by reason of the failure of Mortgagor to make payment of the same. Mortgagor hereby authorizes Mortgagee to make all such payment and repairs. All such sums so advanced by Mortgagee shall be added to and become a part of the Secured Indebtedness, and repayment thereof, together with interest thereon at the "Default Rate" (if any) specified in the Note from the dates of their respective expenditures, may be enforced by Mortgagee against Mortgagor at any time.

**21.    Stamps and Taxes.** If at any time any Governmental Authority shall require internal revenue stamps on all or any part of the Loan Documents or the Secured Indebtedness, Mortgagor shall pay for same upon demand. If Mortgagor fails to make such payment within fifteen (15) days after demand for same, Mortgagee may pay for such stamps and add the amount so paid to the principal indebtedness secured by this Mortgage. If any law or ordinance adopted hereafter imposes a tax on Mortgagee with respect to the Mortgaged Property, the value of Mortgagor's equity therein, the amount of the indebtedness secured hereby or this Mortgage, Mortgagee shall have the right at its election, from time to time, to give Mortgagor sixty (60) days written notice to pay such indebtedness secured hereby, whereupon such indebtedness shall become immediately due, payable and collectible at the expiration of such period of sixty (60) days, without further notice or demand, However, if prior thereto, lawfully and without violation of usury laws, Mortgagor has paid any such tax in full as the same became due and payable, such notice shall be deemed to have been rescinded with respect to any right of Mortgagee hereunder arising by reason of the tax so paid.

Case ID: 160303161

**22.** **Security Deposits.** To the extent permitted by law, Mortgagor shall deposit with Mortgagee all moneys collected as security (or escrow) deposits or other deposits under any leases or agreements of sale for the Mortgaged Property or any part thereof and Mortgagee shall maintain the same in a non-interest-bearing account (to the extent permitted by law), Mortgagee shall hold said security deposits pursuant to the terms and conditions of the respective leases or agreements of sale. To the extent not permitted under law to deposit the foregoing moneys with Mortgagee, Mortgagor will comply with all applicable laws relating to such security (or escrow) deposits.

**23.** **Representations and Warranties.** Mortgagor represents and warrants that:

(a) Mortgagor has the requisite power to execute this Mortgage and the other Loan Documents and any agreements entered into in connection with any Secured Indebtedness and to perform its obligations hereunder and thereunder, and no consent, authorization or permit not obtained is required in connection with Mortgagor's execution, delivery or performance of any such agreements or obligations.

(b) The transactions contemplated herein and in the other Loan Documents and all agreements entered into in connection with any Secured Indebtedness are and will in all respects be legal, valid and binding.

(c) All information, reports, certificates, financial statements and data given by or on behalf of Mortgagor to Mortgagee with respect to any of the Mortgaged Property are accurate in all material respects necessary to make the information contained therein no misleading and are complete insofar as completeness may be necessary to give Mortgagee accurate knowledge of the subject matter. There has been no material or adverse change in any condition or facts stated therein.

(d) None of the Mortgaged Property has been damaged by fire or other casualty that has not now been fully restored.

(e) No notice of taking of any of the Mortgaged Property by eminent domain or condemnation has been received by Mortgagor or its agents, servants or employees and neither Mortgagor nor its agents, servants or employees has knowledge that any such taking or condemnation is contemplated.

(f) Mortgagor has heretofore given Mortgagee an original executed or true copy of all of the existing leases or agreements of sale relating to the Mortgaged Property, accompanied in each case by all related documents.

(g) All approvals, consents, authorizations of or designations, declarations or filings with any federal, state or local regulatory bodies or any stockholder, creditor, trustee, landlord or other person or entity required in connection with the execution, delivery or performance by Mortgagor of this Mortgage have been obtained; all licenses, permits and registrations required in connection with the use, occupancy and maintenance of the Mortgaged

Case ID: 160303161

Property have been issued, are in full force and effect and all appeal periods applicable thereto have expired without appeal having been taken and the current and proposed uses of the Mortgaged Property comply with all applicable zoning laws and other statutes, ordinances, rules and regulations of all governmental authorities having jurisdiction.

### 24. Additional Covenants of Mortgage.

(a)     Mortgagor shall file all tax returns required to be filed by Mortgagor with the proper authorities, bureaus or departments and all taxes owing to the United States, any state(s) in which Mortgagor does business or the state in which the Mortgaged property is situate and any political subdivision thereof shall be paid when due and payable and before interest or penalties are due thereon.  At Mortgagee's request, Mortgagor will deliver to Mortgagee receipts showing payment of such taxes and within ten (10) days after receipt thereof by Mortgagor, Mortgagor will deliver to Mortgagee copies of all notices of deficiency or other notices pertaining to Mortgagor's tax liability, which may be issued by the Untied States, any state(s) in which Mortgagor does business, the state in which the Mortgaged property is situate and any political subdivision thereof.

(b)     Mortgagor shall keep in effect its existence in good standing under the laws of the Commonwealth of Pennsylvania and its right to own property and transact business therein during the term of this Mortgage.

(c)     Mortgagor, in accordance with the terms of the Loan Agreement, shall promptly commence and diligently complete any and all construction, alterations and renovations that are commenced at any time on the Mortgaged Property.

(d)     In addition to any notice requirements contained elsewhere in this Mortgage or any of the other Loan Documents, Mortgagor shall notify Mortgagee of the occurrence of any of the following:

(i)     A fire or other casualty causing damage to any portion of the Mortgaged Property;

(ii)     Receipt of notice of condemnation or intended condemnation of any portion of the Mortgaged Property;

(iii)     Receipt of notice from any governmental or quasi-governmental authority asserting that the present or proposed development, structure, use or occupancy of the Mortgaged Property constitutes a violation of or noncompliance with any applicable law, statute, code, ordinance, rule or regulation promulgated or enforced by such authority;

(iv)     Receipt of any default or acceleration notice from the holder of the Purchase Money Mortgage or of any lien or security interest in the Mortgaged Property;

(v)     Commencement of any material litigation affecting the Mortgaged

Case ID: 160303161

Property, Mortgagor or any guarantor of the Secured Indebtedness; or,

    (vi)    Receipt of any default or termination notice from any tenant of any portion of the Mortgaged Property or from any purchaser or prospective purchaser of all or any portion of the Mortgaged property or any Improvement now or hereafter constructed thereon.

**25.  Events of Default.**  Each of the following shall constitute an event of default hereunder (an "Event of Default"):

    (a)    If there shall occur any Event of Default under the Loan Agreement or a default under any of the other Loan Documents.

    (b)    If Mortgagor shall fail to maintain and deliver to Mortgagee any and all policies of insurance herein required and such failure shall continue beyond ten (10) days after notice from Mortgagee to Mortgagor of such failure.

    (c)    If there shall occur an attachment, execution or other judicial seizure of any assets of Mortgagor or any guarantor of the Secured Indebtedness or of the Premises, Improvements, or Building Equipment.

    (d)    If Mortgagor shall fail to observe or perform any of the other terms, covenants or conditions of this Mortgage or any agreement entered into with respect to any Secured Indebtedness and such failure shall continue beyond ten (10) days after notice from Mortgagee to Mortgagor of such failure.

    (e)    If there shall occur an event of default under any other mortgage encumbering the Premises or any document collateral thereto or under any agreement of sale in respect of all or any portion of the Mortgaged Property.

    (f)    If there shall be any sale or transfer (whether voluntarily or by operation of law) of all or any part of the Mortgaged Property or an interest therein (other than as permitted pursuant to Section 16 hereinabove) or a transfer of any interest in Mortgagor without the prior written consent of Mortgagee, which consent Mortgagee may withhold in its sole and absolute discretion.

    (g)    If Mortgagee receives notice from the holder of any subordinate lien against the Mortgaged Property intended to terminate or limit the indebtedness secured by this Mortgage.

Any Event of Default under this Mortgage shall constitute a default under any other mortgage from Mortgagor to Mortgagee and any other agreement between Mortgagor and Mortgagee.

**26.  Remedies.** Upon the occurrence of an Event of Default, at the option of Mortgagee,

Case ID: 160303161

the whole principal sum and the interest thereon, and all other sums payable under the Note, this Mortgage, the Loan Agreement, the other Loan Documents or any agreement entered into with respect to any Future Advances or any other Secured Indebtedness or under any other loan documents or obligations of Mortgagor to Mortgagee, shall become immediately due and payable. In such event Mortgagee may forthwith and without demand exercise any one or more of the following rights and remedies in addition to any of the rights or remedies provided therein or herein, or in any other documents held as security for the Secured Indebtedness, or such rights and remedies otherwise available to Mortgagee at law or in equity, without further stay, any law, usage or custom to the contrary notwithstanding:

(a)    Foreclosure.   Mortgagee may institute an action to foreclose on this Mortgage against the Mortgaged Property by issuance of a complaint, or take such other action at law or in equity for the enforcement of this Mortgage and realization on the mortgage security or any other security herein or elsewhere provided for, as the law may allow, and may proceed therein to final judgment and execution for the entire unpaid balance of the principal debt evidenced by the Note, with interest at the rate stipulated in the Note to the date of the occurrence of an Event of Default, and thereafter at the Default Rate specified in the Note, together with all other sums due by Mortgagor in accordance with the provisions of the Note, this Mortgage and any of the other Loan Documents, including all sums which may have been loaned by Mortgagee to Mortgagor after the date of this Mortgage, and all sums which may have been advanced by Mortgagee for taxes, water or sewer rents, charges or claims, payments on other liens, insurance or repairs to the Mortgaged Property, completion of construction of improvements (including the Improvements), all costs of suit, together with interest at such rate on any judgment obtained by Mortgagee from and after the date of any Sheriff's sale until actual payment is made by the Sheriff of the full amount due Mortgagee, and reasonable attorney's fees and costs.  Mortgagee may, at its election, foreclose only as to the sum past due with interest and costs, as above provided, without injury to this Mortgage or the displacement or impairment of the remainder of the lien hereof, and at such foreclosure sale the Mortgaged Property shall be sold subject to all remaining items of indebtedness; and Mortgagee may again foreclose, in the same manner, as often as there may be any sum past due.  Any real estate sold pursuant to any writ of execution issued on a judgment obtained by virtue of the Note or this Mortgage, or pursuant to any other judicial proceedings under the Mortgage, may be sold in one parcel or as an entirety, or in such parcels, and in such manner or order as Mortgagee, in its sole discretion, may elect, to the extent permitted by law.  Upon any such foreclosure sale, Mortgagee may bid for and purchase the Mortgaged Property and, upon compliance with the terms of sale, may hold, retain, possess and dispose of the Mortgaged Property in its own absolute right without further accountability, Mortgagee is hereby authorized, at its option, to conduct any such foreclosure sale subject to the rights of any tenants of the Mortgaged Property, and the failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by Mortgagor to be, a defense to any proceedings instituted by Mortgagee to collect the sums secured hereby.

(b)    Possession. Mortgagee may enter into possession of the Mortgaged Property,

Case ID: 160303161

with or without legal action, collect therefrom all rentals (which term shall also include sums payable for use and occupation), issues and profits therefrom, and, after deducting all costs of collection and administration expense, apply the net rentals, issues and profits to any or all of the following in such order and amounts as Mortgagee, in Mortgagee's sole discretion, may elect: payment of any sums due under any prior lien; payment of taxes, water and sewer rents, charges and claims insurance premiums and all other carrying charges; completion of construction of the Improvements and to the maintenance, repair or restoration of the Mortgaged property; and on account of, and in reduction of, the principal or interest, or both, or any other indebtedness of Mortgagor hereby secured. In and for that purpose, Mortgagor hereby assigns to Mortgagee all rentals due and to become due under any lease or leases or rights to use and occupation of the Mortgaged Property heretofore or hereafter created, as well as all rights and remedies provided in such lease or leases or at law or in equity for the collection of the rentals and all sums due or to become due under any agreement to sell all or any portion of the Mortgaged property, as well as all rights and remedies provided in such agreements or at law or in equity for the collection of any sums due or to become due thereunder. If Mortgagee shall take possession of the Mortgaged Property, Mortgagee may (subject to the provisions of leases and agreements then in force in accordance with the terms and conditions of this Mortgage and the Loan Documents); (a) hold, manage, occupy, operate and lease the same to Mortgagor or any other person or persons, on such terms and for such periods of time as Mortgagee may deem proper, and the provisions of any lease made by Mortgagee pursuant hereto shall be valid and binding upon Mortgagor notwithstanding the fact that Mortgagee's right of possession may terminate or this Mortgage may be satisfied of record prior to the expiration of the term of such lease; (b) make such alterations, additions, improvements, renovations, repairs and replacements thereto as Mortgagee may deem proper; (d) demolish all or any portion of the improvements situated upon the Mortgaged property which in the judgment of Mortgagee may be in unsafe condition and dangerous to life and/or property; (d) remodel such improvements so as to make the same available in whole or in part for business purposes; and (e) retain not less than six (6%) percent of the rents, issues and profits collected from the Mortgaged Property in payment of the services of Mortgagee in relation to the Mortgaged property. All moneys advanced by Mortgagee for the purposes aforesaid and not repaid out of the rents collected shall immediately and without demand be repaid by Mortgagor to Mortgagee, together with interest thereon at the Default rate set forth in the Note and shall be added to the Secured Indebtedness. The taking of possession and collection of rents by Mortgagee as aforesaid shall not be construed to be an affirmation of any lease of the Mortgaged Property or any part thereof, and Mortgagee or any other purchaser at any foreclosure sale may if otherwise entitled to do so, exercise the right to terminate any such lease as though such taking of possession and collection of rents had not occurred. **FOR THE PURPOSE OF OBTAINING POSSESSION OF THE MORTGAGED PROPERTY UPON THE OCCURRENCE OF AN EVENT OF DEFAULT HEREUNDER OR UNDER THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, MORTGAGOR HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF ANY COURT OF RECORD IN THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE, AS ATTORNEY FOR MORTGAGOR AND ALL PERSONS CLAIMS BY, UNDER OR THROUGH MORTGAGOR, TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION IN EJECTMENT FOR POSSESSION OF THE MORTGAGED PROPERTY AND TO**

Case ID: 160303161

APPEAR FOR AND CONFESS JUDGMENT AGAINST MORTGAGOR, AND AGAINST ALL PERSONS CLAIMING BY, UNDER OR THROUGH MORTGAGOR, IN FAVOR OF MORTGAGEE, FOR RECOVERY BY MORTGAGEE OF POSSESSION THEREOF, FOR WHICH THIS MORTGAGE, OR A COPY THEREOF, VERIFIED BY AFFIDAVIT, SHALL BE A SUFFICIENT WARRANT; AND THEREUPON A WRIT OF POSSESSION MAY IMMEDIATELY ISSUE FOR POSSESSION OF THE MORTGAGED PROPERTY, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER AND WITHOUT ANY STAY OF EXECUTION. IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED IT SHALL BE DISCONTINUED, OR POSSESSION OF THE MORTGAGED PROPERTY SHALL REMAIN IN OR BE RESTORED TO MORTGAGOR, MORTGAGEE SHALL HAVE THE RIGHT FOR THE SAME EVENT OF DEFAULT OR ANY SUBSEQUENT EVENT OF DEFAULT TO BRING ONE OR MORE FURTHER ACTIONS AS ABOVE PROVIDED TO RECOVER POSSESSION OF THE MORTGAGED PROPERTY. MORTGAGEE MAY BRING AN ACTION IN EJECTMENT AND CONFESS JUDGMENT THEREIN BEFORE OR AFTER THE INSTITUTION OF PROCEEDINGS TO FORECLOSE THIS MORTGAGE OR TO ENFORCE THE NOTE, OR AFTER ENTRY OF JUDGMENT THEREIN OR ON THE NOTE, OR AFTER A SHERIFF'S SALE OF THE MORTGAGED PROPERTY IN WHICH MORTGAGEE IS THE SUCCESSFUL BIDDER, IT BEING THE UNDERSTANDING OF THE PARTIES THAT THE AUTHORIZATION TO PURSUE SUCH PROCEEDINGS FOR OBTAINING POSSESSION AND CONFESSION OF JUDGMENT THEREIN IS AN ESSENTIAL PART OF THE REMEDIES FOR ENFORCEMENT OF THE MORTGAGE AND THE NOTE, AND SHALL SURVIVE ANY EXECUTION SALE TO MORTGAGEE.

(c)    Receiver. Mortgagee, without regard to the value or occupancy of the Mortgaged property or the solvency of Mortgagor, and with or without notice to Mortgagor, shall be absolutely entitled an a matter of right, if it so elects, to the appointment of a receiver to enter upon and take possession of the Mortgaged Property and to collect all rents, revenues, issues, income, products and profits thereof and apply the same as the court may direct, without any consideration of or for the value of the Mortgaged Property, or its depreciation from any cause whatsoever or the solvency or insolvency of Mortgagor or any other party liable to pay the Secured Indebtedness. Mortgagor hereby specifically waives the right to object to the appointment of a receiver as provided herein and hereby expressly consents that such appointment may be done without notice to Mortgagor, the receiver shall have all rights and powers permitted under the laws of the state where the Mortgaged Property is located and such other powers as the court making such appointment shall confer. The expenses, including receiver's fees, attorney's fees and costs and agent's compensation incurred pursuant to the powers herein contained shall be secured by this Mortgage. The right to enter and take possession of and to manage and operate the Mortgaged Property, and to collect the rents, issues and profits thereof, whether by a receiver or otherwise, shall be cumulative to any other right or remedy hereunder or afforded at law or in equity, and may be exercised concurrently therewith or independently thereof. Mortgagee shall be liable to account only for such rents, issues and profits as are actually received by Mortgagee. Notwithstanding the appointment of any receiver or other custodian Mortgagee shall be entitled as pledge to the possession and control of any cash, deposits or instruments at the time held by,

Case ID: 160303161

or payable or deliverable under the terms of this Mortgage to Mortgagee.

