**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>**ISLAND VIEW CROSSING II, L.P.,**<br><br>Debtor. | **CHAPTER 11**<br>**Case No. 17-14454-ELF** |
| **KEVIN O'HALLORAN, in his capacity as Chapter 11 Trustee for Island View Crossing II, L.P.,**<br><br>Plaintiff,<br>v.<br>**PRUDENTIAL SAVINGS BANK,**<br>Defendant. | **Adversary No. 17-00202 (ELF)**<br><br>**Adversary No. 18-00280 (ELF)** |

**<u>ORDER</u>**

**AND NOW**, this _____ day of _____, 2019, upon consideration of Defendant Prudential Savings Bank's Motion to Dismiss the Adversary Complaint and the Plaintiff's response and memorandum in opposition thereto, it is hereby **ORDERED** that Defendant's motion is **DENIED**.

**BY THE COURT:**

_____
**ERIC L. FRANK, J..**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>**ISLAND VIEW CROSSING II, L.P.,**<br><br>Debtor. | **CHAPTER 11**<br>**Case No. 17-14454-ELF** |
| **KEVIN O'HALLORAN, in his capacity as Chapter 11 Trustee for Island View Crossing II, L.P.,**<br><br>Plaintiff,<br><br>v.<br><br>**PRUDENTIAL SAVINGS BANK,**<br><br>Defendant. | **Adversary No. 17-00202 (ELF)**<br><br>**Adversary No. 18-00280 (ELF)** |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

Plaintiff Kevin O'Halloran, in his capacity as the Chapter 11 Trustee ("Plaintiff" or the "Trustee") for Island View Crossing II, L.P., by and through his undersigned counsel, submits this response in opposition to the numbered paragraphs in the Motion to Dismiss Adversary Complaint filed by Defendant Prudential Savings Bank ("Defendant" or "Prudential"):

1.      It is admitted that on June 30, 2017, IVC, Calnshire, and Steeple Run filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2-7.      The allegations in these paragraphs constitute conclusions of law to which no response is required.  To the extent any allegations contained in these paragraphs could be construed as factual, they are hereby denied.

8-34.   The Trustee's Complaint (Adv. No. 18-00280, Doc. No. 1) and the exhibits attached thereto are written documents which speak for themselves.   The Lender Liability Adversary Complaint (Adv. No. 17-00202, Doc. No. 1-2) and the exhibits attached thereto are likewise written documents which speak for themselves.   To the extent paragraphs 8 through 34 of Prudential's Motion contain any factual allegations which are inconsistent with the Trustee's Complaint, the Lender Liability Adversary Complaint, or the documents attached to those pleadings, such allegations are hereby denied.

35-82.  The allegations contained in these paragraphs constitute conclusions of law to which no response is required.  To the extent any allegations contained in these paragraphs could be construed as factual, they are hereby denied.  By way of further response, Prudential's Motion is without merit and must be denied, as explained in detail in the Memorandum of Law filed contemporaneously herewith, which is incorporated by reference as if fully set forth herein.

Dated: March 15, 2019                              Respectfully submitted,

                                                   /s/Matthew R. Williams
                                                   Steven M. Coren, Esq.
                                                   Matthew R. Williams, Esq.
                                                   KAUFMAN, COREN & RESS, P.C.
                                                   Two Commerce Square
                                                   2001 Market Street, Suite 3900
                                                   Philadelphia, PA 19103
                                                   Tel: (215) 735-8700
                                                   Fax: (215) 735-5170
                                                   scoren@kcr-law.com
                                                   mwilliams@kcr-law.com

                                                   *Special Counsel for Plaintiff*
                                                   *Kevin O'Halloran, Chapter 11 Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew R. Williams, Esquire, do hereby certify that on March 15, 2019, a true and correct copy of the foregoing Response in Opposition to Defendant's Motion to Dismiss and accompanying memorandum of law was served upon those required to receive documents pursuant to the applicable Bankruptcy Rules of Procedure via electronic notification.

*/s/ Matthew R. Williams*
MATTHEW R. WILLIAMS

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re:

**ISLAND VIEW CROSSING II, L.P.,**

        **Debtor.**

**CHAPTER 11
Case No. 17-14454-ELF**

**KEVIN O'HALLORAN, in his capacity as Chapter 11 Trustee for Island View Crossing II, L.P.,**

        **Plaintiff,**

        **v.**

**PRUDENTIAL SAVINGS BANK,**

        **Defendant.**

**Adversary No. 17-00202 (ELF)**

**Adversary No. 18-00280 (ELF)**

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Kevin O'Halloran, in his capacity as the Chapter 11 Trustee ("Plaintiff" or the "Trustee") for Island View Crossing II, L.P. ("IVC" or the "Debtor"), by and through his undersigned counsel, submits this memorandum of law in opposition to the Motion to Dismiss Adversary Complaint filed by Defendant Prudential Savings Bank ("Defendant" or "Prudential").

**I.     NATURE AND STAGE OF THE PROCEEDING**

IVC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 30, 2017.  On January 29, 2018, Plaintiff was elected to serve as the Chapter 11 Trustee.

Prior to IVC's bankruptcy, IVC, its general partner Island View Properties, Inc., and its principal Renato Gualtieri had filed a lender liability suit against Prudential in the Court of

Common Pleas of Philadelphia County (the "Lender Liability Action"), which was removed to this Court on July 18, 2017. *See* Adv. 17-00202, Doc. No. 1-2 (the "Lender Liability Adversary Complaint").

On December 3, 2018, the Trustee commenced Adversary Proceeding No. 18-00280 against Prudential.[1] The Trustee's Complaint references and incorporates the allegations from the Lender Liability Adversary Complaint and seeks to avoid and recover constructively fraudulent transfers and to equitably subordinate Prudential's rights below those of other creditors.[2] Prudential filed a motion to dismiss the Trustee's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (applicable here pursuant to Federal Rule of Bankruptcy Procedure 7012), to which the Trustee objects and responds herein.

