### UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re ISLAND VIEW CROSSING II, L.P., | : | Chapter 11 |
| | : | |
| Debtor | : | Bky.  No. 17-14454 |
| | : | |
| | : | |
| KEVIN O'HALLORAN, in his capacity as | : | |
| Chapter 11 Trustee for | : | |
| ISLAND VIEW CROSSING II, L.P., et al. | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| PRUDENTIAL SAVINGS BANK, | : | Adv.  No.  17-202 |
| | : | |
| Defendant | : | |
| | : | Adv.  No.  18-280 |

# M E M O R A N D U M

## I.  INTRODUCTION

Before the court is the Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6)

(incorporated by Fed. R. Bankr. P. 7012), filed in the two (2) above-captioned, and interrelated,

adversary proceedings.

Adv. No. 17-202, which may be characterized as raising lender liability claims (and

which will be referred to as "the Lender Liability Action"), was commenced in state court by

Island View Crossing II, L.P. ("the Debtor" or "IVC") and its principal against Defendant

Prudential Savings Bank ("Prudential").  The matter was removed to this court on July 18, 2017,

eighteen (18) days after the commencement of the Debtor's chapter 11 bankruptcy case.  After

his appointment as chapter 11 trustee, Kevin O'Halloran ("the Trustee") succeeded the Debtor as

plaintiff in this adversary proceeding.[1]  At the time of the adversary proceeding's removal, two

(2) claims survived Prudential's preliminary objections in state court: (1) breaches of the lending

contract, including the covenant of good faith and fair dealing; and (2) tortious interference with

contract.[2]

On December 3, 2018, the Trustee commenced a second action against Prudential, Adv.

No. 18-280, (which I will refer to as "the Avoidance and Subordination Action").  In this second

action, based on 11 U.S.C. §§544, 550 and 12 Pa. C.S. §§5104(a)(2) and 5105, the Trustee

requests the avoidance of six (6) transfers to Prudential and recovery of those transfers pursuant

to 11 U.S.C. §550.  Also, the Trustee requests equitable subordination of Prudential's claim

pursuant to 11 U.S.C. §510.[3]

On February 22, 2019, Prudential filed a motion to dismiss ("the Motion"), seeking

dismissal of the tortious interference claim in the Lender Liability Action and all claims in the

Avoidance and Subordination Action.

With respect to the tortious interference claim in the Lender Liability Action, the Motion

will be denied.

---

[1]     By order dated March 7, 2019, the principal's claims as well as Prudential's
counterclaims against the principal, in the Lender Liability Action were remanded to state court due to
lack of subject matter jurisdiction. See In re Island View Crossing II, L.P., 2019 WL 1102179 (Bankr.
E.D. Pa. Mar. 7, 2019). The Opinion was clarified by Order dated April 24, 2019 (Doc. # 42).

[2]     On August 16, 2016, the Court of Common Pleas dismissed claims for fiduciary breach,
fraud, constructive fraud, fraudulent misrepresentation, negligent misrepresentation, and negligence.

[3]     Although the Avoidance and Subordination Action facially sets out only two (2) claims,
as a practical matter, the Complaint contains as many as twenty-five (25) overlapping claims: (a) three (3)
legal theories for avoidance of six (6) transactions; (b) six (6) claims under 11 U.S.C. §550; and (c) the
equitable subordination claim.

With respect to the Avoidance and Subordination Action, the Motion will be granted in part and denied in part.

## II.  PROCEDURAL HISTORY

The full procedural history of the Lender Liability Action is well known to the parties and was described in detail in my earlier Memorandum, see n.1, supra, so I will not repeat that discussion here.  Suffice it to say that when the action arrived in the bankruptcy court, the pleadings were closed.  After its removal, the Lender Liability Action remained relatively dormant for approximately seventeen (17) months while the parties "focused on other, more pressing matters of case administration."  Island View, 2019 WL 1102179, at *3.  Since November 2018, the court has remanded certain claims over which it lacks subject matter jurisdiction, see id., and entered a pretrial management order establishing various deadlines.

The Trustee commenced the Avoidance and Subordination Action on December 3, 2018. By order dated December 6, 2018, the Lender Liability Action and the Avoidance and Subordination Action were consolidated for pretrial management and for trial.

Prudential filed the Motion on February 22, 2019.  The Debtor and interested creditor Stradley Ronon Stevens and Young, LLP ("Stradley") filed responses and all parties have submitted memoranda in support of their respective positions,[4] the last of which was filed on March 29, 2019.

---

[4]     Stradley supports the Trustee's position and requests that the Motion be denied.

### III.    MOTION TO DISMISS STANDARD

Prudential moves to dismiss the Complaints for failure to state a claim under Fed. R. Civ.

P. 12(b)(6).

The standard on a motion to dismiss is well known.  As I have previously written:

> A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the factual allegations of a complaint, and determines whether the plaintiff is entitled to offer evidence to support the claims, A defendant is entitled to dismissal of a complaint only if the plaintiff has not pled enough facts to state a claim to relief that is plausible on its face. A claim is facially plausible where the facts set forth in the complaint allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

> In evaluating the plausibility of the plaintiff's claim, the court conducts a context-specific evaluation of the complaint, drawing from its judicial experience and common sense. In doing so, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, viewing them in the light most favorable to the plaintiff.  But, the court is not bound to accept as true a legal conclusion couched as a factual allegation.

> The Third Circuit Court of Appeals has condensed these principles into a three (3) part test:

>> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pled factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

> Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quotations and citations omitted).

> In assessing a Rule 12(b)(6) motion, the court may consider the allegations in the complaint, exhibits attached to the complaint and matters of public record [as well as] undisputedly authentic documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss.

In re Boltz-Rubinstein, 574 B.R. 542, 547–48 (Bankr. E.D. Pa. 2017) (numerous citations

omitted) (quotations omitted).

4

## IV.    FACTS SET FORTH IN THE COMPLAINT

The Avoidance and Subordination Action incorporates the Lender Liability Action's

Complaint by reference.  I have arranged the adequately-pled facts from both Complaints to form

a narrative.  For purposes of deciding the Motion, I accept these facts as true.

### A.  The Prudential Mortgage Loans

The Debtor's principal, Renato Gualtieri ("Gualtieri"), began working in real estate in

1989, through various entities and affiliates.  Prudential was Gualtieri's main lender for his

ventures.  Gualtieri's enterprises took out a series of loans from Prudential, all of which have

been repaid in full – except the loans involved in this adversary proceeding.

In September 2011, Gualtieri purchased the controlling interest in the Debtor.  At the

time, the Debtor owned a 17.5 acre facility along the Delaware River ("the Property"), as well as

permits to develop the Property into seventy-three (73) townhouses and ninety-six (96)

condominiums.  When Gualtieri acquired the Debtor, the Property was subject to a $2.5 million

dollar first mortgage in favor of the Bucks County Redevelopment Authority (the "RDA").[5]

The prior owner of the Debtor could not complete the complex site work and construction

stalled.  Gualtieri believed he could accomplish the necessary site work and remediation and gain

untapped profits.  After Gualtieri bought the Debtor, the Property remained undeveloped for

several years while Gualtieri concentrated his efforts on other projects.

