UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| Island View Crossing II, L.P., | . | |
| | . | |
| | . | |
| Debtor. | . | Bankruptcy #17-14454 (ELF) |

...............................................................

| | | |
|---|---|---|
| Kevin O'Halloran, In His | . | |
| Capacity As Chapter 11 | . | |
| Trustee For Island View | . | |
| Crossings II, L.P., | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| Prudential Savings Bank, | . | |
| et al., | . | Adversary #17-0202 (ELF) |
| | . | |
| Defendants. | . | Adversary #18-0280 (ELF) |

...............................................................

Philadelphia, PA
August 13, 2021
1:56 p.m.

TRANSCRIPT OF TELEPHONIC BENCH OPINION

BEFORE THE HONORABLE ERIC L. FRANK
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

No Attorneys Were Present During The Ruling

Audio Operator:

2

Transcribing Firm:                    Writer's Cramp, Inc.
                                       1027 Betty Lane
                                       Ewing, NJ 08628
                                       609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

1          THE COURT:  Presently before the court are two

2     adversary proceedings, consolidated for trial, titled Kevin

3     O'Halloranvs.Prudential Savings Bank.  The adversary numbers

4     are 17-202 and 18-280.  The adversary proceedings are

5     related to the bankruptcy case of Island View Crossing II,

6     LP, bankruptcy #17-14454.

8          The first adversary proceeding, #17-202, which I will

9     refer to as the lender liability action, consists of the

10    Trustee's lender liability complaint and the response thereto.

11    The debtor commenced this action in the Court of Common Pleas,

12    Philadelphia County, Pennsylvania, prior to the filing of the

13    bankruptcy case.  Let me make a correction.  I'm not sure it

14    was in Philadelphia County, but it was in the Court of Common

15    Pleas, the initial filing.  The common pleas action was

16    subsequently removed to the bankruptcy court, and upon

17    appointment of the chapter 11 Trustee, Mr. O'Halloran, he

18    succeeded the debtor as the plaintiff.

19         The second adversary proceeding, 18-280, which I will

20    refer to as the avoidance and subordination action, consists

21    of claims brought by the Trustee for avoidance and recovery of

22    transfers and equitable subordination of Prudential's claim in

23    this bankruptcy case.  Presently before the court are the

24    Trustee's motion for partial summary judgment, which was filed

25    only with respect to the Trustee's claims in the avoidance and

4

1   subordination action, and Prudential's motion for summary

2   judgment filed with respect to all claims asserted by the

3   Trustee in both adversary proceedings.

4       Today I am issuing my bench opinion explaining my ruling

5   upon both motions.  An order will be entered on the docket

6   setting forth the terms of the ruling.  The reasons for the

7   decision are being stated in this bench opinion, recorded

8   today, August 13, 2021.  However, because this will be a very

9   lengthy bench opinion, rather than employing my usual practice

10  of placing an audio file on the docket, instead, I will obtain

11  a transcript of this recorded bench opinion which will allow

12  me to edit it before docketing the transcript as my bench

13  opinion.  Once docketed, the document will constitute my

14  opinion explaining the reasons for my ruling on these

15  two motions.

16      As this is a bench opinion that is unpublished and the

17  parties are familiar with the procedural and factual

18  background, I will set out only those parts of the procedural

19  and factual history necessary to make this bench opinion

20  generally comprehensible.  A more complete discussion of the

21  background of the parties' dispute is set out in this court's

22  memorandum of May 23rd, 2019, which is reported at 604

23  Bankruptcy Reporter 181.  That decision granted in part and

24  denied in part Prudential's motion to dismiss the complaint.

25  In that decision I ruled that while some of the Trustee's

1    avoidance claims, including all of the claims under 12 Pa.C.S.

2    §5105, were not adequately pled in the complaint and would be

3    dismissed with leave to amend, four of the Trustee's avoidance

4    claims under 12 Pa.C.S. §5104(a) were adequately pled, and

5    therefore survived dismissal.  My decision also denied

6    Prudential's motion to dismiss the Trustee's equitable

7    subordination claim.

8        After that decision, the Trustee did not file an amended

9    complaint.  Thus, the Trustee's claims presently before the

10   court in the lender liability action are claims for

11   breaches of the lending contract, including the covenant of

12   good faith and fair dealing, the implied covenant of good

13   faith and fair dealing, and tortious interference

14   with contract.  In the avoidance and subordination action

15   the claims are for avoidance of four transfers under 12

16   Pa.C.S. §5104(a) and 11 U.S.C. §544, and for equitable

17   subordination of Prudential's claim to all other claims in the

18   bankruptcy case.

19       As I stated at the outset, the parties have filed

20   competing motions for summary judgment pursuant to Federal

21   Rule of Civil Procedure 56, made applicable to adversary

22   proceedings by Federal Rule of Bankruptcy Procedure 7056.  I

23   have previously discussed the legal standard for summary

24   judgment motions in reported decisions.  I will not burden

25   this bench opinion with an oral recitation of the various

1    legal principles governing summary judgment motions.  Instead,

2    I will simply cite and incorporate by reference my discussion

3    of the issue in the case In Re Polichuk, 506 B.R. 405, 420-

4    422 (Bankr. E.D. Pa 2014).

5         To address the parties' dueling motions for summary

6    judgment, I begin with the Trustee's fraudulent transfer

7    claims.  The Trustee has filed these claims under §544(b)(1)

8    of the Bankruptcy Code which, generally speaking, grants to

9    the Trustee whatever avoidance powers are available to

10   unsecured creditors under non-bankruptcy law.  See, e.g.,

11   In Re Equipment Acquisition Resources, Inc., 742 F.3d

12   743, 746 (7th Cir. 2014).  §550 of the bankruptcy code permits

13   the Trustee to recover for the estate the value of any avoided

14   transfers.  The Trustee seeks to avoid and recover four

15   transfers under Pennsylvania's Uniform Fraudulent Transfer

16   Act, which as I explain later has been amended and renamed.

17   The statute is codified at 12 Pa.C.S. §§5101 through 5114.

18        Before identifying the four transfers at issue, it is

19   helpful to set out and name a number of transactions and

20   property transfers that form the basis of the Trustee's

21   claims.  And at the outset, I will state that, in the interest

22   of brevity, from time to time I will state the amounts in the

23   transactions in round numbers, not exact numbers.In the first

24   transaction, in 2011, the debtor granted Prudential a 3.9-

25   million-dollar mortgage on its main asset, a piece of real

1   estate.  This mortgage is referred to by the parties as the

2   "Steeple Run Collateral Mortgage".  Second, in 2013 Prudential

3   lent the debtor $1.3 million in a transaction I will refer to

4   as the "2013 IVC loan", or the "IVC loan transaction".  The

5   Trustee asserts that some of the loan proceeds in this

6   transaction were transferred for the benefit of Prudential and

7   that those money transfers should be set aside.  The third

8   transfer also made in the 2013 IVC loan transaction was the

9   debtor's grant of a mortgage on its real estate to Prudential.

10  For reasons I will explain in a moment, I will refer to that

11  mortgage as the "Durham mortgage", a mortgage

12  that the Trustee seeks to set aside.  Fourth, in 2014 the

13  debtor granted Prudential a 5.1-million-dollar mortgage.  This

14  mortgage is referred to by the parties as the "Calnshire

15  collateral mortgage".  Fifth,

16  later in 2014, following the Calnshire collateral mortgage

17  transaction, Prudential loaned the debtor $5.5 million secured

18  by a mortgage on the debtor's real estate in a transaction

19  that I will call the "IVC construction loan", which was

20  secured by what I will call the "IVC Construction Mortgage".

21  In the Court's order of May 23rd, 2019, I dismissed the

22  avoidance claims with respect to the IVC Construction Mortgage

23  granted in 2014.  I mention it now only for purposes of

24  completeness as it is central to the Trustee's limited

25  liability claims, but of course not to the avoidance claims.

1    Turning back to the avoidance claims, the Trustee alleges
2    that the following four transfers are voidable under
3    §5104(a)(2) of 12 Pa.C.S.  1) The debtor's grant of the 3.9-
4    million-dollar Steeple Run collateral mortgage; 2) The
5    debtor's transfer of approximately $1.1 million to Prudential
6    that was used to reduce Durham Manor's debt to Prudential,
7    Durham Manor being an affiliate of the debtor, the $1.1
8    million being derived from the loan proceeds of the 2013 IVC
9    loan.  Third, the debtor's grant of the 1.4-million-dollar
10   Durham mortgage granted in connection with the 2013 IVC loan.
11   And fourth, the debtor's grant of the 5.1-million-dollar
12   Calnshire collateral mortgage in 2014.
13        Under 12 Pa.C.S. §5104(a)(2), a transfer made or
14   obligation incurred by a debtor is voidable if the debtor made
15   the transfer or incurred the obligation without receiving
16   equivalent value in exchange and 1) was engaged or was about
17   to engage in a business or a transaction for which the
18   remaining assets of the debtor were unreasonably small in
19   relation to the business transaction; or 2) intended to incur
20   or believed or reasonably should have believed that the debtor
21   would incur debts beyond the debtor's ability to pay as they
22   became due.
23        The first element that a plaintiff must establish under
24   §5104(a)(2) is that the debtor made the transfer or incurred
25   the obligation without receiving reasonably equivalent value

1   in exchange.  In the May 23rd, 2019 memorandum, I concluded

2   that the avoidance and subordination complaint adequately pled

3   that the debtor did not receive reasonably equivalent value

4   for the transfers in question.  More specifically, I rejected

5   Prudential's argument that the transfers indirectly benefitted

6   the debtor by supporting its affiliated entities and their

7   shared principal, Renato Gualtieri,

8   I noted in that memorandum that the value received by

9   the debtor for purposes of §5104(a)(2) is determined by

10  analyzing what the debtor received that is useful to the

11  debtor's creditors.  Since the complaint alleged that the

12  debtors received nominal consideration, $1, for granting the

13  Steeple Run and the Calnshire collateral mortgages each,

14  and only fractional consideration, that is approximately

15  $280,000 of the $1.4 million of proceeds related to the Durham

16  mortgage, I held that the complaint adequately pled that the

17  debtor did not receive reasonably equivalent value for these

18  transfers.

19      In their respective motions, the parties do not focus

20  heavily on the reasonably equivalent value element of

21  §5104(a)(2.  Nor do they dispute most of the basic facts

22  concerning these transfers, as alleged in the complaint.  The

23  Trustee notes that I have already determined that any value

24  the non-debtor entities received as part of these transactions

25  did not constitute value received by the debtor.  And given

1    the obvious disparity between what the debtor gave away and

2    what the debtor received, the Trustee asserts that there is no

3    present factual dispute regarding whether the debtor received

4    reasonably equivalent value for the transfers.  Prudential

5    makes a minor evidentiary argument, which I will discuss

6    momentarily, regarding the amount of value the

7    debtor received in connection with the September 2013 loan

8    agreement.  However, Prudential primarily focuses its argument

9    on the other elements of §5104(a)(2), namely subsection (i),

10   whether the transfer left the debtor with unreasonably small

11   assets, and subsection (ii), whether the debtor should have

12   reasonably believed that it would incur debts beyond its

13   abilities to pay as they came due.

14       Upon review of the evidence submitted, I am satisfied

15   there is no material factual dispute regarding whether the

16   debtor received reasonably equivalent value for the challenged

17   transfers.  The undisputed evidence shows that the debtor

18   received nominal consideration in exchange for grants of the

19   Steeple Run and Calnshire collateral mortgages, both multi-

20   million-dollar mortgages.  These collateral mortgages

21   encumbered the debtor's property by millions of dollars, at

22   least according to the face value of the mortgages, and in

23   exchange, the debtor only received nominal consideration, $1

24   per transaction.  It is therefore beyond dispute that the

25   debtor did not receive reasonably equivalent value from

1   Prudential in the Steeple Run and Calnshire collateral

2   mortgage transactions.

3        The evidence regarding the value the debtor received in

4   connection with the September 2013 IVC loan is more

5   complicated.  Under the terms of the September 2013 IVC loan

6   agreement, the debtor executed a promissory note along with

7   two other co-obligors in exchange for a 1.4-million-dollar

8   loan from Prudential, and in connection with this loan

9   agreement the debtor also executed and delivered to Prudential

10  a mortgage and security agreement that pledged the debtor's

11  real property as collateral for the loan.  In connection with

12  the September IVC 2013 loan agreement, therefore, the debtor

13  received $1.4 million in funds, incurred an obligation to

14  repay the 1.4-million-dollar loan, and transferred a mortgage

15  to Prudential securing the repayment.  What creates an issue

16  regarding this agreement is that it required the debtor to use

17  the proceeds of the loan to pay certain settlement costs and

18  to reduce the balance due on Durham Manor LLC's outstanding

19  loan to Prudential, Durham Manor being an affiliate of the

20  debtor.  Thus at first blush the loan agreement seems to

21  indicate the debtor did not receive any value from this

22  transaction, with the Durham Manor entity receiving the entire

23  benefit through a reduction of its loan balance to Prudential.

24  However, the loan agreement also specified that monies

25  received by Prudential from subsequent sales of select Durham

1   Manor lots would be used to fund, among other things, certain

2   site preparation and pre-construction projects at the IVC

3   property.  The amount allocated for this back-end funding of

4   IVC's property development appears to be capped at $375,000,

5   with an additional $125,000 to be paid to the debtor as a

6   reimbursement of closing costs.  See Exhibit-2 page 16 of the

7   attached to the Trustee's motion for summary judgment.