(d)     Mortgagee shall have the right, from time to time, to bring an appropriate action to recover any sums required to be paid by Mortgagor under the terms of this Mortgage, as they become due, without regard to whether or not the principal indebtedness or any other sums secured by the Note and this Mortgage shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of Mortgage Foreclosure, co any other action, for any Event of Default by Mortgagor existing at the time the earlier action was commenced.

(e)     Mortgagee shall have the power and authority to institute and maintain at any time and from time to time any suits and proceedings as Mortgagee may deem advisable: (i) to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or to prevent any violation of this Mortgage; (ii) to preserve or protect its interest in the Mortgaged Property; and (iii) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order might impair the security hereunder or be prejudicial to Mortgagee's interest.

(f)     Mortgagee may exercise each and every right available to it as a secured party under the Code.

(g)     Mortgagee may exercise each and every right granted to it hereunder, under any of the other Loan Documents, under any other documents in connection with any of the Secured Indebtedness, at law or in equity.

### 27. **Remedies Cumulative.**

(a)     The rights and remedies of Mortgagee as provided in this Mortgage, in the Note and in the other Loan Documents shall be cumulative and concurrent, may be pursued separately, successively or together against Mortgagor or against the Mortgaged Property, or both, at the sole discretion of Mortgagee, and may be exercised as often as occasion therefor shall arise. The failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof.

(b)     Any failure by Mortgagee to insist upon strict performance by Mortgagor of any of the terms and provisions of this Mortgage or of the Notes or any of the other Loan Documents shall not be deemed to be a waiver of any of the terms or provisions of the mortgage and/or the Note and/or any of the other Loan Documents, and Mortgagee shall have the right thereafter to insist upon strict performance by Mortgagor of any and all of such terms and provisions.

(c)     Neither Mortgagor nor any other person now or hereafter obligated for payment of all or any part of the sums now or hereafter secured by this Mortgage shall be relieved of any such obligation by reason (of the failure of Mortgagee to comply with any request of

Case ID: 160303161

Mortgagor or of any other person so obligated to take action to foreclose on this Mortgage or otherwise (enforce an provisions of the Mortgage, the Note or any of the other Loan Documents, or by reason of the release, regardless of consideration, of all or any part of the security held for the Secured Indebtedness, or by reason of any agreement or stipulation between any subsequent owner of the Mortgaged Property and Mortgagee extending the time of payment or modifying the terms of this Mortgage, the Note or any of the other Loan Documents without first having obtained the consent of Mortgagor or such other person; and in the "latter event Mortgagor and all such other persons shall continue to be liable to make payments according to the terms of any such extension or modification agreement, unless expressly released and discharged in writing by Mortgagee. In the event Mortgagee: (a) releases, as aforesaid, any part of the security described herein or any person liable for any indebtedness secured hereby; (b) grants an extension of time on any payments of the indebtedness secured hereby; (c) takes other or additional security for the payment thereof; or (d) waives or fails to exercise any right granted herein or in the Note or any of the other Loan Documents, said act or omission shall not release Mortgagor, subsequent purchasers of the Mortgaged property or any part thereof under any covenant of this Mortgage or of the Note, nor preclude Mortgagee from exercising any right, power or privilege herein granted or intended to be granted in the event of the occurrence of any other Event of Default then existing or any subsequent Event of Default.

**28. No Release.**  No extension or indulgence granted to Mortgagor, no alteration, change or modification hereof, of either of the Note or of any other Loan Document or any agreement entered into with respect to any Secured Indebtedness consented or agreed to by Mortgagee and no other act or omission of Mortgagee, including the taking of additional security or the release of any security, shall constitute a release of the lien and obligation of this mortgage or be interposed as a defense against the enforcement of this Mortgage, except for an act of Mortgagee that constitutes an express, effective release and satisfaction of the Secured Indebtedness.

**29.   Counsel Fees.**  If Mortgagee becomes a party to any suit or proceeding affecting the Mortgaged Property or title thereto, the lien created by this Mortgage or mortgagee's interest therein, or if Mortgagee engages counsel to collect any of the indebtedness secured hereby or to modify, rearrange or document any work out or restructuring of, or to enforce performance of the agreements, conditions, covenants, provisions or stipulations of this Mortgage, the Note or any of the other Loan Documents, Mortgagee's costs, expenses and reasonable counsel fees, whether or not suit is instituted, shall be paid to Mortgagee by Mortgagor, on demand, with interest at the then effective rate set forth in the Note, and until paid they shall be deemed to be part of the indebtedness evidence by the Note and secured by this Mortgage.

**30.   Modification.**  This Mortgage may not be changed orally or by any course of dealing between Mortgagor and Mortgagee, but only by an agreement in writing duly executed on behalf of the party against whom enforcement of any waiver, change, modification or discharge is sought.

**31. Further Assurances.**  If at any time Mortgagee shall deem or shall be advised that

Case ID: 160303161

any further instruments, documents, acts or things are necessary or desirable to vest or confirm any right or remedy herein granted, Mortgagor will execute, acknowledge when appropriate and deliver any instrument or document and do or cause to be done any act or thing deemed necessary or desirable by Mortgagee for any such purposes.

**32.   Subrogation.**  If any or all of the proceeds of the Note hereby secured or any other sums advanced by Mortgagee to or for the benefit of Mortgagor or to protect the security or priority of the lien hereof have been or are used to pay, extinguish, extend or renew any prior indebtedness, lien, security interest or other encumbrance against all or any part of the Mortgaged Property, then, to that extent, Mortgagee and the Secured Indebtedness and the lien of this Mortgage will be subrogated to all of the rights, claims, liens, titles and interest previously existing in favor of the holder of such prior indebtedness to secure the indebtedness so paid, extinguished, extended or renewed, and the former rights, claims, liens, titles and interest, if any, of the holder of such prior indebtedness shall not be deemed to be waived, but shall continue in full force and effect in favor of Mortgagee as cumulative security for payment of the Secured Indebtedness.

**33. Covenant Running with the Land.** Any act or agreement to be done or performed by Mortgagor shall be construed as a covenant running with the land and shall be binding upon Mortgagor and its successors and assigns as if they had personally made such agreement.

**34.   Notices.**  All notices, requests and demands to or upon the parties hereto shall be in writing and shall be deemed to have been duly given or made if delivered in person, immediately upon delivery; if by facsimile transmission, immediately upon sending and upon confirmation of all transmission; if by nationally recognized overnight courier service with instructions to deliver the next business day, one (1) business day after sending; and if by registered or certified mail, return receipt requested, five (5) days after mailing.  All notices, requests and demands upon the parties are to be given to the following addresses (or to such other  address as any Party may designate by notice in accordance with this Section):

**If to Mortgagor:**
Island View Crossing II, L.P.
One South State Street
Newtown, PA 18940
Attention: Renato J. Gualtieri

**If to Mortgagee:**
Prudential Savings Bank
1834 W. Oregon Avenue
Philadelphia, PA 19145-4725
Attention: Salvatore Fratanduono, Sr. VP/CLO

**with copy to:**

Case ID: 160303161

Jerome R, Balka, Esquire
Two Penn Center, Suite 520
1500 John F. Kennedy Blvd.
Philadelphia, PA 19102-1756

**35.   Waivers**.  To the extent permitted by law, Mortgagor hereby waives and releases: (i) all procedural errors, defects and imperfections in any proceedings instituted by Mortgagee under the terms of this Mortgage or any of the other Loan Documents or any other agreement entered into with respect to any Secured Indebtedness; (ii) all benefits that might accrue to Mortgagor by virtue of any present or future laws exempting the Mortgaged Property, or any other property, real or personal, or any part of the proceeds arising from any sale of any such property, from attachment, levy or sale under execution, or providing for any stay of execution, exemption from civil process or extension of time for payment or otherwise providing for any valuation, appraisal or exemption; (iii) all rights to inquisition of the Mortgaged Property, (iv) any requirement for bonds, security or sureties required by statute, court rule or otherwise; (v) all rights to claim or recover attorney's fees and costs in the event Mortgagor is successful in any action to remove or suspend a judgment entered by confession; and (vi) all provisions under any Act of Assembly of the Commonwealth of Pennsylvania now in effect or hereafter passed to relieve Mortgagor in any manner from the obligations hereby assumed or requiring the foreclosure and sale of the Mortgaged Property before the attachment (of or execution against other property, real or personal, of Mortgagor.

**36.  Construction.**  The use of the words "Mortgagor" or "Mortgagee" shall be deemed to include the successors and assigns of the party or parties, If there shall be more than one Mortgagor or party constituting the Mortgagor, the obligation of each shall be joint and several. The use of any gender shall include all genders.  The singular number shall include the plural, or the plural the singular, as the context may require.

**37. Invalid Provisions Disregard.**  If any term or provision of this Mortgage or the application thereof to any personal circumstances shall to any extent be invalid or unenforceable, the remainder of this Mortgage or the application of such terms or the provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Mortgage shall be valid and be enforced to the fullest extent permitted by law.

**38.  Applicable Law.** This Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**39.  Captions**.   The captions appearing in this Mortgage are inserted solely for convenience of reference and shall not constitute a part of this Mortgage, nor shall they in any way affect its meaning, construction or affect.

**40.   Usury.**  Nothing contained herein nor any transaction related hereto shall be

Case ID: 160303161

construed or shall so operate either presently or prospectively to require Mortgagor to pay interest at a rate greater than is now lawful in such case to contract for, but shall require payment of interest only to the extent of such lawful rate or to make any payments or do any act contrary to law, but if any laws or provisions herein contained shall otherwise so operate to invalidate this Mortgage in whole or in part, then such clauses and provisions only shall be held for naught as though not contained herein and the remainder of this Mortgage shall remain operative and in full force and effect.  Any interest paid in excess of the lawful rate shall be refunded or credited to Mortgagor as provided in the Notes or other instruments evidencing any additional credit.

     **41.**   <u>**No Beneficiaries.**</u>  The rights and remedies of this Mortgage shall not inure to the benefit of any third party other than the successors or assignees of Mortgagee.

     **IN WITNESS WHEREOF,** the undersigned has caused this Mortgage and Security Agreement to be duly executed, under seal, the day and year first above written.

**MORTGAGOR:**

**ISLAND VIEW CROSSING II, L.P.**
**A PA Limited Partnership**
**by: ISLAND VIEW PROPERTIES, INC.**
  **Its General Partner**

**By:**_____
        Renato J. Gualtieri, President

COMMONWEALTH OF PENNSYLVANIA:
COUNTY OF PHILADELPHIA:

     On this, the  <u>**26th**</u>  day of <u>**November , 2014**</u>, before me, the undersigned notary public, personally appeared  <u>**Renato J. Gualtieri**</u>  who acknowledged himself to be the President of <u>**Island View Properties, Inc.,**</u> a PA Corporation which is the General Partner of Island View Crossing II, L.P. and that he as such President of such company, being authorized to do so, executed the foregoing Mortgage and Security Agreement for the purposes therein contained, by signing the name of the corporation by himself as such President.

...............................................
**Notary Public**

My Commission Expires:........................................

**The address of the within named Mortgagee is:**
**Prudential Savings Bank**
**1834 W.  Oregon Avenue**
**Philadelphia, PA 19145**
By:_____

---

Case ID: 160303161

**EXHIBIT 'A'**
**LEGAL DESCRIPTION**

ALL THAT CERTAIN lot or piece of land, situate in Bristol Borough, Bucks County, Pennsylvania described according to Plan of Subdivision dated March 29, 2000, revised May 1, 2000 and recorded in Plan Book 300 Page 96, as follows, to wit:

BEGINNING at a point on the Southeasterly side of Radcliffe Street (SR 2002), a corner of Lot No. 2 on said Plan; thence extending from said point of beginning along said Lot No. 2, South 54 degrees 04 minutes 10 seconds East 694.13 feet to a point in line of the Delaware River; thence extending along the same, the two following courses and distances: (1) South 21 degrees 17 minutes 52 seconds West 271.88 feet; and (2) South 33 degrees 23 minutes 27 seconds West 718.45 feet to a point, a corner of lands now or late of Bucks County Redevelopment Authority; thence extending along the same the three following courses and distances, viz: (1) North 54 degrees 04 minutes 50 seconds West 450.19 feet; (2) South 35 degrees 55 minutes 10 seconds West 36.63 feet; and (3) North 54 degrees 04 minutes 10 seconds West 344.47 feet to a point on the Southeasterly side of Radcliffe Street, aforesaid; thence extending along the same, North 35 degrees 55 minutes 50 seconds East 1017.52 feet to the first mentioned point and place of beginning.

BEING Lot No. 1 on said Plan. - Radcliffe Street, Bristol, PA 19007

BEING Tax Parcel No. 4-027-119.

BEING THE SAME PREMISES which Redevelopment Authority of the County of Bucks by Deed dated June 5, 2003 and recorded on August 25, 2003 in the Office of the Recorder of Deeds in and for the County of Bucks, Pennsylvania in Book 3537 at Page 234 et seq granted and conveyed unto Island View Crossing II, L.P., in fee.

**UNDER AND SUBJECT** to the lien of a certain first mortgage from Redevelopment Authority of Bucks County dated June 13, 2003 and recorded on August 25, 2003 in the Office of the Bucks County Recorder of Deeds in Book 3537 at Page 792 et seq in the principal amount of $2,500,000.00 as reduced by payments on account.

**ANY DEFAULT IN ANY MORTGAGE** which is a lien senior to the lien of this mortgage shall be considered a default under this mortgage.

Case ID: 160303161

# Exhibit 6

Case ID: 160303161

**BRISTOL BOROUGH**
**BUCKS COUNTY, PENNSYLVANIA**


<u>**SUBDIVISION FINANCIAL SECURITY AGREEMENT**</u>


**THIS AGREEMENT,** made this 4th day of March, 2015, between **ISLAND VIEW CROSSING II, L.P.,** with an address of One South State Street, Newtown, Pennsylvania 18940, (hereinafter known as "**Developer**") and **BOROUGH OF BRISTOL,** a municipal corporation, and **BRISTOL BOROUGH WATER & SEWER AUTHORITY,** a municipal authority, with their principal place of business at 250 Pond Street, Bristol, Pennsylvania 19007 (hereinafter called "**Borough**"); and **PRUDENTIAL SAVINGS BANK,** with an address of 1834 W. Oregon Avenue, Philadelphia, Pennsylvania 19145-4725 (hereinafter referred to as "**Bank**").


**W I T N E S S E T H:**

**WHEREAS,** Developer contemplates the completion of construction of internal streets, sidewalks, curbs, drainage facilities, landscaping and other such public and quasi-public improvements as are provided in the final approved plans for the Island View Crossing Subdivision, being a plan entitled Preliminary/Final Land Development Plans, prepared by (Bohler Engineering, Inc.), consisting of 73 townhomes and 96 multifamily residential units, plan date 02/03/2006, last revised 02/03/2015(the "**Plans**"). The improvements made are the subject of this Financial Security Agreement and the estimated cost of construction thereof, together with the estimated cost of ancillary services including engineering, legal, inspection and project administration are specified in **Exhibit "A"** appended hereto; and

**WHEREAS,** said construction of improvements is to be done in accordance with a certain Subdivision Development Improvement Agreement between Developer and Borough (hereinafter called the "**Improvement Agreement**") which Agreement bears even date herewith and which sets forth the terms and conditions under which Developer may obtain permits and construct said development, and which Improvement Agreement is incorporated herein by reference without attachment hereto; and

-1-

Case ID: 160303161

**WHEREAS**, Developer has agreed with Bank to establish a letter of credit as the Financial Security to guarantee construction of the required improvements. A copy of the Financial Security is attached hereto as **Exhibit "B"** and made a part hereof which shall be reserved for the purposes and disbursed only pursuant to the procedures described in this Subdivision Financial Security Agreement.