## II.    INTRODUCTION

Between 2011 and 2014, IVC entered into a series of loan and collateral mortgage agreements with Prudential which benefited other entities and projects, rather than IVC, but were secured with mortgages on IVC's property. Similarly, sums advanced on loans purportedly intended to fund development of residential real estate at IVC's property – which IVC was obligated to repay and which were secured with IVC's property – were instead used for the benefit of other entities. Moreover, in 2015, Prudential began refusing to honor its commitments under its construction loan agreements with IVC, attempting to coerce IVC into accepting drastic changes to the agreements, and refusing to advance funds or pay subcontractors and suppliers.

---

[1]    Adversary Proceeding No. 18-00280 was thereafter consolidated with the Lender Liability Action. *See* Adv. No. 17-00202, Doc. No. 15, Order dated December 6, 2018.

[2]    The Trustee consents to the entry of final orders or judgment by this Court in connection with all claims asserted in his Complaint.

2

Prudential then manufactured a sham default against IVC, which destroyed the Island View project and led to IVC's bankruptcy.

The Trustee's complaint seeks avoidance and recovery of the encumbrances and loan advancements from which it received no benefit, as well as equitable subordination of Prudential's claims. Prudential seeks dismissal of the Trustee's claims, arguing that they have been insufficiently pled. Prudential's motion lacks merit and must be denied.

*First*, because the Trustee's Complaint refers to and incorporates the Lender Liability Adversary Complaint, Prudential renews its argument – already raised before and rejected by the Common Pleas Court – that the tortious interference claim in that pleading is not cognizable under Pennsylvania law because it involves conduct directed at IVC rather than third parties. However, the tortious interference claim is based on Prudential's delay and withholding of payments from subcontractors and suppliers. Prudential was not a party to IVC's contracts with those parties, but was paying them directly and controlling the allocation and timing of the payments. These allegations sufficiently support a tortious interference claim against Prudential and, as the Common Pleas Court has already deemed that the claim was sufficiently pled, it is inappropriate for Prudential to revisit that ruling in this context.

*Second*, the Trustee's factual allegations support equitable subordination of Prudential's claims to all other creditors, due to its misconduct in connection with the Island View project. The conduct at issue includes substantial breaches of contract, advantage-taking by Prudential, and tortious interference, all of which amount to overreaching sufficient to support the Trustee's claim. Further, subordination would not violate the American Rule because, as the Third Circuit has explained, the American Rule is not implicated where subordination is otherwise appropriate.

*Third*, the Trustee's constructive fraudulent transfer claims are likewise adequately pled. At the time of the Transfers, IVC was experiencing serious cash flow and liquidity problems due to the fact that its only significant asset (the Island View property) required major remedial and development work before it could begin generating profits. At the same time, IVC was heavily encumbered by mortgages and other transfers for which it received no benefit. These allegations provide a sufficient basis upon which the Court can plausibly infer IVC's insolvency, undercapitalization, and inability to pay its debts, which is all that is required at the pleading stage.

Simply stated, the Trustee has adequately pled claims for tortious interference, equitable subordination and fraudulent transfer and Prudential has identified no dispositive legal issues that require dismissal of the Trustee's Complaint as a matter of law. Accordingly, Prudential's Motion should be denied.

## III. RELEVANT BACKGROUND

Beginning in 1989, IVC's principal Renato Gualtieri and various entities with which he is affiliated began developing residential real estate. Complaint ("Compl."), ¶ 11. Those entities include:

- IVC, which at the time of the bankruptcy filing was developing a 169 unit townhouse and condominium complex (the "Island View Project" or the "Project") located directly on the Delaware River at 1600 Radcliffe Street in Bristol Borough, Bucks County, Pennsylvania (the "Island View Property" or the "Property");

- Steeple Run, L.P., which at the time of the bankruptcy was developing 21 acres of land in Richland, Bucks County, Pennsylvania (the "Steeple Run Project");

- Calnshire Estates, LLC, which at the time of the bankruptcy was developing single family houses consisting of 26 remaining lots in West Caln Township, Chester County, Pennsylvania (the "Calnshire Project"); and

4

- Durham Manor, LLC, which at the time of the bankruptcy was completing the development of single-family houses on a tract of land in Middletown Township, Bucks County, Pennsylvania (the "Durham Manor Project").

*Id.*, ¶ 12.

### A.    The Island View Project

In 2011, Gualtieri was presented with an opportunity to acquire IVC and its principal asset, the Island View Property – a 17.5-acre, former World War I shipbuilding facility on the Delaware River – at a price that he believed was far below market value. *Id.*, ¶ 13. Gualtieri intended to develop residential real estate on the Property, which would increase the value of the Property significantly. *Id.*

As a result of the Island View Property's historical use as a World War I shipbuilding facility, it had significant industrial issues that needed remediating before vertical construction could begin, including: (i) removal of enormous amounts of concrete and steel that were the foundation of the former shipbuilding facility and its surrounding parking lots; (ii) removal of underground tanks; (iii) supply of vast amounts of clean fill; and (iv) re-grading the entire Property. *Id.*, ¶¶ 14-15. After acquiring IVC, however, efforts were instead focused on the Steeple Run, Calnshire, and Durham Manor Projects, often at the expense of IVC. *Id.*, ¶ 16.

### B.    Prudential Demands, and IVC Provides, a "Collateral Mortgage" on the Island View Property, Encumbering Its Primary Asset

Prudential and IVC entered into a "collateral mortgage" dated September 20, 2011 concerning the Steeple Run Project (the "Steeple Run Collateral Mortgage"), which was recorded with the Bucks County Recorder of Deeds on October 19, 2011. *Id.*, ¶¶ 17-18. The Steeple Run Collateral Mortgage states that:

> [O]n November 20, 2008 Mortgagee [i.e., Prudential] made a Three Million Nine Hundred Eleven Thousand Two Hundred Fifty ($3,911,250.00) Dollar loan to Steeple Run, L.P. . . . to acquire a certain 21.1289 acre tract of land . . . evidenced by a certain Land Acquisition Loan Agreement between [Steeple Run, L.P. and

5

Prudential] and the Note and Mortgage of [Steeple Run, L.P.] and other documents (the '[Steeple Run] Loan Documents').