On October 19, 2011, less than a month after Gualtieri acquired the Debtor, the Debtor

granted Prudential a mortgage on the Property ("the Steeple Run Collateral Mortgage").  The

---

[5]    This fact does not appear in the Complaint, but is referenced in the Motion.  I refer to it
nevertheless, because I am confident that Prudential does not dispute the existence of the RDA mortgage.
.

Steeple Run Collateral Mortgage, in the amount of $3,911,250, provided Prudential collateral for

a loan Prudential made to another Gualtieri real estate development project known as the Steeple

Run.  Under the loan documents for this mortgage, any default by Steeple Run would allow

Prudential to foreclose on the Property.  The loan documents recite one dollar ($1.00) as the

consideration for the Steeple Run Collateral Mortgage.

The Debtor encumbered the Property again on September 20, 2013, taking out a loan

from Prudential ("the Durham Loan") in the amount of $1,400,000, secured by a mortgage ("the

Durham Mortgage").  A portion of the loan proceeds, $280,829.84, was used for the benefit of

the Debtor.  The balance was used to pay down an existing loan owed to Prudential by Durham

Manor LLC ("Durham Manor"), another Gualtieri-owned real estate development entity.

The Debtor encumbered the Property still further on May 30, 2014, granting a mortgage

to Prudential in the amount of $5,136,000 ("the Calnshire Collateral Mortgage").  The Calnshire

Collateral Mortgage collateralized an existing loan to Durham Manor and caused Prudential to

release an existing mortgage on certain real estate parcels owned by Durham Manor.  Thus, the

purpose of the Calnshire Collateral Mortgage was to unencumber another entity's separate debt

to facilitate the that entity's real estate development project.  Prudential provided the Debtor one

dollar ($1.00) in exchange for executing this mortgage.

In November 2014, the Debtor started to develop the Property.  On November 26, 2014,

the Debtor obtained a $5,541,468 construction loan from Prudential ("the Construction Loan"),

secured by yet another mortgage on the Property ("the Construction Mortgage").  The

promissory note and loan documents associated with the Construction Loan established a system

permitting the Debtor to make incremental draws on the loan as the Debtor completed certain

construction benchmarks ("the Draw Process").  The upshot of the Draw Process was that

Prudential could request specific documents in support of a draw request and, if the Debtor

satisfied this request, Prudential had a duty to issue the requested draw within three (3) days.

The loan documents also required that proceeds from the sale of some of the homes constructed

on the Property be used to pay down Prudential's loans to other non-Debtor, Gualtieri-owned

companies (rather than paying down the Construction Mortgage).

From the inception of the Construction Loan, Prudential expressed concern about the

Debtor's cash flow, or lack thereof, because proceeds from the sale of constructed homes would

not be immediate.  Prudential therefore required the Debtor to obtain $600,000 additional

financing from another source before it granted the Construction Mortgage.

The Debtor and Gualtieri satisfied Prudential's demand by borrowing $625,000 from

Gualtieri's father, Francesco Gualtieri ("Francesco").  Francesco, in turn, raised funds on an

emergency basis by borrowing from Lava Funding ("Lava").  Lava obtained three (3) relevant

promises in exchange for lending: (1) Francesco granted a mortgage to Lava on all his real

property; (2) Gualtieri and the Debtor guaranteed the loan; and (3) Prudential agreed to pay off

or buy out Lava's position on the loan before its one-year maturity at the end of 2015.

The Borough of Bristol ("Bristol") regulated the quasi-public aspects of construction on

the Property.  Bristol ensured that curbs, runoff, streets, and waste were taken care of in an

appropriate manner; its approval was necessary in order to release completed units for purchase.

To ensure that the project was constructed according to Bristol's standards, Prudential, the

Debtor, and Bristol agreed that Prudential would lend the Debtor an additional $2,090,381.19,

which would be held in escrow by Prudential.  Upon Bristol's approval of certain benchmarks,

Prudential would release these escrowed funds to the Debtor.

7

## B.  Construction, Loan Draws, and Troubles

Site work on the Property finally began in March 2015.  From March to October 2015, the Debtor submitted draw requests according to the established course of dealing between Prudential and Gualtieri.  Prudential timely funded these draws, as well as escrow disbursements approved by Bristol.

In the fall of 2015, Prudential's leadership changed and Gualtieri's contacts at Prudential were replaced.

As a result, on November 1, 2015, Prudential announced that it would not honor its commitment to pay off or refinance the Lava loan.  Prudential claimed that the chief lending officer who signed that commitment lacked authority to do so.

On November 25, 2015 - with maturity of the Lava loan looming less than a week away - the Debtor and Gualtieri met Prudential's new Chief Operating Officer, Anthony Migliorino ("Migliorino").  Migliorino delivered bad news to the Debtor: he maintained that the loan agreements were not binding on Prudential, that the Debtor was in default, and that Prudential intended to foreclose on the collateral for all loans.

On December 10, 2015, the parties met again.  Migliorino accused Gualtieri of stealing money drawn for management fees and of "screwing" Prudential.  Migliorino demanded both the return of management fees paid and an assignment of rents from another Gualtieri-affiliated company.  He further demanded that Gualtieri sell the Calnshire and Steeple Run projects within ninety (90) days on threat of foreclosure on all of Gualtieri's projects.    Migliorino said these terms were not negotiable.  Pursuant to a request made by Gualtieri, Migliorino memorialized these demands, and further claimed that the Debtor was formally notified of a loan default. However, the Debtor did not receive such notification.

8

Migliorino later admitted that the Debtor was actually not in default of the loans.  Instead, he stated that a default in the complex loan documents could easily be found.  Migliorino again demanded quick sales of the affiliates' properties, threatened foreclosure, and suggested that the Debtor would have to repay any shortfalls incurred by its affiliates with regard to sale of the Debtor's properties.

Beginning in December 2015, Prudential unilaterally modified the Draw Process: it requested many more documents, changed the approval timeline from three (3) days to whatever it wished, and paid certain subcontractors directly in amounts determined solely by Prudential. The Debtor submitted a draw request in December 2015 which was not disbursed by Prudential one month later.  Migliorino, instead, demanded a different set of new and additional documents.

On January 22, 2016, Prudential sent the Debtor a letter stating that if tax returns and other financial documents, which had not yet been requested, were not produced within thirty (30) days, the Debtor would be in default and foreclosure would follow.

At the end of January 2016, following the Debtor's unsuccessful attempts to draw funding, Prudential announced that it was changing the course of dealing between the parties.

On February 4, 2016, Prudential funded the January draw request by cutting checks directly to subcontractors for amounts that were less than those invoiced.  The Debtor submitted an additional draw request later that month. This draw was not paid, yet Prudential failed to identify a deficiency in the application.