8       The remainder of monies received by Prudential from sales

9   of Durham Manor lots would be allocated back into Gualtieri

10   entities as follows:  loan payments: $147,500; Durham Manor

11   construction: $200,000; a refund to Durham Manor for an RDA

12   payment of $120,000; and Calnshire's interest reserve:

13   $100,000; Island View reserve for monthly payments: $50,000;

14   an advance to AmeriCorp, another Gualtieri entity, for

15   operating expenses: $302,250.  Thus, September 2013 loan

16   agreement shows that the debtor was not contractually entitled

17   to receive the full proceeds of the 1.4-million-dollar loan

18   that it obligated itself to repay and for which it secured, or

19   it encumbered, the IVC property.

20       I recognize that the loan agreement planned for some of

21   the loan proceeds ultimately to be funneled back to the debtor

22   in some form.  However, a substantial amount of the loan

23   proceeds were never intended to be realized by the debtor in

24   any way.  Thus, based on the loan agreement alone, I conclude

1    that the debtor did not receive reasonably equivalent value

2    for incurring the 1.4-million-dollar debt secured by a

3    mortgage on its property.  That said, it may prove helpful to

4    the parties for me to comment briefly regarding a factual

5    dispute raised by the parties regarding the precise amount

6    that Prudential was to funnel back to the debtor under the

7    terms of the September 2013 loan agreement.  The Trustee

8    relies on an analysis of various disbursements, see Exhibit-

9    20, to conclude that only $280,829.84 of the September '13

10   loan ultimately benefitted the debtor.  Prudential counters

11   that the Trustee's own spreadsheet omits several significant

12   distribution of funds, totaling $225,000, that the debtor also

13   received on account of lot sales at Durham Manor.  Upon review

14   of the document relied upon, I agree that a genuine factual

15   dispute is present regarding the true payee of some of the

16   payments listed in the document.  Indeed the Trustee's own

17   analysis indicates that as much as $270,977.20 in

18   disbursements have unknown beneficiaries.  See Exhibit-20 at

19   page 13.  (This is Exhibit-20 to the Trustee's motion).

20   However, in the end, this factual dispute is not material at

21   this stage of the case.  Even accepting Prudential's

22   assertions regarding these payments, the evidence shows that

23   the debtor would only have ultimately received a little more

24   than $500,000 in value in exchange for a 1.4-million-dollar

25   loan and accompanying mortgage.  Thus I remain satisfied that

1   the evidence shows conclusively that the debtor did not

2   receive reasonably equivalent value from Prudential in the

3   September 2013 loan transaction.

4       Should the Trustee ultimately prevail in the avoidance

5   and recovery action, the precise amount that the debtor

6   received in connection with this loan will be relevant in

7   determining the scope of the relief to be granted to the

8   Trustee.  But such a determination is presently not necessary

9   because the Trustee's motion is being denied on other grounds,

10  which I will get to.  Having found the evidence shows that the

11  debtor did not receive reasonably equivalent

12  value in the four challenged transfers, I therefore turn to an

13  analysis of whether the evidence is sufficient to grant

14  summary judgment to either party based on subsections (i) and

15  (ii) of §5104(a)(2) of 12 Pa.C.S.  As previously

16      stated, §5104(a)(2)(i) and (ii) provide that a

17  transfer made or obligation incurred by the debtor is voidable

18  if the debtor made the transfer or incurred the obligation

19  without receiving reasonably equivalent value in exchange and

20  either was engaged or was about to engage in a business or a

21  transaction for which the remaining assets of the debtor were

22  unreasonably small in relation to the business or transaction,

23  or intended to incur or believed or reasonably should have

24  believed that the debtor would incur debts beyond the debtor's

25  ability to pay as they became due.

1        The commentary to §5104 points out that the tests under

2   subsections (a)(2)(i) and (ii) should be viewed as addressing

3   slightly different aspects of the same fundamental inquiry,

4   whether the debtor is and on a continuing basis will be able

5   to pay its debt as they become due.  See Committee comment #4

6   (1984).    I digress for a moment to acknowledge that the

7   committee comment I've just cited was made in connection with

8   the drafting and enactment of the Pennsylvania Uniform

9   Fraudulent Transfer Act in 1984 (PUFTA) and that

10  PUFTA was amended in 2017 and is now called the Pennsylvania

11  Uniform Voidable Transaction Act, (PUVTA)

12  There are new comments to PUVTA,

13  but nothing in my view in the

14  new comments serves to undermine the relevance of the prior

15  comments that I've just referenced, so I will rely on them in

16  construing the statute.

17       Turning back to the text of the statute now, subsection

18  (i) tests whether a transfer leaves the debtor with

19  unreasonably small assets to sustain its operations.  As I

20  wrote in the May 23rd, 2019 memorandum, the subsection (i)

21  test does not require insolvency.  Instead, the analysis looks

22  at whether the enterprise's failure was reasonably

23  foreseeable.  See Peltz v. Hatten, 279 B.R. 710, 744, (D.

Del. 2002), citing Moody,

25  vs. Security Pacific Business Credit, Inc., 971 F.2d 1056,

1    1073 (3d Cir. 1992), where the court states that the test for

2    unreasonably small capital is reasonable foreseeability.------

-------------------------------

3        In the context of an operating business, this test asks

4    whether the transfer in question left the debtor with an

5    inability to generate sufficient profits to sustain

6    operations.  See In Re Fidelity Bond & Mortgage Company, 340

7    B.R. 266, 294, (Bankr. E.D. Pa 2006).  Subsection (i)

8    therefore focuses attention on whether the amount of all the

9    assets retained by the debtor was inadequate, that is

10   unreasonably small, in light of the needs of the business or

11   transaction in which the debtor was engaged or about to

12   engage.  See 12 Pa.C.S. §5104 comment 4.  See also United

13   States vs. Rocky Mountain Holdings, Inc., 782 F.Supp. 2d 106,

14   118-119, (E.D. Pa 2011).

15       The ability to avoid a transfer of assets that leaves the

16   transferor with unreasonably small assets does not serve as a

17   basis for second guessing business deals that just simply do

18   not work out.  See In Re R.M.L., Inc., 92 F.3d 139, 155, (3d

19   Cir. 1996).  Rather, this provision is aimed at transactions

20   where the parties should know that the deal will leave the

21   transferor technically solvent but doomed to fail.  MFS Sun

22   Life Trust High Yield Series vs. Van Dusen, Airport 23

     Services Company, 910 F.Supp. 913, 944, (S.D.N.Y. 1995).

24   Subsection (ii) of §5104 is closely related to subsection (i),

25   but focuses more on the debtor's intentions and beliefs

1   regarding its ongoing financial condition.  In particular,

2   subsection (ii) tests the reasonableness of the debtor's

3   beliefs with regard to whether the transfer or obligation in

4   question will impair its ability to pay its debts as they

5   become due.

6        Before moving to a discussion of the parties' arguments

7   and the evidence submitted, one more provision of the PUVTA

8   warrants mention.  §5101(b) provides definitions for the

9   statute, including a definition of the term "asset", which it

10  defines broadly as property of the debtor.  However, §5101(b)

11  excludes from the definition property to the extent that it is

12  encumbered by a valid lien.  Thus, if a debtor owns property

13  that is completely encumbered by liens, that property is not

14  considered an asset of the debtor under §5101, or if that

15  property is only partially encumbered, then §5101 dictates

16  that only the unencumbered portion of the property will be

17  considered an asset of the debtor.  The net effect of this

18  provision is to exclude property interests that are beyond the

19  reach of unsecured creditors from the definition of asset for

20  the purpose of these provisions.  See 12 Pa.C.S. §5101

21  committee comment #2 (1984).

22       A committee comment to this section also states that in

23  the case of property encumbered by a lien securing a

24  contingent obligation, such as a guarantee, in general it

25  would be appropriate to value the obligation by discounting

1   the face amount of the debt to reflect the probability that

2   the guarantee will ever be called upon.  See also Siematic,

3   Mobelwerke,GmbH & Co. KG 4 v. Siematic Corp., 643 F.Supp. 2d

675, 691, (E.D. Pa. 2009).

5   I will discuss these legal principles in connection with each

6   challenged transfer starting with the 2011 Steeple Run

7   collateral mortgage.

8       The Trustee's argument with respect to the 2011 Steeple

9   Run collateral mortgage is straightforward.  In 2011 when the

10  debtor granted this mortgage, its only asset was its real

11  estate, which I will call the "IVC property".  After

12  accounting for the existing mortgage on the property, which is

13  held by the Redevelopment Authority, securing

14  its purchase money loan to the debtor,

15  and based upon an appraisal from May of 2011, see Plaintiff's

16  Exhibit-12, the Trustee maintains that the debtor had about

17  $3.4 million in equity in the IVC property, but with

18  no working capital or other resources to fund its business

19  operations.  The 2011 Steeple Run collateral mortgage

20  encumbered the IVC property by an amount greater than the

21  existing equity, the face amount of the mortgage being $3.9

22  million plus an attorney's commission.  This 3.9-million-

23  dollar amount represented the entire principal amount of the

24  debt that Steeple Run – (a separate entity that was a

25  debtor affiliate) -- owed to Prudential on a land acquisition

19

1  loan from 2008.  The Steeple Run Collateral Mortgage entitled

2  Prudential to foreclose on the IVC property upon any default

3  by Steeple Run for the entire amount of the Steeple Run land

4  acquisition loan or, at the option of Prudential, for the

5  amount necessary to cure the default.  See Exhibit-13, the

6  Trustee's motion.

7     Together with the existing RDA mortgage on the property,

8  the Trustee argues that the grant of the Steeple Run

9  collateral mortgage left the IVC property encumbered by

10 approximately $6.4 million of mortgages at a time when the

11 property was valued at only $5.8 million.  And since the

12 debtor would need several millions of dollars to begin

13 construction on the IVC project, the Trustee asserts that the

14 transfer of the Steeple Run collateral mortgage left the

15 debtor at that time with unreasonably small assets in relation

16 to its business and an inability to pay debts as they came

17 due.

18    Prudential responds first by noting that in 2011 the

19 debtor was not developing the IVC property.  Prudential argues

20 that the debtor was merely a landholding company at the time

21 it acquired the IVC property, and remained a landholding

22 company at least until 2013 when it took out the IVC loan.  In

23 2011 the only obligations the debtor had were real estate

24 taxes and RDA loan payments.  Further, Prudential highlights

25 the fact that despite the grant of the Steeple Run mortgage,

1   the debtor retained an ability to raise working capital.  The

2   debtor made pitches to investors, subsequent to the Steeple

3   Run collateral mortgage, that purported to show significant

4   earnings potential in the IVC project.  Debtor's principal,

5   Gualtieri, testified at his Deposition that he did not believe

6   that granting the Steeple Run collateral mortgage would impair

7   the debtor's ability to make its RDA loan payments.  In

8   addition, the debtor borrowed additional funds from

9   Prudential, just two years after granting the Steeple Run

10  collateral mortgage, to begin construction on the IVC project.

11  Thus, Prudential contends that the granting of the Steeple Run

12  collateral mortgage did not leave the debtor with insufficient

13  capital to sustain its operations nor should the debtor have

14  reasonably believed that the mortgage would render it unable

15  to pay its debts as they became due.  After considering the

16  competing arguments and the evidence submitted by the parties,

17  I conclude that the issues under subsection (i) and (ii) of 12

18  Pa.C.S. 5104(a)(2) are not ripe for summary judgment due to

19  the existence of disputed issues of material fact.

20      Discussion of subsections (i) and (ii) requires analysis

21  of multiple subcomponents, including the assets of the debtor

22  in 2011 and the business needs of the debtor in 2011.  I'll

23  start with the discussion of the debtor's 2011 assets, as that

24  term is defined in §5101.  The parties do not dispute that the

25  only substantial asset that the debtor possessed in 2011

1    before granting the Steeple Run collateral mortgage was the

2    IVC property.  A May 2011 appraisal of the property valued it

3    at slightly over $5.8 million.  The IVC property was

4    encumbered by a 2.5-million-dollar purchase money mortgage,

5    leaving the debtor with approximately 3.3 to 3.4

6    million dollars of equity.  And as stated earlier, the Steeple

7    Run mortgage exceeded that, since it had a face value of 3.9

8    million.  Thus if the Steeple Run mortgage encumbered the IVC

9    property by its full face value, the IVC property would have

10   had negative equity of approximately $500,000.  Being fully

11   encumbered by valid liens, the IVC property would not be

12   considered an asset of the debtor, following the grant of the

13   Steeple Run collateral mortgage.  The debtor would then be

14   considered to have no assets remaining after the transfer for

15   purposes of §5104(a)(2)(i).

16       Prudential disputes this conclusion regarding the

17   debtor's assets by making two primary arguments.  First, that

18   the collateral mortgage only encumbered the IVC property by

19   the shortfall in the Steeple Run property's equity, and

20   second, that the face value of the collateral mortgage should

21   be reduced based on the probability that the Steeple Run loan

22   would ever be called in against IVC.  I will address these

23   arguments in turn.

24       First, I am not persuaded by Prudential's assertion that

25   the Steeple Run collateral mortgage at most encumbered the IVC

1    property by an amount equal to the shortfall of the equity in

2    Steeple Run's own property.  A few undisputed facts regarding

3    the Steeple Run property and the Steeple Run loan must be

4    considered first.  In 2008, Prudential loaned $3.9 million to

5    Steeple Run for the purpose of purchasing Steeple Run's real

6    estate.  Steeple Run granted Prudential a mortgage on the

7    Steeple Run property to secure the loan.  By September of

8    2011, when the debtor granted Prudential the Steeple Run

9    collateral mortgage, the Steeple Run property was worth

10   approximately $3 million and the balance of the Steeple Run

11   loan was approximately $3.9 million.