**NOW, THEREFORE,** in consideration of the Borough relying upon the terms of this Subdivision Financial Security Agreement as security for the conditions set forth in the aforesaid Agreement, and intending to be legally bound, Borough, Developer and Bank hereby agree as follows:

1.     Bank shall set aside, through an unconditional commitment to lend, a Letter of Credit in a form acceptable to Borough, in favor of the Borough, in the sum of Two Million Ninety Thousand Three Hundred Eighty-One Dollars and Nineteen Cents ($2,090,381.19) (**"Financial Security"**) representing 110% of the cost to complete the remaining public and quasi-public improvements as set forth in the Improvement Agreement which is incorporated herein. The Financial Security may be reduced by certain sums as set forth herein not to exceed 90% of the cost to complete the public and quasi-public improvements described above. The remaining balance of the Financial Security shall be designated as the "Base Account" and shall not be released to the order of the Developer until all of the improvements as set forth on Exhibit "A" are finally completed and finally inspected and approved by the Borough Engineer in accordance with Section 510 of the Municipalities Planning code, 53 P.S. Section 10510, and, where appropriate, a deed of dedication is accepted by the Borough and a maintenance bond as described in Section 509 of the Municipalities Planning Code, 53 P.S. Section 10509(J) is received by the Borough. All reductions or release of the Financial Security shall be in accordance with Section 509 and 510 of the Municipalities Planning Code. Final reduction and/or release of the Base Account from the Financial Security to the order of the Developer shall be authorized by the Borough with respect to the public improvements upon acceptance of the deed of dedication and delivery of the maintenance bond and, with respect to the quasi-public improvements, upon final inspection thereof. Notice shall be given to the Bank providing the Financial Security, which notice shall be in substantially the following form:

13007/1 3527921v3

Case ID: 160303161

Prudential Savings Bank is hereby notified that a Deed of Dedication has been accepted by Bristol Borough and a Maintenance Bond has been received with respect to the public improvements and that the quasi-public improvements have been finally inspected, Prudential Savings Bank is hereby authorized to terminate the Financial Security which had been provided by Bank in favor of the Borough.

BRISTOL BOROUGH

BY: _____
                President

ATTEST: _____
                Secretary

BRISTOL BOROUGH WATER & SEWER AUTHORITY

BY: _____
                President

ATTEST: _____
                Secretary

Provided that, Bank may release funds from the Base Account of the Financial Security directly to the Borough pursuant to Paragraphs 6 and 7 hereof.  Provided further that the Borough may request that the balance of the Financial Security be increased by ten percent (10%) of the amount of the remaining improvements to be constructed for each one (1) year period beyond the first anniversary date of this Agreement, within thirty (30) days, following written notice from Borough to Developer.  In accordance with the terms of 53 P.S. §10510, the Borough may prescribe that Developer reimburse it for the reasonable and necessary expenses incurred by the Borough for the Borough Engineer to inspect said public and quasi-public improvements.  In addition, the Borough shall provide Developer with a final itemized bill detailing the work performed in connection with the inspection of said public and quasi-public

-3-

13007/1 3527921v3

Case ID: 160303161

improvements, identifying the person performing the inspection services, and the date and time spent for each task, which Developer may object to in accordance with Sections 509 or 510 of the Municipalities Planning Code. In the event Developer fails to pay or properly object to an itemized bill as prescribed in 53 P.S. §10510, the Borough may draw said amount from the R Financial Security unless such bill, invoice or amount is disputed by Developer as permitted by the Municipalities Planning Code.

2. The Bank will agree to provide the Financial Security as security to cover the completion of any and all improvements as required by the aforesaid development plan and Agreement and pay all estimated costs associated therewith as specified in Exhibit "A" attached hereto.

3. It is agreed that if Developer shall install and dedicate the improvements in substantial accordance with the plans and applications so approved, and in accordance with applicable ordinances of the Borough and with all statutes, laws, ordinances and rules and regulations of all governmental bodies or agencies having jurisdiction over the work or any part hereof involved in said Agreement, Borough shall, upon acceptance of dedication and final inspection and approval of the quasi-public improvements, authorize the release of the balance of the Financial Security to Bank and this Agreement shall thereupon terminate. In the event of default by Developer, Borough may utilize and direct payment of such funds within the Financial Security for and only for completion of those public and quasi-public improvements secured as shown on said plan and for all costs as specified in Exhibit "A" attached hereto.

4. As the work involved progresses, Borough will direct Bank to reduce the Financial Security by certain sums representing the value of the completed improvements as defined in the Agreement. Any reductions in the amount of the Financial Security shall be limited to those amounts representing the value of the completed improvement as defined in the Agreement, authorized by the Borough Engineer and Borough Administrator in writing, in the form as shown on **Exhibit "C"** attached hereto. Such certificates of completion shall constitute full authorization to Bank to make reductions in the Financial Security established hereunder. The Developer may request a final inspection and final release of improvement security

-4-

13007/1 3527921v3

Case ID: 160303161

pursuant to Section 510 of the MPC.

5.    Borough shall have the right to complete the improvements covered by this Financial Security Agreement if any of the following occurs:

a.    the Developer, after notice from the Borough and as further provided in Paragraph 7 below has failed within thirty (30) days to complete or commence and proceed with due diligence to complete, the correction of work improperly done or defective materials installed; or

b.    the work has not been completed in a good and workmanlike manner with such time periods set forth in the Agreement in accordance therewith, and the financial security is not increased as required by the Agreement following such delay.

In that event, Borough may, at is option, after notice in writing to Developer, enter into possession and undertake to complete the improvements described herein and for which the security is furnished hereby.   The work may be done either by the Borough's own agents or by contract, and the cost of completion of said work shall be paid by Borough only from the balance then remaining in the said Financial Security; provided, however, that any balance remaining in the Financial Security after completion by Borough, shall be released to Developer.   It is further provided, in the event the cost of completion shall exceed the balance remaining in the Financial Security at the time of Developer's failure, refusal or neglect the Developer agrees to pay Borough, within ten (10) days after receipt of written notice by Borough, such amount as Borough requires to make up any deficit in the cost of completion.   Cost of completion, as used in this Agreement is defined to include the cost of material, labor, construction and installation costs, engineering and inspection charges, Borough Solicitor's charges, plus the cost of all permits, bonds, insurance and the maintenance bond for eighteen (18) months, as in the Agreement, provided and expenses incurred by the Borough as a result of Developer's breach.   The Borough shall be reimbursed promptly from the Financial Security by the Bank without approval by the Developer upon certification of the Board of Commissioners to the Bank that the improvements are complete.

-5-

13007/1 3527921v3

Case ID: 160303161

6.   In the event of inadequate or improper construction of any of the aforesaid improvements, or of the failure to construct the said improvements in accordance with the approved plans and specifications and the terms and conditions of any approval thereof, or any occurrence described in Paragraph 5 hereof, such portions of the Financial Security as necessary may be applied for the cost of completion and/or for the proper completion and/or construction of said improvements; it being provided, however, that in the event the Borough Engineer determines that said improvements have not been completed in a timely fashion or have been improperly constructed, thirty (30) days notice shall be given to Developer of such defective or incomplete work as is determined by said engineer (such notice shall contain a detailed description of all work required to be performed), and Developer shall have the aforesaid period of thirty (30) days within which to commence the completion or correction of said defects.   If commencement of the correction or completion of the work has not occurred with the said thirty (30) day period or if correction or completion has commenced but, thereafter, the Developer fails to continuously marshal at the job site sufficient men and material to complete or correct the work with all due diligence, then the Bank, upon notice from the Borough shall release from the said Financial Security the sum of money requested by the Borough for correction of the inadequate, improper or untimely construction.   The Borough's demand for such payment, signed by the Borough Administrator, together with a Certification of Compliance by the Borough of the notice provisions of this Paragraph 6 and that the work has been satisfactorily completed, will be all the authority the Bank needs or requires to pay such sums to Borough and may be in substantially the following form:

Pay to the order of Borough in the sum of _____ Dollars ($_____) from _____, the Financial Security established by Developer for the benefit of said Borough, pursuant to a Subdivision Financial Security Agreement dated the 4th day of March, 2015, in accordance with a Subdivision Development Improvement Agreement entered into between said Borough and Developer dated the 4th day of March, 2014, relative to the construction and installation of certain improvements in a development known as the Island View Crossing Subdivision.   Borough certifies that it sent Developer the attached notice on _____

-6-

13007/1 3527921v3

Case ID: 160303161

indicating that certain improvements listed thereon have been improperly constructed or have not been completed and said improvements remain uncompleted or the defective condition thereof remains uncorrected as of this date.

BRISTOL BOROUGH COUNCIL

DATED: _____     BY: _____
President

7.   All parties recognize that the Bank is establishing the Financial Security in order to insure the obligations of Developer.   The Bank's obligation to disburse all or part of the Financial Security promptly to the Borough and in accordance with the Financial Security Agreement shall not be impaired by the bankruptcy or insolvency of Developer or by the default of the Developer under any construction loan agreement, by the termination of any construction loan agreement for any reason or by the default by Developer of any obligation due and owing to Bank.   Bank shall exercise no discretion with respect to payment over of the Financial Security to Borough and when proper and timely demand is made by Borough upon Bank.   Bank shall pay over said funds in accordance with the terms of this Agreement and shall be released, thereafter, from any further liability to either the Developer or Borough.   It is not the responsibility nor the right of the Bank to exercise any discretion whatsoever with respect to whether the Borough is right or correct in its demand for said funds.   Bank's sole responsibility is to pay over those funds promptly after demand.

8.   Bank shall not release any monies unless specifically authorized to do so by the Borough in writing in the form as shown on Exhibit "C" attached hereto.

9.   In the event Bank advises Borough that it does not intend to extend the Financial Security for an additional period of one (1) year, as required in this Agreement, or the Financial Security shall lapse prior to the completion of the public and quasi-public improvements as required by the Agreement, Developer shall post a new financial security in a form acceptable to the Borough for duration of at least one (1) year, in an amount satisfactory to the Borough Engineer necessary to secure the public and quasi-public improvements uncompleted as of the date of the Bank's notification of cancellation of the

-7-

13007/1 3527921v3

Case ID: 160303161

Financial Security.   In the event another form of financial security is not delivered to the Borough on or before thirty (30) days prior to the expiration of the Financial Security, the Borough shall have the right to demand to the Bank for all amounts secured by the Financial Security in order to pay for the cost of completion of all public and quasi-public improvements.

10.   Notwithstanding anything contained in this Agreement to the contrary, in that the financial guarantee provided to Borough is in the form of a Financial Security provided by Bank, the parties agree that the Financial Security shall not expire or lapse for any reason without Bank providing to Borough a ninety (90) days written notice prior to such expiration.

11.   Notwithstanding anything to the contrary contained herein, Bank's liability under this Agreement shall be limited to the amount of the financial security provided for herein, as reduced from time to time by direction or consent of Borough, to payment of such sums as Bank may be required to pay upon demand by Borough pursuant to this Agreement, and Bank shall have no obligation to assure the quality or timeliness of completion of improvements by Developer.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed by their respective duly authorized officers, each intending to be legally bound hereby.

Witness/Attest:

ISLAND VIEW CROSSING II, L.P.
By:  Island View Properties, Inc.,
     its General Partner

BY:

NAME: Renato J. Gualtieri

TITLE: President

-8-

13007/1 3527921v3

Case ID: 160303161

Witness/Attest:                          **THE BOROUGH OF BRISTOL**

_(signature)_

Secretary                                BY: _Ralph D. Giuseppe_

                                         NAME: _Ralph DiGuiseppe_

                                         TITLE: _Council President_

Witness/Attest:                          **BRISTOL BOROUGH WATER & SEWER AUTHORITY**

_(signature)_

Secretary                                BY: _Rosemarie Mignoni Szczucki_

                                         NAME: _Rosemarie Mignoni-Szczucki_

                                         TITLE: _Chairman_

Witness/Attest:                          **PRUDENTIAL SAVINGS BANK**

_(signature)_

                                         BY: _(signature)_

                                         NAME:  Thomas A. Vento

                                         TITLE:  President/CEO

13007/1 3527921v3

Case ID: 160303161

COMMONWEALTH OF PENNSYLVANIA    :
                                :    SS
COUNTY OF *Philadelphia*        :


     On this, the _4th_ day of _March_____, 2015, before me,
the undersigned officer, personally appeared, Renato J.
Gualtieri, who acknowledged himself to be the President of
**Island View Properties, Inc., the General Partner of Island View
Crossing II, L.P.,** known to me (or satisfactorily proven) to be
the person whose name is subscribed to the within instrument and
acknowledged that he executed the same for the purposes therein
contained.


     IN WITNESS WHEREOF, I hereunto set my hand and official
seal.


                                         Notary Public

> COMMONWEALTH OF PENNSYLVANIA
> NOTARIAL SEAL
> ANGELA ZANGARI, Notary Public
> City of Philadelphia, Phila. County
> My Commission Expires May 6, 2016


COMMONWEALTH OF PENNSYLVANIA    :
                                :    SS
COUNTY OF *BUCKS*               :


     On this, the _12th_ day of _March_____, 2015, before
me, the undersigned officer, personally appeared
___Louis Quattrocchi_____, who acknowledged him/herself to be
the ___Secretary_____ of the Council of **BRISTOL
BOROUGH,** known to me (or satisfactorily proven) to be the person
whose name is subscribed to the within instrument, and
acknowledged that he/she executed the same for the purposes
therein contained.


                                         Notary Public


COMMONWEALTH OF PENNSYLVANIA    :

13007/1 3527921v3                    -10-

> COMMONWEALTH OF PENNSYLVANIA
> NOTARIAL SEAL
> ANNA L. LARRISEY, Notary Public
> Bristol Boro., Bucks County
> My Commission Expires April 15, 2018

Case ID: 160303161

COUNTY OF *Bucks*                              :     SS
                                              :


      On this, the _12th_ day of _March_____, 2015, before
me, the undersigned officer, personally appeared
___*Michael Duva*_____, who acknowledged him/herself to be
the ___*Assistant Secretary*___ of the Council of **BRISTOL BOROUGH
WATER & SEWER AUTHORITY**, known to me (or satisfactorily proven)
to be the person whose name is subscribed to the within
instrument, and acknowledged that he/she executed the same for
the purposes therein contained.


     *Anna L. Larrisey*                              Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANNA L. LARRISEY, Notary Public
Bristol Boro., Bucks County
My Commission Expires April 15, 2018

Case ID: 160303161

COMMONWEALTH OF PENNSYLVANIA   :
                              :      SS
COUNTY OF *Philadelphia*       :

    On this, the 4 day of *March*         , A.D. 2014 before
me, the undersigned officer, personally appeared Thomas A. Vento
who acknowledged him/herself to be the President/CEO of
**Prudential Savings Bank**, known to me (or satisfactorily proven)
to be the person whose name is subscribed to the within
instrument, and acknowledged that they executed the same for the
purposes therein contained.

*Angela Zangari*
_____                    Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANGELA ZANGARI, Notary Public
City of Philadelphia, Phila. County
My Commission Expires May 6, 2016

13007/1 3527921v3                       -12-

Case ID: 160303161

EXHIBIT "A"

CONSTRUCTION ESCROW

13007/1 3527921v3

Case ID: 160303161

# ESCROW STATUS REPORT

**Gilmore & Associates, Inc.**
**Engineering and Consulting Services**

| | |
|---|---|
| PROJECT NAME: | Island View Crossing II, LP |
| PROJECT NO.: | 13-12451 |
| PROJECT OWNER: | Island View Crossing II, LP |
| MUNICIPALITY: | Bristol Borough |
| ESCROW AGENT: | |
| TYPE OF SECURITY: | |
| AGREEMENT DATE: | |

RELEASE NO.:
RELEASE DATE:

**SUMMARY OF ESCROW ACCOUNT**

| | |
|---|---|
| TOTAL CONSTRUCTION: | $1,858,116.61 |
| TOTAL CONSTRUCTION CONTINGENCY: | $185,811.66 |
| TOTAL ENG/INSP/LEGAL: | $46,452.92 |
| TOTAL ESCROW POSTED: | $2,090,381.19 |

| | |
|---|---|
| AMOUNT OF WORK IN PLACE THIS PERIOD: | $ - |
| REQUIRED RETAINAGE THIS RELEASE (10%): | $ - |
| AMOUNT OF THIS RELEASE: | $ - |
| TOTAL ESCROW RELEASED TO DATE: | $ 2,090,381.19 |
| TOTAL ESCROW REMAINING: | $ 185,811.66 |
| TOTAL CONSTRUCTION CONTINGENCY: | $ 46,452.92 |
| TOTAL ENGINS/LEGAL: | |
| TOTAL RETAINAGE TO DATE: | |
| TOTAL CONSTRUCTION AVAILABLE FOR RELEASE: | $ 1,858,116.61 |

| CONSTRUCTION ITEMS | ESCROW TABULATION | | | | CURRENT RELEASE | | RELEASED TO DATE | | AVAILABLE FOR RELEASE | | RELEASE REQ # 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | UNITS | QUANTITY | UNIT PRICE | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | QUANTITY |
| **A.   EROSION CONTROL** | | | | | | | | | | | |
| 1.   Stone Construction Entrance | EA | 1 | $1,750.00 | $1,750.00 | | | | | 1 | $1,750.00 | |
| 2.   30' Silt Fence | LF | 390 | $1.75 | $682.50 | | | | | 390 | $682.50 | |
| 3.   Super Silt Fence | LF | 2,026 | $7.50 | $15,195.00 | | | | | 2,026 | $15,195.00 | |
| 4.   NAGS S-75 | SF | 26,878 | $0.12 | $3,225.36 | | | | | 26,878 | $3,225.36 | |
| 5.   Inlet Protection | EA | 45 | $150.00 | $6,750.00 | | | | | 45 | $6,750.00 | |
| 6.   P-300 | SF | 3,320 | $0.59 | $1,958.80 | | | | | 3,320 | $1,958.80 | |
| 7.   R-6 Rip Rap | CY | 284 | $60.00 | $17,040.00 | | | | | 284 | $17,040.00 | |
| **B.   WOODLAND REMOVAL** | | | | | | | | | | | |
| 1.   Tree Removal | LS | 1 | $7,500.00 | $7,500.00 | | | | | 1 | $7,500.00 | |
| 2.   E/RNMX-178 Seeding | LS | 1 | $2,500.00 | $2,500.00 | | | | | 1 | $2,500.00 | |
| **C.   EXCAVATION** | | | | | | | | | | | |
| 1.   Curb Removal | LF | 8,058 | $2.50 | $20,145.00 | | | | | 8,058 | $20,145.00 | |
| 2.   Pavement Removal | SY | 40,428 | $0.90 | $36,385.20 | | | | | 40,428 | $36,385.20 | |
| 3.   18" HDPE | LF | 1,420 | $8.00 | $11,360.00 | | | | | 1,420 | $11,360.00 | |
| 4.   Inlet removal | EA | 9 | $500.00 | $4,500.00 | | | | | 9 | $4,500.00 | |
| 5.   8" PVC | LF | 900 | $7.00 | $6,300.00 | | | | | 900 | $6,300.00 | |
| **D.   EARTHWORK** | | | | | | | | | | | |
| 1.   Subgrade Site | LS | 1 | $19,646.60 | $19,646.60 | | | | | 1 | $19,646.60 | |
| 2.   Grade and Compact Site | LS | 1 | $20,000.00 | $20,000.00 | | | | | 1 | $20,000.00 | |
| 3.   Deliver and Spread Topsoil | LS | 1 | $13,611.70 | $13,611.70 | | | | | 1 | $13,611.70 | |
| 4.   Import Clean Fill for Soil Remediation | CY | 6,610 | $12.00 | $79,320.00 | | | | | 6,610 | $79,320.00 | |
| **E.   STORM SEWER** | | | | | | | | | | | |
| 1.   18" HDPE (0-6' deep) | LF | 2,288 | $38.50 | $88,088.00 | | | | | 2,288 | $88,088.00 | |
| 2.   21" HDPE (0-6' deep) | LF | 43 | $40.38 | $1,736.34 | | | | | 43 | $1,736.34 | |
| 3.   24" HDPE (0-6' deep) | LF | 528 | $47.50 | $25,080.00 | | | | | 528 | $25,080.00 | |
| 4.   27" HDPE (0-6' deep) | LF | 82 | $49.13 | $4,028.66 | | | | | 82 | $4,028.66 | |
| 5.   30" HDPE (0-6' deep) | LF | 582 | $55.00 | $32,010.00 | | | | | 582 | $32,010.00 | |