*Id.*, ¶ 19.  The Steeple Run Collateral Mortgage further states that "an Addendum to the [Steeple Run] Loan Agreement requires Mortgagor herein [i.e., IVC] to give a Mortgage on [the Island View Property] as additional collateral security for the loan to Borrower."  *Id.*, ¶ 20.

The Steeple Run Collateral Mortgage purports to give Prudential a mortgage on the Island View Property, and states that any default under the Steeple Run Loan Agreement entitles Prudential to foreclose on IVC's primary asset to collect "the entire principal amount of this Mortgage [i.e., $3,911,250.00] or at the option of [Prudential] so much thereof as shall be necessary to cure the said default by [Steeple Run, L.P.] . . . together with an attorney's commission of five (5%) percent of the original principal sum or the amount of the default."  *Id.*, ¶ 21.  The only consideration purportedly provided by Prudential to IVC in exchange for the Steeple Run Collateral Mortgage was "One ($1.00) Dollar in hand received."  *Id.*, ¶ 22.

### C.   Prudential Loans Money to IVC Which Is Used to Reduce Loan Balances Owed by Other Entities

Prudential and IVC entered into a Loan Agreement dated September 20, 2013 (the "September 2013 Loan Agreement"), which states that IVC is borrowing $1.4 million from Prudential (the "September 2013 Loan") "to be used to reduce the balance due on a certain loan from the Bank to Durham Manor, LLC . . . andfor [sic] payment of costs and expenses associated with the loan closing."  *Id.*, ¶¶ 25-26.

In connection with the September 2013 Loan Agreement, IVC and Prudential entered into a $1.4 million Mortgage and Security Agreement dated September 20, 2013 (the "IVC-Durham Mortgage"), which further encumbered the Island View Property.  *Id.*, ¶¶ 27-28.  Only $280,829.84 of the advances made by Prudential under the $1.4 million September 2013 Loan

were made for the benefit of IVC, and IVC received no further consideration for the encumbrance of its principal asset.  *Id.*, ¶¶ 29-30.  Further, the funds intended to benefit IVC were transferred elsewhere, thus impeding prospects for profitable development.  *Id.*, ¶ 31.

### D.     The Calnshire Manor "Collateral Mortgage" Further Encumbers the Island View Property

Prudential and IVC entered into a "Collateral Mortgage" dated May 30, 2014 concerning the Calnshire Project (the "Calnshire Collateral Mortgage"), which states that "Mortgagee [i.e., Prudential] has made a Five Million One Hundred Thirty Six Thousand ($5,136,000.00) Dollar loan to Durham Manor, LLC . . . to construct sixteen (16) single family houses on a tract of land in Middletown Township, Bucks County, Pennsylvania . . . evidenced by a certain Development Construction Loan Agreement (the '[Durham Manor] Loan Agreement') between [Durham Manor, LLC] and [Prudential]."  *Id.*, ¶¶ 32-34.

The Calnshire Collateral Mortgage purports to give Prudential a mortgage on the Island View Property, IVC's primary asset, and states that any default by Durham Manor, LLC under the Durham Manor Loan Agreement entitles Prudential to foreclose on the Island View Property. *Id.*, ¶ 36.  The Calnshire Collateral Mortgage also references another collateral mortgage on certain properties located on West Street Road in Warminster, Bucks County, and states that Durham Manor, LLC "has requested that the Street Road Properties be released from th[at] lien . . . and that this [Calnshire] Collateral Mortgage given by [IVC] to [Prudential] be substituted in replacement."  *Id.*, ¶ 35.

The only consideration purportedly provided by Prudential to IVC in exchange for the Calnshire Collateral Mortgage is "One ($1.00) Dollar in hand received."  *Id.*, ¶ 37.

### E.   The November 2014 Island View Construction Loan Requires Other Loans to Be Repaid With Island View Proceeds

In late 2014, IVC approached Prudential about providing a construction loan for the development and construction of the Island View Project, in connection with which IVC shared with Prudential its comprehensive and confidential data, projections, and plans for the Project. *Id.*, ¶ 40.  IVC negotiated the new construction loan with Salvatore Fratanduono, Prudential's Senior Vice President and Chief Credit Officer, and Thomas Vento, Prudential's President, Chief Executive Officer, and Chairman of the Board.  *Id.*, ¶ 41.

On November 26, 2014, IVC and Prudential reached an agreement on a new $5,541,468 construction loan for the Island View Project, and the terms of that agreement were embodied in a series of documents prepared on behalf of Prudential by its counsel and board member, Jerome Balka, Esquire.  *Id.*, ¶ 42.  Such documents included, among others, a $5,541,468 promissory note (the "November 2014 Note"), a Development Construction Loan Agreement (the "November 2014 Loan Agreement"), and a mortgage on the Project which was recorded with the Bucks County Recorder of Deeds on January 7, 2015 (the "November 2014 Mortgage").  *Id.*, ¶ 43.  While ostensibly intended to fund construction of the Island View Project, Section 1.5 of the November 2014 Loan Agreement specifically requires that proceeds from the sale of specified Island View townhouses and condominiums by IVC instead be used to repay other loans not made to IVC, including the loans to Durham Manor and Steeple Run.  *Id.*, ¶ 44.

### F.   Prudential's Wrongful Conduct Destroys the Island View Project

Shortly after Prudential underwent personnel changes in the fall of 2015, Prudential embarked on an effort to substantially change the parties' existing loan agreements, and stopped

honoring its commitments in connection with the Island View Project.    Lender Liability

Adversary Complaint, ¶¶ 1-2, 56.[3]  Prudential's conduct in this regard included:

- Coercing and attempting to force IVC to accept drastic changes to the operative loan agreements (*see id.*, ¶¶ 61-71, 75-78, 83-84, 93-94);

- Delaying and refusing to advance funds as required under the operative loan agreements (*see id.*, ¶¶ 85-89, 95-98, 105-06, 108-17);

- Refusing to release funds escrowed for site improvements (*see id.*, ¶¶ 119-22);

- Refusing to honor its unconditional commitment to refinance or purchase the $625,000 Lava Funding, LLC loan, which Prudential induced IVC and Gualtieri's father to enter into (*see id.*, ¶¶ 27-33, 57-58);

- Threatening to foreclose on the Project and other collateral without any default existing or having been declared (*see id.*, ¶¶ 63, 70, 73-74, 76-78, 82);

- Manufacturing a sham default against IVC and its affiliated entities (*see id.*, ¶¶ 123-26);

- Attempting to control allocation of payment, including timing and amount, to subcontractors and suppliers (*see id.*, ¶¶ 86-91, 115);

- Attempting to force IVC and Gualtieri's affiliated entities to sell real estate for millions of dollars less than the value reflected in appraisals obtained by Prudential itself (*see id.*, ¶¶ 83-84, 94); and

- Intentionally refusing to fund the Project such that it materially interfered with IVC's contractual relations with third parties such as subcontractors, suppliers, and purchasers of residential properties (*see id.*, ¶¶ 85-91, 115-17, 125, 135-36).