The Debtor then submitted an escrow release request, approved by Bristol, on February 12, 2016.  Without explanation, Prudential refused to honor this escrow disbursement.

The failure of the Draw Process and the escrow disbursements left the Debtor with no ready cash to pay its invoices.

At this point, the Debtor was $53,400.00 in arrears to Prudential.  The escrow

disbursement, if approved, would have advanced $87,200 to the Debtor.  The Debtor suggested

that Prudential, which was holding the escrow, set off these amounts, bring the Debtor current,

and disburse the net amount to IVC.  Prudential refused, leaving the Debtor in default.

Lava, whose loan had not been satisfied, sued Prudential, the Debtor, Gualtieri, and

Francesco in state court on March 2, 2016.

By mid-March 2016, the Debtor was out of cash and had to stop work on the Property.

On March 31, 2016, the Debtor filed the Lender Liability Action in state court.


## V.  DISCUSSION

### A.  The Tortious Interference Claim

Prudential asserts that the claim for tortious interference stated in the Lender Liability

Action is legally insufficient.  In response, the Trustee emphasizes that the Court of Common

Pleas already considered this issue and determined that the allegations in the Complaint are

sufficient to support the tortious interference claim.  The Trustee contends that it would be

"inappropriate" to revisit that ruling.  (Plaintiff's Mem. in Opposition to Motion at 3).

I agree with the Trustee.

Initially, I observe that the filing of the Avoidance and Subordination Action did not

reopen the pleadings in the Lender Liability Action.  So, at best, Prudential's request for

dismissal of Count VII of the Complaint in the Lender Liability Action (tortious interference

with contractual and prospective business relations) should be treated as a motion for judgment

on the pleadings.  However, Prudential's argument was raised and rejected when the Court of

Common Pleas overruled Prudential's Preliminary Objections to Count VII.

In requesting that the court deny Prudential's request, the Trustee's word choice --
"inappropriate" -- is conspicuous in that he has not identified the precise legal basis for the
position that the Motion should be summarily denied.[6]  The Trustee's argument  --  that
consideration of the adequacy of the tortious interference pleading is "inappropriate"  --  appears
to be an invocation of the law of the case doctrine.

The law of the case doctrine is designed to maintain consistency and avoid
reconsideration of matters decided during the course of a single lawsuit.   18B Charles Alan
Wright & Arthur R. Miller, Federal Prac. and Proc. Jurisd §4478 (2d ed. West 2019); see
Hamilton v. Leavy, 322 F.3d 776, 786–87 (3d Cir. 2003).  The doctrine provides that once a
court decides an issue, that decision should govern throughout subsequent stages in the same
case.  E.g., In re G-I Holdings, Inc., 568 B.R. 731, 764 (Bankr. D.N.J. 2017) (citing cases).
However, courts maintain their inherent power to reconsider prior orders.  E.g., In re Energy
Future Holdings Corp., 904 F.3d 298, 310–11 (3d Cir. 2018); Lesende v. Borrero, 752 F.3d 324,
338–39 (3d Cir. 2014).  The doctrine merely "governs [the] exercise of [the court's] discretion."
In re City of Phila. Litig., 158 F.3d 711, 718 (3d Cir. 1998).

In exercising this discretion, the Court of Appeals has stated that a court should be
reluctant to exercise its power to reconsider its prior orders "in the absence of extraordinary
circumstances such as where the initial decision was clearly erroneous and would make a
manifest injustice."  Lesande, 752 F.3d at 339.  In more than one (1) reported decision, the Court

___

[6]      Commonly, when litigants ask a court to reconsider a prior order, they invoke either Fed.
R. Bankr. P. 59 or 60(b).  Rule 59, as modified by Fed. R. Bankr. P. 9023, authorizes the bankruptcy
court to reconsider its own orders, but only if the motion is filed within fourteen (14) days after the entry
of the order.  The order overruling Prudential's Preliminary Objection to Count VII was entered on
August 31, 2016, approximately two and one-half (2 1/2) years before the instant Motion was filed,
making that rule of court inapplicable. Rule 60(b) (applicable by operation of Fed. R. Bankr. P. 9024)
applies only to a final judgment or order. Rule 60, too, does not apply.

11

of Appeals approved the use of the Rule 59(e) standard for determining the propriety of reconsidering an interlocutory order: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court made its initial decision; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. See Energy Future, 904 F.3d at 311; City of Phila. Litig., 158 F.3d at 718.

In this proceeding, the Court of Common Pleas order overruling Prudential's Preliminary Objection to Count VII was the functional equivalent of an order of this court denying a motion to dismiss under Fed. R. Bankr. P. 12(b)(6).

Based on the standards described above, I decline to exercise my discretion to reconsider the earlier order at this late stage. There has been no change in the law or new evidence presented. While there may have been some errors of law committed by entry of the prior order, I perceive no danger of a manifest injustice; I consider it highly unlikely that leaving Count VII in place pending further consideration of the merits of the claim at a later stage in the litigation will impose undue time and expense on the parties. Any potential benefit to the parties is outweighed by the additional cost and delay likely to result from dismissing a portion of the lengthy Lender Liability Action Complaint with leave to amend, thereby prolonging the pleading stage of this already slow-moving adversary proceeding.

Therefore, based on the law of the case, I will deny Prudential's request for dismissal of the tortious interference claim.[7]

---

[7]      I note that Count VII is not pled with precision and fails to recognize that tortious interference with prospective contractual relations and tortious interference with an existing contract are distinct causes of action that should be pled separately. Compare Sears, Roebuck & Co. v. 69th Street Retail Mall, L.P., 126 A.3d 959, 979 (Pa. Super. Ct. 2015) with Glenn v. Point Park College, 272 A.2d 895, 898 (Pa. 1971); see also Restatement (Second) of Torts §766 (1979).      *[fn. continued]*

## B. The Avoidance Claim

### 1. introduction

In Count I of the Avoidance and Subordination Complaint, the Trustee requests the avoidance of the following "transfers" as fraudulent under 11 U.S.C. §§544 and 550, as well as the bankruptcy estate's recovery of the property transferred or its value:

a. the 2011 Steeple Run Collateral Mortgage;

b. the Debtor's transfer of $1,119,170.16 to Prudential used to reduce Durham's debt to Prudential, derived from the loan proceeds of 2013 Durham Loan;

c. the Durham Mortgage associated with the September 2013 Loan Agreement;

d. the 2014 Calnshire Collateral Mortgage;

e. the 2014 Construction Loan; and

f. the 2014 Construction Mortgage associated with the 2014 Construction Loan.

(Compl. ¶ 48) (collectively, "the Transfers").