12   See Gualtieri Deposition at 46 to 48.

13       Prudential's theory is that because the Steeple Run

14   property had an equity shortfall of only $900,000, and

15   assuming, as Prudential does, that the Steeple Run property

16   would be sold first in the event of any default by Steeple

17   Run, Prudential asserts then that the debtor would, at most,

18   be required to cover the $900,000 difference remaining after

19   foreclosure on the Steeple Run property.  That, of course,

20   would leave the debtor with substantial equity in the IVC

21   property.  The problem with Prudential's theory is that it

22   conflicts with the unambiguous terms of the Steeple Run

23   collateral mortgage.  The document gives Prudential the right,

24   upon default by Steeple Run on the Steeple Run loan, to

25   foreclose against the IVC property for the entire principal

1   amount of the mortgage, or whatever amount is necessary to

2   cure the default.  Again, <u>see</u> Exhibit-13 to the Trustee's

3   Motion.  Prudential incorrectly asserts that because Gualtieri

4   testified that the Steeple Run property would be sold before

5   Prudential would pursue collection of

6   of any deficiency against

7   the IVC property

8   that the 900,000-dollar figure is the proper amount to be

9   considered.  Prudential has stretched Gualtieri's testimony

10  far past its breaking point.  Gualtieri merely admitted the

11  arithmetic regarding how much encumbrance would remain on the

12  IVC property, assuming that the Steeple Run property was sold

13  first.  <u>See</u> Gualtieri Deposition ats 51 to 53.

14  Perhaps more importantly, Gualtieri's testimony on this point

15  is irrelevant, as the terms of the collateral mortgage control

16  the legal rights of the parties, not Gualtieri's suppositions

17  about what would happen in the event of a default.  Under

18  §5101, assets of the debtor do not include property to the

19  extent that it is encumbered by a valid lien.  Since the

20  Steeple Run collateral mortgage gave Prudential the

21  unqualified right to foreclose on the IVC property for the

22  full amount of the balance of the Steeple Run loan, that

23  number being $3.9 million, the existence of the

24  additional collateral securing the Steeple Run loan is

25  irrelevant.  Thus, for purposes of determining a debtor's

1    assets under §5101(b), I hold that the facial amount of the

2    mortgage or the loan balance of the underlying mortgage, if

3    less, is the proper starting point in determining the

4    encumbrance a mortgage places on the debtor's property.

5         But there is a second argument, and I turn to that second

6    argument, which is that the face value of the collateral

7    mortgage should be reduced based on the probability that the

8    Steeple Run loan would ever be called.  At the outset, I agree

9    with Prudential that the 2011 Steeple Run collateral mortgage

10   was a contingent obligation.  It is undisputed that the debtor

11   was not obligated to repay the Steeple Run loan.  The debtor's

12   obligation would be triggered only upon a default by Steeple

13   Run, the primary obligor.  In other words, the debtor

14   effectively was a guarantor.  Trustee asserts, in,

15   that it is a well established principle that mortgages are

16   not contingent liabilities.  See Trustee's Reply Brief at

17   6.  However, the cases cited by the Trustee do not establish a

18   per se rule regarding mortgages.  In each of the cases cited

19   by the Trustee, it appears that the mortgagor had granted the

20   mortgage in connection with and to secure a promissory note

21   for which the mortgagor was the primary obligor.  Thus in

22   those cases, the mortgages and accompanying notes would

23   properly have been considered fixed liabilities rather than

24   contingent liabilities.

25        The Steeple Run and Calnshire collateral mortgages differ

1    from the mortgages in those cited cases in that the mortgagor,

2    (here the debtor), was not liable under the notes and its

3    obligation or more -- or perhaps more accurately the IVC

4    property's obligation under the collateral mortgages only

5    would arise upon the occurrence of a default by the primary

6    obligors.  Thus, I agree with Prudential that the collateral

7    mortgages granted by the debtor to Prudential are contingent

8    liabilities for purposes of a fraudulent transfer analysis

9    under Pennsylvania law.  Consequently, it is appropriate under

10   §5101(b) to discount the face value of these mortgages by the

11   probability that the underlying debt will come due to the

12   debtor, here IVC.  See 12 Pa.C.S. §5101 comment 2 (1984).

13   Such a determination is necessary because §5104(a)(2) requires

14   consideration whether the remaining assets of a debtor

15   following a challenged transaction were unreasonably small in

16   relation to the entity's business needs.  Having agreed with

17   Prudential that the Steeple Run collateral mortgage is

18   contingent in nature, I conclude that there is insufficient

19   evidence at the summary judgment stage to determine the amount

20   or degree to which the face value of the mortgages should be

21   discounted.

22        The parties have submitted little evidence regarding the

23   risk of default by Steeple Run on the underlying Steeple Run

24   collateral mortgage obligation.  Prudential refers to a

25   concession from Gualtieri that when the debtor granted the

1    collateral mortgage in 2011, Steeple Run was not in default,

2    Prudential had never alleged a default, and that there was

3    nothing to suggest that such a default was likely.   See

4    Gualtieri Deposition at 57-60.    On the other side, the

5    Trustee, having asserted that the collateral mortgages are not

6    contingent, has not mounted a substantive argument or

7    developed evidence regarding the probability that Steeple Run

8    would default, such a default thereby entitling Prudential to

9    foreclose on the IVC property.  Thus the only evidence

10   submitted regarding the probability that Prudential would call

11   in the Steeple Run mortgage against IVC consists of

12   Gualtieri's deposition testimony.  However, I find Gualtieri's

13   unadorned statement that Steeple Run was not likely to

14   default to be minimally probative evidence at this stage of

15   the litigation, and insufficient to permit me to discount the

16   face value of the collateral mortgage without engaging in

17   sheer speculation regarding the risk of Steeple Run's default.

18   And, since the debtor's grant of the collateral mortgage

19   resulted in a total facial encumbrance on the IVC property of

20   approximately $500,000 more than the property was worth, I am

21   unable to find as an undisputed fact that the debtor had any

22   remaining assets following the transfer of the Steeple Run

23   collateral mortgage or the amount of those assets.

24       But the Trustee fares no better on this issue,

25   particularly considering that as respondent, Prudential

1   receives the benefit of all reasonable inferences.  I have no

2   difficulty accepting the proposition that some discount of the

3   face value of the collateral mortgage would be appropriate,

4   based on the contingent nature of the obligation itself.  But

5   the Trustee has pointed to no evidence that would suggest that

6   this discount would be minimal.  Therefore, I must assume that

7   the evidence may show, especially in light of Gualtieri's

8   Deposition testimony, that the discount to the face value of

9   the collateral mortgage would be substantial, thereby

10  leading to the conclusion that the debtor retained

11  significant equity in the IVC property following the grant of

12  the Steeple Run collateral mortgage.

13      In sum, I find a disputed issue of material fact remains

14  with regard to the debtor's assets under §5101 following the

15  transfer of the Steeple Run collateral mortgage, making it

16  impossible to make a ruling on summary judgment.

17  §5104(a)(2)(i) requires an analysis of whether the remaining

18  assets of the debtor will run reasonably small in relation to

19  the debtor's business following the transfer.  Without

20  establishing what assets remain, there is a disputed issue of

21  fact.

22      I reached the same conclusion regarding subsection (ii)

23  of §5104(a)(2).  The text of subsection (ii) does not

24  explicitly require consideration of a debtor's assets in

25  weighing whether, in connection with the challenged transfer,

1    the debtor intended to incur or reasonably should have

2    believed it would incur debts beyond its ability to pay as

3    they become due.  However, determining whether the debtor

4    retained an ability to pay its forthcoming debts following a

5    challenged transfer logically requires consideration of the

6    assets that the debtor retained from which a debtor could pay

7    those bills or raise money to pay those bills.  See 12 Pa.C.S.

8    §5104 comment 4 (1984).     Consideration of the debtor's

9    assets under (ii) is particularly appropriate here where the

10   debtor had only one meaningful asset and

11   no stream of income. Thus I find the

12   parties' failure to establish and absence of disputed material

13   facts regarding the debtor's remaining assets precludes

14   summary judgment under both subsections (i) and (ii) of

15   §5104(a)(2).

16        Nevertheless, I will briefly discuss the submitted

17   evidence regarding the debtor's business and anticipated

18   business needs.  Such an analysis is also necessary under both

19   subsections (i) and (ii).  Subsection (i) requires the court

20   to determine whether the debtor's remaining assets are

21   unreasonably small in light of its business activities, and

22   subsection (ii) requires the court to determine whether the

23   debtor intended or reasonably should have believed that the

24   challenged transfer would have left the debtor unable to pay

25   its bills as they became due.  Similar to my conclusion

regarding the existence of a factual dispute as to the
debtor's remaining assets, I also conclude that material
disputed facts exist regarding the debtor's business and
anticipated business needs at the time of the Steeple Run
collateral mortgage.  The Trustee relies on the undisputed
fact that the debtor needed millions of dollars to fund
development of the IVC property, and it had no way of
generating revenue at the time.  It fully encumbered its only
asset with the collateral mortgage. Thus, the Trustee asserts,
as a logical conclusion that the debtor was doomed to fail and
would be unable to pay its then extant bills, which consisted
of ongoing real estate taxes and RDA loan payments.  On the
flip side, Prudential insists that the Debtor was merely a
landholding company in 2011 and therefore did not need
millions of dollars at that time.  Prudential also notes that
the Debtor had access to funds from its affiliates that would
enable it to pay its ongoing bills and did, in fact, obtain
additional capital to fund development for Prudential in later
years.

I find evidentiary holes in both parties' positions.
First, from the Trustee's side, the Trustee takes it as a
given that evacuating the equity from IVC property necessarily
prevented the debtor from obtaining financing to complete the
IVC project.  I do not find this assumption to be
self-evident.  Granted, a real estate development company

1   would be in a stronger financial position if the property it

2   owned and intended to develop had millions of dollars in

3   equity that could be used to obtain development financing.

4   But it is not entirely clear to me that a developer would be

5   unable to procure development financing in the absence of such

6   equity, much less that a developer's company would be doomed

7   to fail.  The Trustee has developed no evidence on this point.

8   Plus, I cannot ignore the fact that the debtor did in fact

9   obtain a construction loan in 2014, albeit from Prudential.

10  Without some additional evidence, perhaps expert testimony, I

11  am unwilling to draw the inference on this bare record that

12  the Trustee asks me to make.  Now if the Trustee develops

13  a record that the debtor's business in 2011

14  required millions of dollars in equity to succeed or to pay

15  its bills as they became due, the outcome may differ.

16       Prudential's theory has its own set of problems.  Without

17  drawing any final conclusion, I do find some intuitive appeal

18  in Prudential's argument that the debtor was merely a

19  landholding company in September 2011, and therefore did not

20  need millions of dollars in development financing at that

21  time.  This assertion also has some evidentiary support

22  because it is undisputed that the debtor delayed development

23  of the IVC property until several years after the Steeple Run

24  transaction.  And,Gualtieri testified that the debtors delayed

25  development of the IVC property at least in part to try to

1    time "the market."                                    See

2    See Gualtieri Deposition at 80.    However, it remains clear

3    that the ultimate purpose of IVC was to develop the property

4    and the actions taken in 2011 could have ramifications when

5    the time finally came for IVC to commence the development

6    process. I need further evidence or argument on this issue

7         Also,Prudential fails to point to probative

8    evidence demonstrating that the reasonably anticipated

9    ultimate capital needs of the debtor as of

10   September 2011 were such that the debtor could reasonably

11   assume that it could raise the money that it needed.   Concerns

12   I have include whether the debtor

13   reasonably would need unencumbered equity in the IVC property

14   to obtain subsequent financing.   Prudential's observation that

15   the debtor did obtain such financing in 2013 and afterward,

16   while of some probative value, does not entirely cure the

17   problem.   I note that the debtor's acquisition of additional

18   funds for Prudential may have been enabled in part by IVC's

19   appreciation in value from 5.8 million in 2011, arguably to

20   $6.4 million in 2013, and $7.8 million in 2014.   Was such

21   appreciation reasonably certain in 2011 when the debtor

22   granted the Steeple Run collateral mortgage?   That

23   determination requires that I engage in fact finding which I

24   may not do at the summary judgment stage.

25        Also, the additional financing came from a lender with

1   whom the debtor had an existing relationship, perhaps

2   suggesting that Prudential was,to put it colloquially, "in for

3   a penny, in for a pound," and that the financing from

4   Prudential might not otherwise have been obtainable in the

5   open market.  My point here is that the record is bare

6   and that the fact that the debtor subsequently acquired

7   development funds standing alone does not demonstrate that the

8   transfer of the collateral mortgage in 2011 did not leave the

9   debtor with unreasonably small assets in light of its business

10   needs.  Or at a minimum, I will have to engage in fact finding

11   even if I do not receive additional evidence on the issue. Nor

12   does the subsequent Prudential financing demonstrate that the

13   Debtor reasonably should have believed that after the transfer

14   it could pay its bills as they became due.

15

16       A similar logic undermines Prudential's reliance on the

17    mere fact that the debtor obtained development financing

18   following the transfer, particularly since it was obtained

19   from Prudential.  A business' access to necessary financing

1  years after a challenged transfer that syphoned off a

2  significant portion, or perhaps all of the business' equity,

3  does not necessarily prove that the transfer did not impair

4  the business to such a degree that it was likely to fail, or

5  to be unable to pay its bills as they fell due.