Case ID: 160303161

# ESCROW STATUS REPORT

**Gilmore & Associates, Inc.**
**Engineering and Consulting Services**

| | |
|---|---|
| PROJECT NAME: | Island View Crossing II, LP |
| PROJECT NO.: | 13-12051 |
| PROJECT OWNER: | Island View Crossing II, LP |
| MUNICIPALITY: | Bristol Borough |
| ESCROW AGENT: | |
| TYPE OF SECURITY: | |
| AGREEMENT DATE: | |
| RELEASE NO.: | |
| RELEASE DATE: | |

### SUMMARY OF ESCROW ACCOUNT

| | |
|---|---|
| TOTAL CONSTRUCTION: | $1,858,116.61 |
| TOTAL CONSTRUCTION CONTINGENCY: | $185,811.66 |
| TOTAL ENG/INS/LEGAL: | $46,452.92 |
| TOTAL ESCROW POSTED: | $2,090,381.19 |

| | |
|---|---|
| AMOUNT OF WORK IN PLACE THIS PERIOD: | $ - |
| REQUIRED RETAINAGE THIS RELEASE (10%): | $ - |
| AMOUNT OF THIS RELEASE: | $ - |
| TOTAL ESCROW RELEASED TO DATE: | |
| TOTAL ESCROW REMAINING: | $ 2,090,381.19 |
| TOTAL CONSTRUCTION CONTINGENCY: | $ 185,811.66 |
| TOTAL ENG/INS/LEGAL: | $ 46,452.92 |
| TOTAL RETAINAGE TO DATE: | $ - |
| TOTAL CONSTRUCTION AVAILABLE FOR RELEASE: | $ 1,858,116.61 |

| CONSTRUCTION ITEMS | UNITS | QUANTITY | UNIT PRICE | TOTAL AMOUNT | CURRENT RELEASE QUANTITY | CURRENT RELEASE TOTAL AMOUNT | RELEASED TO DATE QUANTITY | RELEASED TO DATE TOTAL AMOUNT | AVAILABLE FOR RELEASE QUANTITY | AVAILABLE FOR RELEASE TOTAL AMOUNT | RELEASE REQ #1 QUANTITY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **E. STORM SEWER (cont'd)** | | | | | | | | | | | |
| 6. Storm Manholes (0-6' deep) | EA | 8 | $2,850.00 | $22,800.00 | | | | | 8 | $22,800.00 | |
| 7. Type C Inlet (0-6' deep) | EA | 23 | $2,300.00 | $52,900.00 | | | | | 23 | $52,900.00 | |
| 8. Type M Inlet (0-6' deep) | EA | 22 | $2,350.00 | $51,700.00 | | | | | 22 | $51,700.00 | |
| 9. 30" Concrete Headwall | EA | 2 | $2,210.00 | $4,420.00 | | | | | 2 | $4,420.00 | |
| 10. Rip Rap. with Filter Fabric | SY | 22 | $57.00 | $1,254.00 | | | | | 22 | $1,254.00 | |
| 11. Snouts | EA | 12 | $500.00 | $6,000.00 | | | | | 12 | $6,000.00 | |
| **F. SANITARY SEWER** | | | | | | | | | | | |
| 1. 4" PVC | LF | 3,170 | $21.00 | $66,570.00 | | | | | 3170 | $66,570.00 | |
| 2. 6" PVC (6-10' deep) | LF | 302 | $26.50 | $8,003.00 | | | | | 302 | $8,003.00 | |
| 3. 8" PVC (10'-15' deep) | LF | 2,008 | $35.00 | $70,280.00 | | | | | 2008 | $70,280.00 | |
| 4. 4' Diameter Manhole (8-12' deep) | EA | 10 | $3,650.00 | $36,500.00 | | | | | 10 | $36,500.00 | |
| 5. 4' Diameter Manhole (12'-16' deep) | EA | 7 | $3,950.00 | $27,650.00 | | | | | 7 | $27,650.00 | |
| 6. Cleanout | EA | 82 | $150.00 | $12,300.00 | | | | | 82 | $12,300.00 | |
| 7. Core Drill/Tie into Existing Manhole | LS | 1 | $1,750.00 | $1,750.00 | | | | | 1 | $1,750.00 | |
| 8. Pump Station Upgrade | LS | 1 | $127,000.00 | $127,000.00 | | | | | 1 | $127,000.00 | |
| **G. SITE IMPROVEMENTS** | | | | | | | | | | | |
| 1. Concrete/Belgian Block Curb | LF | 6,070 | $15.00 | $91,050.00 | | | | | 6070 | $91,050.00 | |
| 2. 1.5" 9.5mm Wearing | SY | 12,087 | $7.00 | $84,609.00 | | | | | 12087 | $84,609.00 | |
| 3. 5" 19mm Binder | SY | 12,087 | $12.00 | $145,044.00 | | | | | 12087 | $145,044.00 | |
| 4. 6" Modified Stone | SY | 12,087 | $6.00 | $72,522.00 | | | | | 12087 | $72,522.00 | |
| 5. 2.5" 9.5mm Wearing - Asphalt Walk | SY | 640 | $8.00 | $5,120.00 | | | | | 640 | $5,120.00 | |
| 6. 4" Modified Stone - Asphalt Walk | SY | 640 | $5.00 | $3,200.00 | | | | | 640 | $3,200.00 | |
| 7. 4" Concrete Sidewalk | SF | 8,600 | $6.00 | $51,600.00 | | | | | 8600 | $51,600.00 | |
| 8. 6" Concrete Sidewalk | SF | 16,155 | $6.50 | $105,007.50 | | | | | 16155 | $105,007.50 | |
| 10. ADA Curb Ramps | EA | 27 | $1,500.00 | $40,500.00 | | | | | 27 | $40,500.00 | |
| 11. Rain Garden Construction | EA | 6 | $5,000.00 | $30,000.00 | | | | | 6 | $30,000.00 | |

Page 2

Case ID: 160303161

# ESCROW STATUS REPORT

**Gilmore & Associates, Inc.**
Engineering and Consulting Services

| | |
|---|---|
| PROJECT NAME: | Island View Crossing II, LP |
| PROJECT NO.: | 13-12051 |
| PROJECT OWNER: | Island View Crossing II, LP |
| MUNICIPALITY: | Bristol Borough |
| ESCROW AGENT: | |
| TYPE OF SECURITY: | |
| AGREEMENT DATE: | |

### SUMMARY OF ESCROW ACCOUNT

| | |
|---|---|
| TOTAL CONSTRUCTION: | $1,858,116.61 |
| TOTAL CONSTRUCTION CONTINGENCY: | $185,811.66 |
| TOTAL ENGINSP&LEGAL: | $46,452.92 |
| TOTAL ESCROW POSTED: | $2,090,381.19 |

RELEASE NO.:
RELEASE DATE:

| | |
|---|---|
| AMOUNT OF WORK IN PLACE THIS PERIOD: | $ - |
| REQUIRED RETAINAGE THIS RELEASE (10%): | $ - |
| AMOUNT OF THIS RELEASE: | $ - |
| TOTAL ESCROW RELEASED TO DATE: | $ 2,090,381.19 |
| TOTAL ESCROW REMAINING: | $ 185,811.66 |
| TOTAL CONSTRUCTION CONTINGENCY: | $ 46,452.92 |
| TOTAL ENGINSP/LEGAL: | $ - |
| TOTAL RETAINAGE TO DATE: | $ - |
| TOTAL CONSTRUCTION AVAILABLE FOR RELEASE: | $ 1,858,116.61 |

| CONSTRUCTION ITEMS | UNITS | QUANTITY | UNIT PRICE | TOTAL AMOUNT | CURRENT RELEASE QUANTITY | CURRENT RELEASE TOTAL AMOUNT | RELEASED TO DATE QUANTITY | RELEASED TO DATE TOTAL AMOUNT | AVAILABLE FOR RELEASE QUANTITY | AVAILABLE FOR RELEASE TOTAL AMOUNT | RELEASE REQ #1 QUANTITY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **H. HQP IMPROVEMENTS** | | | | | | | | | | | |
| 1. Storm Manhole | EA | 1 | $2,850.00 | $2,850.00 | | | | | 1 | $2,850.00 | |
| 2. ADA Curb Ramps | EA | 2 | $2,500.00 | $5,000.00 | | | | | 2 | $5,000.00 | |
| 3. 15" RCP | LF | 930 | $31.75 | $29,527.50 | | | | | 930 | $29,527.50 | |
| 4. Type C Inlets | EA | 8 | $2,300.00 | $18,400.00 | | | | | 8 | $18,400.00 | |
| 5. Signage | EA | 6 | $200.00 | $1,200.00 | | | | | 6 | $1,200.00 | |
| 6. Sawcutting | LF | 830 | $3.00 | $2,490.00 | | | | | 830 | $2,490.00 | |
| 7. Pavement Milling | SY | 83 | $3.00 | $249.00 | | | | | 83 | $249.00 | |
| 8. 1 1/2" Overlay | SY | 83 | $7.25 | $601.75 | | | | | 83 | $601.75 | |
| 9. Full Depth Pavement | SY | 435 | $27.00 | $11,745.00 | | | | | 435 | $11,745.00 | |
| 10. Core Drill/Tie into Existing Manhole | LS | 1 | $1,750.00 | $1,750.00 | | | | | 1 | $1,750.00 | |
| **I. STRIPING & SIGNAGE** | | | | | | | | | | | |
| 1. Painted Stop Bars | EA | 9 | $100.00 | $900.00 | | | | | 9 | $900.00 | |
| 2. Painted Handicap Symbols | EA | 12 | $125.00 | $1,500.00 | | | | | 12 | $1,500.00 | |
| 3. Handicap Parking Signs | EA | 12 | $225.00 | $2,700.00 | | | | | 12 | $2,700.00 | |
| 4. Traffic Control Signs | EA | 16 | $200.00 | $3,200.00 | | | | | 16 | $3,200.00 | |
| **J. SITE LANDSCAPING** | | | | | | | | | | | |
| 1. Shade Tree (2.5"-3.5" caliper) | EA | 110 | $400.00 | $44,000.00 | | | | | 110 | $44,000.00 | |
| 2. Ornamental Tree (2"-2.5" caliper or 8-10') | EA | 28 | $350.00 | $9,800.00 | | | | | 28 | $9,800.00 | |
| 3. Evergreen Tree (6'-7') | EA | 32 | $280.00 | $8,960.00 | | | | | 32 | $8,960.00 | |
| 4. Evergreen Shrubs (24"-30") | EA | 72 | $75.00 | $5,400.00 | | | | | 72 | $5,400.00 | |
| 5. Deciduous Shrubs (18"-24") | EA | 90 | $65.00 | $5,850.00 | | | | | 90 | $5,850.00 | |
| 6. Ground Cover Shrubs (15"-18") | 3 GAL | 24 | $35.00 | $840.00 | | | | | 24 | $840.00 | |
| 7. Ornamental Grasses | 1 GAL | 55 | $15.00 | $825.00 | | | | | 55 | $825.00 | |
| 8. Seeding | LS | 1 | $17,545.70 | $17,545.70 | | | | | 1 | $17,545.70 | |
| **K. MISCELLANEOUS** | | | | | | | | | | | |
| 1. 250 Watt Pole Mounted Light | EA | 24 | $2,500.00 | $60,000.00 | | | | | 24 | $60,000.00 | |
| 2. 175 Watt Pole Mounted Trail Light | EA | 17 | $3,295.00 | $56,015.00 | | | | | 17 | $56,015.00 | |
| 3. Iron Pins | EA | 200 | $100.00 | $20,000.00 | | | | | 200 | $20,000.00 | |
| 4. Concrete Monuments | EA | 1 | $175.00 | $175.00 | | | | | 1 | $175.00 | |
| 5. Utility As-Built Plans | LS | 1 | $10,000.00 | $10,000.00 | | | | | 1 | $10,000.00 | |

Page 3

Case ID: 160303161

EXHIBIT "B"

LETTER OF CREDIT

13007/1 3527921v3

Case ID: 160303161

 **Prudential Savings Bank**

1834 West Oregon Avenue, Philadelphia, PA 19145-4725    215-755-1500

**STANDBY LETTER OF CREDIT
ISLAND VIEW CROSSING II, LP
SUBDIVISION DEVELOPMENT IMPROVEMENTS**

IRREVOCABLE    STANDBY    LETTER    OF    CREDIT    No    IVC-1
Expiration Date: November 26, 2019

TO: Borough of Bristol, Bucks County, PA          Bristol Borough Water & Sewer Authority
    250 Pond Street                               250 Pond Street
    Bristol, PA 19007                             Bristol, PA 19007

Gentlemen:

For the account of Island View Crossing, II, LP, LLC ("Owner"), party to that certain Subdivision Development Improvement Agreement, dated January 26, 2015 for the subdivision and development of premises situate and known as 1600 Radcliff Street located in Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-027-119 for the construction of townhouses and multi-family units thereon (the "Tract") and party to that certain Subdivision Financial  Security Agreement  of even date requiring a security guaranteeing the faithful performance by the Owner of the installation of the public improvements required for development of the Tract, Prudential Savings Bank, (the "Bank") hereby issues in your favor its Irrevocable Standby Letter of Credit for $2,090,381.19.

The amount of this credit is available to you by presentation to the Bank at its offices at 1834 W. Oregon Avenue, Philadelphia, PA 19145-4725  of a draft accompanied by a written Certification signed by an authorized official of the Borough or of the Borough Authority setting forth that there has been a default by Owner under the aforesaid Subdivision Development Improvement Agreement and that the Borough or the Borough Authority is entitled to payment pursuant to the Subdivision Financial Security Agreement dated January 26, 2015 by and between the Borough and Island View Crossing II, LP.

This credit is available to you for payment of all obligations of the Owner in accordance with the Subdivision Development Agreement, aforesaid.

This credit is subject to the Uniform Customs and Practices for Documentary Credits (1993 revision), International Chamber of Commerce Publication 590 and to the Financial Security Agreement, aforesaid.

The Bank engages with you that drafts drawn under and in compliance with the terms of this credit will be duly honored by the Bank on delivery of documents as specified.