*See* Compl., ¶¶ 45, 63-65 (referencing and incorporating the misconduct allegations set forth in

the Lender Liability Adversary Complaint).

With respect to payments to subcontractors and suppliers, Prudential unilaterally decided

to start paying them directly (rather than advancing funds to IVC for disbursement, as had been

the parties' usual process prior to December 2015).  *See* Lender Liability Adversary Complaint,

---

[3]      The Trustee's Complaint refers to and incorporates the allegations contained in the Lender Liability Adversary Complaint by reference.  *See* Compl., ¶¶ 45, 63.

¶¶ 86, 89, 114.  Prudential also began unilaterally determining which contractors should and should not be paid as part of the draw request process, and even how much to pay those contractors.  *Id.*, ¶¶ 90-91, 115.  As a result, on multiple occasions contractors were paid less than the amount properly budgeted in the draw request, or not at all.  *Id.*, ¶ 91, 115-17.

### G.    The Lender Liability Action

On March 31, 2016, IVC, Gualtieri, and IVC's general partner Island View Properties, Inc. filed the Lender Liability Adversary Complaint against Prudential in the Court of Common Pleas of Philadelphia County (the "Common Pleas Court"), asserting claims for breach of contract and breach of the duty of good faith and fair dealing, as well as various tort claims, including tortious interference with contractual and prospective business relations.  *See* Lender Liability Adversary Complaint, Counts I-VIII.  Prudential filed preliminary objections in response, seeking dismissal of all the claims.[4]  On August 31, 2016, the Common Pleas Court sustained Prudential's preliminary objections regarding most of the tort claims, but overruled Prudential's preliminary objections regarding the contract claim and the tortious interference claim.  *See* Adv. No. 17-00202, Doc. No. 1-7, Order.

Following IVC's bankruptcy, the Lender Liability Action was removed to this Court.  *See* Adv. No. 17-00202, Doc. No. 1.[5]

---

[4]    The parties' preliminary objection briefing is attached to Prudential's Notice of Removal removing the Lender Liability Action to this Court on July 18, 2017.  *See* Adv. No. 17-00202, Doc. Nos. 1-3 through 1-6.

[5]    On March 7, 2019, the Court determined that it lacked jurisdiction over Gualtieri's claims against Prudential, and remanded them back to the Common Pleas Court.  *See* Adv. No. 17-00202, Doc. Nos. 34 and 35.

### H.    The Trustee's Complaint

On December 3, 2018, the Trustee filed his Complaint seeking to avoid and recover the following as constructively fraudulent transfers: (1) the Steeple Run Collateral Mortgage; (2) at least $1,119,170.16 of the funds disbursed pursuant to the September 2013 Loan Agreement; (3) the IVC-Durham Mortgage; (4) the Calnshire Collateral Mortgage; and (5) the November 2014 Loan Agreement and Note; and (6) the November 2014 Mortgage (collectively, the "Fraudulent Transfers").  *See* Compl., First Claim.  The Trustee also seeks to equitably subordinate Prudential's rights below those of other creditors, based on the inequitable conduct by Prudential that is described in the Lender Liability Adversary Complaint.  *See id.*, Second Claim.

On December 6, 2018, by agreement of the parties, the Trustee was substituted as party plaintiff in lieu of Island View Properties, Inc. t/a Island View Crossing II, L.P. in the Lender Liability Action.  *See* Adv. No. 17-00202, Doc. No. 14.  On the same date, also by agreement of the parties, the adversary proceeding commenced by the Trustee (Adv. No. 18-00280) was consolidated for all purposes with the Lender Liability Action.  *See* Adv. No. 17-00202, Doc. No. 15.

## IV.    STANDARD OF REVIEW

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

For purposes of Rule 12(b)(6), the court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). When documents are integral to or explicitly relied upon in a complaint, those documents may be considered in determining whether the complaint states a plausible claim. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## V.    ARGUMENT

### A.    Prudential's Arguments Regarding the Tortious Interference Allegations Are Without Merit and Were Already Rejected By the Common Pleas Court

The Trustee's Complaint seeks to equitably subordinate Prudential's claims to those of all other creditors based on the inequitable conduct by Prudential that is described in the Lender Liability Adversary Complaint. *See* Compl. ¶¶ 63-65. Prudential's misconduct in this regard included, among other things, tortiously interfering with IVC's contractual relations with third parties by improperly delaying and withholding payments owed to subcontractors and suppliers working on the Project. *See id.*, ¶¶ 64.h, 64.j; Lender Liability Adversary Complaint, ¶¶ 85-91, 114-17, 179-85. Prudential incorrectly argues that these allegations are deficient because they involve conduct directed only towards IVC, not third parties. This argument should be rejected (as it already was by the Common Pleas Court prior to removal) because the Lender Liability Adversary Complaint specifically alleges interfering acts by Prudential which were directed towards third party subcontractors and suppliers and which interfered with contracts to which Prudential was not a party.

Pennsylvania has adopted Section 766 of the Restatement (Second) of Torts as the basis for a tortious interference with contractual relations claim. *See Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 97-98 (Pa. Super. 2009), *aff'd*, 20 A.3d 468 (Pa. 2011)

(*citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175 (Pa. 1978)). Section 766 provides: "One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." RESTATEMENT (SECOND) OF TORTS § 766. "The necessary elements of the cause of action are (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct." *Walnut St. Assocs.*, 982 A.2d at 98.