A bankruptcy trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding

------

There are at least two (2) issues, involving necessary elements of a tortious interference claim that I am prepared to revisit later in the proceeding, either at summary judgment or trial:

(1) whether there is evidence that Prudential directed its conduct at third parties who were in a contractual relationship with the Debtor or who were prospective contractual parties, see Karpf v Mass. Mut. Life Ins.Co., 2018 WL 1142189, at *12-13 (E.D. Pa. March 1, 2018); Cottman Transmission Sys., LLC v. Bence, 2004 WL 739907, at *3 (E.D. Pa. Apr. 5, 2004); see also Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co., 40 F.3d 63, 66 (3d Cir. 1994); and

(2) whether the Debtor suffered damages proximately caused by conduct Prudential directed against third parties, see Abdellatif v. Alza Wrae Indus. Co., 2019 WL 1284689, at *7 (E.D. Pa. Mar. 20, 2019); Pilot Air Freight Corp. v. Target Logistics Servs., 2001 WL 959400, at *2 (E.D. Pa. Aug. 20, 2001).

13

an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."  11 U.S.C. §544(b)(1).

Section 544(b)(1) gives the trustee whatever avoidance powers a creditor would have under nonbankruptcy law, and "enables the trustee to do in a bankruptcy proceeding what a creditor would have been able to do outside of bankruptcy - except the trustee will recover the property for the benefit of the estate." In re Equip. Acquisition Res., Inc., 742 F.3d 743, 746 (7th Cir. 2014); accord In re Incare, LLC, 2018 WL 2121799, at *7 (Bankr. E.D. Pa. May 7, 2018); In re Spitko, 2007 WL 1720242, at *15 (Bankr. E.D. Pa. June 11, 2007).

The applicable nonbankruptcy law here is Pennsylvania's Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. C.S. § 5101 et seq.

In the Complaint, the Trustee invokes two PUFTA avoidance mechanisms: 12 Pa. C.S. §5104(a)(2) and 12 Pa. C.S. §5105.

12 Pa. C.S. §5104(a)(2) provides that a transfer is fraudulent

> if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (i)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (ii)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa. C.S. §5105(a) provides that a transfer is fraudulent

> if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

14

Both avoidance provisions require that the debtor failed to receive "reasonably equivalent value" in exchange for the transfer.

To avoid a transfer under 12 Pa. C.S. §5105, the transfer must occur while the Debtor is insolvent, or must cause the Debtor to become insolvent.

In requesting dismissal of the avoidance actions, Prudential asserts that the Trustee did not adequately plead facts which, if proven, would establish that that the Transfers were for less than reasonably equivalent value.  If Prudential is correct, both the §5104 and the §5105 claims should be dismissed.

Prudential also argues that the Trustee did not adequately plead facts showing the Debtor's insolvency at the time of the various transactions, rendering defective the §5105 claim.

For the reasons explained below, Prudential's Motion will be granted in part and denied in part.

### 2.  reasonably equivalent value

#### a.

In 2013, I summarized the principles governing the determination of "reasonably equivalent value" under PUFTA as follows:

- A two-step process is employed to determine whether a debtor received reasonably equivalent value in the form of indirect economic benefits in a particular transaction: (1) whether any value is received; and (2) whether that value was reasonably equivalent to the transfer made.

- Nevertheless, if the court concludes that the benefits the debtor received were minimal and certainly not equivalent to the value of a substantial outlay of assets, a plaintiff need not prove the exact value conferred because the amount of value is then rendered irrelevant.

- Because the purpose of PUFTA is to protect creditors, the court determines whether value was received from the vantage of the creditor. The inquiry focuses

on what the debtor gave up and what the debtor received in return that could benefit creditors.

- In this determination, value includes any benefit, whether direct or indirect. The "touchstone" in the determination is whether the parties exchanged comparable "realizable commercial value."

- The party challenging the transfer bears the burden of proving all of the elements of a constructive fraudulent transfer claim under PUFTA § 5104(a)(2) and § 5105.

In re David Cutler Indus., Ltd., 502 B.R. 58, 73 (Bankr. E.D. Pa. 2013) (numerous citations omitted); see also Image Masters, Inc. v. Chase Home Fin., 489 B.R. 375, 387 (E.D. Pa. 2013); In re Computer Personalities Sys., Inc., 2002 WL 31988134, at *4 (Bankr. E.D. Pa. Dec. 23, 2002).

The Complaint adequately pleads that the Debtor failed to receive reasonably equivalent value in exchange for the transfers.

In granting the Steeple Run Collateral Mortgage in 2011 and the Calnshire Collateral Mortgage in 2014, the Debtor encumbered its only asset (the Property) with millions of dollars in liens. According to the Complaint, the Debtor received only nominal ($1.00 in each transaction) in exchange for the property it transferred (i.e., the grant of mortgages on the Property); the affiliated entities received all of the value Prudential provided in return. Drawing all reasonable inferences in favor of the Trustee, the Complaint adequately alleges the absence of reasonably equivalent value with respect to the transfers resulting in:

- the 2011 Steeple Run Collateral Mortgage; and

- the 2014 Calnshire Collateral Mortgage.

This makes it unnecessary for the Trustee to plead with more particularity and quantify the degree to which the property the Debtor transferred exceeded the value received. See In re Fruehauf Trailer Corp., 444 F.3d 203, 214 (3d Cir. 2006).

16

In its Reply Memorandum (Doc. #50), Prudential argues that the Debtor received indirect value by supporting its affiliate entities and their shared principal (Gualtieri).  But Prudential is looking at value from the wrong perspective.  Value is determined not on an absolute scale, but by analyzing what the Debtor received that is *useful to the Debtor's creditors*, and how that compares to the value that the Debtor transferred in exchange.  The Transfers may well have benefitted Gualtieri's non-Debtor entities.  Yet none of these transactions provides an equivalent benefit to the Debtor itself.

At the pleading stage, the Trustee adequately alleges lack of reasonable equivalent value to IVC.[8]

---

[8]       There is one (1) exception to this ruling.

The Trustee's request for avoidance of the Construction Loan is inherently flawed. Under PUFTA, a transfer is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. The term includes payment of money, release, lease, license and creation of a lien or other encumbrance."  12 Pa.C.S. §5101.  This definition is derived from the Bankruptcy Code, 11 U.S.C. §101(54). See 12 Pa.C.S. §5101, Committee Comment (10) (1993).

The grant of a mortgage is a transfer because it involves the conveyance of an interest in property to the mortgagee.  However, taking on liability embodied in a promissory note is not a transfer: the obligor does not part with any property by executing the note.  If there is no transfer, there can be no avoidable transfer. See U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc., 2012 WL 3100778, at *5 (N.D. Tex. July 31, 2012).  The Trustee cannot possibly "avoid" the Construction Loan itself.

Therefore, the Motion will be granted with respect to the Construction Loan without leave to amend.

The Construction Mortgage, however, is a transfer that is potentially avoidable.  So the distinction drawn above does not prejudice the Trustee in a material fashion.

**b.**

The Durham Mortgage, granted in 2013, stands on a somewhat different footing.