6      I'll also note that I perceive some ambiguity under the

7  PUVTA regarding how to treat the debtor's access to and

8  receipt of funds from its affiliates which the debtor

9  apparently used to pay its ongoing obligations for property

10  taxes and RDA loan payments.  I noted in my May 2019

11  memorandum that any value the debtor received in the

12  challenged transfers should be viewed from the perspective of

13  the debtor's creditors.  See 604 B.R. at

14  196.  Perhaps such an approach also is proper under §5104 of

15  the PUVTA when considering the debtor's financial condition

16  following its alleged transfers.  From a creditor's

17  perspective, a debtor's dependence upon funding from

18  affiliates that is based on an informal relationship rather

19  than contractual obligations may justifiably appear ephemeral

20  and unreliable.  Such a source of funding depends solely on

21  the continued largess of the gifting affiliates.  Plus, I may

22  be persuaded, but I do not at this time decide, whether the

23  availability of funds from the debtor's affiliates establishes

24  the kind of financial soundness that subsections (i) and (ii)

25  of §5104(a)(2) require.  In other words, without more evidence

1    at summary judgment, I cannot determine that the debtor's

2    reliance on the resources of its affiliates permits any

3    finding of an undisputed fact under §5104(a)(2).  I mention

4    this issue to flag it for the parties as an issue that may

5    play a greater role as litigation progresses.  The bottom line

6    is the only way I could grant summary judgment with respect to

7    this first transfer would be to engage in fact finding at

8    the summary judgment stage.  I am not prepared to do so.

9        The next two transfers challenged by the Trustee

10   derive from the 2013 IVC loan

11   agreement.  These claims

12   involve, first, the Debtor's putative receipt of $1.4 million

13   in funds and incurrence of an obligation to repay the 1.4-

14   million-dollar loan.  I'm referring to the 2013 IVC loan.  The

15   second is the debtor's grant of a mortgage to Prudential

16   securing that repayment, that mortgage being the Durham

17   mortgage.  The Trustee's argument under subsections (i) and

18   (ii) of §5104 is relatively straightforward. The 2013 IVC

19   loan required the debtor to allocate the majority of the 1.4-

20   million-dollar loan for use by its affiliates.  Accordingly,

21   the debtor, arguably, only received approximately $280,000 in

22   value for incurring an additional $1.4 million in debt while

23   granting an encumbrance of $1.4 million on its only asset.  In

24   that effect of the loan and mortgage left the debtor with $7.8

25   million in mortgages on its property, then valued at 6.4

1    million.  At that time, the debtor had only $10 in cash

2    reserves, had not generated any revenue, had not yet commenced

3    construction on the IVC development project, and still needed

4    millions of dollars to develop the IVC property, according to

5    the Trustee.  Thus, the Trustee asserts that the transfer left

6    the debtor with an unreasonably small capital for its business

7    and unable to pay its bills as they came due.

8         In response, Prudential notes that in July 2013 Gualtieri

9    asserted that the debtor was not short of equity and was

10   poised to be successful.  Further, in September 2013,

11   Gualtieri did not believe that the 2013 IVC loan would render

12   the debtor unable to pay its bills, in part because the

13   proceeds from the Durham house sales would be funneled back to

14   the debtor and would enable the debtor to pay the bills.

15   Prudential also argues that the value of the IVC property

16   exceeded the encumbrances on it even after the additional 1.4-

17   million-dollar mortgage is added to the property.  Prudential

18   reaches this conclusion by again asserting that the Steeple

19   Run collateral mortgage should be discounted down from its

20   face value, based on the then-existing equity shortfall for

21   Durham which Prudential calculates as $770,000.  Adding to the

22   $770,000 the remaining balance of the RDA loan, the then 6.4-

23   million-dollar IVC property had a net value of more than --

24   net equity of more than $2 million, according to Prudential.

25        Upon consideration of the parties' arguments and evidence

1   and for largely the same reasons articulated in detail in

2   connection with the Steeple Run collateral mortgage,I conclude

3   material issues of disputed fact remain with respect to both

4   subsections (i) and (ii) in connection with the 2013

5   transaction.  Primarily, there are still disputed issues

6   regarding how to calculate the debtor's assets under 12

7   Pa.C.S. §5101(b).  In September 2013 the debtor still had only

8   one primary asset, the IVC property.  The parties have not

9   presented persuasive evidence how this court can discount the

10  value at summary judgment of the Steeple Run collateral

11  mortgage, first in 2011, now again in 2013.  I am unable,

12  under the summary judgment standard, to determine the value of

13  the debtor's only piece of property.  I again cannot determine

14  whether the debtor's assets were unreasonably small in

15  relation to its business, or whether the debtor would have

16  been able to and should have known that it could not pay its

17  debts as they fell due.

18       In addition, I reiterate my observation that the parties

19  did not present persuasive evidence regarding the debtor's

20  ability to access necessary credit in light of its reduced

21  equity following this transfer.  The availability of such

22  access to credit may be crucial in determining whether the

23  added encumbrances to the IVC property would have

24  significantly increased the likelihood that the debtor's IVC

25  project would fail or would have rendered the debtor unlikely

1   to pay its bills as they came due.

2        Prudential cites instances of the Debtor, specifically

3   Gualtieri, soliciting outside investors prior to the debtor's

4   transfer of significant equity through the IVC loan in 2013,

5   and Prudential asserts that because at least one potential

6   investor offered Gualtieri a deal for financing in exchange

7   for an interest in IVC, IVC had the ability to

8   generate sufficient profits to sustain its operations at that

9   time.   See Prudential's Memorandum in Support of Motion

10  for Summary Judgment at 13. However, because this offer

11  and Gualtieri's accompanying projections of the IVC project

12  success preceded the challenged transfer, they do not

13  persuasively demonstrate that the debtor's financial strength

14  or access to necessary capital following the transfer would be

15  adequate.

16       Also lurking in the shadows of this transaction is the

17  Debtor's access to and use of affiliate funds to pay bills as

18  they came due, and how this court should view the debtor's

19  financial position under §5104 in light of that informal

20  business relationship between the Debtor and its affiliates.

21  Thus, for substantially similar reasons as those described in

22  my analysis of the Steeple Run collateral mortgage, I find

23  that the parties have not demonstrated an absence of material

24  disputed facts with respect to the debtor's remaining assets

25  and business needs following the 2013 IVC loan and the grant

1    of the Durham mortgage in connection with them.  Neither party

2    has demonstrated an entitlement to summary judgment under

3    subsections (i) or (ii) of §5104(a)(2).

4         Next I turn to the Calnshire collateral mortgage.  I

5    reach the same conclusion with respect to the parties' motions

6    for summary judgment with respect to this mortgage.  The

7    parties' arguments regarding this mortgage largely track their

8    arguments regarding the other challenged transactions.  The

9    Trustee asserts at the time of this transfer the debtor had

10   only $1,500 in working capital to fund its business

11   operations.  Debtor's grant of the Calnshire collateral

12   mortgage further encumbered the IVC property by the face

13   amount of the mortgage, approximately $5.1 million.  Together

14   with the other liens on the IVC property, the RDA loan

15   mortgage, the Steeple run collateral mortgage, and the

16   September 2013 IVC mortgage, the IVC property was encumbered

17   by almost $13 million in mortgages and worth only $7.8 million

18   according to the Trustee.  Since the debtor still needed

19   several millions of dollars to develop the IVC project, the

20   Trustee asserts that the transfer of the 2014 collateral

21   mortgage left the debtor inadequately capitalized and unable

22   to pay its debts as they became due.

23        Prudential responds by first noting that the Calnshire

24   collateral mortgage secured the Durham Calnshire loan, which

25   is May of 2014 had a remaining balance of only $2.8 million.

1    The Durham Calnshire loan was also secured by

2    the Calnshire property which was worth approximately $2.6

3    million.  We are again looking at the argument that the equity

4    shortfall left the debtor exposed for only $200,000.  If

5    reduced to that level as an encumbrance on the IVC property,

6    Prudential calculates that IVC still had a net equity of over

7    $3 million.  Prudential's argument again assumes that the

8    mortgages on the IVC property should be calculated only by

9    looking at the equity shortfall on the additional collateral.

10   I have previously explained why I disagree with that.

11   Further, Prudential notes that the Debtor was able to acquire

12   some capital in May of 2014 from Gualtieri's brother and his

13   wife and from Nancy Maychuk who, the parties agree, is

14   Gualtieri's girlfriend.  Thus, Prudential contends that the

15   granting of the Calnshire mortgage did not leave the debtor

16   with insufficient capital to sustain its operations; nor

17   should the debtor have reasonably believed that the mortgage

18   would render it unable to pay its debts as they became due.

19   Once again, I find the parties' positions are flawed for

20   largely the same reasons as those explained in my analysis of

21   the Steeple Run collateral mortgage and the September 2013

22   loan agreement.  There are still disputed issues of fact with

23   respect to what assets remain to the debtor following the

24   grant of the mortgage.

25       Like the Steeple Run collateral mortgage, the Calnshire

1    collateral mortgage gave Prudential the unqualified right to

2    foreclose on the IVC property upon default for the entire

3    principal amount of the mortgage, which is 5.1 million.   Thus,

4    the face value of the Calnshire collateral mortgage is the

5    appropriate starting point for determining the encumbrance on

6    the property, and again the parties have not provided evidence

7    which would allow me to make any determination about

8    discounting that amount based on any reduced probability that

9    the Calnshire collateral mortgage would be called upon the

10   default by the primary obligor.   I am unable to quantify the

11   remaining assets of the debtor following this transfer in any

12   way that would permit a grant of summary judgment.

13       In addition, the parties have not provided evidence

14   regarding the debtor's ability to obtain development financing

15   following the transfer of the Calnshire collateral mortgage.

16   The Trustee relies solely on the face value of the mortgages

17   and assumes the Debtor would be unable to obtain development

18   financing.   As I stated previously, this assumption is not

19   entirely self-evident to me and I have no evidence on the

20   issue to substantiate the Trustee's assumption.   Prudential

21   points to two instances in May 2014 where the debtor did

22   obtain some financing for the IVC project.   However, the

23   financial transaction with Gualtieri's brother and his wife

24   appears to have occurred on the same day that the debtor

25   granted the Calnshire collateral mortgage to Prudential,

1   that date being May 30, 2014.

2   Therefore I cannot determine whether this transaction should

3   be considered as occurring subsequent to or prior to the

4   Calnshire collateral mortgage.  And as I stated earlier, the

5   inquiry under (i) and (ii) of §5104(a)(2) is a forward-looking

6   inquiry starting with the time of the challenged transfer,

7   even if the financial transactions occurred prior to the

8   collateral -- Calnshire collateral mortgage transaction.  The

9   transactions are not especially

10  probative in determining whether the debtor would have been

11  able to obtain financing to finish the IVC project following

12  the grant of the Calnshire collateral mortgage.

13      It appears likely that this transaction occurred

14  contemporaneously with the grant of the Calnshire collateral

15  mortgage, so that determining which transactions occurred

16  first may be of little value.  In any case, the significance

17  of these transactions is just unclear.  Moreover, it is not

18  obvious that a capital infusion from insiders who appear to

19  already have ties to the Gualtieri entities actually

20  demonstrates that the debtor was on solid financial footing

21  with respect to its anticipated business needs or its present

22  and ongoing obligations.  The same issues arise with respect

23  to the other investor, Nancy Maychuk.

24      For all these reasons, I conclude the parties have failed

25  to demonstrate a lack of disputed material facts.  The

1    evidence at this point simply does not demonstrate what assets

2    remained to the debtor following the transfers or whether the

3    debtor could reasonably anticipate that it could obtain

4    financing or pay its bills.  Accordingly, both parties'

5    request for summary judgment with respect to the Trustee's

6    transfer and recovery action will be denied.

7         I next turn to Prudential's

8    motion for summary judgment in connection with the lender

9    liability action.  The Trustee's lender liability action

10   consists of claims for breaches of the lending contracts

11   including the covenant of good faith and fair dealing and for

12   tortious interference with contracts.

13        I will first address the breach of contract claims.

14   Distilled from the Trustee's Response and Surreply, the

15   Trustee contends that Prudential breached the lending

16   contracts and specifically the implied duty of good faith and

17   fair dealings, by refusing to honor its commitment to

18   refinance the Lava loan, threatening foreclosure when

19   Prudential knew no default existed and delaying the release of

20   funds for the development of the IVC property.  The Trustee

21   also refers to what he considers Prudential's improper conduct

22   in declaring sham defaults and efforts to change reporting

23   and draw requirements in an effort to take over the IVC

24   project in violation of a court order.

25        In its motion for summary judgment and reply to the

1   debtor's submissions, Prudential argues that the Lava loan is

2   irrelevant to alleged breaches of the lending contracts.  The

3   Debtor was in fact in default as of February 2016 when draws

4   were delayed, and any delay in funding the draw and escrow

5   release requests were due to the Debtor's own failure to

6   submit required supporting documentation.  Regarding the

7   implied duty of good faith and fair dealing, Prudential

8   insists that it was only acting in a manner consistent with

9   the clear terms of the lending contracts.

10      Pennsylvania contract law is well established and the

11  principles are very basic.  To recover for breach of contract

12  a plaintiff must prove 1) the existence of a contract

13  including its essential terms; 2) the breach of a duty imposed

14  by the contract; and 3) resulting damages.  See,e.g.,

15  In Re Green Goblin, Inc., 470 B.R. 739, 749, (Bankr. E.D. Pa.

16  2012).  When performance of an obligation arising under a

17  contract is due, any failure on the part of the party charged

18  with that obligation amounts to a breach.  See Green Goblin,

19  470 B.R. at 749.  Every contract in Pennsylvania also has an

20  implied duty of good faith and fair dealings.  See Donahue vs.