Very truly yours,

PRUDENTIAL SAVINGS BANK

..................................................
Thomas A. Vento, President & CEO

4, March, 2015

———————— OTHER PRUDENTIAL OFFICES (215) 755-1500 ————————

Member FDIC

2101 SOUTH 19TH STREET, PHILADELPHIA, PA 19145-3709          1722 SOUTH BROAD STREET, PHILADELPHIA, PA 19145-2315
112 SOUTH 19TH STREET, PHILADELPHIA, PA 19103-4629              28 NORTH 3RD STREET, PHILADELPHIA, PA 19106-2113
238 A MOORE STREET, PHILADELPHIA, PA 19148-1925          601 MORGAN AVENUE, DREXEL HILL, PA 19026-3105   610-259-8100
www.prudentialsavingsbank.com                               Bank by Phone/Rate Line 215-755-1505




Case ID: 160303161

EXHIBIT "C"

Financial Security REDUCTION LANGUAGE

<u>CERTIFICATE OF COMPLETION</u>

We, the undersigned, hereby certify that the work provided for in a certain Subdivision Development Improvement Agreement between Bristol Borough and Island View Crossing II, L.P., Developer, dated the _____ day of _____, 20__, relative to the construction and installation of certain improvements in a development known as the Island View Crossing Subdivision, has been completed to the extent of ___% representing _____ Dollars ($_____). We, as Beneficiary authorize the reduction of _____ Financial Security No. ___ established and set over to Bristol Borough, pursuant to a Subdivision Financial Security Agreement dated the ___ day of _____, 20__, by the amount of $_____ (Insert Reduction Amount), the new balance of the Financial Security will be $_____ (Insert New Balance). It is agreed that the reduction of the Financial Security hereby authorized shall not be construed as acceptance of the work by said Borough and said Borough hereby reserves the right to reinspect the said work and to require the Developer referred to in said Agreement to correct any and all deficiencies and defects. This Certificate does not authorize a reduction in the Financial Security below an amount of ten (10%) percent of the initial Financial Security balance ($_____).

BRISTOL BOROUGH COUNCIL

By:_____
                President

Attest:_____
                Secretary

Date:_____

Case ID: 160303161

# <u>Exhibit 7</u>

Case ID: 160303161



# Prudential Savings Bank

1834 West Oregon Avenue, Philadelphia, PA 19145-4725   215-755-1500

---

**STANDBY LETTER OF CREDIT**
**ISLAND VIEW CROSSING II, LP**
**SUBDIVISION DEVELOPMENT IMPROVEMENTS**

IRREVOCABLE   STANDBY   LETTER   OF   CREDIT   No   IVC-1
Expiration Date: November 26, 2019

TO: Borough of Bristol, Bucks County, PA        Bristol Borough Water & Sewer Authority
     250 Pond Street                                250 Pond Street
     Bristol, PA 19007                              Bristol, PA 19007

Gentlemen:

For the account of Island View Crossing, II, LP, LLC ("Owner"), party to that certain Subdivision Development Improvement Agreement, dated January 26, 2015 for the subdivision and development of premises situate and known as 1600 Radcliff Street located in Bristol Borough, Bucks County, Pennsylvania (Tax Parcel No. 4-027-119 for the construction of townhouses and multi-family units thereon (the "Tract") and party to that certain Subdivision Financial Security Agreement of even date requiring a security guaranteeing the faithful performance by the Owner of the installation of the public improvements required for development of the Tract, Prudential Savings Bank, (the "Bank") hereby issues in your favor its Irrevocable Standby Letter of Credit for **$2,090,381.19.**

The amount of this credit is available to you by presentation to the Bank at its offices at 1834 W. Oregon Avenue, Philadelphia, PA 19145-4725 of a draft accompanied by a written Certification signed by an authorized official of the Borough or of the Borough Authority setting forth that there has been a default by Owner under the aforesaid Subdivision Development Improvement Agreement and that the Borough or the Borough Authority is entitled to payment pursuant to the Subdivision Financial Security Agreement dated January 26, 2015 by and between the Borough and Island View Crossing II, LP.

This credit is available to you for payment of all obligations of the Owner in accordance with the Subdivision Development Agreement, aforesaid.

This credit is subject to the Uniform Customs and Practices for Documentary Credits (1993 revision), International Chamber of Commerce Publication 590 and to the Financial Security Agreement, aforesaid.

The Bank engages with you that drafts drawn under and in compliance with the terms of this credit will be duly honored by the Bank on delivery of documents as specified.

Very truly yours,

PRUDENTIAL SAVINGS BANK

Thomas A. Vento, President & CEO

4, March, 2015

———————— OTHER PRUDENTIAL OFFICES (215) 755-1500 ————————

Member FDIC

2101 SOUTH 19TH STREET, PHILADELPHIA, PA 19145-3709        1722 SOUTH BROAD STREET, PHILADELPHIA, PA 19145-2315
112 SOUTH 19TH STREET, PHILADELPHIA, PA 19103-4629         28 NORTH 3RD STREET, PHILADELPHIA, PA 19106-2113
238 A MOORE STREET, PHILADELPHIA, PA 19148-1925            601 MORGAN AVENUE, DREXEL HILL, PA 19026-3105  610-259-8100
www.prudentialsavingsbank.com                             Bank by Phone/Rate Line 215-755-1505


EQUAL HOUSING
LENDER

Case ID: 160303161

# **Exhibit 8**

Case ID: 160303161



# Prudential Savings Bank

**1834 West Oregon Avenue, Philadelphia, PA 19145-4725   215-755-1500**

ANTHONY MIGLIORINO
Executive Vice President &
Chief Operating Officer
(215) 755-1505 x 8241
amigliorino@prudentialsavingsbank.com

Via US Mail, Certified Mail and email rjg@AmerciCorpHomes.com

December 18, 2015

Mr. Renato J. Gualtieri        Mr. Ron J. Gualtieri         Mr. Renato J. Gualtieri
Island View Crossing II, LP    AmeriCorp Homes             1628 Carlene Court
1600 Radcliffe Street          One South State St          Middletown Township, PA 19047
Bristol, PA 19007              Newtown, PA 18940

Dear Mr. Gualtieri,

Re: Island View Crossing II, LP Default under Loan with Prudential Savings Bank

As we have previously notified you, Prudential Savings Bank (the "Bank") has determined that Island View Crossing II, LP's ("IVC") loans are in default. You met with Bank representatives on December 10, 2015 and requested the issues to prevent foreclosure be placed in writing. The requirements outlined below must be mutually agreed upon by December 31, 2015 (i.e. the "Deadline Date") by entering into a formal forbearance agreement to that effect.

1. <u>Calnshire Estates</u> and <u>Steeple Run</u> must be sold immediately. Funds received will be applied to reduce IVC's and other relationship debt. You and the Bank will select a broker from a list submitted by the Bank no later than January 11, 2016. Sale Bids will be reviewed by you and the Bank with the Bank having final approval.

2. <u>Management Fee component in the site work line of credit and construction line of credit:</u> Until further notice the Bank will not fund the management/overhead fee component of the draw requests submitted by IVC to the Bank. Instead, the Bank will allow Mr. Gualtieri to receive a management fee of $5,000 from the closing proceeds of each townhome unit, provided sufficient cash exists after paying all release payments required from each settled unit. This management fee begins after the existing 12 sold units complete closing as Mr. Gualtieri has already received a management fee in excess of $250,000.

3. <u>IVC site improvements:</u> All site work shall be limited to the work required to complete the townhome section only. All utilities etc. shall be capped, as



Case ID: 160303161



necessary, leading to the condominium site. No work shall be performed on the condominium project.

4. <u>New construction draw schedule:</u> A new construction draw schedule due to increases in costs shall be prepared by IVC by January 22, 2016 and approved by the Bank and its inspector in its sole discretion. Costs of the new in-depth schedule shall be borne by the borrower.

5. <u>One South State Street and 106-110 North State Street commercial properties:</u> Effective January 1, 2016 all rents paid by tenants, in kind will be paid directly to the Bank for the benefit of loans outstanding on the properties and borrower shall prepare a notice to the tenants directing them to make the rental payments directly to the Bank. Payments will be presented to the bank within 15 days of rental due dates. A new rent roll is required with an effective date of January 1, 2016.

6. <u>The LAVA loan:</u> If Mr. Gualtieri agrees to the Bank's conditions above, the Bank will advance funds from the IVC construction line to pay the outstanding LAVA debt up to $650,000, provided LAVA will assign to the Bank the 3 mortgages and related documents related to its debt.

7. Prudential Savings Bank's willingness to offer these terms to IVC and Mr. Gualtieri is expressly conditioned upon acceptance of these terms by Mr. Gualtieri in writing <u>no later than December 31, 2015.</u> Once Mr. Gualtieri confirms his acceptance, the Bank will have a forbearance agreement prepared to memorialize these terms.

8. Until the appropriate forbearance agreement is entered into, the Bank reserves all rights and remedies it has under any of the loan documents and applicable law.

Respectfully,

_____

Accepted:
Island View Crossing II, LP

Accepted:

By: _____          _____

Renato J. Gualtieri

Case ID: 160303161

# Exhibit 9

Case ID: 160303161



Stradley Ronon Stevens & Young, LLP

Suite 2600

2005 Market Street

Philadelphia, PA 19103-7018

Telephone 215.564.8000

Fax 215.564.8120

www.stradley.com

William R. Sasso, Chairman
(215) 564-8045
wsasso@stradley.com

December 23, 2015

**Via Email (AMigliorino@prudentialsavingsbank.com)**
Anthony Migliorino, EVP and COO
Prudential Savings Bank
1834 West Oregon Avenue
Philadelphia, PA  19145-4725

RE:    **Loans from Prudential Savings Bank to Island View Crossing II, L.P.**

Dear Mr. Migliorino:

Please be advised that my firm represents Island View Crossing II, L.P.  ("Island View LP"), its general partner Island View Properties, Inc. ("Island View Inc.") and Renato J. Gualtieri ("Mr. Gualtieri") with regard to the loans extended to Island View LP by Prudential Savings Bank ("Prudential").  We have received a copy of your December 18, 2015, letter to Island View LP and Mr. Gualtieri that demands specified concessions and changes to the existing loan documents.  However, what is unclear to us at the moment is what Prudential is asserting is the basis for its requests.

In particular, Prudential has not sent a default letter to any of our clients in relation to the Island View loans.  At your earliest opportunity, please forward to me copies of whatever documents or other default communications Prudential sent to our clients and let us know what Prudential is claiming is the basis for all of the changes demanded in your December 18 letter.

Furthermore, my clients and I would like to have a meeting with Prudential and its counsel after you provide the requested default information.  Assuming that you can quickly send to me whatever default communications might exist, my clients and I are prepared to meet with Prudential and its counsel, at a mutually convenient date and time, before the December 31 deadline indicated in your letter.  I look forward to resolving whatever issues may exits.

Very truly yours,

*William Sasso/dk*

William R. Sasso,
Chairman

WRS/dk
cc:    Mr. Renato J. Gualtieri (via Email)
       Jerome R. Balka, Esquire (via Email jbalka@regerlaw.com)
       Michael J. Cordone, Esquire

**Philadelphia, PA** ∘ **Harrisburg, PA** ∘ **Malvern, PA** ∘ **Cherry Hill, NJ** ∘ **Wilmington, DE** ∘ **Washington, DC** ∘ **New York, NY**

A Pennsylvania Limited Liability Partnership

MERITAS LAW FIRMS WORLDWIDE                    ESTATES # 824536 v.1

Case ID: 160303161

# Exhibit 10

Case ID: 160303161

## Cordone, Michael

| | |
|---|---|
| **From:** | Alex Nadalini <ANadalini@prudentialsavingsbank.com> |
| **Sent:** | Thursday, January 14, 2016 6:35 PM |
| **To:** | Cordone, Michael; Anthony Migliorino |
| **Cc:** | Joe Corrato; Doug Smith; Sasso, William |
| **Subject:** | RE: Island View Crossing |
| | |
| **Categories:** | Yellow Category |

Michael,

I have been asked to e-mail you our response pursuant to a discussion we have just completed.  First, the letter from Ron is not useful by itself because it is not accompanied by the detailed back-up which Ron knows we require.  Second, we are confirming what we have said verbally to everyone earlier (and in writing to Ron's Controller on December 24, 2015); that we will fund all legitimate costs directly related to Island View ("the Project") provided that we are given the required documentation.  That includes the names of the payees so that we can pay them directly and without delay.  Absent this, we are not able to fund draw requests.  In addition, we have asked Ron verbally during our last conference call to provide us with a  detailed report on all of the work completed recently.  This has been a requirement for some time which had been met by Bernie sending us his updated production schedules .  We have not received these even though we have asked for them repeatedly.  Without all of this we are working in the dark.  We confirm that we want to keep the Project moving but Ron has to understand the rules.  We look forward to our discussion next Tuesday.  Regards – Alex

 **Prudential Savings Bank**

*Alex D. Nadalini*
*Senior Vice President/Chief Credit Officer*
*Prudential Savings Bank*
*215-755-1500, Extension 8280*
*Cell: 336-509-9575*

---

**From:** Cordone, Michael [mailto:MCordone@STRADLEY.COM]
**Sent:** Thursday, January 14, 2016 4:25 PM
**To:** Anthony Migliorino
**Cc:** Joe Corrato; Alex Nadalini; Doug Smith; Sasso, William
**Subject:** Island View Crossing

Anthony-
        In furtherance of our discussions yesterday, our client has provided the attached draw request, cover letter and photos taken today to show you the work that is occurring today.  The attached draw request was being held by our client because Provident had not yet funded the December draw request.

        Although the conversations yesterday between you and our client became a little heated, there is a simple response to your suggestion that nothing has been done in the past two weeks on the IVC project.  As reflected at the site, the attached pictures and draw request for work recently completed (and there is much more to come with the work that is in process but not completed and billed by the subs), the project is moving forward with significant work

Case ID: 160303161

having been completed in the past two weeks, and that work is continuing. Below is an email from the project manager on the site detailing the status of the work on the day of Doug Smith's latest visit. The attached draw requests and those that will follow, along with the land development escrow release requests are an easy way to verify that the project is moving forward and keep tabs on what is occurring. Hopefully, the attached draw request will be honored promptly in order to keep the subcontractors and the project moving forward.

We intend to provide additional financial information to you shortly. I also called and left a message for you to briefly discuss one of the other issues raised during our call and to see if Bill Sasso and I could have a call with your team on Tuesday, January 19. Please let me know if there are any times would work that day for your team.

Regards,
Michael Cordone

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018



This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

From: Bernie Sauer [mailto:bsauer@americorphomes.com]
Sent: Thursday, January 14, 2016 3:30 PM
To: Ron
Subject: Doug Visit

Ron,

On Friday January 8th the following activity happened at Island View.

Building 4
Lot 47 (Model)- Finishing Trim
Lot 46- Tape and Spackle was applied and was drying. Cannot apply the second coat until dry.
Lot 45- same conditions as lot 46
Lot 44- Drywall Inspection; need to pass inspection before applying 1st coat. Inspection passed and notified contractor to continue.
Lot 43- Same condition as lot 44
Lot 42- Frame Inspection was scheduled; passed and contractor was notified to install insulation.
Lot 41- Same condition as 42

Building 2
Lot 7- Rough plumbing was being installed Lot 10- Rough Electric was finishing

Lots 8-9-11 were waiting for trades to finish

Thanks,
Bernie

Case ID: 160303161

CAUTION: Electronic mail sent through the Internet is not secure and could be intercepted by a third party. For your protection, avoid sending identifying information such as account, Social Security, or card numbers to us or others. Further, do not send time-sensitive, action-oriented messages such as transaction orders, fund transfer instructions or check stop payments, as it is our policy not to accept such items electronically. This message w/attachments (message) may be privileged, confidential or proprietary, and if you are not an intended recipient, please notify the sender, do not use or share it and delete it. Subject to applicable law, Prudential Savings Bank may monitor, review and retain e-communications (EC) traveling through its networks/systems. This message cannot be guaranteed to be secure or error-free. Attachments that are part of this E-communication may have additional important disclosures and disclaimers, which you should read. By messaging with Prudential Savings Bank you consent to the foregoing.

Case ID: 160303161

# **Exhibit 11**

Case ID: 160303161

## Cordone, Michael

| | |
|---|---|
| **From:** | Alex Nadalini <ANadalini@prudentialsavingsbank.com> |
| **Sent:** | Tuesday, January 19, 2016 9:37 AM |
| **To:** | Cordone, Michael |
| **Subject:** | RE: Island View Crossing |

What appears to be missing is the rest of the site-work, including the binder, roads and curbs, required for the Certificates of Occupancy.  Could you please get that for us?  Thanks - Alex

**From:** Cordone, Michael [mailto:MCordone@STRADLEY.COM]
**Sent:** Tuesday, January 19, 2016 9:26 AM
**To:** Alex Nadalini
**Cc:** Anthony Migliorino; Joe Corrato; Doug Smith; Sasso, William
**Subject:** RE: Island View Crossing

Alex-

In response to your recent request, I have attached the recent production schedules to further demonstrate that the construction of the units is continuing to move forward notwithstanding the payment delays and the bank's efforts to restrict payment of the overhead associated with the project.  The progress indicated in the reports and draw request will be further confirmed when the bank performs its inspection in response to the recent draw request.

We look forward to speaking with your team later today.