The Restatement differentiates between interfering conduct directed at third parties (as described in Section 766) and interfering conduct directed at the plaintiff. *See* RESTATEMENT (SECOND) OF TORTS § 766A (addressing acts directed at the plaintiff). The Pennsylvania Supreme Court has not explicitly adopted Section 766A, and the Third Circuit has previously predicted that it would not do so. *See Gemini Physical Therapy and Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3d Cir. 1994). More recently, however, the Pennsylvania Supreme Court has favorably cited to Section 766A as a relevant part of the Second Restatement's "detailed framework for analyzing claims of tortious interference with contractual relations" and evaluating "'improper' conduct." *Walnut St. Assocs.*, 20 A.3d at 476 n.11; *see also XTO Energy, Inc. v. Dominion Field Servs., Inc.*, 2014 WL 10788907, at *17 (Pa. Super. Oct. 22, 2014) (addressing a tortious interference claim "governed by the Restatement (Second) of Torts § 766A"). The Court does not need to determine whether Section 766A applies here, however, because the Common Pleas Court already determined that IVC's tortious interference

13

claim is sufficiently stated and because the claim is based on Prudential's interfering conduct directed at third parties, including IVC's subcontractors, suppliers and residential purchasers.

Prior to removal of the Lender Liability Action to this Court, Prudential filed preliminary objections seeking dismissal of the Lender Liability Adversary Complaint for legal insufficiency. *See* Adv. No. 17-00202, Doc. No. 1-3 (Prudential's Preliminary Objections, and Memorandum of Law in support thereof).  In seeking dismissal of IVC's tortious interference claim, Prudential raised the same argument it raises here – that the alleged tortious conduct was directed at IVC, not a third party. *See id.*, Preliminary Objections at ¶¶ 21-26, and Memorandum of Law at pp. 12-14.  On August 31, 2016, the Common Pleas Court dismissed IVC's other tort claims, but overruled Prudential's preliminary objections to IVC's tortious interference claim. *See* Adv. No. 17-00202, Doc. No. 1-7 (Order).  The Common Pleas Court held that "[t]he only tort defendant may have committed is that of tortious interference with plaintiffs' contracts with subcontractors, homebuyers, and possibly other lenders." *Id.*  The Common Pleas Court's ruling with respect to the legal sufficiency of the Lender Liability Adversary Complaint remained (and still remains) in effect following removal to this Court. *See* FED. R. BANKR. PROC. 9027(i) ("All injunctions issued, orders entered and other proceedings had prior to removal shall remain in full force and effect until dissolved or modified by the court.").  The Trustee's incorporation of the contents of the Lender Liability Adversary Complaint into his Complaint did not operate to provide a second bite at the apple for Prudential to re-argue the sufficiency of the tortious interference claim.

In any event, Prudential's argument is without merit.  The Lender Liability Adversary Complaint specifically alleges that Prudential had begun paying third party subcontractors and suppliers directly, and was controlling the timing, amount, and manner of those payments. *See, e.g.*, Lender Liability Adversary Complaint, ¶ 86 ("[I]n December of 2015, Prudential . . .

14

unilaterally decided to begin paying the subcontractors and suppliers directly[.]"), ¶ 89 (referencing "checks that Prudential had cut directly to some of the subcontractors and suppliers"), ¶ 91 ("Between December 2015 and February 2016, Prudential also began determining what subcontractors should and should not be paid as part of the draw request process, and even how much to pay the subcontractors[.]"), ¶ 115 ("Prudential unilaterally and without warning or explanation to Plaintiffs decided how much to pay some of Plaintiffs' subcontractors, paying their plumbing, electric, and drywall subcontractors $12,349.50 less than the budgeted amount set forth in the draw request . . ."); *see also* Compl., ¶ 64.h (referencing Prudential's "attempt[s] to control allocation of payment, including timing and amount, to subcontractors and suppliers").  Thus, the failure of IVC's subcontractors to be paid was not merely incidental to Prudential's failure to advance funds to IVC; rather, Prudential had unilaterally assumed control over subcontractor and supplier payments, but delayed and withheld those payments – thereby causing a breach of the contractual agreements between IVC and its service providers, to which Prudential was not a party.  Prudential's conduct was contrary to the parties' past practices, pursuant to which loan proceeds had typically been advanced to IVC for subsequent disbursement to the appropriate service providers.  *See* Lender Liability Adversary Complaint, ¶¶ 86, 114.  Further, Prudential damaged the relationships between IVC and residential purchasers, due to the delayed completion of work on the Island View Project and on townhomes that are the subject of existing purchase contracts.  *Id.*, ¶¶ 36, 183; *see also* Compl., ¶ 64.h.

As the Common Pleas Court previously found, IVC's tortious interference claim is adequately pled.  Prudential's attempt to re-argue the claim's sufficiency here should be rejected.

**B.      The Complaint States a Claim for Equitable Subordination of Prudential's Claims to All Creditors**

"The bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003) ("*Citicorp II*"). "The purpose of equitable subordination is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Computer Personalities Sys., Inc.*, 284 B.R. 415, 427 (Bankr. E.D. Pa. 2002) (internal quotation marks omitted).

Section 510 of the Bankruptcy Code provides that the Court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c). The Third Circuit has explained that "[b]efore ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Citicorp Venture Capital Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998) ("*Citicorp I*"). "Without question, cases of this character are fact intensive." *In re Lois/USA, Inc.*, 264 B.R. 69, 134 (Bankr. S.D.N.Y. 2001).

Based on the inequitable conduct alleged in the Lender Liability Adversary Complaint, the Trustee seeks equitable subordination of all of Prudential's claims to those of all other

creditors. *See* Compl., ¶¶ 67-68.[6]  Prudential erroneously argues that (1) the Complaint fails to state a claim for equitable subordination, and (2) the Trustee's subordination request is an attempt to recover attorneys' fees in violation of the American Rule.  These arguments are without merit.