In this transaction, the Debtor encumbered the Property and was the borrower in the transaction; the Debtor neither guaranteed another entity's loan nor provided additional collateral in connection with another entity's loan.  Thus, at first blush, it appears that the Debtor received reasonably equivalent value, i.e., $1,400,000, in return for granting a $1,400,000 mortgage. However, the Loan Agreement expressly requires that the Debtor use the loan proceeds to "pay down and reduce" the outstanding Durham Manor LLC loan, (Loan Agreement §1.5) (Compl. Ex. B), and the Complaint further alleges that $1,119,170.16[9] was used for this purpose. [10]

In essence, the Complaint alleges that, although the loan documents were drafted to appear otherwise, the 2013 Durham Mortgage transaction, for the most part, was functionally the same as the 2011 Steeple Run Collateral Mortgage transaction and the 2014 Calnshire Collateral Mortgage transaction, resulting in an encumbrance on the Debtor's Property in exchange for value provided to another entity.

These facts are sufficient to satisfy the pleading standard for the "reasonably equivalent value" element of the Trustee's claims under 12 Pa. C.S. §§5104(a)(2) and 5105.

---

[9]     The Debtor used the remaining $280,829.84 of the loan.

[10]     The Complaint does not specifically describe where these loan proceeds went.  The Trustee alleges that the loan was given with the intent of using proceeds to pay down Durham Manor LLC's debts to Prudential and further alleges that loan proceeds were "transferred elsewhere."  (Compl. ¶31).  Drawing an inference in the Trustee's favor, I will infer that those proceeds were transferred to their intended use: back to Prudential to pay down the separate entity's debts.

18

**c.**

The Construction Mortgage, too, stands on a different footing from both the 2011 Steeple Run Collateral Mortgage and the 2014 Calnshire Collateral Mortgage transaction.

Like the 2013 Durham Mortgage, under the Construction Mortgage loan documents, the Debtor was the borrower receiving the loan proceeds in exchange for the mortgage it granted Prudential.  The Construction Mortgage differs from the 2013 Durham Mortgage, however, in that the Debtor actually received the full benefit of the loan; the proceeds were made available to the Debtor and used to develop the Property.  Taking on a five million dollar ($5,000,000) mortgage in exchange for a five million dollar ($5,000,000) loan amounts to reasonably equivalent value.

The Complaint, however, alleges that the Debtor did not receive reasonably equivalent value with regard to the Construction Mortgage and points to a related document, the Development Construction Loan Agreement. (See Complaint ¶44, Ex. F).  That agreement required the Debtor to make certain payments to reduce the outstanding debt on the Lava loan, as well as on the Durham, Steeple Run, and Calnshire debts from the sale proceeds generated by condominium units built by the Debtor (as a result of the use of proceeds from the Construction Mortgage).[11]

---

[11]     Section 1.5 of the Development Construction Loan Agreement provides, in pertinent part:

> (B) In addition to the payments required by Subsection (A) above, on the settlement on the sale of each of the first 25 houses, the Borrower shall pay LAVA Financial Twenty Five Thousand ($25,000.000) Dollars, on the sale of each of the first 128 houses and Condominium units, the Borrower shall pay the Bank Ten Thousand ($10,000.00) Dollars in reduction of a certain $1,400,000.00) Dollar mortgage loan by the Bank to Island View, LP. which is subordinated to the loan which is the subject of this Agreement. Upon settlement on the sale of each of the 21st house and/or Condominium to the 128th, the Borrower shall pay the Bank Thirty Five Thousand ($35,000.00) Dollars in reduction of a certain mortgage loan known as Steeple Run. On settlement

The Trustee's argument is not persuasive.

Looking at the transaction functionally, Prudential advanced a loan that was designed to allow the Debtor to develop and substantially increase the value of its real property. Viewed in isolation, the transaction indisputably involved an exchange for reasonably equivalent value. [12]

The complication is that the Construction Loan Agreement also obligated the Debtor to allocate some of the (presumably increased) property value and future profit realized from sales of condominium units to pay down debts of other entities, potentially indicating that the Debtor did not receive reasonably equivalent value in the transaction.

It is theoretically possible that a contractual obligation to allocate future profits could so dwarf the benefit a borrower receives from the use of the loan proceeds as to render the transaction constructively fraudulent. But the Complaint fails to flesh out how that occurred here. The Trustee makes no effort to explicate how the formula for dividing the loan proceeds from condominium unit sales would render constructively fraudulent an otherwise facially non-fraudulent transaction. In a case in which the Debtor actually received the loan proceeds and

---

on the sale of each of the 21st house and/or Condominium to the 169th, Borrower shall pay the Bank Ten Thousand ($10,000.00) Dollars in reduction of a certain mortgage loan known as Calnshire Estates and on settlement on the sale of each of the 69th house and/or Condominium unit to the 169th, the Borrower shall pay Ten Thousand ($10,000.00) on account of certain past due accounts payable. On settlement on the sale of each of the 21st house and/or Condominium unit to the 169th, Borrower shall deposit with the Bank Ten Thousand ($10,000.00) Dollars to replenish the Interest Reserve.

[12]    I also observe that the Trustee's fraudulent transfer theory with respect to the Construction Mortgage is dependent upon his success in avoiding the other mortgages outlined in the Complaint. If those mortgages are not avoidable, the Debtor's obligation via the Development Construction Loan Agreement to pay down the affiliates' debts also benefits the Debtor by reducing the amount of those other mortgages encumbering the Property.

used them to enhance the value of its property, the inference the Trustee requests the court to make is too great, even at the plaintiff-favored Rule 12(b)(6) stage.

Further, promising to route payments in the future which will be derived from expected profits is not a transfer.  Actually making such payments might be, but the Complaint does not allege that the Debtor transferred any property to Prudential based on §1.5 of the Development Construction Loan Agreement.

As presently pled, the Trustee has not stated a plausible claim with regard to the Construction Mortgage.  While it may be unlikely that the Trustee can plead additional facts to support this claim, I will grant him leave to file an amended complaint to fill the gaps in his legal theory.  See, e.g., Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004).

### 3.   Insolvency under PUFTA

#### a.

To avoid a transfer under 12 Pa. C.S. §5105, the transfer must occur while the Debtor is insolvent, or must cause the Debtor to become insolvent.

A debtor may be found insolvent in one (1) of two (2) ways.

First, a debtor "is insolvent if, at fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." 12 Pa. C.S. §5102(a).  This test is a "balance sheet test," i.e., whether "debts exceed assets." 12 Pa. C.S. §5102, cmt. 1; accord Spitko, 2007 WL 1720242, at *15; In re Fid. Bond & Mortg. Co., 340 B.R. 266, 288 (Bankr. E.D. Pa. 2006), aff'd 371 B.R. 708 (E.D. Pa. 2007).

Second, 12 Pa. C.S. §5102(b) provides that there is a presumption of insolvency if the debtor "is generally not paying the debtor's debts as they become due."  In applying this test, a court should

> look at more than the amount and due dates of the indebtedness. The court should
> also take into account such factors as the number of the debtor's debts, the
> proportion of those debts not being paid, the duration of the nonpayment, and the
> existence of bona fide disputes or other special circumstances alleged to constitute
> an explanation for the stoppage of payments.