21  Federal Express Corporation, 753 A.2d 238, 242, (Pa.

22  Super. Ct. 2000). However, these implied duties do not

23  override express provisions in a contract.  See Wells Fargo

24  Bank, N.A. vs. Chun Chin Yung, 317 F.Supp.3d

25  879, 888 (E.D. Pa 2018).  The implied duty of good faith and

1   fair dealings may be invoked where a contracting party

2   exercises a contract right but does so in a manner that is

3   unreasonable and oppressive and takes undue advantage of the

4   counter-party, thereby frustrating the overarching purpose of

5   the contract.  The burden of proof in a contract action is on

6   the party asserting the breach, and the standard is

7   preponderance of the evidence.  Green Goblin, 470 B.R.

8   at 749.

9        The Trustee alleges three explicit breaches of the

10  lending contracts by Prudential.  I will discuss each in turn

11  and focus on the evidence submitted by the parties, then I

12  will follow up to analyze how the evidence squares with the

13  Trustee's theories regarding the implied duty of good faith

14  and fair dealing.

15       I begin with the Lava loan as the first of the

16  Trustee's breach of contract claims.  The Trustee asserts that

17  Prudential breached the lending contracts by reneging on its

18  agreement to purchase or refinance the Lava loan.  A few

19  background facts will help frame this discussion.

20  It appears undisputed that Prudential

21  required the debtor to raise at least $600,000 in additional

22  funds as a precondition of entering into the 2014 IVC

23  Construction Loan.  To satisfy Prudential's demand, the debtor

24  and Gualtieri's father, Francesco Gualtieri, as joint

25  borrowers, obtained a $625,000 loan from Lava Funding, LLC.

1    Prudential, through its then-Vice President,

2    Salvatore Fratanduono,

3    the vice president, sent letters to Lava

4    Funding on October 20, 2014, promising to refinance the loan

5    balance of the Lava loan no later than 15 days prior to its

6    loan maturity, and it was a short-term loan.  Prudential also

7    sent letters to Francesco Gualtieri on November 21st, 2014, in

8    which it made similar promises.  Debtor argues that Prudential

9    made these promises in order to induce the Debtor to accept

10   the loan terms offered by Lava Funding and to induce Lava

11   Funding to make the loan.  Lava Funding did make the $625,000

12   loan to the debtor and Francesco Gualtieri on December 1st,

13   2014.  The note obligated the borrowers to repay interest only

14   from January to December 2015 at which time a final balloon

15   payment would fall due.  Prudential reneged on its

16   promises to Lava Funding and Francesco Gaultieri to refinance

17   the loan balance when the time for its performance came due in

18   November 2015.

19        Lava Funding subsequently commenced litigation against

20   Prudential, the debtor, Renato Gaultieri and Francesco

21   Gaultieri, which ultimately was settled by the parties six

22   months later.

23        The Trustee maintains that Prudential's failure to

24   perform the Lava loan obligation was a factor that led to the

25   demise of the IVC development project.  And the Trustee

1   asserts that Prudential's failure to honor its commitments

2   with respect to the Lava loan constituted a breach of the

3   lending contracts between Prudential and the debtor.

4        Prudential responds primarily by asserting that

5   Prudential's actions with respect to the Laval loan are

6   irrelevant for the Trustee's breach of contract claims.

7   Specifically, Prudential argues that its alleged failure to

8   refinance Lava loan cannot be construed as a breach of the

9   2014 construction loan.  After reviewing the evidence

10  submitted by the parties, I agree with Prudential.  The

11  Trustee has failed to demonstrate that the agreements or

12  promises from Prudential to Lava Funding or Prudential to

13  Francesco Gaultieri were part of the lending contracts between

14  Prudential and the Debtor, IVC.

15       The commitment letters sent by Prudential to Lava Funding

16  and to Francesco Gaultieri do not reference the lending

17  contracts between the Debtor and Prudential; nor are they

18  addressed to the debtor.  Likewise, the Lava loan note does

19  not reference the lending contracts between the Debtor and

20  Prudential, although it does refer to Prudential's promise to

21  refinance the loan.

22       Thus, neither the Lava loan nor Prudential's commitment

23  letters demonstrate any connection to the lending contracts

24  between the Debtor and Prudential.  The inverse is also true.

25  The 2014 construction loan agreement does not recognize or

1    incorporate the agreements between Prudential and Lava

2    funding, or Prudential and Francesco Gaultieri.  It does

3    contain a reference to Lava Funding in Section 1.5, which

4    relates to the payments the debtor was to receive from the

5    sale of the first 25 homes in the IVC project.  However, this

6    bare reference does not establish a connection sufficient to

7    demonstrate that Prudential's promises to refinance the Lava

8    loan should be considered part of the loan contract between

9    the debtor and Prudential.

10        This result does not change, even if I accept that,

11    through these letters, Prudential intended to induce the

12    debtor, Lava Funding, and Francesco Gaultieri to enter into

13    the separate Lava loan agreements.  From the evidence

14    submitted, it appears Prudential merely insisted that the

15    Debtor raise additional capital as a pre-condition to its own

16    infusion of funds into the IVC project.  Such insistence,

17    standing alone, would not make Prudential a party to the

18    lending agreements between the debtor, Francesco Gaultieri,

19    and Lava Funding.

20        Even giving the Trustee all beneficial inferences, the

21    current evidence does not establish that Prudential's promises

22    for Lava Funding and Francesco Gaultieri were part of the

23    lending contract between Prudential and the debtor.

24        Accordingly, there is no present support in the record

25    for the conclusion that Prudential's decision to renege on its

promises to Lava lending and Gaultieri, suggested by the
Trustee, would constitute a breach of any express contractual
provision between Prudential and the debtor.

My conclusion is reinforced by the fact that the record
is devoid of any evidence connecting this breach to any damage
suffered by the debtor.  As discussed in my prior memorandum
regarding the limited scope of this court's subject matter
jurisdiction reported at 598 B.R. 552, it appears that the
Lava Loan has been repaid by Prudential, and Prudential does
not appear to have made any claim in this bankruptcy case
against the debtor based on the Lava loan.

That said, I make no conclusive determination regarding
the admissibility of trial evidence regarding the Lava loan
transaction.  It is possible that this evidence could
constitute a part of the evidentiary framework to support a
claim for a breach of the implied duty of good faith and fair
dealing.

But standing alone, the Lava loan transaction did not
give rise to any claim for a breach of contract based on any
express contractual provision.

I now move on to the Trustee's contention that Prudential
breached its lending contracts with the debtor by repeatedly
threatening to declare a default and foreclose, when
Prudential knew such default did not exist.  The Trustee
asserts that such stark repudiation of its agreements with the

49

1    debtor constituted an anticipatory breach of contract.   In

2    response, Prudential points out that it paid $680,000 to fund

3    site approval work at the IVC property in the months following

4    the November and December 2015 meeting, in which the Trustee

5    alleges such anticipatory repudiation occurred.

6        Prudential argues that it is, therefore, impossible to

7    few any alleged threats of foreclosure as anticipatory

8    breaches of its lending contracts.   Again, I agree with

9    Prudential.   A party's renunciation of a contract constitutes

10    an anticipatory breach if the party states an absolute and

11    unequivocal refusal to perform, or a distinct and positive

12    inability to do so.   See In re: St. Mary's Hospital, 101 B.R.

13    451, at 457 (Bankr. E.D. Pa. 1989).

14

15        The Trustee offers as evidence the November and December

16    2015 meeting notes between Debtor representatives and bank

17    representatives. Those notes were composed by Gaultieri.

18    And those notes were attached to a declaration submitted with

19    the Trustee's motion through the declaration of

20    Michael Cordone, its attorney.   These are at Exhibits 16 and

21    17.   I have serious doubt about the competency of this

22    evidence.   See Federal Rule of Civil Procedure 56(c)(2).

23        But even if I consider this evidence, it does not help

24    the Trustee.   According to the Trustee, in both of these

25    meetings, Prudential's representatives informed Gaultieri of

1    their belief that the debtor was in breach of the lending

2    contracts.  On the basis of this and certain other assertions,

3    Prudential insisted that Gaultieri accept new lending terms.

4    See the Cordone Declaration, Exhibit 16, which includes

5    quotations such as, "You are in default; we can foreclose on

6    you."  Another quotation is, "We are not negotiating with you.

7    We are telling you what we want going forward or we will

8    foreclose on you."

9         Prudential, however, indicated its willingness to

10   continue financing the IVC project, but only on its own terms.

11   The import of the Cordone Declaration was: "if you

12   agree on everything, we will not foreclose.  You have my word

13   on it.  We will continue to finance Island's view."

14        Crucially, however, Prudential never stated unequivocally

15   that it would not perform under the lending contracts with the

16   debtor.  Rather, Prudential threatened to foreclose, which was

17   a remedy permitted by the lending contracts upon the debtor's

18   default.  This distinction is important.

19        In the cases cited by the Trustee, the parties found to

20   have anticipatorally breached their contracts, made statements

21   or took actions indicating an absolute and unequivocal refusal

22   to perform their contractual obligations.  The breaching

23   parties did not, as Prudential did here, merely accuse the

24   other party of default, and threaten to exercise contractual

25   remedies.

1        The cases cited by the Trustee, therefore, are

2    inapposite.  In addition, Prudential did not actually cease

3    performance under the contract, following the November and

4    December 2015 meetings.  Its ongoing performance is entirely

5    inconsistent with the legal standard here, that legal standard

6    being an absolute and unequivocal refusal to perform.

7        I also point out that Prudential's email correspondence

8    with the debtor following the November and December 2015

9    meetings demonstrates Prudential's intention to continue to

10    fund the IVC project, (although, as will be discussed,

11    Prudential did begin to insist that the Debtor submit

12    additional documentation with its draw requests, which the

13    lending contract permitted Prudential to do).

14        This all does not arise to an anticipatory breach of

15    contract.  Viewed in context, Prudential's

16    statements at the November and December 2015 meetings cannot

17    reasonably be considered to be an anticipatory breach of the

18    lending contracts.  The evidence shows that Prudential's

19    allegations of default and threats of foreclosure were merely

20    part of an aggressive negotiating posture.

21        I recognize that the Trustee has offered the

22    Cordone Declaration, which if accepted, would suggest that

23    Prudential's agents knew or believed that the debtor was not

24    in default when they made the threats at the November and

25    December 2015 meeting.

1        However, even accepting that fact, potential statements

2    do not constitute an anticipatory breach of the lending

3    contracts.  At best, that conduct may be relevant in

4    evaluating whether it exercised its contractual rights

5    consistent with the implied duty of good faith and fair

6    dealing.

7        Finally, I turn to the heart of the Trustee's alleged

8    breaches of expressed contractual provisions.  Prudential's

9    failure to fund, draw requests, and escrow disbursements in a

10    timely manner under the lending contracts.  The Trustee

11    references several such draw requests and escrow

12    disbursements.  See Trustee's Response to Prudential's

13    Motion at 19-20, and Cordone's Declaration at ¶ 50.a

14    I will discuss them one at a time. But before

15    I do, it is helpful to describe briefly a few of the contract

16    provisions that are relevant.

17        Section 5.2 of the 2014 construction loan agreement

18    specifies the draw request process by which the debtor would

19    receive funds for construction of the IVC project.  See

20    Exhibit 5 to the Cordone Declaration.

21        In relevant part, Section 5.2 states that disbursements

22    and advances shall be made upon written application for

23    payment in a form and content satisfactory to Prudential.

24    Section 5.2(b) further states that Prudential reserved the

25    right to approve the form and content of each application, and

53

1    to verify the representations made by an inspection of the

2    real property and the improvements.

3         Section 5.3 obligated Prudential to fund such draw

4    requests on or about three business days after receipt of an

5    application, provided that Prudential had inspected and

6    verified various representations the Debtor to make in

7    connection with the draw request.

8         Also relevant here, Section 5.4 states in part that

9    Prudential would not have an obligation to fulfill draw

10   requests if the debtor was in default of its obligations under

11   the contract.

12        Now, on to the draw requests. The first draw request that

13   the Trustee alleges occurred was that Prudential unduly

14   delayed a draw request submitted by the debtor on December

15   1st, 2015.  The Trustee emphasizes that the contractual

16   obligation was to fund such draw requests on or about three

17   business days after receipt of an application.  Prudential

18   failed to release funds for the December 1st, 2015 draw

19   request until January 16, 2016, 46 days after the request was

20   made.

21        Relying on the Cordone Declaration, the Trustee

22   further alleges that this was the first draw request for which

23   Prudential demanded additional invoices, schedules, and other

24   documentation, and insisted on writing check directly to the

25   subcontractors.  See Cordone Declaration ¶  50.

1         The Cordone Declaration also states that the debtor's

2    first nine draw requests from July 24th to November 18th,

3    2015, were typically funded within three business days.   In

4    response, Prudential points out that Gaultieri admitted that

5    Prudential was contractually entitled to verification of the

6    work performed.   This included receipt of invoices from

7    particular vendors.   <u>See</u> Gaultieri Deposition at 600-602.

9         Gaultieri also admitted that the loan agreement permitted

10   Prudential, at its sole discretion, to issue checks directly

11   to any subcontractor or material.   <u>See</u> Gaultieri

12   Deposition at 372, and the 2014 Construction Loan Agreement

13   ¶ 5.5.

14        Prudential further points out that emails from

15   Prudential's employees show that Prudential only delayed

16   fulfillment of this draw request because the debtor had not

17   submitted the subcontractor's names, addresses, or amounts due

18   in connection with the December 1st, 2015 draw request.