Regards,
Michael Cordone

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018



This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

**From:** Alex Nadalini [mailto:ANadalini@prudentialsavingsbank.com]
**Sent:** Thursday, January 14, 2016 6:35 PM
**To:** Cordone, Michael; Anthony Migliorino
**Cc:** Joe Corrato; Doug Smith; Sasso, William
**Subject:** RE: Island View Crossing

Michael,

I have been asked to e-mail you our response pursuant to a discussion we have just completed.  First, the letter from Ron is not useful by itself because it is not accompanied by the detailed back-up which Ron knows we require.  Second, we are confirming what we have said verbally to everyone earlier (and in writing to Ron's Controller on December 24,

1

Case ID: 160303161

2015); that we will fund all legitimate costs directly related to Island View ("the Project") provided that we are given the required documentation. That includes the names of the payees so that we can pay them directly and without delay. Absent this, we are not able to fund draw requests. In addition, we have asked Ron verbally during our last conference call to provide us with a detailed report on all of the work completed recently. This has been a requirement for some time which had been met by Bernie sending us his updated production schedules. We have not received these even though we have asked for them repeatedly. Without all of this we are working in the dark. We confirm that we want to keep the Project moving but Ron has to understand the rules. We look forward to our discussion next Tuesday. Regards – Alex

 **Prudential Savings Bank**

*Alex D. Nadalini*
*Senior Vice President/Chief Credit Officer*
*Prudential Savings Bank*
*215-755-1500, Extension 8280*
*Cell: 336-509-9575*

---

**From:** Cordone, Michael [mailto:MCordone@STRADLEY.COM]
**Sent:** Thursday, January 14, 2016 4:25 PM
**To:** Anthony Migliorino
**Cc:** Joe Corrato; Alex Nadalini; Doug Smith; Sasso, William
**Subject:** Island View Crossing

Anthony-
        In furtherance of our discussions yesterday, our client has provided the attached draw request, cover letter and photos taken today to show you the work that is occurring today. The attached draw request was being held by our client because Provident had not yet funded the December draw request.

        Although the conversations yesterday between you and our client became a little heated, there is a simple response to your suggestion that nothing has been done in the past two weeks on the IVC project. As reflected at the site, the attached pictures and draw request for work recently completed (and there is much more to come with the work that is in process but not completed and billed by the subs), the project is moving forward with significant work having been completed in the past two weeks, and that work is continuing. Below is an email from the project manager on the site detailing the status of the work on the day of Doug Smith's latest visit. The attached draw request and those that will follow, along with the land development escrow release requests are an easy way to verify that the project is moving forward and keep tabs on what is occurring. Hopefully, the attached draw request will be honored promptly in order to keep the subcontractors and the project moving forward.

        We intend to provide additional financial information to you shortly. I also called and left a message for you to briefly discuss one of the other issues raised during our call and to see if Bill Sasso and I could have a call with your team on Tuesday, January 19. Please let me know if there are any times would work that day for your team.

Regards,
Michael Cordone

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP

Case ID: 160303161

p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120



2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

From: Bernie Sauer [mailto:bsauer@americorphomes.com]
Sent: Thursday, January 14, 2016 3:30 PM
To: Ron
Subject: Doug Visit

Ron,

On Friday January 8th the following activity happened at Island View.

Building 4
Lot 47 (Model)- Finishing Trim
Lot 46- Tape and Spackle was applied and was drying. Cannot apply the second coat until dry.
Lot 45- same conditions as lot 46
Lot 44- Drywall Inspection; need to pass inspection before applying 1st coat. Inspection passed and notified contractor to continue.
Lot 43- Same condition as lot 44
Lot 42- Frame Inspection was scheduled; passed and contractor was notified to install insulation.
Lot 41- Same condition as 42

Building 2
Lot 7- Rough plumbing was being installed Lot 10- Rough Electric was finishing

Lots 8-9-11 were waiting for trades to finish

Thanks,
Bernie

CAUTION: Electronic mail sent through the Internet is not secure and could be intercepted by a third party. For your protection, avoid sending identifying information such as account, Social Security, or card numbers to us or others. Further, do not send time-sensitive, action-oriented messages such as transaction orders, fund transfer instructions or check stop payments, as it is our policy not to accept such items electronically. This message w/attachments (message) may be privileged, confidential or proprietary, and if you are not an intended recipient, please notify the sender, do not use or share it and delete it. Subject to applicable law, Prudential Savings Bank may monitor, review and retain e-communications (EC) traveling through its networks/systems. This message cannot be guaranteed to be secure or error-free. Attachments that are part of this E-communication may have additional important disclosures and disclaimers, which you should read. By messaging with Prudential Savings Bank you consent to the foregoing.
CAUTION: Electronic mail sent through the Internet is not secure and could be intercepted by a third party. For your protection, avoid sending identifying information such as account, Social Security, or card numbers to us or others. Further, do not send time-sensitive, action-oriented messages such as transaction orders, fund transfer instructions or check stop payments, as it is our policy not to accept such items electronically. This message w/attachments (message) may be privileged, confidential or proprietary, and if you are not an intended recipient, please notify the sender, do not use or share it and delete it. Subject to applicable law, Prudential Savings Bank may monitor, review and retain e-communications (EC) traveling through its networks/systems.

Case ID: 160303161

This message cannot be guaranteed to be secure or error-free. Attachments that are part of this E-communication may have additional important disclosures and disclaimers, which you should read. By messaging with Prudential Savings Bank you consent to the foregoing.

Case ID: 160303161

# **Exhibit 12**

Case ID: 160303161

## Cordone, Michael

| | |
|---|---|
| **From:** | Alex Nadalini <ANadalini@prudentialsavingsbank.com> |
| **Sent:** | Monday, January 25, 2016 10:26 AM |
| **To:** | Cordone, Michael; Doug Smith |
| **Cc:** | Anthony Migliorino; Joe Corrato; Joe Corrato; Sasso, William |
| **Subject:** | RE:  Island View Crossing |
| | |
| **Categories:** | Red Category |

1. The "Vendor Name and Address" should refer to the building and unit with the amount due so that we can reconcile and keep track.  This is sloppy.  The inspection will give us the info but so should Ron in his request.
2. We have asked for a reconciliation of how previous draws were spent.  Is this a pre-condition to further funding?  Ron has been used to getting his own way around here but this is over.  Are we showing weakness if we don't insist on this?
3. I am forwarding my previous e-mails to you so that we know what it was that we've asked for previously.

**From:** Cordone, Michael [mailto:MCordone@STRADLEY.COM]
**Sent:** Monday, January 25, 2016 10:02 AM
**To:** Doug Smith
**Cc:** Anthony Migliorino; Alex Nadalini; Joe Corrato; Joe Corrato; Sasso, William
**Subject:** FW: Island View Crossing

Doug-

    In light of the further discussions between the parties and request for additional information from the bank, the draw request that I sent to the bank on January 14 has now been updated.  Attached is a revised draw request that replaces the January 14 draw request.  Please discard the January 14 draw request and replace it with the attached.

    Although I have not yet received the bank's list of what it wants for to support all future draw requests, we are hoping that the attached documents provide a sufficient basis for the bank to commence the requisite inspection of improvements to evaluate and hopefully fund the attached draw request.  To the extent that the bank wants to pay the contractors directly, we would again ask that the checks be delivered to Island View to distribute in order to manage relations with the subcontractors and suppliers and avoid unnecessary concerns about the status and future of this project.

    We hope to provide additional information, discussed in our recent call, to you soon.  As usual, Island View reserves all of its rights and remedies, and by cooperating with the bank's recent requests, Island View is not agreeing to any changes to its existing loan documents or a new course of performance or dealing unless set forth in a writing signed by Island View.

Regards,
Mike

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

STRADLEY
RONON

1

Case ID: 160303161

This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

**From:** Cordone, Michael
**Sent:** Thursday, January 14, 2016 4:25 PM
**To:** amigliorino@prudentialsavingsbank.com
**Cc:** 'jcorrato@prudentialsavingsbank.com'; 'anadalini@prudentialsavingsbank.com'; Doug Smith (DougSmith@prudentialsavingsbank.com); Sasso, William
**Subject:** Island View Crossing

Anthony-

In furtherance of our discussions yesterday, our client has provided the attached draw request, cover letter and photos taken today to show you the work that is occurring today. The attached draw request was being held by our client because Provident had not yet funded the December draw request.

Although the conversations yesterday between you and our client became a little heated, there is a simple response to your suggestion that nothing has been done in the past two weeks on the IVC project. As reflected at the site, the attached pictures and draw request for work recently completed (and there is much more to come with the work that is in process but not completed and billed by the subs), the project is moving forward with significant work having been completed in the past two weeks, and that work is continuing. Below is an email from the project manager on the site detailing the status of the work on the day of Doug Smith's latest visit. The attached draw requests and those that will follow, along with the land development escrow release requests are an easy way to verify that the project is moving forward and keep tabs on what is occurring. Hopefully, the attached draw request will be honored promptly in order to keep the subcontractors and the project moving forward.

We intend to provide additional financial information to you shortly. I also called and left a message for you to briefly discuss one of the other issues raised during our call and to see if Bill Sasso and I could have a call with your team on Tuesday, January 19. Please let me know if there are any times would work that day for your team.

Regards,
Michael Cordone

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018



This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

From: Bernie Sauer [mailto:bsauer@americorphomes.com]
Sent: Thursday, January 14, 2016 3:30 PM
To: Ron
Subject: Doug Visit

Ron,

Case ID: 160303161

On Friday January 8th the following activity happened at Island View.

Building 4
Lot 47 (Model)- Finishing Trim
Lot 46- Tape and Spackle was applied and was drying. Cannot apply the second coat until dry.
Lot 45- same conditions as lot 46
Lot 44- Drywall Inspection; need to pass inspection before applying 1st coat. Inspection passed and notified contractor to continue.
Lot 43- Same condition as lot 44
Lot 42- Frame Inspection was scheduled; passed and contractor was notified to install insulation.
Lot 41- Same condition as 42

Building 2
Lot 7- Rough plumbing was being installed Lot 10- Rough Electric was finishing

Lots 8-9-11 were waiting for trades to finish

Thanks,
Bernie

CAUTION: Electronic mail sent through the Internet is not secure and could be intercepted by a third party. For your protection, avoid sending identifying information such as account, Social Security, or card numbers to us or others. Further, do not send time-sensitive, action-oriented messages such as transaction orders, fund transfer instructions or check stop payments, as it is our policy not to accept such items electronically. This message w/attachments (message) may be privileged, confidential or proprietary, and if you are not an intended recipient, please notify the sender, do not use or share it and delete it. Subject to applicable law, Prudential Savings Bank may monitor, review and retain e-communications (EC) traveling through its networks/systems. This message cannot be guaranteed to be secure or error-free. Attachments that are part of this E-communication may have additional important disclosures and disclaimers, which you should read. By messaging with Prudential Savings Bank you consent to the foregoing.

Case ID: 160303161

# **Exhibit 13**

Case ID: 160303161

## Cordone, Michael

| | |
|---|---|
| **From:** | Cordone, Michael |
| **Sent:** | Friday, February 12, 2016 3:08 PM |
| **To:** | Doug Smith (DougSmith@prudentialsavingsbank.com); anadalini@prudentialsavingsbank.com |
| **Cc:** | Nasatir, David (David.Nasatir@obermayer.com); christopher.hill@obermayer.com |
| **Subject:** | FW: Island View - Escrow Release #3 |
| **Attachments:** | Americorp Construction Inc - Inv to IVC for Sitework 02-12-2015.pdf; IVC Escrow Release #3 Approval 02-12-2015.pdf |
| | |
| **Categories:** | Purple Category |

Doug and Alex –

Attached are: (i) a fully-executed and approved escrow release request which is ready for funding; and (ii) (although not required) the supporting invoices for the work performed by Americorp as part of the escrow release request. Please fund the request, as soon as possible, and make the required advances in accordance with the instructions set forth in the email from Judy Schmitt below.

On a separate note, Bill and I have adjusted our schedules in order to participate in a call at 2:30 on February 17 if that still works for your group. Please let us know.

Regards,
Mike

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018



This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

**From:** Judy Schmitt [mailto:judy@americorphomes.com]
**Sent:** Friday, February 12, 2016 2:38 PM
**To:** Cordone, Michael
**Cc:** 'Ron Gualtieri'
**Subject:** Island View - Escrow Release #3

Mike,

Attached please find IVC Escrow Release #3, as approved by Bristol Borough, for the amount of $303,261.75. Please have Prudential cut the following checks:

Case ID: 160303161

1.  Premium Excavating, LLC
    269 Canal Road
    Fairless Hills, PA 19030                         **$216,061.75**

2.  Americorp Construction, Inc.                     **$87,200.00** Please split the check as follows:

    A.  Check to  Americorp Construction, Inc.
        1 S. State Street
        Newtown, PA 18940                            **$33,800.00** and the balance of

    B.  **$53,400.00** to be deposited to Prudential Saving Bank, account #21-22614854 (PSB Escrow Agent
        for Island View Crossing II LP) for the February payment of the Non Island View Loans at Prudential.

Also attached is the invoice from Americorp Construction, Inc. in the amount of $87,200.00 (#2) above for IVC
site work.

Please feel free to contact me if you have any questions.

Thank you,

Judy

Judy S. Schmitt, Controller
Americorp Homes, Inc.
One South State Street
Newtown, PA 18940
Phone 215-968-0800
Fax 215-968-5550



Case ID: 160303161

 GILMORE & ASSOCIATES, INC.

ENGINEERING & CONSULTING SERVICES

**VIA EMAIL**

February 12, 2016

Project No.: 13-12051(Borough) & 14-08043 (BBWSA)

Mr. James Dillon, Manager
Borough of Bristol / Bristol Borough Water & Sewer Authority
250 Pond Street
Bristol, PA 19007

Reference:    Island View Crossing II
Escrow Release #3

Dear Mr. Dillon:

In response to the Applicant, AmeriCorp Homes, request for an escrow release dated February 1, 2016 associated with the above referenced project, we have prepared the attached Certificate of Completion No. 3. Each item requested has been reviewed and either withheld or partially released based on actual site conditions per the approved plans. The items/quantities for this release are as delineated on the attached breakdown. Gilmore & Associate, Inc. (G&A) recommends the release of the escrow equal Three Hundred Three Thousand Two Hundred Sixty-One Dollars and Seventy-Five Cents ($303,261.75), contingent upon the Borough and Authority's approval.

If you have any questions regarding the above, please contact this office.

Sincerely,                                          Sincerely,

Kurt M. Schroeder, P.E.                            Stuart L. Rosenthal, P.E.
Borough Engineer                                   Vice President
Gilmore & Associates, Inc.                         Manager, Water/Wastewater
                                                   Gilmore & Associates, Inc.

KMS:SLR/cjr:tjf

cc:    Sally Bellaspica, Zoning Officer - Bristol Borough
       Angela Incollingo, Finance Officer - Bristol Borough
       William Salerno, Esq., Solicitor - Bristol Borough
       Gregg I. Adelman, Esq. – Kaplin Stewart Meloff Reiter & Stein, P.C.
       Ron Gualtieri, Applicant – Island View Crossing II, L.P.
       Christopher J. Rufo, P.E., Project Manager – Gilmore & Associates, Inc.
       Thomas Figaniak, P.E., Project Engineer - Gilmore & Associates, Inc.
       Victor Lameira, Construction Observer - Gilmore & Associates, Inc.

Case ID: 160303161

### CERTIFICATE OF COMPLETION NO. 3
### ISLAND VIEW CROSSING II, L.P.
### BRISTOL BOROUGH

We, the undersigned, hereby certify that the work provided for in a certain Subdivision Development Improvement Agreement between Bristol Borough and Island View Crossing II, L.P., Developer, dated the 4th day of March, 2015, relative to the construction and installation of certain improvements in a development known as the Island View Crossing Subdivision, has been completed to the extent of 23% representing Four Hundred Seventy-Nine Thousand Two Hundred Forty-Three Dollars and Twenty-Three Cents ($479,243.23). We, as Beneficiary authorize the reduction of Prudential Savings Bank Financial Security No. IVC-1 established and set over to Bristol Borough, pursuant to a Subdivision Financial Security Agreement dated the 4th day of March, 2015, by the amount of $303,261.75; the new balance of the Financial Security will be $1,611,137.96. It is agreed that the reduction of the Financial Security hereby authorized shall not be construed as acceptance of the work by said Borough and said Borough hereby reserves the right to reinspect the said work and to require the Developer referred to in said Agreement to correct any and all deficiencies and defects. This Certificate does not authorize a reduction in the Financial Security below an amount of ten (10%) percent of the initial Financial Security balance ($209,038.12).