### 1.    The Complaint Sufficiently Pleads Each Element of the Trustee's Equitable Subordination Claim

The claims of non-insiders may be subordinated if they "engaged in gross or egregious misconduct such as fraud, spoliation or overreaching." *Computer Personalities Sys.*, 284 B.R. at 429 (internal quotation marks omitted).  Here, the Trustee alleges that Prudential's inequitable conduct included, among other things, coercing and attempting to force IVC to accept drastic changes to the loan agreements (which benefited Prudential, to IVC's detriment), refusing to release or advance funds as required, making unwarranted threats to foreclose on the Project, and manufacturing a sham default against IVC and its affiliates.  *See supra* Section III.F.  These allegations are exhaustively detailed in the Lender Liability Adversary Complaint, which the Trustee re-alleges and incorporates by reference.  *See* Compl., ¶ 63.

Prudential argues that the Trustee's equitable subordination claim fails because, in the Lender Liability Action, the Common Pleas Court dismissed IVC's fraud and negligence-based tort claims.  *See* Prudential's Motion, ¶ 73.  But the Common Pleas Court also found that – based on the misconduct alleged in the Lender Liability Adversary Complaint – IVC's breach of contract and breach of the duty of good faith and fair dealing claims were sufficiently pled.  *See* Adv. No. 17-00202, Doc. No. 1-7, Order (overruling preliminary objections to Count I).

---

[6]    In the Release of Liens Agreement approved by the Court on September 12, 2018, Prudential agreed to subordinate the Steeple Run Collateral Mortgage, the Calnshire Collateral Mortgage, the IVC-Durham Mortgage, and the November 2014 Mortgage to some, but not all, of the Debtor's creditors.  *See* Compl., ¶ 66.  The Complaint seeks equitable subordination of Prudential's claims to <u>all</u> creditors.

17

Substantial contractual breaches, when accompanied by "advantage-taking by the creditor," may justify subordination of the creditor's claim. *In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994); *see also In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1362 (1st Cir. 1992) (bank's arbitrary advancement and withdrawal of loan proceeds and improper charging of interest on misappropriated proceeds, which handicapped the debtor's renovation project, "could fairly be characterized as gross misconduct amounting to overreaching" and "r[ose] to the level of advantage-taking"). Further, as discussed above, the Common Pleas Court also found that the allegations in the Lender Liability Adversary Complaint sufficiently stated a claim for tortious interference with IVC's contractual relations with third parties – another example of overreaching on Prudential's part. *See In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, at *12 (Bankr. D. Del. Apr. 27, 2017) (non-insider's exercise of control over debtor's operations, where that control benefits the non-insider at the expense of other creditors and/or where the non-insider determines which bills will be paid, may provide a basis for equitable subordination) (*citing Lois/USA*, 264 B.R. at 136).

Prudential further argues that the Trustee cannot prove that its conduct specifically "cause[d]" creditors Stradley Ronon Stevens and Young, LLP ("Stradley"), Americorp Construction Inc., and Calnshire to incur debt. *See* Prudential's Motion, ¶¶ 75-76.[7] However, this is a fact-based defense which requires consideration of facts and related inferences beyond the four-corners of the complaint and its exhibits and is inappropriate for resolution at the pleading stage. *See LMI Legacy Holdings*, 2017 WL 1508606, at *12. Moreover, the second required element for an equitable subordination claim requires only an identification of harm to the creditor body as a whole or of an unfair advantage to the claimant, not an identification of

---

[7] Prudential notably does not cite any legal authority in support of this argument.

individualized harms to individual creditors. *See 604 Columbus Ave. Realty Trust*, 968 F.2d at 1363 ("depletion of the funds available for construction, and its attendant impact on the successes of the [debtor's] renovation efforts, was a sufficiently concrete harm to the [debtor's] other creditors to warrant equitable subordination of the Bank"); *Citicorp II*, 323 F.3d at 233 ("The inequitable conduct may arise out of any unfair act by the creditor as long as the conduct affects the bankruptcy results of the other creditors.").[8]   The Complaint alleges that Prudential's misconduct destroyed the Project, which drove IVC into bankruptcy, caused harm to IVC's other creditors, and gave Prudential an unfair advantage over other creditors. *See* Compl., ¶¶ 3, 45-46, 65; *see also* Lender Liability Adversary Complaint, ¶ 136 (alleging that Prudential's misconduct will cause IVC to default on existing agreements of sale, force further litigation with Lava Funding, and prevent cash flow needed to repay obligations to Prudential, the Redevelopment Authority, subcontractors, suppliers, and other creditors).

The third element of an equitable subordination claim – *i.e.*, whether subordination would be inconsistent with the provisions of the Bankruptcy Code – "has been read as a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable." *Citicorp I*, 160 F.3d at 990 (*quoting U.S. v. Noland*, 517 U.S. 535, 539 (1996)).   Here, the Trustee has alleged significant misconduct on the part of Prudential (including failure to act in accordance with the implied covenant of good faith and fair dealing), and has further alleged that the loan agreements and mortgages at issue are avoidable as constructively fraudulent transfers.   With respect to this element, Prudential argues only that

---

[8]      Indeed, "[t]he inequitable conduct underlying equitable subordination may be unrelated to the acquisition or assertion of the particular claim whose status is at issue." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) (internal quotation marks omitted).

equitable subordination is not "necessary" to ensure other creditors' claims are protected.  *See* Prudential's Motion, ¶ 80.  As the Third Circuit has explained, however, the potential availability of alternative remedies does not make equitable subordination incompatible with the Bankruptcy Code.  *Citicorp I*, 160 F.3d at 990 ("While [other provisions of the Bankruptcy Code] may also be applicable, we perceive no reason why the availability of alternative remedies makes equitable subordination under § 510(c) incompatible with the Code under the circumstances of this case.").  Moreover, the doctrine of equitable subordination is remedial in nature, and requires evaluation of fact issues which cannot be resolved at the pleading stage.  *See Citicorp II*, 323 F.3d at 233; *LMI Legacy Holdings*, 2017 WL 1508606, at *13 (determining whether subordination was consistent with Bankruptcy Code required fact analysis not appropriate at the pleading stage); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 69-70 (Bankr. S.D.N.Y. 2007) (the issue of whether, and to what extent, subordination is the appropriate remedy could not be determined on a Rule 12(b)(6) motion).