Incare, 2018 WL 2121799, at *10 (quoting 12 Pa. C.S. §5102 Committee Comment) (quotation

marks and emphasis omitted).

**b.**

The Trustee did not adequately plead 'balance sheet' insolvency.

The Complaint provides few facts about the Debtor's debts at the time of any of the

Transfers.  The Complaint describes the initial amount of the various large loans the Debtor

owed – to Prudential, the RDA, and Lava – but not what the loan balances were at the time of the

Transfers.  Nor are there facts in the Complaint detailing the value of the Debtor's assets (the

Property and its associated permits).

It would be sheer speculation to assume that the Debtor was insolvent or rendered

insolvent at the time of each transaction – in 2011, 2013 and 2014 – simply because the Debtor

filed a chapter 11 bankruptcy case in 2017.  The Trustee merely states the boilerplate conclusion

that the Transfers were made when the Debtor was insolvent or rendered the Debtor insolvent.

This is insufficient.  See, e.g., In re CRC Parent Corp., 2013 WL 781603, at *5 (Bankr. D. Del.

Mar. 1, 2013) (under equivalent Bankruptcy Code provision, 11 U.S.C. §548(a)(1), "to

adequately plead insolvency, the Trustee must present some information of the Debtors' financial

status at the time of the transfer"); see also In re Life Fund 5.1 LLC, 2010 WL 2650024, at *7

(Bankr. N.D. Ill. June 30, 2010). [13]

As for the test under 12 Pa. C.S. §5102(b)  -  not paying debts as they become due  --  the

Complaint sets forth no facts that support its statement that the Debtor was not paying its debts

as they fell due as of the date of each transfer the Trustee seeks to avoid.  Again, the Complaint

includes only conclusory, boilerplate allegations that are insufficient.

Therefore, the Complaint fails to state a claim under 12 Pa. C.S. §5105.  Because this

defect is potentially remediable, I will grant the Trustee leave to amend the Complaint.  See, e.g.,

Alston, 363 F.3d at 235.

---

[13]    There is information outside the four (4) corners of the Complaint that may shed light on
the Debtor's financial position.  In its bankruptcy schedules, filed on July 18, 2017, the Debtor valued the
Property at $22,000,000.  Subsequently, at the hearing on the Debtor's motion for postpetition financing,
held in November 2017, the Debtor offered an expert opinion that the Property's value was $17,800,000.
(In denying the Debtor's motion, I found the value to be less than that without the necessity of making a
precise valuation determination).

    To some extent, these two (2) valuations help the Trustee.  Presumably, the value of the
Property was less in 2011-14, before the Debtor partially developed it using the proceeds of the
Construction Loan.  However, even if I consider this evidence, the Complaint would still be inadequate.

    The Debtor's debts at the time of the last potentially-avoidable Transfer (the 2014
Calnshire Collateral Mortgage) totaled $12,900,000.  ($2,500,000 to the RDA, $3,900,000 on the Steeple
Run Collateral Mortgage, $1,400,000 on the Durham Mortgage, and $5,100,000 on the Calnshire
Collateral Mortgage.  The Debtor subsequently took on an additional $625,000 on the loan from Lava,
$2,090,381.19 on the escrowed loan monitored by Bristol, and $5,541,468 on the Construction Mortgage.
These later debts, however, cannot be considered in the balance sheet test, which looks at the assets and
debts at the time of a specific potentially-avoidable transfer).

    No reasonable inference in the Trustee's favor can bridge this gap between a $22,000,000
or even a $17,800.00 valuation of assets and a total debt load of $12,900,000.

23

#### 4.  unreasonably small assets

The Trustee also alleges that the Transfers are avoidable under §5104(a)(2), which requires that a transfer leave the debtor with unreasonably small assets to sustain its operations or that the debtor intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay.  Prudential argues that this claim is not adequately pled.  I disagree.

The test for unreasonably small assets does not require insolvency.  Instead, the analysis looks at whether the enterprise's failure was reasonably foreseeable.  Peltz v. Hatten, 279 B.R. 710, 744 (D. Del. 2002) (citing Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1073 (3d. Cir. 1992) (test for "unreasonably small capital" is "reasonable foreseeability")), aff'd sub nom In re USN Commc'ns, Inc., 60 Fed. Appx. 401, 2003 WL 1551287 (3d Cir. March 25, 2003) (not precedential).

In the context of an operating business, the test aims at an enterprise's "inability to generate sufficient profits to sustain operations."  In re Fidelity Bond and Mortg. Co., 340 B.R. 266, 294 (Bankr. E.D. Pa. 2006).  The test "take[s] into account, among other things, the debtor's present and prospective debts, and whether the retained assets are sufficiently liquid to enable the debtor to pay such debts as they become due." 12 Pa. C.S. §5104 cmt. 4; U.S. v. Rocky Mountain Holdings, Inc., 782 F. Supp. 2d 106, 118–19 (E.D. Pa. 2011).

The ability to avoid a transfer of assets that leaves the transferor with unreasonably small assets does not serve to second-guess business deals that do not work out.  In re R.M.L., Inc., 92 F.3d 139, 155 (3d Cir. 1996).  Rather, this provision is aimed at transactions where the parties should know that the deal will "leave the transferor technically solvent but doomed to fail."

24

MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995).

At the time of the alleged first transfer, the grant of the Steeple Run Collateral Mortgage in 2011, the Debtor had no liquid assets and no ability to pay bills as they came due. IVC was also not operating, so it had few debts that might periodically come due. When the Debtor acquired the Steeple Run Collateral Mortgage, it took on the risk that Steeple Run LLC would default, and Prudential would try to collect from the Debtor. It is fair to infer that there was some reasonable possibility of a Steeple Run default; why else would Prudential seek another source of collateral for an existing loan. And, had Steeple Run defaulted, the Debtor's lack of liquid assets would have prevented it from paying. The Calnshire Collateral Mortgage transaction was similar: the transfer was linked the Debtor to another entity's debts, with terms of default the Debtor could not control, at a time when it had no cash to pay on a default. These facts are sufficient to make out a plausible theory for satisfying the requirement of §5104(a)(2).

After the Debtor granted the Durham Mortgage, the issue is somewhat closer. The Debtor did have a liquid asset: the associated disbursement of $1,400,000. The Complaint alleges that the majority of this disbursement was transferred away to pay down Durham Manor LLC's debts to Prudential. The transfer of $1,119,170.16 left the Debtor with approximately $280,000. In absolute terms, that may be a significant sum. But in the context of a real estate development the size of IVC, the Trustee is entitled to prove at trial the remaining funds were unreasonably small, especially considering the fact that the Debtor had already substantially encumbered the Property. If the Debtor needed additional operating capital, the Trustee may be able to establish that no lender would provide financing to obtain fourth lien position (behind the various existing mortgages) on a barely-developed parcel when site work had not begun.

The Debtor presents itself as a real estate development company, which it became when it took out the Construction Mortgage and began work on the Property.  Prior to that, the Complaint suggests that the Debtor's day-to-day operations amounted to providing finance support for Gualtieri's other entities.  In that line of business, a reserve of liquid assets is essential to prevent foreclosure.