19        For example, one of Prudential's senior vice presidents,

20   Douglas Smith, emailed the debtor's counsel on January 6th,

21   2016, stating that the bank was only waiting on this

22   information to make payment.   <u>See</u> Exhibit D to Prudential's

23   Reply in Support of its Motion for Summary Judgment

24        In another email dated January 14th, 2016, another

1    Prudential senior vice president, Alex Nadalini,

2    asserted that Prudential had informed the Debtor, at least

3    by December 24th, 2015, that Prudential would fund all

4    legitimate costs directly related to the IVC project, provided

5    that the Debtor submitted the required documentation.  See

6    Exhibit 27 to the Cordone Declaration.

7         And on January 15th, 2016, Douglas Smith informed the

8    Debtor by email that the December 1, 2015 draw request would

9    be fulfilled the following day.  See Prudential's Reply at

10   Exhibit E.

11        Though not stated in the January 15, 2016 email, or shown

12   by any other evidence submitted to the court for that matter,

13   Prudential asserts that it did, in fact, release the funds to

14   fulfill the December 1, 2015 draw request upon receipt of the

15   necessary supporting documentation from the Debtor.  And I do

16   not see any place where the Trustee has disputed this fact.

17        Upon review of the evidence submitted by the parties

18   regarding the December 1, 2015 draw request, I find a number

19   of disputed issues of material fact remaining.  Despite the

20   massive amount of discovery conducted in this case, neither

21   party submitted the December 1st, 2015 draw request itself, or

22   the supporting documentation, if any, the debtor provided.

23   That said, the evidence just discussed does demonstrate the

24   following undisputed facts.

25        The debtor submitted a draw request on December 1st,

1    2015, at least by January 14th, and perhaps as early as

2    December 24th, Prudential requested the names of payees in

3    order to pay them directly, and Prudential apparently

4    fulfilled this draw request on January 16th, 2016, by writing

5    checks directly to the subcontractors.

6         It is also clear to me, based on Gaultieri's testimony

7    and Section 5.5 of the Construction Loan Agreement, that

8    Prudential had the right in its sole discretion to issue

9    checks directly to the subcontractors.  However, some key

10   factual issues remain unclear regarding this draw request.

11        The record does not disclose when Prudential made its

12   demand to the debtor for additional information, whether the

13   first such request made on December 24th, or January 14th, or

14   January 16th for the names of the subcontractors and the

15   additional information that was required for direct payment.

16   This is significant, because the contract may fairly be

17   interpreted as imposing a duty upon Prudential to either fund

18   or deny the draw request on or about three days after receipt

19   of the application.  <u>See</u> Construction

20   Loan Agreement ¶  5.3.

21   If, upon receipt of the December 1 draw request, Prudential

22   waited until December 24th, or perhaps even later, to make

23   this demand for the first time, and otherwise ignored the draw

24   request until then, then the Trustee may have a viable claim

25   that Prudential breached its obligations, and an actionable

1  claim, assuming that all of the other elements of a breach

2  could be established (e.g., that the Debtor incurred

3  damages as a result of this delay).

4      But giving the Trustee the benefit of all favorable

5  inferences, Prudential has not demonstrated that it did not

6  breach the lending contract with the debtor when it did not

7  properly fund or deny the December 1st draw request.

8      I recognize that the contractual procedure for

9  disbursement of funds in the 2014 construction loan agreement

10  contains some conditions precedent to Prudential's duty to

11  perform.  However, Prudential does not argue that any

12  conditions precedent, other than the debtor's failure to

13  provide the names and addresses of the subcontractors, would

14  justify its failure to fund or deny the debtor's draw request

15  made on December 1st within three business days.

16      Next, I turn to the January 14, 2016 draw request.

17  Although it's not entirely clear in the record, it appears the

18  Debtor submitted this draw request on January 14th.

19  See Cordone Declaration ¶ 50(b)(i) and Exhibit

20  30 and 31 thereto.

21      After the initial submission of this draw request, the

22  Debtor resubmitted the draw request on January 25th.

23  According to an email from Cordone to Prudential, Prudential

24  had requested that additional information be included, which

25  Cordone attached to the resubmitted draw request.  Exactly

58

1    what additional information Prudential requested, or when, is

2    unclear from the record.  Cordone stated in the email that the

3    revised draw request replaced the January 14th draw request.

4    A week later, or more than a week later, perhaps on February

5    1st, the Debtor again resubmitted the same revised

6    draw request to Prudential.

7         At least according to Cordone's email, the Debtor then

8    resent the same revised draw request and supporting

9    documentation that it had sent on January 25th, 2016.  The

10   only evidence in the record regarding the February 1st

11   resubmission, which is Cordone's February 1st email, indicates

12   that the January 25th and February 1st resubmissions were

13   identical.

14        Therefore, the record supports a finding that Prudential

15   funded the January 14th draw request ten days after the debtor

16   first submitted, and revised, and properly documented the

17   request on January 25th.  The record suggests, therefore, that

18   the draw request was honored in early February.  Prudential

19   offers no explanation why it waited ten days to fund the

20   request after the request was revised with supporting

21   documentation on January 25th.  Again, Prudential has not

22   demonstrated that the Trustee cannot establish a claim for a

23   breach of contract with request to the January 14th request.

24        The next draw requested issue was made on February 10th,

25   2016.  According to Michael Cordone, the February 10th, 2016

59

1  draw request was not honored until April 13th, 2016.  It

2  appears that the only evidence regarding this request is

3  the Cordone's Declaration, which does not cite to

4  any of the exhibits attached to the Declaration to support his

5  attestation.  However, Mr. Cordone was representing the Debtor

6  during this period, and his emails to Prudential demonstrate

7  his involvement in the draw request process.

8      Prudential has not submitted any evidence that would

9  undermine the Cordone Declaration regarding this draw request,

10  and whether through inadvertence or deliberate omissions,

11  Prudential does not reference this draw request in any of its

12  memoranda.

13      Therefore, for purposes of evaluating Prudential's motion

14  for summary judgment, I will accept the Cordone Declaration

15  regarding the February 10th draw request.  The record,

16  therefore, supports the Trustee's allegation that there was a

17  breach of the lending contract by funding the February 10th

18  draw request more than two months after its submission.

19      Prudential does argue in its reply memorandum that the

20  debtor was in default of a loan document as of February 2016.

21  See Prudential's Reply at 27.      The event giving rise to

22  the alleged default was the debtor's failure to deposit in an

23  escrow account with Prudential all security or escrow deposits

24  on the property.

25      Gaultieri admitted at his deposition that the debtor

1   received a number of escrow deposits from Prudential buyers,

2   but did not deposit those amounts in an escrow account.  See

3   Gaultieri Deposition at 353-354.            Rather, the debtor

4   deposited these funds in his operating accounts and used them

5   to fund construction.  Gaultieri recalled Prudential asking

6   that those funds be deposited in an escrow account, but the

7   Debtor never did so.  See Gaultieri Deposition at 355-356.

9        On even a cursory reading of the 2015 Construction Loan

10  agreement, a default by the debtor appears to eliminate

11  Prudential's obligation to fund draw requests.   See

12  Construction Loan Agreement ¶ 5.4.

13       However, Prudential did not send a notice of default to

14  the Debtor until February 19th, 2016.  See Prudential's

15  Reply at Exhibit J.  That notice stated that the Debtor's

16  failure to deposit the escrow amount with Prudential, under

17  Section 3.24 of the loan agreement, within 30 days of the date

18  of the letter would constitute an event of default pursuant to

19  Section 9.1(b) of the loan agreement.

20       Thus, assuming the default when uncured, it appeared that

21  the Debtor would not have been in default until at least March

22  20th, 2016.  Prudential would have, therefore, been obligated

23  to fund the February 10th draw request under the operative

24  terms of the loan agreement within three days.

25       Therefore, I again conclude that Prudential has failed to

1   demonstrate that the Trustee cannot establish a breach of

2   contract with respect to the February 10th draw request.

3        Next, is the Trustee's alleged claim with respect to

4   draw request dated April 18, 2016.      The Trustee relies

5   solely on the Cordone Declaration, which states that

6   Prudential never distributed the requested funds.  In

7   response, Prudential argues that this draw request was not

8   funded because it impermissibly sought to pay the debtor's

9   drywall contractor for work performed by other contractors.

10       Prudential cites Gaultieri's deposition testimony

11  regarding the April 18th draw request.  Gaultieri reviewed

12  that draw request, which requested funding from various types

13  of completed work, including rough electric, trim, and paint,

14  tile, and kitchen.  See Gaultieri Deposition at 526-530

15  tHowever, the draw request asked Prudential to pay the

16  costs for all those completed work items solely to the drywall

17  contractor, about $27,000.  Gaultieri admitted that this

18  $27,000 was intended to pay the drywall contractor for work it

19  had completed earlier in the year.

20       Here is what happened.  The Debtor submitted a draw

21  request for payment of the drywall contractor's work in

22  January 2016.  Prudential funded that draw request, giving

23  those funds directly to the debtor.  Instead of paying the

24  drywall contractor, the Debtor used those funds to pay other

25  expenses.  Thus, at the time of the April 18th draw request,

62

1    the drywall contractor had not been paid for the prior work,

2    and the Debtor had already drawn all of the funds that

3    should have been -- had already expended all of the funds that

4    should have been paid to the drywall contractor.

5        To remedy that situation, the Debtor attempted to use

6    funds it would receive through the April 18th draw request

7    that should have gone to other contractors to pay the drywall

8    contractor for the prior work.  Gaultieri admitted that such

9    shifting of funds was no permitted under the 2014 Construction

10   Loan Agreement.  <u>See</u> Gaultieri Deposition at 497-498.

12       Prudential caught wind of this shifting payment scheme.

13   In the April 25th email between Prudential and the debtor,

14   Prudential points out that the vendor payment for this April

15   18th draw request to the drywall contractor appears to cover

16   much more than just the list -- the drywall's installation

17   expenses.  <u>See</u>  Cordone Declaration at Exhibit 41.

18       Accordingly, Prudential asked the Debtor to clarify the

19   amount, and whether the drywall contractor performed all of

20   the work listed.  Viewing the evidence, even in the light most

21   favorable to the Trustee, it is impossible to see how a breach

22   of contract could be sustained with respect

23   to the April 18th draw request.

24

25       Gaultieri agreed that the 2014 Construction Loan

1    Agreement did not permit the debtor to use funds allocated for

2    the payment of one contractor to pay a different contractor.

3    Therefore, when the debtor submitted a draw request indicating

4    that disbursements for various contractor work would actually

5    be paid to a different contractor, Prudential was well within

6    its rights to refuse that disbursement, at least until the

7    Debtor changed or clarified the draw request.

8         And from the evidence submitted, I see no indication

9    following Prudential's expressed concerns on April 25th that

10   the Debtor provided such a change or clarity.

11        Thus, Prudential's failure to fund the April 18th draw

12   request did not constitute a breach of contract.  In addition,

13   as noted earlier, the debtor appears to have been in default

14   by March 20th for failing to deposit escrow funds in an escrow

15   account.  The debtor had 30 days to cure the default, and

16   there was nothing to indicate that the debtor did so.  In

17   fact, Gaultieri admitted as much.  <u>See</u> Gaultieri

18   Deposition at 355-356.

19        Under Section 5.4 of the loan agreement, such a default

20   eliminated Prudential's obligation to fund draw requests.

21   Thus, summary judgment in Prudential's favor is

22   warranted regarding the April 18th draw request.

23        The last express contractual breach asserted by the

24   Trustee involves Prudential's failure to fund an escrow

25   release, requested on February 12th, 2016.  The escrow was not

1    released until April 13th, 2016.  Escrow releases are governed

2    by a separate contract among Prudential, the debtor, and the

3    Bristol Bureau Water and Sewer Authority.  So I will call that

4    the Tri-Party Agreement.  See Exhibit 60 to the Cordone

5    declaration.

6         The Tri-Party Agreement operated differently than the

7    2014 loan agreement.  Under paragraph 7 of the Tri-Party

8    Agreement, Prudential was required to disburse funds promptly

9    once the bureau made a proper and timely demand for such

10   funds.  This obligation was unconditional.  Prudential had no

11   discretion with respect to disbursement of funds; nor could

12   the Debtor's insolvency or default impair Prudential's

13   obligation to disburse those funds.

14        Now, turning to the evidence regarding the February 12th

15   escrow release request, on February 12th, 2016, the debtor

16   submitted a properly supported escrow release that had been

17   approved by Bristol Bureau.  All prior escrow release

18   requests, each identical in form and content, had been funded

19   within three business days.  However, despite the contractual

20   obligation to promptly disburse the funds, Prudential failed

21   to fund the February 12th escrow release request until April

22   13th, approximately 60 days later.

23        The Trustee asserts that Prudential's failure to timely

24   find the draw requests and escrow releases that I've discussed

25   caused substantial project delays, and disharmony and

65

1    disruption in the relationships between the debtor and its

2    subcontractors, and that these problems ultimately prevented

3    the debtor from completing the IVC project.

4         The Trustee relies on the Cordone

5    Declaration ¶ ¶  50-51, about which I question

6    probative value. But the Trustee also

7    cites to the declaration of Bernie Sauer, who was the project

8    of the IVC devlopment from September 2015 to

9    March 2016.  The Debtor laid off Sauer, along with the entire

10   site staff in March 2016 due to lack of funding.

11        The Trustee has since re-hired Mr. Sauer as the project

12   manager as of September 2018.  Mr. Sauer stated that

13   Prudential's delays and non-payments caused numerous

14   subcontractors to begin cutting their work hours at the IVC

15   project in February 2016.  By March 2016, Sauer stated that

16   most subcontractors stopped showing up, and refused to do any

17   more work until they were paid.

18        In its reply, Prudential does not challenge these

19   allegations, at least the allegations that it failed to fund

20   the February 12th escrow release request.  Instead, Prudential

21   argues that the Trustee has failed to show that any breach

22   caused any damages to the debtor.  Prudential notes that when

23   asked, Gaultieri could not recall whether delaying the

24   February 12th escrow release prevented any site work from

25   being performed.  See Gaultieri Deposition at 841.