BRISTOL BOROUGH COUNCIL

By: _Ralph D. Di_____
President

Attest: _____
Secretary

Date: _2-12-16_

**Gilmore & Associates, Inc.**
**Engineering and Consulting Services**

## ESCROW STATUS REPORT

### SUMMARY OF ESCROW ACCOUNT

| | | | |
|---|---|---|---|
| PROJECT NAME: | Island View Crossing II, LP | TOTAL CONSTRUCTION: $ 1,856,116.61 | AMOUNT OF WORK IN PLACE THIS PERIOD: $ 339,957.50 |
| PROJECT NO.: | 13-12051 | TOTAL CONSTRUCTION CONTINGENCY: $ 185,811.66 | REQUIRED RETAINAGE THIS RELEASE (10%): $ 33,995.75 |
| PROJECT OWNER: | Island View Crossing II, LP | TOTAL ENG/INSP/LEGAL: $ 46,452.92 | AMOUNT OF THIS RELEASE: $ 303,281.75 |
| | | TOTAL ESCROW POSTED: $ 2,690,381.19 | |
| MUNICIPALITY: | Bristol Borough | | TOTAL ESCROW RELEASED TO DATE: $ 479,243.23 |
| ESCROW AGENT: | Prudential Savings Bank | RELEASE NO.: 3 | TOTAL ESCROW REMAINING: $ 1,011,137.96 |
| TYPE OF SECURITY: | Letter of Credit | RELEASE DATE: 2/12/2016 | TOTAL CONSTRUCTION CONTINGENCY: $ 185,811.66 |
| AGREEMENT DATE: | March 4, 2015 | | TOTAL ENG/INSP/LEGAL: $ 46,452.92 |
| | | | TOTAL RETAINAGE TO DATE: $ 53,249.26 |
| | | | TOTAL CONSTRUCTION AVAILABLE FOR RELEASE: $ 1,325,624.13 |

| | | | | ESCROW TABULATION | | | CURRENT RELEASE | | RELEASED TO DATE | | AVAILABLE FOR RELEASE | | RELEASE REQ # 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CONSTRUCTION ITEMS | | UNITS | QUANTITY | UNIT PRICE | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | COMMENTS |
| A. | EROSION CONTROL | | | | | | | | | | | | |
| 1. | Stone Construction Entrance | EA | 1 | $1,760.00 | $1,760.00 | | | | | 1.00 | $1,760.00 | |
| 2. | 30" Silt Fence | LF | 390 | $1.75 | $682.50 | | | | | 390.00 | $682.50 | |
| 3. | Super Silt Fence | LF | 2,026 | $7.50 | $15,195.00 | | | 1,526.00 | $11,445.00 | 500.00 | $3,750.00 | |
| 4. | NAGS S-75 | SF | 26,878 | $0.12 | $3,225.36 | | | | | 26,878.00 | $3,225.36 | |
| 5. | Inlet Protection | EA | 45 | $150.00 | $6,750.00 | | | | | 45.00 | $6,750.00 | |
| 6. | P-300 | SF | 3,320 | $0.59 | $1,958.80 | | | | | 3,320.00 | $1,958.80 | |
| 7. | R-6 Rip Rap | CY | 284 | $60.00 | $17,040.00 | | | | | 284.00 | $17,040.00 | |
| B. | WOODLAND REMOVAL | | | | | | | | | | | | |
| 1. | Tree Removal | LS | 1 | $7,500.00 | $7,500.00 | | | | | 1.00 | $7,500.00 | |
| 2. | ERNMX-178 Seeding | LS | 1 | $2,500.00 | $2,500.00 | | | | | 1.00 | $2,500.00 | |
| C. | EXCAVATION | | | | | | | | | | | | |
| 1. | Curb Removal | LF | 8,058 | $2.50 | $20,145.00 | | | 7,708.00 | $19,270.00 | 350.00 | $875.00 | |
| 2. | Pavement Removal | SY | 40,428 | $0.90 | $36,385.20 | | | 39,873.00 | $35,885.70 | 555.00 | $499.50 | |
| 3. | 18" HDPE | LF | 1,420 | $8.00 | $11,360.00 | 700.00 | $5,600.00 | 1,420.00 | $11,360.00 | | | |
| 4. | Inlet removal | EA | 9 | $500.00 | $4,500.00 | 3.00 | $1,500.00 | 9.00 | $4,500.00 | | | |
| 5. | 8" PVC | LF | 900 | $7.00 | $6,300.00 | 300.00 | $2,100.00 | 900.00 | $6,300.00 | | | |
| D. | EARTHWORK | | | | | | | | | | | | |
| 1. | Subgrade Site | LS | 1 | $19,646.60 | $19,646.60 | | | 0.80 | $15,717.28 | 0.20 | $3,929.32 | |
| 2. | Grade and Compact Site | LS | 1 | $20,000.00 | $20,000.00 | | | 0.50 | $10,000.00 | 0.50 | $10,000.00 | |
| 3. | *Deliver and Spread Topsoil | LS | 1 | $13,811.70 | $13,811.70 | | | | | 1.00 | $13,811.70 | |
| 4. | Import Clean Fill for Soil Remediation | CY | 6,610 | $12.00 | $79,320.00 | 6,500.00 | $78,000.00 | 6,500.00 | $78,000.00 | 110.00 | $1,320.00 | |
| E. | STORM SEWER | | | | | | | | | | | | Redcliffe Excluded |
| 1. | 18" HDPE (0-6' deep) | LF | 2,288 | $38.50 | $88,088.00 | 2,179.00 | $83,891.50 | 2,179.00 | $83,891.50 | 109.00 | $4,196.50 | |
| 2. | 21" HDPE (0-6' deep) | LF | 43 | $40.38 | $1,736.34 | 43.00 | $1,736.34 | 43.00 | $1,736.34 | | | |
| 3. | 24" HDPE (0-6' deep) | LF | 526 | $47.50 | $25,080.00 | 526.00 | $25,080.00 | 526.00 | $25,080.00 | | | |
| 4. | 27" HDPE (0-6' deep) | LF | 82 | $49.13 | $4,028.66 | 82.00 | $4,028.66 | 82.00 | $4,028.66 | | | |
| 5. | 30" HDPE (0-6' deep) | LF | 582 | $55.00 | $32,010.00 | 379.00 | $20,845.00 | 379.00 | $20,845.00 | 203.00 | $11,165.00 | Exc. 177 LF |

Page 1

<span style="color:red">Case ID: 160303161</span>

Gilmore & Associates, Inc.
Engineering and Consulting Services

## ESCROW STATUS REPORT

### SUMMARY OF ESCROW ACCOUNT

| | | |
|---|---|---|
| PROJECT NAME: | Island View Crossing II, LP | TOTAL CONSTRUCTION: $ 1,859,118.61 |
| PROJECT NO.: | 13-12051 | TOTAL CONSTRUCTION CONTINGENCY: $ 185,811.66 |
| PROJECT OWNER: | Island View Crossing II, LP | TOTAL ENGINRS/LEGAL: $ 46,452.92 |
| | | TOTAL ESCROW POSTED: $ 2,090,361.19 |
| MUNICIPALITY: | Bristol Borough | |
| ESCROW AGENT: | Prudential Savings Bank | RELEASE NO.: 3 |
| TYPE OF SECURITY: | Letter of Credit | RELEASE DATE 2/12/2016 |
| AGREEMENT DATE: | March 4, 2015 | |

AMOUNT OF WORK IN PLACE THIS PERIOD: $ 336,957.50
REQUIRED RETAINAGE THIS RELEASE (10%): $ 33,695.75
AMOUNT OF THIS RELEASE: $ 303,291.75

TOTAL ESCROW RELEASED TO DATE: $ 479,243.23
TOTAL ESCROW REMAINING: $ 1,611,137.96
TOTAL CONSTRUCTION CONTINGENCY: $ 185,811.66
TOTAL ENGINRS/LEGAL: $ 46,452.92
TOTAL RETAINAGE TO DATE: $ 53,249.25
TOTAL CONSTRUCTION AVAILABLE FOR RELEASE: $ 1,328,624.13

| CONSTRUCTION ITEMS | UNITS | QUANTITY | UNIT PRICE | TOTAL AMOUNT | CURRENT RELEASE QUANTITY | CURRENT RELEASE TOTAL AMOUNT | RELEASED TO DATE QUANTITY | RELEASED TO DATE TOTAL AMOUNT | AVAILABLE FOR RELEASE QUANTITY | AVAILABLE FOR RELEASE TOTAL AMOUNT | RELEASE REQ # 4 COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **E.  STORM SEWER (con't)** | | | | | | | | | | | |
| 6.  Storm Manholes (0-6' deep) | EA | 8 | $2,850.00 | $22,800.00 | 7.00 | $19,950.00 | 7.00 | $19,950.00 | 1.00 | $2,850.00 | 12 raised w/block |
| 7.  Type C Inlet (0-6' deep) | EA | 23 | $2,300.00 | $52,900.00 | 11.00 | $25,300.00 | 11.00 | $25,300.00 | 12.00 | $27,600.00 | Asbuilt WQ sump |
| 8.  Type M Inlet (0-6' deep) | EA | 22 | $2,350.00 | $51,700.00 | 16.00 | $37,600.00 | 16.00 | $37,600.00 | 6.00 | $14,100.00 | |
| 9.  30" Concrete Headwall | EA | 2 | $2,210.00 | $4,420.00 | 2.00 | $4,420.00 | 2.00 | $4,420.00 | | | |
| 10. Rip Rap, with Filter Fabric | SY | 22 | $57.00 | $1,254.00 | 11.00 | $627.00 | 11.00 | $627.00 | 11.00 | $627.00 | |
| 11. Snouts | EA | 12 | $500.00 | $6,000.00 | | | | | 12.00 | $6,000.00 | |
| **F.  SANITARY SEWER** | | | | | | | | | | | |
| 1.  4" PVC (Townhouse Laterals) | LF | 3,170 | $21.00 | $66,570.00 | 274.00 | $5,754.00 | 850.00 | $17,850.00 | 2,320.00 | $48,720.00 | |
| 2.  6" PVC (8'-10' deep) (Condo Laterals) | LF | 302 | $28.50 | $8,003.00 | | | 154.00 | $4,081.00 | 148.00 | $3,922.00 | |
| 3.  8" PVC (10'-15' deep) (Sewer Main) | LF | 2,008 | $35.00 | $70,280.00 | 275.00 | $9,625.00 | 1,408.00 | $49,280.00 | 600.00 | $21,000.00 | |
| 4.  4' Diameter Manhole (8'-12' deep) | EA | 10 | $3,650.00 | $36,500.00 | 1.60 | $5,475.00 | 5.00 | $18,250.00 | 5.00 | $18,250.00 | |
| 5.  4' Diameter Manhole (12'-16' deep) | EA | 7 | $3,950.00 | $27,650.00 | 0.50 | $1,975.00 | 3.50 | $13,825.00 | 3.50 | $13,825.00 | |
| 6.  Cleanout | EA | 82 | $150.00 | $12,300.00 | 23.00 | $3,450.00 | 79.00 | $11,850.00 | 3.00 | $450.00 | |
| 7.  Core Drill/Tie Into Existing Manhole | LS | 1 | $1,750.00 | $1,750.00 | | | 0.80 | $1,400.00 | 0.20 | $350.00 | |
| 8.  Pump Station Upgrade | LS | 1 | $127,000.00 | $127,000.00 | | | | | 1.00 | $127,000.00 | |
| **G.  SITE IMPROVEMENTS** | | | | | | | | | | | |
| 1.  Concrete/Belgian Block Curb | LF | 6,070 | $15.00 | $91,050.00 | | | | | 6,070.00 | $91,050.00 | |
| 3.  1.5" 9.5mm Wearing | SY | 12,087 | $7.00 | $84,609.00 | | | | | 12,087.00 | $84,609.00 | |
| 4.  6" 19mm Binder | SY | 12,087 | $12.00 | $145,044.00 | | | | | 12,087.00 | $145,044.00 | |
| 5.  6" Modified Stone | SY | 12,087 | $6.00 | $72,522.00 | | | | | 12,087.00 | $72,522.00 | |
| 6.  2.5" 9.5mm Wearing - Asphalt Walk | SY | 640 | $8.00 | $5,120.00 | | | | | 640.00 | $5,120.00 | |
| 7.  4" Modified Stone - Asphalt Walk | SY | 640 | $5.00 | $3,200.00 | | | | | 640.00 | $3,200.00 | |
| 8.  4" Concrete Sidewalk | SF | 8,600 | $6.00 | $51,600.00 | | | | | 8,600.00 | $51,600.00 | |
| 9.  6" Concrete Sidewalk | SF | 16,155 | $6.50 | $105,007.50 | | | | | 16,155.00 | $105,007.50 | |
| 10. ADA Curb Ramps | EA | 27 | $1,500.00 | $40,500.00 | | | | | 27.00 | $40,500.00 | |
| 11. Rain Garden Construction | EA | 6 | $5,000.00 | $30,000.00 | | | | | 6.00 | $30,000.00 | |

Case ID: 160303161

**Gilmore & Associates, Inc.**
Engineering and Consulting Services

## ESCROW STATUS REPORT

### SUMMARY OF ESCROW ACCOUNT

| | | | |
|---|---|---|---|
| PROJECT NAME: | Island View Crossing II, LP | TOTAL CONSTRUCTION: $ 1,858,116.61 | AMOUNT OF WORK IN PLACE THIS PERIOD: $ 336,957.50 |
| PROJECT NO.: | 13-12051 | TOTAL CONSTRUCTION CONTINGENCY: $ 185,811.66 | REQUIRED RETAINAGE THIS RELEASE (10%): $ 33,695.75 |
| PROJECT OWNER: | Island View Crossing II, LP | TOTAL ENGINS/PE/LEGAL: $ 46,452.92 | AMOUNT OF THIS RELEASE: $ 303,261.75 |
| | | TOTAL ESCROW POSTED: $ 2,090,381.19 | |
| MUNICIPALITY: | Bristol Borough | | TOTAL ESCROW RELEASED TO DATE: $ 479,243.23 |
| ESCROW AGENT: | Prudential Savings Bank | RELEASE NO.: 3 | TOTAL ESCROW REMAINING: $ 1,611,137.96 |
| TYPE OF SECURITY: | Letter of Credit | RELEASE DATE: 2/12/2016 | TOTAL CONSTRUCTION CONTINGENCY: $ 185,811.66 |
| AGREEMENT DATE: | March 4, 2015 | | TOTAL ENGIN/PE/LEGAL: $ 46,452.92 |
| | | | TOTAL RETAINAGE TO DATE: $ 53,249.25 |
| | | | TOTAL CONSTRUCTION AVAILABLE FOR RELEASE: $ 1,325,624.13 |

| | | | | | CURRENT RELEASE | | RELEASED TO DATE | | AVAILABLE FOR RELEASE | | RELEASE REQ # 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CONSTRUCTION ITEMS | UNITS | QUANTITY | UNIT PRICE | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | QUANTITY | TOTAL AMOUNT | COMMENTS |
| **H.  HOP IMPROVEMENTS** | | | | | | | | | | | |
| 1.  Storm Manhole | EA | 1 | $2,850.00 | $2,850.00 | | | | | 1.00 | $2,850.00 | |
| 2.  ADA Curb Ramps | EA | 2 | $2,500.00 | $5,000.00 | | | | | 2.00 | $5,000.00 | |
| 3.  15" RCP | LF | 930 | $31.75 | $29,527.50 | | | | | 930.00 | $29,527.50 | |
| 4.  Type C Inlets | EA | 8 | $2,300.00 | $18,400.00 | | | | | 8.00 | $18,400.00 | |
| 5.  Signage | EA | 6 | $200.00 | $1,200.00 | | | | | 6.00 | $1,200.00 | |
| 6.  Sawcutting | LF | 830 | $3.00 | $2,490.00 | | | | | 830.00 | $2,490.00 | |
| 7.  Pavement Milling | SY | 83 | $3.00 | $249.00 | | | | | 83.00 | $249.00 | |
| 8.  1 1/2" Overlay | SY | 83 | $7.25 | $601.75 | | | | | 83.00 | $601.75 | |
| 9.  Full Depth Pavement | SY | 435 | $27.00 | $11,745.00 | | | | | 435.00 | $11,745.00 | |
| 10.  Core Drill/Tie Into Existing Mahole | LS | 1 | $1,750.00 | $1,750.00 | | | | | 1.00 | $1,750.00 | |
| **I.  STRIPING & SIGNAGE** | | | | | | | | | | | |
| 1.  Painted Stop Bars | EA | 9 | $100.00 | $900.00 | | | | | 9.00 | $900.00 | |
| 2.  Painted Handicap Symbols | EA | 12 | $125.00 | $1,500.00 | | | | | 12.00 | $1,500.00 | |
| 3.  Handicap Parking Signs | EA | 12 | $225.00 | $2,700.00 | | | | | 12.00 | $2,700.00 | |
| 4.  Traffic Control Signs | EA | 16 | $200.00 | $3,200.00 | | | | | 16.00 | $3,200.00 | |
| **J.  SITE LANDSCAPING** | | | | | | | | | | | |
| 1.  Shade Tree (2.5"-3.5" caliper) | EA | 110 | $400.00 | $44,000.00 | | | | | 110.00 | $44,000.00 | |
| 2.  Ornamental Tree (2"-2.5" caliper or 8-10') | EA | 28 | $350.00 | $9,800.00 | | | | | 28.00 | $9,800.00 | |
| 3.  Evergreen Tree (6'-7') | EA | 32 | $280.00 | $8,960.00 | | | | | 32.00 | $8,960.00 | |
| 4.  Evergreen Shrubs (24"-30") | EA | 72 | $75.00 | $5,400.00 | | | | | 72.00 | $5,400.00 | |
| 5.  Deciduous Shrubs (18"-24") | EA | 90 | $65.00 | $5,850.00 | | | | | 90.00 | $5,850.00 | |
| 6.  Ground Cover Shrubs (15"-18") | 3 GAL | 24 | $35.00 | $840.00 | | | | | 24.00 | $840.00 | |
| 7.  Ornamental Grasses | 1 GAL | 55 | $15.00 | $825.00 | | | | | 55.00 | $825.00 | |
| 8.  Seeding | LS | 1 | $17,545.70 | $17,545.70 | | | | | 1.00 | $17,545.70 | |
| **K.  MISCELLANEOUS** | | | | | | | | | | | |
| 1.  250 Watt Pole Mounted Light | EA | 24 | $2,500.00 | $60,000.00 | | | | | 24.00 | $60,000.00 | |
| 2.  175 Watt Pole Mounted Trail Light | EA | 17 | $3,295.00 | $56,015.00 | | | | | 17.00 | $56,015.00 | |
| 3.  Iron Pins | EA | 200 | $100.00 | $20,000.00 | | | | | 200.00 | $20,000.00 | |
| 4.  Concrete Monuments | EA | 1 | $175.00 | $175.00 | | | | | 1.00 | $175.00 | |
| 5.  Utility As-Built Plans | LS | 1 | $10,000.00 | $10,000.00 | | | | | 1.00 | $10,000.00 | |
| | | | | **TOTALS** | | $336,957.50 | | $532,492.48 | | $1,325,624.13 | |