Because the allegations of the Trustee's Complaint (including those incorporated from the Lender Liability Adversary Complaint) support each element of the Trustee's equitable subordination claim, Prudential's motion to dismiss should be denied.

### 2.    Equitable Subordination of Prudential's Claims Would Not Violate the American Rule

The Trustee's subordination request is not, as Prudential argues, an attempt to circumvent the American Rule, which provides that litigants are typically responsible for their own attorney fees.[9]  According to Prudential, because Stradley's claim for attorneys' fees (related to its prior representation of IVC) is among the claims to which Prudential's claims would be subordinated,

---

[9]    *See Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015).

"the Stradley Law Firm would essentially be collecting its attorneys' fees from Prudential." Prudential's Motion, ¶ 79. The only support Prudential cites for this contention is *Citicorp II*, in which the Third Circuit addressed the subordination of attorneys' fees. *Id.*, ¶ 78 (*citing Citicorp II*, 323 F.3d at 233-34). But *Citicorp II* does not support Prudential's position. In that case, the Third Circuit held that the American Rule was not implicated merely because attorneys' fees were involved:

> We hold that because the Bankruptcy Court subordinated attorneys' fees pursuant to its equitable powers, the American Rule is not implicated. The Bankruptcy Court did not award a money judgment for attorneys' fees to penalize CVC. Rather, the Bankruptcy Court analyzed the record facts, found specific damages, and used its equitable powers to return the non-selling creditors to the position they would have been in had CVC not acted inequitably.

*Citicorp II*, 323 F.3d at 234.[10]

Here, the Trustee seeks subordination in accordance with the Court's equitable powers which, if granted, would have the result of subordinating Prudential's claims to the claims of Stradley and others. Such a result would not, as Prudential argues, be equivalent to a money judgment for Stradley's attorneys' fees against Prudential. Where equitable subordination is warranted, the Court has broad power to subordinate a creditor's rights below those of other creditors. *See* 11 U.S.C. § 510(c) ("the court may . . . subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim"). Prudential's misconduct had the effect of reducing funds otherwise available to IVC's creditors, by, among other things, causing IVC to expend funds defending itself against the suit brought by Lava Funding (which was the result of Prudential's failure to honor its commitment to refinance or purchase the Lava

---

[10]    In *Citicorp II*, the fees themselves were subordinated to other creditors' claims, as opposed to the situation here where Stradley's fees are among the claims to which Prudential's claims would be subordinated. The Third Circuit's reasoning in *Citicorp II* regarding the interplay between equitable subordination concepts and the American Rule is nonetheless relevant to the situation at issue here, as discussed above.

Funding loan),[11] to default on its obligations to other creditors, and to expend funds prosecuting the Lender Liability Action against Prudential.  *See Citicorp II*, 323 F.3d at 234-35 (increased litigation expenses may appropriately be considered in evaluation of damages resulting from creditor's inequitable conduct).  Subordination of Prudential's claims would have the remedial effect of preventing Prudential from obtaining recovery from the estate in advance of other creditors which have thus far gone unpaid as a result of Prudential's misconduct.  *See* Compl., ¶¶ 45-46 (alleging that Prudential's conduct drove IVC into bankruptcy, and that the uncompensated encumbrances on and transfers away from IVC's principal asset damaged IVC's business and its unsecured creditors).  The reordering of priorities is indisputably within the equitable powers of the Court, and Prudential has not provided any legal support for its contention that those powers are limited or otherwise altered when one of the claims at issue is related to attorneys' fees.  Rather, as *Citicorp II* instructs, where subordination is otherwise appropriate, the American Rule is not implicated.  323 F.3d at 234.

> ### C.     The Trustee's Fraudulent Transfer Claims Are Sufficiently Pled

Section 544 of the Bankruptcy Code authorizes the avoidance of transfers of the debtor's property that are avoidable by unsecured creditors under applicable state law – here, the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA").  *See* 11 U.S.C. § 544.  The constructive fraud standards applicable here are set forth in PUFTA Sections 5104(a)(2) and 5105.[12]  Section 5104(a)(2) provides that a transfer made or obligation incurred is constructively

---

[11]      *See* Lender Liability Adversary Complaint, ¶¶ 31-32, 57-58, 132.

[12]      Prudential asserts that it "is unable to determine whether IVC is asserting a claim under Section 5104(a)(2) or Section 5105, or both."  Motion, ¶ 63.  The Trustee's Complaint, however, makes clear that the Trustee is asserting claims under both Sections.  *See* Compl., p. 10 (stating that the First Claim, for avoidance and recovery of transfers, is brought "Pursuant to 12 Pa.C.S.

fraudulent if it was made "without receiving a reasonably equivalent value in exchange for the

transfer or obligation" and if the debtor:

> (i) was engaged or was about to engage in a business or a transaction for which
> the remaining assets of the debtor were unreasonably small in relation to the
> business or transaction; or

> (ii) intended to incur, or believed or reasonably should have believed that the
> debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa. C.S.A. § 5104(a)(2).  Section 5105 similarly provides that a transfer made or obligation

incurred is constructively fraudulent if the debtor did not receive reasonably equivalent value and

"was insolvent at that time or . . . became insolvent as a result of the transfer or obligation."  12

Pa. C.S.A. § 5105(a).

Prudential does not contest that the Trustee has adequately pled lack of reasonably

equivalent value in connection with the Fraudulent Transfers,[13] but argues that the Trustee fails

to plead sufficient facts regarding IVC's financial condition.