Consequently, considering the actual business practice of the Debtor at the time of the Transfers, and giving the Trustee the benefit of all reasonable inferences, the Complaint provides a sufficient factual basis for the Trustee's contention that the Debtor's assets were unreasonably small.  The avoidance claim under 12 Pa. C.S. §5104(a)(2)(i) has therefore been adequately pled. [14]

### 5.  summary

To sum up, for the reasons discussed, some, but not all, of the avoidance causes of action will be dismissed.

| Transaction | 12 Pa. C.S. §5104(a) | 12 Pa. C.S. §5105 |
|---|---|---|
| 2011 Steeple Run Collateral Mortgage | Motion denied | Motion granted<br>Claim dismissed with leave to amend |
| | | |
| transfer of $1,119,170.16 from 2013 Durham Loan | Motion denied | Motion granted<br>Claim dismissed with leave to amend |
| | | |

---

[14]    12 Pa.C.S. §5104(a)(2)(ii) also provides that a transfer made without receiving reasonably equivalent value in exchange is fraudulent if the debtor intended, believed or reasonably believed it would incur debts beyond its ability to pay as they fall due.

While there are some differences between the two (2) subsections, subsection (ii) is closely related to subsection (i).  The tests "address[ ] slightly different aspects of the same fundamental inquiry: whether the debtor is and, on a continuing basis, will be able to pay its debts as they become due."  12 Pa. C.S. § 5104, Committee Comment No. 4.

Subsection (ii) focuses more on the debtor's intentions and the reasonableness of the debtor's conduct than subsection (i).  Considering that I have found the claim under subsection (i) to be adequately pled, I conclude that the claim under subsection (ii), too, is adequately pled.

| Durham Mortgage associated with 2013 Durham Loan Agreement | Motion denied | Motion granted Claim dismissed with leave to amend |
|---|---|---|
| | | |
| 2014 Calnshire Collateral Mortgage | Motion denied | Motion granted Claim dismissed with leave to amend |
| | | |
| 2014 Construction Loan | Motion granted Claim dismissed without leave to amend | Motion granted Claim dismissed without leave to amend |
| | | |
| 2014 Construction Mortgage | Motion granted Claim dismissed with leave to amend | Motion granted Claim dismissed with leave to amend |

## C.  Equitable Subordination

The Trustee seeks to subordinate Prudential's claim to all other claims against the Debtor.

A bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. §510(c)(1).

Equitable subordination of a claim is proper when:

(1)  the claimant engaged in some type of inequitable conduct;

(2)  the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and

(3)  equitable subordination of the claim is consistent with the provisions of the Bankruptcy Code.

In re Winstar Commc'n, Inc., 554 F.3d 382, 411–12 (3d Cir. 2009); Citicorp Venture Capital, Ltd. v. Comm. of Unsecured Creditors, 160 F.3d 982, 986–87 (3d Cir.1998).

The purpose of equitable subordination is "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results."  Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding

27

Unsecured Claims, 323 F.3d 228, 233 (3d Cir. 2003).  A claimant who fairly obtains and asserts

a claim can still be subordinated if it engages in subsequent misconduct that harms other

creditors.  Matter of Mobile Steel Co., 563 F.2d 692, 700–01 (5th Cir. 1977) (inequitable

conduct can be unrelated to the "acquisition or assertion of a particular claim").

Courts apply rigorous scrutiny to dealings between insiders and a debtor and find

subordination proper if the insider engaged in unfair conduct.  Winstar Communications, 554

F.3d at 412.  "If the claimant is not an insider, then evidence of more egregious conduct such as

fraud, spoliation or overreaching is necessary." Matter of Fabricators, Inc., 926 F.2d 1458, 1465

(5th Cir. 1991) (citing In re N & D Properties, Inc., 799 F.2d 726, 731 (11th Cir. 1986)); In re

Computer Personalities Sys., Inc., 284 B.R. 415, 427–28 (Bankr. E.D. Pa. 2002).

A non-insider can be subordinated even if he or she did not specifically commit "fraud,

spoliation or overreaching" – these are just helpful examples, repeatedly referenced in the case

law, of the "more egregious" conduct necessary for subordination. [15]  Any "'very substantial'

misconduct involving 'moral turpitude or some breach of duty or some misrepresentation

whereby other creditors were deceived to their damage'" can justify subordination.  In re M.

Paolella & Sons, Inc., 161 B.R. 107, 119 (E.D. Pa. 1993) (citing In re Osborne, 42 B.R. 988, 996

(W.D. Wis. 1984)), aff'd 37 F.3d 1487 (3d Cir. 1994) (Table).

The exercise of contractual rights is not inequitable, even if the rights are exercised

harshly and cause harm to other creditors.  M. Paolella & Sons, 161 B.R. at 120.  "Firms that

have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort

---

[15]    Prudential argues that, because the state court dismissed all fraud claims in the Lender
Liability Action, the Trustee cannot establish grounds for equitable subordination.  However, the Trustee
does not need to show fraud, only sufficiently egregious conduct.

of their trading partners, without being mulcted for their lack of 'good faith.'" Kham & Nate's

Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990).

However, the enforcement of a contract can inch over into inequitable conduct. This

principle is illustrated by In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332 (1st Cir. 1992).

In that case, a lender extended a secured loan in order to finance a real estate development

project held by a trust.  The bulk of the loan was disbursed on signing, but a substantial portion

was held back by the lender, to be disbursed after a properly-documented draw request.  The

lender had a right to take loan closing costs out of any undisbursed loan proceeds.  The lender

intentionally exaggerated its closing costs and applied them to the entire undisbursed amount.

As a result, there were no funds left to complete construction.  When the debtor made a draw

request and no money was left, the project failed.  The bankruptcy court found that this failure to

disburse funds was inequitable conduct that harmed all of the trust's creditors and that equitable

subordination of the lender's claim to all other claims was proper.

The Complaint here alleges similar conduct that, if proven, constitutes inequitable

conduct sufficient to permit this court to subordinate the Prudential debt.  The Trustee alleges

that Prudential intentionally breached the lending agreements by making extensive demands for

documents during the Draw Process and that these demands were not made in good faith.  This

conduct caused suppliers and subcontractors to cease work and the project to fail.  The Debtor

defaulted on its debts to all its creditors, leaving them with little chance of getting paid, while

Prudential's secured position protected it from being severely harmed by its own conduct.  If

proven, Prudential's conduct went beyond "enforcing the contract to the letter."

Prudential raises an interesting defense.  Prudential has agreed to subordinate its claim.[16]

to all other creditors, save three (3):

- Americorp Construction Inc. ("Americorp");

- Calnshire Estates LLC, another Gualtieri-controlled real estate development entity currently in its own chapter 7 bankruptcy; and

- Stradley, the law firm that served as the Debtor's pre-bankruptcy counsel in the Lender Liability Action and the Lava lawsuit.