66

1          However, viewed in the light most favorable to the

2    Trustee, I find that Prudential has failed to demonstrate that

3    the evidence negates any essential element of the Trustee's

4    claim for breach of contract with respect to the February 12th

5    escrow release request.  First, on the question of breach, the

6    Tri-Party Agreement obligated Prudential to promptly disburse

7    the funds upon the receipt of a timely and proper release

8    request from Bristol Bureau.  It's undisputed that Prudential

9    didn't fund the February 12th escrow release request, which

10   had been approved by Bristol Bureau until April 13th.

11         As to the issue of damages, the only affirmative evidence

12   I have relating to breaches to damages are the declarations of

13   Cordone and Sauer.  Both of them state that the delays caused

14   problems with the subcontractors, ultimately leading to the

15   demise of the project.  Neither of declarants specify whether

16   it was Prudential's failure to timely fund draw requests, or

17   the February 12th escrow release that damaged the IVC project.

18         However, it is a reasonable inference from their

19   declaration to say that both delays contributed to the

20   project's demise.  Accordingly, viewing the evidence in the

21   light most favorable to the Trustee, the declarations support

22   the conclusion, if barely, that delays in funding, draw

23   requests, and the escrow release request damaged the IVC

24   project and damaged the Debtor.

25   Prudential's citation to Gaultieri's Depositions as

1    demonstrating a lack of damages, is unpersuasive.Gaultieri

2    merely could not recall whether the delayed escrow release

3    specifically prevented any site work from being performed.

4    Such testimony does not undermine Sauer's affirmative

5    declarations that the delayed escrow release did damage the

6    project.

7        I note in particular that Sauer, as the on site project

8    manager, appears to have been best positioned to observe the

9    effect of non-payment on the subcontractors.  Thus, Prudential

10   has failed to demonstrate an entitlement to summary judgment

11   regarding the February 12th escrow release request.

12       I pause at this point to address a related argument that

13   Prudential raises concerning causation generally.  Prudential

14   asserts that the IVC project's demise is attributable solely

15   to the debtor, Gaultieri's, project mismanagement and

16   deliberate misuse of funds.  See Prudential Memorandum at

17   41 to 43, and Prudential's Reply Memorandum at 36-42.

18       Prudential references numerous exhibits in support of

19   this contention, including Gaultieri's own admissions to some

20   of Prudential's mismanagement or misuse of funds.  See

21   Prudential's Statement of Undisputed facts at ¶ ¶  34-43

22   and 49 to 66.

23       Thus, Prudential claims that the Trustee is unable to

24   demonstrate in its contract or tort claims that Prudential's

25   conduct directly and proximately caused any damage to the IVC

1   project or the debtor.

2       However, based on the evidence just discussed, namely the

3   Sauer Declaration and perhaps the Cordone Declaration, it is

4   apparent that the cause of the demise of the IVC project is

5   disputed.  This makes summary judgment on causation grounds

6   inappropriate.

7       Summing up my discussion so far, the evidence submitted

8   supports summary judgment for Prudential on the Trustee's

9   breach of contract claims with respect to Prudential's failure

10  to purchase or refinance their Lava loan, any alleged

11  anticipatory breach of contract, and a breach of contract in

12  connection with the delay or failure to fund the April 18th

13  draw request.

14      However, the evidence does not support summary judgment

15  on the Trustee's breach of contract claims with respect to the

16  December 1, 2015, January 14, 2016, February 10, 2016 draw

17  requests, and a February 12th, 2016 escrow release request.

18      Before considering the Trustee's claim that Prudential

19  also breached its contract with the debtor by breaching the

20  implied duty of good faith and fair dealing, I pause briefly

21  to make two observations.  First, I am aware of Prudential's

22  argument that the debtor was in default of the construction

23  loan agreement by virtue of its misappropriation of draw

24  requests, which if deemed a material breach, would excuse

25  Prudential from further performance of its obligations under

69

1    the parties' agreement.

2        Further, it does appear that the B. Rilie,

3    Advisory Services expert report submitted by Prudential

4    suggests these misappropriations preceded all of the draw

5    requests that I had previously discussed.  However, after

6    reviewing Prudential's memoranda and arguments, I conclude

7    that Prudential has not argued that the debtor was in material

8    default of the construction loan agreement prior to February

9    2016.

10        To the extent Prudential has raised the argument

11    regarding the earlier misappropriations, it has done so only

12    with respect to its lack of causation argument and its *in pari*

13    *delicto* defense

14    The potential success of a more

15    comprehensive argument on this point also requires an analysis

16    of the Construction Loan Agreement and a demonstration that

17    the default of this nature is one that does not require a

18    declaration and notice of default.  Prudential has not

19    developed this argument, and it is not the Court's role to do

20    so on Prudential's behalf.  Therefore, at this time, I will

21    not consider this theory of defense.

22        My decision in this regard is reinforced by the overall

23    record before me regarding the interrelationship among the

24    various Gaultieri affiliates.  While I am aware that some of

25    the alleged misappropriations, as described in the expert

1    report, appeared to be for the personal benefit of Gaultieri,

2    many may also have been for the benefit of other Gaultieri

3    real estate development entities.

4         Considering the provisions of the various loan agreements

5    that I have already discussed, which contemplated that

6    revenues from one entity might be available to another entity,

7    it is possible that as finder of fact, I may be persuaded by

8    the Trustee that the parties' relationship was such that this

9    type of conduct, the use of the funds in the manner described

10   by the expert report, was known and even countenanced by

11   Prudential, and does not support a finding that it constituted

12   a material breach by the Debtor.  In any event, all of this

13   requires me to exercise my role as fact finder, which I cannot

14   do on summary judgment.

15        I turn now to the Trustee's claim that Prudential also

16   breached its contract with the debtor by breaching the implied

17   duty of good faith and fair dealing.  The Trustee alleges that

18   Prudential breached this duty through declarations of sham

19   defaults, efforts to change reporting and draw requirements,

20   delays or refusals to honor or fund draw requests, and efforts

21   to take over the IVC project in violation of a court order.

22        In response, Prudential insists it was only acting in a

23   manner consistent with the clear terms of the lending

24   contracts.  Since some of the Trustee's claims for express

25   breaches of the contract will survive, I will not exhaustively

1    analyze the issue of whether Prudential breached its implied

2    duty of good faith and fair dealing.

3         Based solely on the evidence already discussed, it is

4    apparent that the Trustee potentially can succeed on this

5    claim.  Take, for instance, the evidence related to the draw

6    requests.  I have already explained why the evidence supports

7    the Trustee's claim for breach of contract under Section 5

8    point -- for breach of contract.

9         Under Section 5.3 of the Construction Loan Agreement,

10   Prudential was obligated to fund or deny draw requests within

11   three days of receipt of the request.  However, the 2014

12   construction loan agreement also specifies that the draw

13   request shall be in a form and content satisfactory ro the

14   bank, and that Prudential has a right to approve the form and

15   content of such draw requests.  See Construction Loan

16   Agreement ¶ 5.2.

17        Thus, Prudential may be able to demonstrate at trial that

18   its demands for additional documentation in the draw request

19   was duly authorized by the contractual provision.  Indeed, it

20   appears that way.  Nevertheless, Prudential's sudden

21   insistence on additional documentation may constitute a breach

22   of the implied duty of good faith and fair dealing,

23   particularly if it was motivated by extrinsic purposes, as the

24   as the Trustee appears to maintain.

25        As I have stated earlier, the implied duty may be

1    implicated where contracting parties exercises a contractual

2    right, but does so in a manner that is unreasonable and

3    oppressive, and takes undue advantage of the counter party to

4    frustrate the overriding purpose of the contract.

5         Another case I would cite for that proposition is

6    Tanenbaum, v. Chase Home Finance, LLC, 2014

7    WL 4063358 at *7 (E.D. Pa.

8    August 18th, 2014).

9         By abruptly demanding additional documentation that

10    perhaps it had never sought before, and perhaps about not

11    being clear as to what it needed in its new demands, Prudential

12    may have inched over the line and breached the implied duty.

13    What I would say at this point is that the record developed

14    for me on summary judgment does not eliminate this

15    possibility.  And I would need to see all of the evidence at

16    trial to make a final determination on it.

17        Prudential points to Gaultieri's deposition in which he

18    admitted that certain types of verification information sought

19    by Prudential for the draw requests was reasonable.  See

20    Gaultieri Deposition at 499-500.

21        However, the Cordone Sauer's Declarations paint a

22    more complicated story.  Cordone states that Prudential

23    attempted to change the requirements for draw requests

24    multiple times.  See Cordone Declaration ¶ 42

25        According to Cordone, Prudential refused to provide a

73

1    complete list of new draw requirements, even after his

2    repeated requests that Prudential do so.   See Cordone

3    Declaration ¶ ¶  27-28.

4        On February 18th, 2016, Cordone e-mailed Prudential and

5    stated those concerns, and complained that it was difficult

6    for the debtor to hit, depicted by Cordone as a

7    moving target.   See Cordone Declaration at Exhibit 26.

8        Bernie Sauer, the project manager, who sat in on

9    conference calls between Gaultieri and Prudential,

10    supports the view that the bank's request for

11    information created a moving target.  Sauer also stated

12    that a representative of Prudential visited the site in

13    January 2016, and indicated that he had checks written out to

14    subcontractors in his desk drawer, but would not release them

15    without an agreement from the debtor to alter the process for

16    funding requests.  See Sauer Declaration ¶ 17.

17        Taken together, I find this evidence creates a disputed

18    issue of material fact regarding the manner in which

19    Prudential exercised its contractual rights. Even though the

20    Construction Loan Agreement gave Prudential discretion

21    over the form and content of draw requests, the implied duty

22    of good faith and fair dealing required Prudential exercise

23    that discretion in a reasonable and unoppressive manner.

24        Accepting Sauer and Cordone's Declarations, as I must,

25    unless contradicted by other indisputable evidence,

1    Prudential's alleged conduct could demonstrate a violation of

2    the implied duty of good faith and fair dealing.   See

3    generally Somers v. Somers, 613 A.2d 1211, 1213

4    Pa. Super. Ct 1992).

5        The Somers case cites the Restatement Second of Contracts

6    for the proposition that bad faith includes the evasion of the

7    spirit of the bargain, and abuse of power to specify terms.

8    Further, the Trustee points to numerous other instances that

9    allegedly demonstrate Prudential's bad faith conduct.   In

10   particular, Cordone asserted that Prudential was attempting to

11   manufacture or find a default as part of a larger attempt to

12   undermine the Debtor, and permit Prudential to de-leverage its

13   lending position.   See Cordone Declaration ¶  45.

14

15       I am skeptical that such an allegation, if proved, would

16   by itself constitute a violation of the implied duty of good

17   faith and fair dealing.   However, such allegations do

18   potentially add weight to the scale when evaluating in the

19   totality of circumstances whether Prudential breached its

20   implied duty of good faith and fair dealing.

21       For these reasons, I find that Prudential has not

22   demonstrated an entitlement to summary judgment regarding the

23   Trustee's claims for breach of the implied duty of good faith

24   and fair dealings.

25       I next address Prudential's motion to dismiss the

1   Trustee's claim for tortious interference with contract.

2   Pennsylvania law recognizes the tort of intentional

3   interference with an existing contractual relationship.   See

4   Adler Barash, Daniel Levin, and Creskoff,

5   v. Epstein, 393 A.2d 1175, 1182 (Pa. 1978)

6

7       The general elements that a plaintiff must establish for

8   such a claim are the existence of a contractual relationship

9   between a plaintiff and a third party; purposeful action by

10   defendants, specifically intended to harm an existing

11   relationship; the absence of a privilege or

12   justification on the part of the defendant;  and  legal

13   damage to the plaintiff as a result of the defendant's

14   conduct.   See Acumed,  LLC v. Advanced Surgical

15   Services Incorporated, 561 F.3d 199 at 212 (3d

16   Cir. 2009).       See also Brokerage Concepts Incorporated v.

17   U.S. Health Care Inc., 140 F.3d 494, 530 (3d

18   Cir. 1998).

19       However, Pennsylvania Courts have not deemed all forms of

20   interference as tortious.  Of particular relevance here,

21   Pennsylvania courts distinguish between interference directed

22   at a third party's performance under a contract with the

23   plaintiff, and interference directed at plaintiff's own

24   performance under that contract.

25       Section 766 of the Restatement sets forth the definition

76

1    for tortious interference with a contract that a defendant

2    directs at a third party's performance.  It provides that one

3    who intentionally and improperly interferes with a performance

4    of a contract, other than a contract to marry, between another

5    and a third person by inducing or otherwise causing the third

6    person not to perform the contract is subject to liability for

7    the pecuniary loss resulting from the failure of the third

8    person to perform the contract.  <u>Restatement Second</u>

9    <u>of Torts</u>, §766 (1979).

10       By contrast, Section 766A of the Restatement provides

11    the a different definition for tortious interference of

12    contract.  It provides:

13    "One who intentionally and improperly interferes

14    with the performance of a contract, except a contract to

15    marry, between another and a third person by preventing the

16    other, that is, the plaintiff, from performing the contract or

17    causing his performance to become more expensive or burdensome

18    is subject to liability to the other for the pecuniary loss

19    resulting to him."

20       The Pennsylvania Supreme Court has adopted the definition

21    for tortious interference as set forth in Restatement Section

22    766.  <u>Adler Barash</u>,393 A.2d at 1182.

23    <u>See also</u> <u>Windsor Securities Inc. v. Park Third Life</u>

24    <u>Insurance Company</u>, 986 F.2d 655 at 659 (3d Cir.1993).