Case ID: 160303161



**Americorp Construction, Inc.**
1 S State Street
Newtown PA 18940

License:

# Contract Invoice

Invoice#: 15999-0116

Date: 01/25/2016

**Billed To:**   Island View Crossing II, LP
1 S State Street
Newtown PA 18940

**Project:**   Island View Crossing
1600 Radcliffe Street
Bristol PA 19007

**Due Date:** 01/25/2016          **Terms:**          **Order#**

| Description | Amount |
|---|---|
| EXCAVATION: | |
| C.3 - 18" HDPE - 700 LF | 5,600.00 |
| C.4 - Inlet Removal - 3 | 1,500.00 |
| C.5 - 8" PVC - 300LF | 2,100.00 |
| EARTHWORK: | |
| D.4 - Import Clean Fill for Soil Remediation | 78,000.00 |

*A service charge of 0.00  % per annum will be charged on all amounts overdue on regular statement dates.*

*Thank you for your prompt payment!*

| | |
|---|---|
| Non-Taxable Amount: | 87,200.00 |
| Taxable Amount: | 0.00 |
| Sales Tax: | 0.00 |
| **Amount Due** | **87,200.00** |

Case ID: 160303161

# Exhibit 14

Case ID: 160303161

## Cordone, Michael

| | |
|---|---|
| **From:** | Cordone, Michael |
| **Sent:** | Thursday, February 18, 2016 3:54 PM |
| **To:** | Nasatir, David (David.Nasatir@obermayer.com) |
| **Cc:** | christopher.hill@obermayer.com; Sasso, William |
| **Subject:** | Island View Crossing |
| | |
| **Categories:** | Purple Category |

Dave-

    While we are waiting to hear back from you on the bank's postponement of the February 17 call, we wanted to add an additional item to the agenda – funding delays by Prudential.  Since the end of November, Prudential has attempted to change the long history with this borrower and its related companies concerning draw requests and now escrow release requests.  What was once a simple, fast and well-known process between the parties has become a moving target with constantly evolving demands by Prudential, resulting in repeated delays in Prudential's processing of draw requests and now escrow releases.  These funding delays are adversely affecting the IVC project, IVC and the subcontractors and suppliers.

    In Anthony Migliorino's emails to me over the weekend accusing us of delaying matters, he suggested that IVC is not following the proper draw procedures but failed to specify how.  According to my client, he has been following the same draw procedures with Prudential for many years and experienced no problems prior to November 2015.  In an effort to prevent additional delays, since December, IVC has been providing to the bank additional information that does not appear to be required under the loan documents, and I have been asking repeatedly (including on the last call in which you participated) for a list of what the bank believes is required under the existing loan documents to properly support draw and escrow release requests.  The only thing that I have received from the bank to date in response to these requests is the bank's proposal for changes to the draw process (which we have commented upon).  Based upon my review of the governing loan documents, it appears to me that our clients are making the draw requests in the format required.  While it is certainly worth considering changes to the current draw procedures as part of our settlement discussions and possible amendments to the loan, it is difficult to hit a moving target in the interim if the bank is attempting to implement new draw procedures before any agreement is reached on those procedures or any amendments to the loan.

    Please confirm what the bank believes is currently required for draws, where those requirements can be found in the existing loan documents and when the current draw and escrow releases will be funded?  Thank you.

Regards,
Mike

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018



This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments.

1

Case ID: 160303161

Instead, please notify the sender and delete the e-mail and attachments. Thank you.

Case ID: 160303161

# **<u>Exhibit 15</u>**

Case ID: 160303161

## Cordone, Michael

| | |
|---|---|
| **From:** | Cordone, Michael |
| **Sent:** | Friday, February 19, 2016 4:17 PM |
| **To:** | 'Nasatir, David' |
| **Cc:** | Hill, Christopher; Sasso, William; Poduslenko, Nicholas |
| **Subject:** | RE: Island View Crossing |

**Categories:**          Purple Category

Dave-

Perhaps we should have another call today.  You are conflating the draw request issues and the escrow release requirements.  I would agree with you that the provisions in the loan agreement create some flexibility for your client, but only as to draw requests.  Moreover, your client has an obligation to clearly communicate what the new draw requirements are and they must be reasonable.  Escrow releases are not discretionary and are required upon certification by the Borough of Bristol and the engineers.

Please let us know specifically what is now required for draw requests and what email, letter or other document specifies what is required.  We need a clear statement of what the bank is now requiring and when those new requirements for **draw** requests went into effect.  All that we have received is a proposal for new procedures, which we commented upon last week and heard nothing from you or your client in response.  In our last group telephone conversation, we discussed the fact that your client would send proposals for new **draw** procedures for the lawyers to comment upon.  I don't recall ever hearing that the bank was unilaterally imposing new draw procedures upon IVC.

I will respond to your default letters separately, but it is the bank's failure to fund the **escrow** release request that has resulted in the delay in payments to your client.  If there has also been a change in the **escrow** release procedures that would be new to me, as that has never been discussed with your client or you at any time, and no written materials have ever been provided to us, IVC or the Borough of Bristol to advise us of any intent by the bank to change those procedures.

Hopefully, we can work this out if we all get together to discuss all of the issues, instead of just listening to the one-sided demands that your client has been making since November.

Regards,
Mike

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

STRADLEY
RONON

This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

Case ID: 160303161

**From:** Nasatir, David [mailto:David.Nasatir@obermayer.com]
**Sent:** Friday, February 19, 2016 3:40 PM
**To:** Cordone, Michael
**Cc:** Hill, Christopher; Sasso, William; Poduslenko, Nicholas
**Subject:** RE: Island View Crossing

Mike

I wanted to respond to this email directly, notwithstanding the fact that an Event of Default has occurred under the IVC loan and thus my client has no obligation to release funds. First off, my client per the loan agreement Section 5.2 has the right to request whatever it reasonably believes is necessary. Further, while I disagree with your characterizations of past events, even if the Bank had not previously required compliance with all the conditions to fund previous draws, it retained the right to require such compliance per Section 9.3(a) of the Loan Agreement. Pursuant to such rights, the Bank in fact did notify your client, and you, of certain documents that would be necessary prior to funding the currently open draw requests, but your client chose not to comply. It is important to point out that the Bank did honor the pending draw request when it notified your client of the changes, as it understood it would not have been reasonable to change such requirements for a draw request that had already been submitted.

While I understand you are trying to press your client's concerns, I think it is important to be honest about the rights granted under the governing loan documents if we are to have any hope of resolving this amicably (you will note I have not included my clients as I have no interest in inflaming the situation). We have both been doing this too long to not acknowledge such.

I look forward to speaking with you next week and working to resolve this matter.



**David A. Nasatir, Esquire**
**Business and Finance Department Chair**
Partner
**Obermayer Rebmann Maxwell & Hippel LLP**
One Penn Center, 19th floor
1617 John F. Kennedy Blvd., Philadelphia, PA 19103-1895
215.665.3036 tel | 215.665.3165 fax
david.nasatir@obermayer.com | www.obermayer.com



**From:** Cordone, Michael [mailto:MCordone@STRADLEY.COM]
**Sent:** Thursday, February 18, 2016 3:54 PM
**To:** Nasatir, David
**Cc:** Hill, Christopher; Sasso, William
**Subject:** Island View Crossing

Dave-

While we are waiting to hear back from you on the bank's postponement of the February 17 call, we wanted to add an additional item to the agenda – funding delays by Prudential. Since the end of November, Prudential has attempted to change the long history with this borrower and its related companies concerning draw requests and now escrow release requests. What was once a simple, fast and well-known process between the parties has become a moving target with constantly evolving demands by Prudential, resulting in repeated delays in Prudential's processing of draw requests and now escrow releases. These funding delays are adversely affecting the IVC project, IVC and the subcontractors and suppliers.

Case ID: 160303161

In Anthony Migliorino's emails to me over the weekend accusing us of delaying matters, he suggested that IVC is not following the proper draw procedures but failed to specify how. According to my client, he has been following the same draw procedures with Prudential for many years and experienced no problems prior to November 2015. In an effort to prevent additional delays, since December, IVC has been providing to the bank additional information that does not appear to be required under the loan documents, and I have been asking repeatedly (including on the last call in which you participated) for a list of what the bank believes is required under the existing loan documents to properly support draw and escrow release requests. The only thing that I have received from the bank to date in response to these requests is the bank's proposal for changes to the draw process (which we have commented upon). Based upon my review of the governing loan documents, it appears to me that our clients are making the draw requests in the format required. While it is certainly worth considering changes to the current draw procedures as part of our settlement discussions and possible amendments to the loan, it is difficult to hit a moving target in the interim if the bank is attempting to implement new draw procedures before any agreement is reached on those procedures or any amendments to the loan.

Please confirm what the bank believes is currently required for draws, where those requirements can be found in the existing loan documents and when the current draw and escrow releases will be funded? Thank you.

Regards,
Mike

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

STRADLEY RONON

This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and attachments. Thank you.

Case ID: 160303161

# <u>Exhibit 16</u>

Case ID: 160303161



Stradley Ronon Stevens & Young, LLP

Suite 2600

2005 Market Street

Philadelphia, PA 19103-7018

Telephone 215.564.8000

Fax 215.564.8120

www.stradley.com

*William R. Sasso, Chairman*
*(215) 564-8045*
*wsasso@stradley.com*

February 23, 2016

**Via Email (David.Nasatir@obermayer.com)**
David A. Nasatir, Esq.
Obermayer, Rebmann, Maxwell & Hippel LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

> **RE:**   **Loans from Prudential Savings Bank ("Prudential") to Island View Crossing II, L.P. et al.**

Dear David:

As you know, my firm has been asked to represent Island View Crossing II, L.P. ("Island View LP"), its general partner Island View Properties, Inc. ("Island View Inc.") and Renato J. Gualtieri ("Mr. Gualtieri") with regard to the loans extended to Island View LP by Prudential. We have received copies of Prudential's latest "default" letters addressed to Island View LP, Mr. Gualtieri and their related companies, as well as copies of the December 18, 2015 and January 21, 2016 letters from Prudential and your firm. I am writing in response to the latest in the string of letters and what is a blatant attempt to carry through on the threats that Anthony Migliorino has been making on behalf of Prudential since November 2015 to foreclose upon all of the collateral securing the loans made to Island View Crossing LP and its related entities. Although Mr. Gualtieri and his related companies and partnerships have a more than 23 year history with Prudential, beginning in November of 2015 when Prudential underwent some personnel changes, Prudential began making a series of threats and constant changes to the way that Mr. Gualtieri and Prudential had operated for the prior 23 years, likely in an effort to divert attention from Prudential's default on its commitment to refinance the Lava Funding Loan made to Mr. Gualtieri's father and invested in Island View LP.

In December, in response to Prudential's first letter and first series of written and numerous oral threats, we advised Prudential that its letter referenced the alleged existence of defaults, but our clients had not ever received a default letter from Prudential. In a telephone conversation following my response letter, Anthony Migliorino, on behalf of Prudential, advised

Case ID: 160303161

David A. Nasatir, Esq.
February 23, 2016
Page 2

my partner Michael Cordone and me that the loan documents were voluminous and detailed and that Prudential "would find a default if it needed to" and that "Prudential would foreclose on all of its collateral if Island View LP, Mr. Gualtieri and their related entities did not agree to the terms in his December 18, 2015 letter." In total disregard of its obligations under the existing loan documents and its long course of dealing with these borrowers, Prudential has proceeded to follow through on Mr. Migliorino's threats ever since by, among other things: (i) refusing to timely honor draw requests; (ii) refusing to promptly fund escrow releases to fund site improvements; (iii) restricting Island View LP's cash flow; (iv) changing the draw request requirements and never providing us with a clear answer on what Prudential currently requires in order to fund such draw requests; (v) directly paying subcontractors and suppliers on the project; (vi) unilaterally deciding which subcontractors and vendors to pay and how much to pay them; and (vii) withholding monies due to Island View LP and its related entities in an effort to severely restrict their cash flow and create the very defaults that Mr. Migliorino had threatened months before. It would be a severe understatement to say that Prudential has not acted in good faith since November.

The foregoing conduct of Prudential has caused and continues to cause substantial harm to Island View LP, Mr. Gualtieri and all of their related entities and is jeopardizing the entire Island View project at this point. As our clients have established in the numerous financial and other project reports provided to Prudential, this is a critical time in the project, as Island View and its subcontractors are working hard to complete the first two sets of townhouses (including a model home) and key site improvements (the water lines and roads) in time for the spring marketing season. Restricting the draws and escrow releases to Island View LP and its subcontractors will prevent Island View LP from completing the project on a timely basis and may even cause it to shut down shortly if the draw and escrow release requests are not promptly funded. As Prudential is well aware, continuing funding delays that cause subcontractors to delay their work on the project could be devastating to the success of the project, a project conservatively projected to earn profits in excess of $25 million.

While we still believe that it is in our clients' mutual best interest to avoid the foreclosure and lender liability litigation battle, Prudential must recognize that it has potential exposure for its conduct, stop insisting upon one-sided demands and be open to exploring mutually-beneficial solutions in order to enable Island View LP, Mr. Gualtieri and their related entities to fully repay their loans to Prudential.

My clients and I would to have a face-to-face meeting with Prudential and its counsel later this week or early next week, if we can coordinate our schedules and if Prudential is open to exploring a mutually beneficial resolution of these issues. I am trying to clear some time for us to meet either in our offices or Obermayer (in order to fit it into my schedule) on Friday,

Case ID: 160303161

David A. Nasatir, Esq.
February 23, 2016
Page  3

February 26 and will get back to you with a potential time(s) after I attempt to adjust my schedule.

Very truly yours,

William R. Sasso,
Chairman

WRS/jk

cc:    Mr. Renato J. Gualtieri (via Email)
Michael J. Cordone, Esquire

Case ID: 160303161

# **Exhibit 17**

Case ID: 160303161

## Cordone, Michael

| | |
|---|---|
| **From:** | Cordone, Michael |
| **Sent:** | Tuesday, February 23, 2016 5:23 PM |
| **To:** | Nasatir, David (David.Nasatir@obermayer.com) |
| **Cc:** | christopher.hill@obermayer.com; Sasso, William |
| **Subject:** | Island View Crossing |
| **Attachments:** | image1.jpg; image2.jpg; image3.jpg |
| | |
| **Categories:** | Purple Category |

Dave-

    I am writing to request that Prudential carefully reconsider an immediate release of the funds that were part of the escrow release request submitted to Prudential by Island View Crossing ("IVC") on February 12 pursuant to the email below and the attachments. While I recognize that the parties are still discussing their issues and that certain positions have been taken on both sides, I do believe that prompt and continuing funding of the project is particularly critical (and in the best interest of both borrower and lender) at this time.  As you probably know, the escrow release requests are for site improvements and are governed by the Subdivision Financial Security Agreement dated March 4, 2015 and Section 5.6 of the Development Construction Loan Agreement instead of the general process for construction draw requests.  Once approved by the Township and the engineers, the escrow release is supposed to be funded in order to ensure that the site improvements are completed on a timely basis.

    At present, IVC and its subcontractors have been working hard to install the water mains and have been making very good progress.  IVC believes that is either on or slightly ahead of schedule in completing the water mains provided that the primary subcontractor, who has not been paid for any of his previous storm water work yet (part of the current escrow release request), keeps moving forward at the same pace and with the same number of workers on this project instead of some other project.  Timely paying the subcontractors performing this work is not only important to keep the water main installation on schedule, but it has a domino effect on other critical site improvements like the curbs and roads.  Any delay in completing the curbs and roads, which were scheduled to be completed by the end of March, will impact IVC's ability to have its model home open and roads completed at the site in time for the spring marketing season, which is the best time of year to push to sell new units for the benefit of all involved.  Similarly, the funding delays and issues have restricted IVC's cash and budget, and it can little afford to spend money on advertising if it is not certain that the water lines and roads will be complete and the model home open as part of this spring marketing push.  Missing that spring market will certainly have a negative impact on this project.

    Please ask your client to reconsider approving the escrow release as soon as possible for the mutual benefit of IVC and Prudential.  Thank you.

Regards,
Mike

bio | vcard | email | map | website

**Michael J. Cordone**
Stradley Ronon Stevens & Young, LLP
p: 215.564.8002 | c: 267.334.6803
f: 215.564.8120
2005 Market Street, Suite 2600
Philadelphia, PA 19103-7018

STRADLEY
RONON

This e-mail is from the law firm of Stradley Ronon Stevens & Young, LLP, and may contain information that is confidential

Case ID: 160303161

or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments.
Instead, please notify the sender and delete the e-mail and attachments. Thank you.

Case ID: 160303161