Section 5104(a)(2) focuses on whether a debtor had unreasonably small assets (*i.e.*, the

"inability to generate sufficient profits to sustain operations") or could not pay its debts as they

came due.  *U.S. v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 118 (E.D. Pa. 2011); 12

Pa. C.S.A. § 5104(a)(2)(i)-(ii).  PUFTA Section 5105 addresses insolvency, in which "[a] debtor

is insolvent if, at fair valuation, the sum of [its] debts is greater than the sum of [its] assets."  12

Pa. C.S.A. § 5102(a).  "A debtor that is generally not paying [its] debts as they become due other

than as a result of a bona fide dispute is presumed to be insolvent."  12 Pa. C.S.A. § 5102(b).  At

the pleading stage, a plaintiff is not required to plead "specific financial information," as long as

---

§§ 5104(a)(2) & 5105. . .").   And, as discussed herein, the Trustee's Complaint includes
allegations supporting the elements set forth in both Sections.

[13]     The Complaint alleges lack of reasonably equivalent value in connection with each of the
Fraudulent Transfers.  *See, e.g.*, Compl., ¶¶ 22, 29, 37, 44, 48.

he pleads facts from which the Court may "reasonably infer" insolvency. *In re Atomica Design Group, Inc.*, 556 B.R. 125, 166 (Bankr. E.D. Pa. 2016); *see also In re FAH Liquidating Corp.*, 572 B.R. 117, 128 (Bankr. D. Del. 2017) (as long as complaint provides enough information "to raise a reasonable expectation that discovery will reveal evidence of" insolvency, that is sufficient at the pleading stage) (*quoting Twombly*, 550 U.S. at 556).

The Complaint alleges that each of the Fraudulent Transfers was made at a time when IVC was inadequately capitalized for the business in which it was engaged, unable to pay its debts as they came due, and was or had been rendered insolvent. *See* Compl., ¶¶ 2, 24, 30, 39, 52. As set forth in the Lender Liability Adversary Complaint, which is incorporated into the Trustee's Complaint, IVC had significant liquidity concerns due to the fact that IVC's only significant asset was the Property itself. *See* Lender Liability Adversary Complaint, ¶ 26 (Prudential was concerned that the Project would not be "cash flowing" and expressed concern that Plaintiffs would be unable to pay monthly loan obligations to the Redevelopment Authority until several years later when they were able to close on the sale of residential properties), ¶¶ 27, 58 (Plaintiffs did not have any other liquid assets to invest into the Project), ¶ 42 (between November 2014 and February 2015, Plaintiffs borrowed from affiliated entities to pay more than $500,000 of engineering and legal fees related to the Project by, because there were no funds available until advances from Prudential could be obtained), ¶ 132 (Lava Funding sues IVC and others regarding outstanding loan); *see also* Compl., ¶¶ 14-15 (alleging that the Island View Property, IVC's primary asset, required significant remedial work before any residential properties or other vertical construction could begin). In addition, the Property was heavily encumbered by not only mortgages relating to the Island View Project (the value of which was destroyed by Prudential's subsequent conduct), but also by collateral mortgages relating to other

projects on other properties not owned by IVC. *Id.*, ¶¶ 17-39. These allegations indicate a company unable to generate sufficient cash flow to sustain its operations or pay its debts as they came due, which are the standards used under PUFTA to evaluate insolvency, undercapitalization, and inability to pay debts as they come due. *See Atomica Design Group*, 556 B.R. at 165-66.

Prudential argues that the Trustee's position is contradictory because of the equity IVC has in the Island View Property, and asserts that the Trustee "should be estopped" from making allegations regarding IVC's pre-petition financial infirmities as a result. *See* Prudential's Motion, ¶¶ 61-62. This argument is baseless. It is undisputed that IVC owned the Island View Property at the time of the Fraudulent Transfers, but having equity in the Property is not the same as having working capital needed to sustain operations, generate profits, and pay debts as they come due. *See Black's Law Dictionary* (10th ed. 2014) ("Working capital measures liquidity and the ability to discharge short term obligations."); *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 44 n.217 (Del. 2017) ("Working capital … represents the capital the business has at its disposal to fund operations."). Indeed, as the Lender Liability Adversary Complaint alleges, Prudential was aware of and worried about this very issue. *See* Lender Liability Adversary Complaint, ¶ 26 ("…Prudential was concerned that the Project would not be 'cash flowing.' Prudential expressed concern that Plaintiffs would be unable to pay the monthly loan obligations to the Redevelopment Authority on account of its first mortgage on the Project for what might be several years because Plaintiffs had no other liquid assets from which they could fund the monthly payments to the Redevelopment Authority until such time that Plaintiffs could close on the sale of the townhouses and condominiums that they planned to build."). At the time of the Fraudulent Transfers, the Property was undeveloped and in need of significant

remediation before vertical construction – much less the sale of completed homes – could begin. *See* Compl., ¶¶ 14-16.   Thus, there is nothing contradictory about the Trustee's allegations regarding IVC's significant cash flow problems and inability to meet its obligations as they came due – which Prudential itself acknowledged in its past communications with IVC.

Prudential makes little attempt to establish the prerequisites for applying judicial estoppel in this instance, nor could it.  "[J]udicial estoppel is an extreme remedy, to be used only when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court."  *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n.5 (3d Cir. 2008).  Neither inconsistency nor any aggravating factor warranting estoppel is present here.  Prudential's arguments otherwise should be rejected.

## VI.   CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion in its entirety.[14]

Dated: March 15, 2019                                    Respectfully submitted,

                                                        */s/Matthew R. Williams*
                                                        Steven M. Coren, Esq.
                                                        Matthew R. Williams, Esq.
                                                        KAUFMAN, COREN & RESS, P.C.
                                                        2001 Market Street, Suite 3900
                                                        Philadelphia, PA 19103
                                                        T: (215) 735-8700;  F: (215) 735-5170
                                                        scoren@kcr-law.com
                                                        mwilliams@kcr-law.com
                                                        *Special Counsel for Plaintiff*
                                                        *Kevin O'Halloran, Chapter 11 Trustee*

---

[14]    In the alternative, if the Court determines that dismissal of any claims is warranted, Plaintiff respectfully requests leave to amend the Complaint.  Leave to amend should be granted freely pursuant to Federal Rule of Civil Procedure 15(a)(2), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015.  *See also In re Total Containment, Inc.*, 335 B.R. 589, 601 (Bankr. E.D. Pa. 2005) (leave to amend, rather than dismissal, is ordinarily appropriate, unless repleading could not correct the defects in the claim).