Equitable subordination is remedial, not penal.  In re U.S. Abatement Corp., 39 F.3d 556,

561 (5th Cir. 1994).  It exists to correct harms, not to provide a windfall to uninjured creditors.

In re 80 Nassau Assocs., 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994).  Subordination of

Prudential's claim must correct some actual injury to the specific creditors.  Essentially,

Prudential argues that even if it engaged in inequitable conduct, it has already subordinated its

---

[16]    Prudential's 'claim' is actually made up of four (4) mortgages against the Property: the Steeple Run Collateral Mortgage, the Durham Mortgage, the Calnshire Collateral Mortgage and the Construction Mortgage.  Because these mortgages are consecutively second, third, fourth and fifth in priority – behind the mortgage to the RDA – I have followed the parties in generally referring to them as a bloc, a single claim.

Both Prudential and the Trustee appear to agree that Prudential voluntarily subordinated all four (4) mortgages to all other claims except the three discussed in the text.  The actual subordination agreements are not in the record. Prudential agreed to execute subordination agreements as part of the postpetition financing obtained by the Trustee that restarted the development of the Property.  The resulting "Release of Liens Agreement" is part of the record; it requires Prudential to deliver subordinations to the Trustee in the future.  (Bky. No. 17-14454, Doc. #341, Ex. D)  Even if Prudential followed its obligations to the letter, the terms only require it to subordinate three (3) of its mortgages; there is no language requiring subordination of the Construction Mortgage.  Id. at ¶¶ 2.5-2.7.

If the Construction Mortgage was not voluntarily subordinated, Prudential's defense is weaker because it had not voluntarily remedied all the harm done.  Because I find that the four (4) mortgages are still susceptible to equitable subordination even if all four (4) were voluntarily subordinated, this mismatch in the record does not impact my decision.  Even giving Prudential its strongest defense, the equitable subordination claim is still well-pled.

claim to the entities which were actually harmed by that conduct and that Americorp, Calnshire

Estates LLC and Stradley were not so harmed.

The argument has some superficial appeal, but ultimately is unconvincing.

The Complaint fails to provide information about Americorp. Even if I were to go outside

the four (4) corners of the Complaint to consider the Debtor's schedules, the only information

available there is that the Debtor scheduled Americorp as the holder of a general unsecured

"contractor claim" for $200,000.  (Schedule E/F).  Similarly, Calnshire Estates, LLC is the

holder of a general unsecured "loan" claim for $175,519.28.  (Schedule E/F).[17]  It is also the

owner of real property that is the primary collateral for the Calnshire Collateral Mortgage.

Drawing inferences in favor of the Trustee, both these entities would have been paid if the

Debtor had been able to complete development of the Property.  Prudential's inequitable conduct

ensured they would not be paid, so they were harmed by Prudential's conduct.[18]

Prudential has slightly different arguments against subordinating to Stradley's claim.

First, Prudential argues that Stradley began to represent the Debtor only after the

supposedly inequitable conduct began.  That is, Stradley knew the risk of nonpayment and

---

[17]   I acknowledge that my description of Americorp in the text is technical.  Based on the
evidence presented at the hearing on the Debtor's request for approval of post-petition financing
and Prudential's request for the appointment of a Trustee, I am well aware that Americorp is another
Gualtieri-controlled entity.  I have no doubt that, at summary judgment or at trial, either party could
establish this fact.  I express no opinion whether Americorp's insider status affects the Trustee's equitable
subordination claim.

[18]   There is an interesting aspect to this defense that involves facts outside the allegations in
the Complaint.  The Trustee is currently developing the Debtor's Property.  Based on profit projections
made during the hearing on the Debtor's unsuccessful request for post-petition financing and Prudential's
request for the appointment of a chapter 11 trustee, the development of the Property is expected to
produce sufficient revenue to pay all creditors in full and even provide a return to equity.  If this occurs, it
is difficult to see how any creditors were harmed.

voluntarily assumed that risk.  It was not improperly disadvantaged; Stradley just took a chance that did not pan out in its favor.

Second, Prudential argues that subordinating its claim to Stradley would be improper fee-shifting.  Stradley incurred its claim as counsel for the Debtor in suing Prudential.  Subordinating Prudential would ensure that Stradley gets paid its fees before Prudential gets paid a single dollar, effectively taking those legal fees out of Prudential's pocket.

I conclude that the Trustee's claim for equitable subordination of Prudential's claim to Stradley is well-pled.

The Complaint alleges that the Debtor retained Stradley when it started to have trouble with the Draw Process.  Stradley began to work, and after that Prudential disbursed one of the long-delayed draw requests.  Stradley and the Debtor could easily have viewed Prudential's conduct up to that point as a pressure tactic; Prudential played "hardball" and threatened to manufacture a default, but when given proper documents, it paid accordingly.  So Stradley continued to work on the Debtor's behalf.  When it became clear that Prudential did want to force a default, Stradley had already been Debtor's counsel for over three months.  At least some portion of Stradley's claim accrued before the breakdown of the lender-borrower relationship. That portion, and possibly all of Stradley's claim, was harmed by Prudential's alleged unfair acts.

Prudential's argument against fee shifting also misses the mark.  This defense implicitly invokes the third prong of the test for equitable subordination: subordination must be consistent with the Bankruptcy Code.

For the purposes of a chapter 11 plan, a claim by prepetition counsel is simply a claim.  It should be classified appropriately and paid according to that classification.  According to

Prudential, the Trustee is implicitly arguing that Prudential should be subordinated to Stradley because attorney's fees should be shifted to the wrongdoer party but that such shifting in not supportable by applicable nonbankruptcy law and therefore, is inconsistent with the Bankruptcy Code.

But that is not the Trustee's argument.  The Trustee seeks to subordinate Prudential to *all* other claims, because all creditors suffered harm from Prudential's conduct.  The fact that Stradley's claim is owed to prepetition counsel neither factors into the Trustee's argument nor mandates different treatment for Stradley from the rest of the general unsecured creditors.  The equitable subordination cause of action is adequately pled and will not be dismissed.[19]

---

[19]  Stradley filed a response to these arguments alleging that the voluntary subordination agreements are an attempt to work around the requirement that all creditors in the same class receive the same treatment.  (Doc. #41).  Stradley is a general unsecured creditor, and it argues on its own behalf that treating it differently than the other general unsecured creditors is improper discrimination.  <u>See</u> 11 U.S.C. §1122.

In effect, Stradley argues that a voluntary subordination as to some claims requires equitable subordination as to all claims, but cites no authority for this broad proposition.

Also, Stradley's argument puts the cart before the horse.  The equitable subordination claim is either well-pled or it is not.  If equitable subordination as to Stradley is not appropriate, the voluntary subordination of Prudential's claim as to the other creditors is a confirmation issue.

In any event, having denied the Motion on other grounds, I need not reach the issues raised by Stradley.

## VI.  CONCLUSION

For the reasons stated above, the Motion will be granted in part and denied in part.

An appropriate order follows.

Date: **May 23, 2019**

_____
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**