1    The Pennsylvania appellate courts have declined to

2    expand the tort of interference with an existing contract to

3    include the type of interference described in §766A

4    of the Restatement.  See Phillips v. Selig, 959

5    A.2d 420, 436, n.13 (Pa. Super. Ct.2008);

6    see also Karps, v. Massachusetts Mutual

7    Life Insurance Company, 2018 WL 1142189 at *13

8    (E.D. Pa., Feb. 28, 2018).

9    Thus, to substantiate a cause of action in Pennsylvania

10   for tortious interference with contracts, a plaintiff must

11   show that the defendant's interfering contract was intended to

12   induce or otherwise cause the third party not to perform the

13   contract.

14   Where a defendant interferes only with the plaintiff's

15   own performance under a contract, such conduct will not result

16   in liability under a tortious interference theory.  See

17   Karps. In its submissions,

18   Prudential argues that none of Prudential's actions were

19   directed at or toward any third party that had a contract with

20   the debtor.  Rather, all of Prudential's actions recited by

21   the Trustee in support of the tortious interference claim,

22   such as delaying payment of draw requests, were directed to

23   the Debtor.

24   Prudential further argues that any harm the Debtor

25   suffered from its subcontractors refusing to work due to non-

1    payment was the direct result of the debtor's diversion and

2    misappropriation of funds.  In response, the Trustee argues

3    that Prudential tortiously interfered with its subcontractors

4    and suppliers on the IVC project, and with purchasers of

5    residential properties by refusing to disburse funds under the

6    terms of the Construction Loan Agreement.

7         Prudential insisted that it pay the subcontractors and

8    suppliers directly, but then refused to disburse the funds

9    when requested for the subcontractor's work.  According to the

10   Trustee, this failure to pay the subcontractors constitutes

11   interference directed at third parties, and resulted in damage

12   to the debtor when these subcontractors refused to provide

13   additional services at the IVC project.

14        The Trustee also asserts that Prudential's failure to

15   fund the IVC project was targeted at the purchases of the IVC

16   homes, IVC project homes, because its failure to pay the

17   subcontractors and vendors necessarily prevent completion of

18   the homes.

19        Upon review of the parties' arguments, I conclude that

20   Prudential has demonstrated its entitlement to summary

21   judgment on the Trustee's claim for tortious interference.

22   Section 766 of the Restatement requires that the defendant

23   have induced or otherwise caused third parties here,

24   subcontractors, vendors, and homeowners, not to perform their

25   contracts with the debtor.

1      The comments to Section 766 explain and give examples for

2  the terms induced and otherwise caused.  The term induce

3  represents persuasion and operates in the mind of the third

4  party induced.  See Restatement § 766, Comment h. Inducement

5  leaves the third party free to perform its contract with the

6  plaintiff, but the third party has been persuaded or

7  intimidated into not performing.

8      By contrast, the term "otherwise causing" refers to

9  situations where the interfering party leaves the third party

10  with no choice by rendering performance of the contract

11  impossible.  The interfering parties' imprisonment of a third

12  party or disruption of goods that the third party was to

13  deliver to the plaintiff are examples of this kind of

14  causation.

15      Applied here, the evidence does not show in any way that

16  Prudential induced or otherwise caused the subcontractors,

17  vendors, and home purchasers not to perform their contracts

18  with the Debtor.  Instead, the evidence shows that

19  Prudential's actions, if anything, simply interfered with the

20  Debtor's own performance of its contracts with the

21  subcontractors, vendors, and home purchasers.

22      Take, for instance, the home purchasers.  The Trustee has

23  submitted a list of persons who submitted deposits for the

24  purchase of homes on specific lots in the IVC project.  The

25  Trustee argues that Prudential's refusal to fund draw requests

1    was directed at the purchasers of these homes, because of

2    failure to pay the subcontractors and vendors necessarily

3    prevents completion of the homes.

4         However, the evidence failed to demonstrate that

5    Prudential induced or otherwise caused these home purchasers

6    not to perform on their contracts.  Rather, it is apparent

7    that Prudential's refusal to fund certain draw requests simply

8    interfered with the Debtor's own performance, that is building

9    the homes, that the purchasers had placed deposits upon.

10        Similarly, Prudential's failure to pay the subcontractors

11   and vendors relates to the debtor's failure to perform on its

12   contracts with those third parties.  The Construction Loan

13   Agreement specifies that Prudential would only fulfill draw

14   request applications after work was completed on the IVC

15   project.  See Construction Loan Agreement¶ 445.2. The evidence

16   is that the subcontractors would bill the debtor for work they

17   had already completed.  See Trustee's Response ¶ 19 and

18   Exhibit R; Gaultieri Deposition at 497-498;

19   and Cordone Declaration at Exhibit 31.

20        Thus, for the contracts between the Debtor and the

21   subcontractors, the Debtor's failure to pay was a failure

22   of its own performance.  By failing to fulfill draw requests,

23   Prudential interfered only with the Debtor's performance,

24   since the subcontractors had already performed their work.

25        The Trustee points to no evidence in the record that

1   would show that Prudential's actions interfered with the

2   subcontractor or vendor's ability to perform under their

3   contracts with the debtor.

4        Thus, while the evidence may demonstrate a theory of

5   liability under Restatement §766A, it does not show

6   tortious interference under Restatement §766.  And as I

7   stated earlier, Section 766A has not been adopted in

8   Pennsylvania.

9        Accordingly, Prudential is entitled to summary judgment

10  on the Trustee's claim for tortious interference with the

11  contract.

12       In response to both the Trustee's tort and contract

13  claim, Prudential also raised the defense know as *in pari*

14  *delicto*.  Prudential argues that *in pari delicto* operates as a

15  defense to liability, where plaintiff's own wrongful action

16  substantially causes the damages the plaintiff seeks to

17  recover.  Applied here, Prudential contends that the debtor

18  and Gaultieri's alleged misconduct, including fraudulent

19  inducement of Prudential, fraudulent misappropriation of

20  funds, and mismanagement of the IVC project prevent the

21  Trustee from recovering on the breach of contract claim and

22  the tortious interference claim, (although the latter is a

23  moot point, since I'm granting

24  summary judgment on that claim on other grounds.

25       The Trustee responds by arguing that the defense of *in*

82

1   *pari delicto* requires that the plaintiff participated in or

2   bears substantial equal responsibility for the underlying

3   illegality giving rise to damages.  Since neither the Debtor

4   nor Gaultieri participated in or is responsible for

5   Prudential's breach of contract, the Trustee argues that the

6   evidence does not support a defense of *in pari delicto*.

7        I conclude that Prudential has not demonstrated

8   entitlement to summary judgment based on the defense of *in*

9   *pari delicto*.  At the outset, I note my skepticism that *in*

10  *pari delicto* applies here at all.  Stated succinctly, the

11  doctor provides that the plaintiff may not assert a claim

12  again a defendant if the plaintiff bears fault for the claim.

13  See <u>Official Committee of Unsecured Creditors v. RF Lafferty</u>

14  <u>and Company, Incorporate</u>, 267 F.3d 340 (Third Circuit, 2001).

15  The Pennsylvania Supreme Court has noted that the defense of

16  in pari delicto has been applied principally in cases

17  involving illegal contracts or illegal conduct.  See <u>Official</u>

18  <u>Committee of Unsecured Creditors of Allegheny Health Education</u>

19  <u>and Research Foundation v. PriceWaterhouseCoopers</u>,

20  989 A.2d 313, 328 (Pa. 2010).

21

22

23        Under Pennsylvania law, if parties engaged in fraud or

24  other illegality seek a common law redress relative to

25  matters in which they bear sufficient culpability, the

1   doctrine of *in pari delicto* relieves the courts from lending

2   their offices to mediating disputes among wrongdoers.

3   <u>See</u> <u>Allegheny Health and Education Research Foundation</u>

4   989 A.2d at 329.   For *in pari delicto* to apply, the plaintiff

5   must be an active, voluntary participant in the wrongful

6   conduct or transaction, and bear substantial, equal, or

7   greater responsibility for the underlying illegalities

8   compared to the defendant.

9       Applied here, it is difficult to see how Prudential can

10  successfully raise an *in pari delicto* defense.   The contracts

11  that form the basis of the Trustee's claims, whether the

12  lending contract between the debtor and Prudential, or the

13  contracts between the debtor and third parties, are not

14  themselves illegal, nor is there any evidence that the Debtor

15  bears any responsibility for Prudential's alleged contract

16  breach actions for which the Trustee seeks damages.

17      Prudential's allegations of various misconduct on the

18  part of the debtor in Gaultieri may serve to reduce or

19  eliminate liability that the debtor -- that Prudential might

20  have towards the bankruptcy estate should the Trustee prevail

21  on any of his claims.   But as currently presented,

22  Prudential's allegations seem more properly raised as

23  conventional contractual defenses to the Trustee's contractual

24  claims.   For these reasons, I find that summary judgment is

25  not warranted in Prudential's favor based on *in pari delicto*.

1        Prudential also argues that even if I do not grant

2   summary judgment on the lender liability claims, I should

3   dismiss as a matter of law the Trustee's demand for lost

4   profits.  Prudential asserts that the lost profits alleged by

5   the Trustee are speculative, at best.  Prudential points out

6   that the Trustee has not produced an expert report in support

7   of its alleged lost profits.  And Prudential emphasizes that

8   the Debtor never completed any significant portion of the IVC

9   project.

10       In response, the Trustee argues that no expert testimony

11  is needed to establish lost profits, as courts have recognized

12  that an owner or executive of a business may be competent to

13  testify regarding projected lost profits.  Moreover, the

14  Trustee relies upon Prudential's own projection for sales and

15  compares them to the actual sales made while the Trustee has

16  been in charge of the project.  See Trustee's Response,

17  Exhibit T, at ¶ ¶ 25 to 31.

18       I agree with the Trustee on this issue.  Prudential has

19  not pointed out any case law that states that expert testimony

20  is required to establish lost profits.  In fact, it appears

21  the courts do not impose such a requirement.  Lightning Lube

22  Incorporated v. Witco Corporation, 4 F.3d 1153 at 1175

23  (3d Cir. 1993).

24       Additionally, Prudential does not challenge the basic and

25  intuitive methodology by which the Trustee has calculated the

1   lost profits of the IVC project.  Accordingly, Prudential has

2   not demonstrated that the evidence demonstrates an entitlement

3   to judgment in its favor as a matter of law regarding lost

4   profits.  The issue is one that requires fact finding, which

5   is inappropriate at the summary judgment stage.

6        Lastly, I addressed Prudential's motion for summary

7   judgment on the Trustee's claim

8   for equitable subordination.        I have previously discussed

9   the elements of equitable subordination in an earlier opinion

10  in this case, In re Island View Crossing LP, 604 B.R. 181,

11  202-03.          I incorporate that discussion by reference.

12  I need only review a few of the legal principles regarding

13  equitable subordination at this time.

14       Under Section 510(c)(1) of the Bankruptcy Code, a

15  bankruptcy court may, under principles of equitable

16  subordination, subordinate for purposes of distribution all or

17  part of an allowed claim to all or part of another allowed

18  claim, or all or part of an allowed interest to all or part of

19  another allowed interest.

20       The Third Circuit has specified that equitable

21  subordination is proper when the claimant has engaged in some

22  type of inequitable conduct, the misconduct resulted in injury

23  to the creditors or conferred an unfair advantage on the

24  claimant.  And, equitable subordination is consistent with the

25  provisions of the Bankruptcy Code.  See In re Windstar

1    Communication Inc., 554 F.3d 382,411-12.

2        In its submissions, Prudential argues that the Trustee's

3    equitable subordination claim also merits summary judgment.

4    The starting point for this argument is Prudential's

5    insistence is that summary judgment is appropriate on all of

6    the Trustee's other lender liability claims.

7        If I agreed to dismiss all of the

8    lender liability claims, then Prudential would have been

9    found to have acted appropriately in accord with its

10   contractual rights.  The necessary implication for such a

11   finding is that the Trustee would be unable to establish the

12   requisite inequitable conduct for equitable subordination to

13   apply.

14       So to some extent, at least, Prudential's argument is

15   contingent on my dismissal of the Trustee's other lender

16   liability claims.  However, I have found that at least some of

17   the Trustee's claims survive.  Most importantly, the Trustee's

18   claim for breach of the implied duty of good faith and fair

19   dealing has survived summary judgment.  At bottom, while the

20   parties are entitled to enforce contracts to the letter, even

21   to the great discomfort of their trading partners, the

22   enforcement of a contract can turn into inequitable conduct.

23   The disputed facts here that permit the implied duty claims to

24   survive summary judgment also tend to support the equitable

25   subordination claim.

87

1        While it is possible that as fact finder I might find

2    tfacts that render the implied duty and

3    the equitable subordination claim meritorious, or I might find

4    both claims non-meritorious, or the implied duty claim

5    meritorious, but the equitable subordination claim non-

6    meritorious, those determinations all involve fact finding

7    that I will not engage in at the summary judgment stage.

8        Therefore, Prudential's motion for summary judgment on

9    the equitable subordination claim will be denied.  That

10   concludes this lengthy bench opinion.  When it is ready to be

11   docketed as a transcript of this recitation, I will do so with

12   an accompanying consistent order.

13       (Court adjourned)

14

15                    CERTIFICATION*
16   I certify that the foregoing is a correct transcript from the
17   electronic sound recording of the proceedings in the above-
18   entitled matter.
19
20
21   *Lewis Parham*                          8/23/21
22
23   _____        _____
24   Signature of Transcriber                Date


     *The transcript has been modified and edited by the court
     prior to its docketing, but is largely the same as the
     electric sound recording.


     Date: August 24, 2021



                                    _____

                                    ERIC L. FRANK
                                    U.S. BANKRUPTCY JUDGE